Case No. 15-50759

# In the United States Court of Appeals for the Fifth Circuit

DEFENSE DISTRIBUTED;
SECOND AMENDMENT FOUNDATION, INCORPORATED,
Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,
Defendants-Appellees

Appeal from an Order of the United States District Court for the Western District of Texas, The Hon. Robert L. Pitman, District Judge
(Dist. Ct. No. 1:15-CV-372-RP)

## BRIEF FOR THE APPELLANTS

Matthew Goldstein
Matthew A. Goldstein, PLLC
1875 Connecticut Avenue, N.W.
10th Floor
Washington, DC 20009
202.550.0040/Fax 202.683.6679

Alan Gura
   Counsel of Record
Gura & Possessky, PLLC
916 Prince Street, Suite 7
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

December 10, 2015

Counsel for Appellants
(Additional Counsel Inside Cover)

Additional Counsel for Appellants

William B. Mateja
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
214.747.5070/Fax 214.747.2091

Josh Blackman
1303 San Jacinto Street
Houston, TX 77002
202.294.9003/Fax 713.646.1766

CERTIFICATE OF INTERESTED PERSONS

*Defense Distributed, et al.* v. *U.S. Dep't of State, et al.*, No. 15-50759

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

<u>Plaintiffs</u>:
Defense Distributed, Second Amendment Foundation, Inc.

<u>Defendants</u>:
U.S. Dep't of State, John F. Kerry, Directorate of Defense Trade Controls, Kenneth B. Handelman, C. Edward Peartree, Sarah J. Heidema, Glenn Smith

<u>Plaintiffs' Counsel</u>:
Alan Gura, Gura & Possessky, PLLC; Matthew A. Goldstein, Matthew A. Goldstein, PLLC; William B. Mateja, William T. "Tommy" Jacks, David Morris, Fish & Richardson P.C.; Josh Blackman

<u>Defendants' Counsel</u>:
Loretta Lynch, Michael S. Raab, Daniel Bentele Hahs Tenny, Eric J. Soskin, Stuart J. Robinson, Richard L. Durban, Benjamin C. Mizer, Anthony J. Coppolino, Zachary C. Richter, – U.S. Department of Justice

/s/ Alan Gura
Alan Gura
Counsel for Appellants

## Statement Regarding Oral Argument

The case raises significant constitutional issues, some of which may be of first impression. Oral argument would likely be of significant assistance to the Court.

# TABLE OF CONTENTS

Certificate of Interested Persons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    1.      The Regulatory Scheme. . . . . . . . . . . . . . . . . . . . . . . . . . 4

        a.   "Technical Data". . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        b.   "Export". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        c.   "Public Domain". . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    2.      The History of ITAR's Prior Restraint Application. . . . . . . 9

    3.      Three-dimensional Printing and Computer Numeric Control. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

4.      Defendants' Imposition of a Prior Restraint Against
Plaintiffs' Speech................................... 19

      a.    The Published Files........................... 20

      b.    The "Ghost Gunner" Files..................... 24

      c.    The CAD Files............................... 25

      d.    Prior Restraint on Other Files.................. 26

      e.    The Prior Restraint's Impact.................... 26

5.      Relevant Procedural History. ....................... 28

6.      The District Court's Decision. ...................... 28

Summary of Argument....................................... 32

Standard of Review......................................... 34

Argument................................................. 34

I.      Plaintiffs Are Likely to Succeed on the Merits. ......... 35

   A.    Congress Never Authorized Defendants'
Censorship of Privately-Generated,
Unclassified Speech................................ 35

   B.    Defendants Are Violating Plaintiffs'
First Amendment Rights. .......................... 43

      1.    Plaintiffs' Files Constitute Protected Speech. ...... 43

      2.    ITAR's Application to All Public, Unclassified
Speech Containing Technical Data Is
Unconstitutionally Overbroad.................... 46

3.    Defendants Impose an Unconstitutional
Prior Restraint Against Plaintiffs' Lawful
Public Speech. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    a.    Unbridled Discretion to Censor Speech. . . . . . 50

    b.    Lengthy Delays and the Lack of Procedural
Safeguards. . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

4.    Defendants' Speech Regulation of Plaintiffs' Speech
Fails Any Level of First Amendment Scrutiny. . . . . . 55

C.    Defendants' Prior Restraint is Void for Vagueness. . . . . . . 60

D.    Defendants Are Violating Plaintiffs' Second Amendment
Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

1.    The Government Bears the Burden of Proving that
Laws Burdening Second Amendment Rights Pass
Heightened Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . 62

2.    The Second Amendment Secures the Right to
Produce Firearms, and to Exchange Technical
Data Concerning Firearms. . . . . . . . . . . . . . . . . . . . 64

3.    Defendants' Regulations Fail Any Level of Second
Amendment Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . 67

II.    Defendants' Licensing Scheme Irreparably
Harms Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

III.    The Balance of Equities Favors Granting Injunctive
Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

IV.    The Public Interest Warrants Injunctive Relief. . . . . . . . . 71

V.    No Bond or Other Security Is Required as a Condition
of Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Addendum

# TABLE OF AUTHORITIES

**Cases**

*Asgeirsson* v. *Abbott*,
    696 F.3d 454 (5th Cir. 2012)............................ 56

*Ashcroft* v. *Free Speech Coalition*,
    535 U.S. 234 (2002). ................................... 44

*Bernstein* v. *DOC*, No. C-95-0582-MHP,
    2004 U.S. Dist. LEXIS 6672 (N.D. Cal. Apr. 19, 2004)........... 14

*Bernstein* v. *U.S. Dep't of State*,
    922 F. Supp. 1426 (N.D. Cal. 1996) ......................... 13

*Bernstein* v. *U.S. Dep't of State*,
    945 F. Supp. 1279 (N.D. Cal. 1996) ................... 13, 52, 53

*Bernstein* v. *U.S. Dep't of State*,
    974 F. Supp. 1288 (N.D. Cal. 1997) ......................... 13

*Bernstein* v. *United States Dep't of Justice*,
    176 F.3d 1132 (9th Cir. 1999) .......................... 14, 43

*Bond* v. *United States*,
    134 S. Ct. 2077 (2014) ................................. 36

*Bowen* v. *Georgetown Univ. Hospital*,
    488 U.S. 204 (1988) ................................... 37

*Cahaly* v. *Larosa*,
    796 F.3d 399 (4th Cir. 2015)............................. 57

*Carey* v. *Pop. Servs. Int'l*,
    431 U.S. 678 (1977) ................................... 66

*Catholic Leadership Coalition of Texas* v. *Reisman*,
764 F.3d 409 (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 49

*Chesapeake B & M, Inc.* v. *Harford County*,
58 F.3d 1005 (4th Cir. 1995) (en banc). . . . . . . . . . . . . . . . . . . . . . 51

*Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Christensen* v. *Harris County*,
529 U.S. 576 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Citizens United* v. *FEC*,
558 U.S. 310 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*City of Lakewood* v. *Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

*Connally* v. *General Const. Co.*,
269 U.S. 385 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Deerfield Med. Center* v. *City of Deerfield Beach*,
661 F.2d 328 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 64, 70

*East Brooks Books, Inc.* v. *Shelby County*,
588 F.3d 360 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Elrod* v. *Burns*,
427 U.S. 347 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Ezell* v. *City of Chicago*,
651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 70

*Fantasy Ranch, Inc.* v. *City of Arlington*,
  459 F.3d 546 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*FDA* v. *Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Florida Star* v. *B.J.F.*,
  491 U.S. 524 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Forsyth County* v. *Nationalist Movement*,
  505 U.S. 123 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Freedman* v. *Maryland*,
  380 U.S. 51 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 53, 55

*FW/PBS, Inc.* v. *Dallas*,
  493 U.S. 215 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Gibson* v. *Tex. Dep't of Ins.–Div. of Workers' Comp.*,
  700 F.3d 227 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Gonzales* v. *Oregon*,
  546 U.S. 243 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Gorin* v. *United States*,
  312 U.S. 19 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Grayned* v. *City of Rockford*,
  408 U.S. 104 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Herceg* v. *Hustler Magazine, Inc.*,
  814 F.2d 1017 (5th Cir. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Hoechst Diafoil Co.* v. *Nan Ya Plastics Corp.*,
  174 F.3d 411 (4th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

ix

*Holder* v. *Humanitarian Law Project*,
    561 U.S. 1 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 47

*Hynes* v. *Mayor & Council of Oradell*,
    425 U.S. 610 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*INS* v. *Chadha*,
    462 U.S. 919 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*INS* v. *St. Cyr*,
    533 U.S. 289 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Jackson Women's Health Org.* v. *Currier*,
    760 F.3d 448 (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . 71

*Junger* v. *Daily*,
    209 F.3d 481 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 43

*Kaepa, Inc.* v. *Achilles Corp.*,
    76 F.3d 624 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 72

*King* v. *Burwell*,
    135 S. Ct. 2480 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . 35, 42

*Lake Eugenie Land & Dev., Inc.* v. *BP Exploration & Prod.*
    (*In re Deepwater Horizon*), 732 F.3d 326 (5th Cir. 2013) . . . . . . . . . 34

*Louisiana Pub. Serv. Comm'n* v. *FCC*,
    476 U.S. 355 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Mance* v. *Holder*,
    74 F. Supp. 3d 795 (N.D. Tex. 2015). . . . . . . . . . . . . . . . . . . . 67

*Marceaux* v. *Lafayette City-Parish Consol. Gov't*,
    731 F.3d 488 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . 49

*Martin* v. *Harrington & Richardson, Inc.*,
  743 F.2d 1200 (7th Cir. 1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*McCullen* v. *Coakley*,
  134 S. Ct. 2518 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Michigan* v. *EPA*,
  268 F.3d 1075 (D.C. Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Miller* v. *California*,
  413 U.S. 15 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Murchison Capital Partners, L.P.* v. *Nuance Communs., Inc.*,
  No. 14-10819, 2015 U.S. App. LEXIS 14228
  (5th Cir. Aug. 11, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Nat'l Endowment for the Arts* v. *Finley*,
  524 U.S. 569 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Nat'l Fed'n of Indep. Bus.* v. *Sebelius*,
  132 S. Ct. 2566 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  700 F.3d 185 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . 63, 64, 68

*New York Times* v. *United States*,
  403 U.S. 713 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Norton* v. *City of Springfield*,
  612 Fed. Appx. 386 (7th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . 57

*Reed* v. *Town of Gilbert*,
  135 S. Ct. 2218 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56-58

*Reliable Consultants, Inc.* v. *Earle*,
  517 F.3d 738 (5th Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 66

*Richmond Newspapers* v. *Virginia*,
448 U.S. 555 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Riley* v. *Nat'l Fed. of Blind of N.C.*,
487 U.S. 781 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Shuttlesworth* v. *Birmingham*,
394 U.S. 147 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Simon & Schuster, Inc.* v. *Members of the N.Y. State Crime Victims Bd.*,
502 U.S. 105 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Skidmore* v. *Swift & Co.*,
323 U.S. 134 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*Speiser* v. *Randall*,
357 U.S. 513 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States ex rel. Attorney Gen.* v. *Delaware & Hudson Co.*,
213 U.S. 366 (1909). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States* v. *Alvarez*,
132 S. Ct. 2537 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States* v. *Brown*,
218 F.3d 415 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States* v. *Chi Mak*,
683 F.3d 1126 (9th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . 59

*United States* v. *Edler Industries*,
579 F.2d 516 (9th Cir. 1978).. . . . . . . . . . . . . . . . . . . . 11, 12, 48

*United States* v. *Featherston*,
461 F.2d 1119 (5th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States* v. *Henry*,
688 F.3d 637 (9th Cir. 2012).................................. 65

*United States* v. *Hsu*,
364 F.3d 192 (4th Cir. 2004)................................. 62

*United States* v. *Marzzarella*,
614 F.3d 85 (3d Cir. 2010). ................................ 68

*United States* v. *Masciandaro*,
638 F.3d 458 (4th Cir. 2011) ............................... 68

*United States* v. *Mead Corp.*,
533 U.S. 218 (2001). .................................. 40, 42

*United States* v. *Playboy Entm't Group*,
529 U.S. 803 (2000) ........................................ 58

*United States* v. *Rehlander*,
666 F.3d 45 (1st Cir. 2012)................................. 36

*United States* v. *Scruggs*,
714 F.3d 258 (5th Cir. 2013) ............................... 46

*United States* v. *Stevens*,
559 U.S. 460 (2010). ................................... 46, 55

*United States* v. *Wu*,
711 F.3d 1 (1st Cir. 2013)................................. 62

*Universal City Studios, Inc.* v. *Corley*,
273 F.3d 429 (2d Cir. 2001). .............................. 43

*Utility Air Regulatory Group* v. *EPA*,
134 S. Ct. 2427 (2014). ................................... 42

*Whitman* v. *Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Winter* v. *Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Statutes and Rules

18 U.S.C. § 2339A(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

18 U.S.C. § 794(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

22 U.S.C. § 2278 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22 U.S.C. § 2278(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 39

22 U.S.C. § 2778(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 U.S.C. § 2778(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 U.S.C. § 2778(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

28 U.S.C. § 1292(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22 C.F.R. § 120.4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 52

22 C.F.R. § 120.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

22 C.F.R. § 120.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 52

22 C.F.R. § 120.10(a)(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

22 C.F.R. § 120.10(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8, 23

22 C.F.R. § 120.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

22 C.F.R. § 120.11(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

22 C.F.R. § 120.11(a)(7).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

22 C.F.R. § 120.17. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 C.F.R. § 120.17(a)(4).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 38

22 C.F.R. § 120.41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

22 C.F.R. § 121.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 49, 52

22 C.F.R. § 127.1(a)(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 C.F.R. § 128.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Fed. R. Civ. P. 65(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Fed. R. Evid. 201(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## Other Authorities

49 Fed. Reg. 47,682 (Dec. 6, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

74 Fed. Reg. 63,497 (Dec. 3, 2009). . . . . . . . . . . . . . . . . . . . . . . . . 32, 54

80 Fed. Reg. 31,525 (June 3, 2015).. . . . . . . . . . . . . . . . . . . . . . . 16, 17

Andy Greenberg, "3D-Printed Guns As Art: London Design
    Museum Buys Two 'Liberator' Printed Pistols," *Forbes*,
    (Sep. 15, 2013), www.forbes.com/sites/andygreenberg/
    2013/ 09/15/3d-printed-guns-as-art-london-design-
    museum-buys-two-liberator-printed-pistols (last visited
    Dec. 7, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Bureau of Alcohol, Tobacco, Firearms & Explosives,
    *Top 10 Frequently Asked Firearms Questions
    and Answers*, https://www.atf.gov/file/61721/
    download (last visited Dec. 9, 2015). . . . . . . . . . . . . . . . . . . . . . . . 45

Chris Anderson, "The New MakerBot Replicator Might
    Just Change Your World," *Wired* (Sep. 19, 2012),
    http://www.wired.com/ 2012/09 /how-makerbots-
    replicator2-will-launch-era-of-desktop-manufacturing/
    all (last visited Dec. 3, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Eugene Volokh, *Crime-Facilitating Speech*,
    57 Stan. L. Rev. 1095 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Eugene Volokh, *Freedom of Speech, Permissible
    Tailoring and Transcending Strict Scrutiny*,
    144 U. Pa. L. Rev. 2417 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Josh Blackman, *The 1st Amendment, 2nd Amendment,
    and 3D Printed Guns*, 81 Tenn. L. Rev. 479 (2014). . . . . . . . . . . . . 66

Mark Wilson, "Artist Warps 3-D Printed Gun Blueprints,
    Protests Gun Violence," *Fast Company* (April 15, 2014),
    http://www.fastcodesign.com/3028300/infographic-
    of-the-day/artist-warps-3-d-printed-gun-blueprints-
    protests-gun-violence (last visited Dec. 7, 2015). . . . . . . . . . . . . . . . 21

Norman J. Singer, SUTHERLAND ON STATUTORY CONSTRUCTION
    (7th ed. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Paola Antonelli, "Design and Violence Debate I: Open Source,"
*MOMA* (March 27, 2014), http://designandviolence.
moma.org/design-and-violence-debate-i-open-source
(last visited Dec. 7, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Peter Jensen-Haxel, *3D Printers, Obsolete Firearm Supply Controls,*
*and the Right to Build Self-Defense Weapons Under Heller*,
42 Golden Gate U. L. Rev. 447 (2012). . . . . . . . . . . . . . . . . . . . . . 66

PM522 Washbear 3D Printed .22LR Revolver Files,
http://www.jamesrpatrick.com/p/pm522-
washbear-3d-printed-22lr-pistol.html
(last visited Dec. 4, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rachel Donadio, "A History of the Now, Found in Politically
Charged Objects," *New York Times* (July 6, 2014)
http://www.nytimes.com/2014/07/07/arts/design/
victoria-and-albert-museum-pushes-boundaries-of-
collecting.html (last visited Dec. 7, 2015). . . . . . . . . . . . . . . . . . . 22

The Writings of Thomas Jefferson
(T.J. Randolph, ed., 1830). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

"Final Commodity Jurisdiction Determinations," https://www.
pmddtc.state.gov/commodity_jurisdiction/determination.
html (last visited Dec. 7, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## INTRODUCTION

The pen may be mightier than the sword, but it is not a sword. Nor are blueprints, computer files, and other forms of expression about guns the "functional equivalent" of guns. Nor should public speech including unclassified "technical data" be the stuff of national security controls merely because it might theoretically relate to military articles.

And when Americans speak in public forums about unclassified information that they have created, they are not "exporting" it overseas just because a foreigner might overhear their conversation.

This is not merely Plaintiffs' position. For years, it was the position of the Department of Justice, which repeatedly warned that the International Traffic in Arms Regulations ("ITAR") could not be used as a prior restraint against speech in public forums. Indeed, the State Department has adopted Plaintiffs' position in litigating ITAR's limits before federal courts.

But Defendant State Department officials now veer far from the recognized path. Ignoring DOJ advice, these officials singled out one

speaker among many on the novel theory that its speech falls within ITAR's boundless definition of "technical data" and thus cannot be "exported"—that is, expressed in any manner potentially accessible to foreigners—without prior approval. And the Government's speech-licensing regime is expensive, slow, indeterminate, and bereft of judicial review.

We have thus reached the point where Americans cannot speak about "technical data," whatever that is, without ensuring that the theater, auditorium, trade show floor, television audience or street corner is free of "foreign persons." And because the Internet is available worldwide, Americans risk severe penalties when exchanging a broad array of information online, including the most basic information pertaining to Second Amendment-protected arms.

Congress never sanctioned this state of affairs, which is intolerable under established First, Second, and Fifth Amendment precedent. The District Court's denial of a preliminary injunction against this prior restraint should be reversed.

STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202. ROA.15. The district court denied Plaintiffs' motion for a preliminary injunction on August 4, 2015. ROA.703. Plaintiffs filed a timely notice of appeal on August 13, 2015. ROA.1045. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

STATEMENT OF ISSUES

1. Whether, in enacting the Arms Export Control Act of 1976 ("AECA"), 22 U.S.C. § 2278 *et seq.*, Congress authorized the State Department to create and enforce a prior restraint against public speech potentially related to "defense articles."

2. Whether the Government violates the First Amendment by imposing a content-based prior restraint, lacking procedural safeguards, on public speech that potentially aids the manufacture of "defense articles."

3. Whether the Government violates the Second Amendment by barring the dissemination of information used in the manufacture or maintenance of arms that responsible, law-abiding Americans typically possess for traditional lawful purposes.

4  Whether the Government's use of ITAR as a prior restraint on

public speech violates the Fifth Amendment right to due process.

1.      *The Regulatory Scheme*

Congressional authorization for Defendants' trade regulation of

"defense articles" is found in 22 U.S.C. § 2278(a)(1):

> In furtherance of world peace and the security and foreign policy of
> the United States, the President is authorized to control the import
> and the export of defense articles and defense services . . . The
> President is authorized to designate those items which shall be
> considered as defense articles and defense services for the purposes
> of this section and to promulgate regulations for the import and
> export of such articles and services . . . The items so designated shall
> constitute the United States Munitions List.

The State Department's Directorate of Defense Trade Controls

("DDTC") seeks to fulfill this function by administering the ITAR

regime, which sets forth the "U.S. Munitions List" ("USML") of items—

including "technical data," 22 C.F.R. § 120.10—whose "export" requires

advance government authorization. 22 C.F.R. §§ 120.17, 127.1(a)(1).

Unauthorized exports are punishable by up to twenty years in prison,

fines of up to $1,000,000, and civil penalties up to $500,000. 22 U.S.C. §

2778(c), (e).

a. *"Technical Data"*

The USML purports to cover twenty-one categories of "technical data," broadly defined to include information "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." 22 C.F.R. § 120.10(a)(1). This includes "information in the form of blueprints, drawings, photographs, plans, instructions or documentation" and "software" "directly related to defense articles," *id.*, although it excludes, inter alia, "general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain . . . ." 22 C.F.R. § 120.10(b).

When referring to various types of "technical data," the USML utilizes open-ended terms, such as "military application," *see, e.g.,* 22 C.F.R. § 121.1, which is undefined; and/or "specially designed," whose definition exceeds 900 words, 22 C.F.R. § 120.41. Moreover, the USML's Category XXI is an open-ended catch-all provision, controlling "Articles, Technical Data, and Defense Services Not Otherwise Enumerated." 22 C.F.R. § 121.1 at USML paragraph XXI(a).

"[I]f doubt exists as to whether an article or service is covered by the U.S. Munitions List," prospective exporters can obtain a "commodity jurisdiction" determination from DDTC. 22 C.F.R. § 120.4(a). Over four thousand commodity jurisdiction requests have been submitted since 2010.[1] Defendants identify the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which persons must obtain prior approval before they can publish unclassified technical information subject to ITAR control, regardless of whether the information is privately created. However, neither the Code of Federal Regulations nor any other public law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations. Exacerbating this situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR without a formal commodity jurisdiction determination.

Obtaining a commodity jurisdiction determination can take a long time. Reportedly, nonpublic National Security Council ("NSC")

------

[1]"Final Commodity Jurisdiction Determinations," https://www.pmddtc.state.gov/commodity_jurisdiction/determination.html (last visited Dec. 7, 2015).

guidelines establish a sixty-day deadline for DDTC to render a commodity jurisdiction determination. ROA.144. But Government Accountability Office, Office of Inspector General and Defendant DDTC's reports show that the NSC guidelines are routinely disregarded, as commodity jurisdiction requests languish at DDTC awaiting final determinations for well over a year or more. ROA.163-68, 211-13, 221.

b.   *"Export"*

"Export" is not defined by the AECA, but has been broadly defined by Defendants to mean, inter alia, "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad," 22 C.F.R. § 120.17(a)(4).

c.   *"Public Domain"*

Public discourse contains a large, ever-expanding array of technical information arguably subject to ITAR control. Simple Google, Amazon, and Yahoo searches under terms such as "how to make a firearm" reveal all manner of technical data published in books, journals, and other mediums that might well fit within one or another USML designation. As the Department of Justice once reported to Congress,

"anyone interested in manufacturing a bomb, dangerous weapon or weapon of mass destruction can easily obtain detailed instructions for fabricating and using such a device" from "manuals written for legitimate purposes, such as military, agricultural, industrial and engineering purposes." ROA.287. "Such information is also readily available to anyone with access to a home computer equipped with a modem." *Id.*

Yet Defendants now dispute whether ITAR permits people to *place* information into the public domain, or merely to access information already placed there by others. As noted *supra*, ITAR's "public domain" exclusion, 22 C.F.R. § 120.10(b), includes eight categories of "information which is published and which is generally accessible or available to the public," *id.* § 120.11(a), including information publicly released after obtaining "after approval by the cognizant U.S. government department or agency," *id.* § 120.11(a)(7). A reasonable person might therefore understand that one is free to publish "technical data" not developed under government contracts in one of the other approved "public domain" channels.

But that depends on what Defendants claim the meaning of "is" is. If "is," as first used in Section 120.11(a), relates only to information *already* found in a newspaper, library, trade show, etc., an individual would still require a license to "export" the information into these venues, which are accessible to foreign persons. As discussed *infra*, the Government has not always taken this restrictive position.

2.      *The History of ITAR's Prior Restraint Application*

Decades ago, an ITAR provision suggested that public speech about "technical data" required an export license, raising concerns about ITAR's application as a prior restraint. Specifically, in a much earlier iteration of ITAR, Footnote 3 to former Section 125.11 implied a prior restraint on all public speech that happened to fall within ITAR's meaning of "technical data":

> The burden for obtaining appropriate U.S. Government approval for the publication of technical data falling within the definition in § 125.01, including such data as may be developed under other than U.S. Government contract, is on the person or company seeking publication.

ROA.327.

Beginning in 1978, in response to concerns raised by this language, the Office of Legal Counsel issued a series of opinions advising

Congress, the White House, and the State Department that ITAR's use as a prior restraint on the dissemination of privately generated, unclassified information violates the First Amendment. ROA.226-323. And in 1980, Defendant DDTC's predecessor, the Department of State Office of Munitions Control, issued official guidance providing that "[a]pproval is not required for publication of data within the United States . . . Footnote 3 to Section 125.11 does not establish a prepublication review requirement." ROA.332.

Finally, in 1984, the State Department removed Footnote 3 from ITAR, expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682, 47,683 (Dec. 6, 1984) ("Concerns were expressed, for example, on licensing requirements as they relate to the First Amendment to the Constitution. The revision seeks to reflect these concerns . . . .").

Two cases revealed and shaped the Government's evolving response to the question of ITAR's prior restraint application. In 1978, the Ninth Circuit overturned a conviction under the AECA's predecessor act, and the ITAR regulations then in effect, because the trial court rejected arguments that the technical data had non-military applications.

*United States* v. *Edler Industries*, 579 F.2d 516 (9th Cir. 1978). The act and its

> definition of technical data are susceptible of an overbroad interpretation. Their expansive language may be construed to restrict not only the export of arms and information directly leading to the production of articles on the Munitions List, but also the interchange of scientific and technical information that of itself is without any substantial military application.

*Id.* at 520. To avoid the constitutional problem, the court construed ITAR's reach narrowly, to "control the conduct of assisting foreign enterprises to obtain military equipment and related technical expertise. So confined, the statute and regulations are not overbroad [or] an unconstitutional prior restraint on speech." *Id.* at 521.

> [T]echnical data must relate in a significant fashion to some item on the Munitions List. Moreover, adequate notice to the potential exporter requires that the relationship be clear . . . Presumably, Congress intended that the technical data subject to control would be directly relevant to the production of a specified article on the Munitions List, not simply vaguely useful for the manufacture of arms.

*Id.* at 520-21. "If the information could have both peaceful and military applications, as Edler contends that its technology does, the defendant must know or have reason to know that its information is intended for the prohibited use." *Id.* at 521 (citation omitted).

Following *Edler*, the Office of Legal Counsel warned the State

Department of "serious constitutional questions" were ITAR applied to

"transactions in which an 'exporter' who is not otherwise connected or

concerned with any foreign enterprise transmits technical data

knowing, or having reason to know, that the data may be taken abroad

and used by someone there in the manufacture or use of arms."

ROA.248.

> [T[he revised technical data provisions cannot constitutionally be
> applied to the dissemination of technical data by persons having no
> direct connection with foreign conduct in settings in which there is
> no more than belief or a reasonable basis for believing (1) that a
> foreign national may take the technical data abroad and (2) that the
> data could be used by someone there in the manufacture or use of
> items on the Munitions List.

ROA.255

"For obvious reasons, the best legal solution for the overbreadth

problem is for the Department of State, not the courts, to narrow the

regulations." ROA.256; *see also* ROA.258 (1981 DOJ Memorandum to

Commerce Department).

The Department of Justice reiterated these concerns in a 1997

report to Congress, counseling that prior restraints against Internet

publication of information on bomb-making and use violated the First

Amendment, unless the publication was made "(i) with the intent that the information be used to facilitate criminal conduct, or (ii) with the knowledge that a particular recipient of the information intends to use it in furtherance of criminal activity." ROA.283.

But the Government's commitment to these principles would be tested by Dr. Daniel Bernstein, an academic who challenged ITAR's application against his cryptographic software. In Bernstein's case, the Northern District of California held that the source code for an ITAR-designated cryptographic program constituted protected First Amendment expression. *Bernstein* v. *U.S. Dep't of State*, 922 F. Supp. 1426 (N.D. Cal. 1996) ("*Bernstein I*"). The court subsequently struck down ITAR's provisions relating to cryptographic speech. *Bernstein* v. *U.S. Dep't of State*, 945 F. Supp. 1279 (N.D. Cal. 1996) ("*Bernstein II*"). When the government shifted control over the code's export from the State Department to the Commerce Department, Bernstein amended his complaint to challenge the relevant Export Administration Regulations. The district court struck down these regulations as well. *Bernstein* v. *U.S. Dep't of State*, 974 F. Supp. 1288 (N.D. Cal. 1997) ("*Bernstein III*").

A Ninth Circuit panel affirmed that decision, but the opinion was vacated when the full court granted rehearing en banc. *Bernstein* v. *United States Dep't of Justice*, 176 F.3d 1132 (9th Cir.) ("*Bernstein IV*"), *reh'g in banc granted,* 192 F.3d 1308 (9th Cir. 1999). Before the case could be reheard, however, the Government amended its regulations to exclude Bernstein's code from export controls, mooting the case. *See Bernstein* v. *DOC*, No. C-95-0582-MHP, 2004 U.S. Dist. LEXIS 6672, at *6 & n.2 (N.D. Cal. Apr. 19, 2004).

Plaintiffs' argument, *infra*, addresses the *Bernstein* opinions' reasoning. But for purposes of understanding this case's posture, and the evolution of the Government's positions, Plaintiffs respectfully request that the Court take judicial notice of the Government's litigating position in *Bernstein*, as reflected in the pleadings filed in that case, true and correct excerpts of which are attached in the addendum; *see* https://app.box.com/Bernstein for complete copies.[2]

---

[2]*See Murchison Capital Partners, L.P.* v. *Nuance Communs., Inc.*, No. 14-10819, 2015 U.S. App. LEXIS 14228, at *2 n.1 (5th Cir. Aug. 11, 2015) ("because they are public records, we also take judicial notice of court pleadings in other cases") (citations omitted); *id.* ("The court may take judicial notice at any stage of the proceeding") (quoting Fed. R. Evid. 201(d)).

In *Bernstein*, Defendant State Department argued that ITAR does *not* impose a prior restraint on public speech. William Lowell, then-Director of Defendant DDTC, declared that "the Department does not seek to regulate the <u>means</u> themselves by which information is placed in the public domain." (emphasis in original). Addendum ("Add.") 23. As the Government argued:

> In fact, the State Department does not seek to control the various means by which information is placed in the public domain. Lowell Decl. ¶ 22. The Department does not review scientific information to determine whether it may be offered for sale at newsstands and bookstores, through subscriptions, second-class mail, or made available at libraries, or distributed at a conference or seminar in the United States. <u>Id</u>.

Add. 26; *see also* Add. 29 ("Moreover, the regulations are not applied to regulate the <u>means</u> by which such information is placed in the public domain.").

Defendants State Department and DDTC explained in *Bernstein* that ITAR's "public domain" provision "contains several specific exceptions as to what is controlled as technical that any ordinary person can understand--information in bookstores, newsstands, or disclosed at conferences." Add. 30. Forcefully rejecting the construction of ITAR's "public domain" provision in a manner enabling a prior

restraint on public speech, Defendants declared:

> Plaintiff sees a "Catch-22" "lurking" in the provision that, unless something is already published, it is subject to export controls. He would construe the definition to mean, in other words, that nothing can be published without the government's approval. Not only is this wrong as a factual matter, <u>see</u> Lowell Decl. ¶ 22, it is by far the most **<u>un-</u>**reasonable interpretation of the provision, one that people of ordinary intelligence are <u>least</u> likely to assume is the case.

*Id.* (emphasis in original).

But on June 3, 2015, following the filing of Plaintiffs' motion for preliminary injunction, Defendants published a Federal Register notice in which they propose to amend ITAR's "public domain" definition to unambiguously impose a prior restraint and now claim: "[p]aragraph (b) of the revised definition explicitly sets forth the Department's requirement of authorization to release information into the 'public domain.'" 80 Fed. Reg. 31,525, 31,528 (June 3, 2015).

And notwithstanding the DOJ warnings dating to 1978 and the 1984 amendments that removed former Footnote 3's prior restraint implications, Defendants have now adopted the position that the Government once claimed is both "wrong as a factual matter" and "by far the most **<u>un-</u>**reasonable interpretation of the provision, one that people of ordinary intelligence are <u>least</u> likely to assume is the case."

Add. 30. They now insist that ITAR has imposed a prior restraint all

along.

> The requirements of paragraph (b) are not new. Rather, they are a
> more explicit statement of the ITAR's requirement that one must
> seek and receive a license or other authorization from the
> Department or other cognizant U.S. government authority to release
> ITAR controlled "technical data," as defined in § 120.10. A release of
> "technical data" may occur by disseminating "technical data" at a
> public conference or trade show, publishing "technical data'" in a
> book or journal article, or posting "technical data" to the Internet.

*Id.* at 31,528. "Posting 'technical data' to the Internet without a

Department or other authorization is a violation of the ITAR even

absent specific knowledge that a foreign national will read [it]." *Id.* at

31,529.

  3.  *Three-dimensional Printing and Computer Numeric Control*

Three-dimensional ("3D") printing technology allows a computer to

"print" a physical object (as opposed to a two-dimensional image on

paper). Today, 3D printers are sold at stores such as Home Depot and

Best Buy, and the instructions for printing everything from jewelry to

toys to car parts are shared and exchanged freely online at sites like

GrabCAD.com and Thingiverse.com. Computer numeric control

("CNC") milling, an older industrial technology, involves a computer

directing the operation of a drill upon an object. 3D printing is

"additive;" using raw materials, the printer constructs a new object. CNC milling is "subtractive," carving something (more) useful from an existing object.[3]

Both technologies require some instruction set or "recipe"—in the case of 3D printers, computer aided design ("CAD") files, typically in .stl format;[4] for CNC machines, text files setting out coordinates and functions to direct a drill. ROA.976, ¶41. "A CAD file is a data set defining the geometric representation of a bounded volume." ROA.975, ¶38.

> Viewed on a computer, [CAD files] display and project an image in three-dimensions, similar to a model sculpted out of clay. The files can be viewed and manipulated in various contexts without an intent to ever manufacture anything.

ROA.978, ¶44. Likewise, "CNC code is expressive in that it can be read and edited by humans, who can also understand and adjust its

---

[3]Chris Anderson, "The New MakerBot Replicator Might Just Change Your World," *Wired* (Sep. 19, 2012), http://www.wired.com/2012/09 /how-makerbots-replicator2-will-launch-era-of-desktop-manufacturing/all (last visited Dec. 3, 2015).

[4]*Supra* n.3; ROA.960, ¶4; ROA.961, ¶5; ROA.975, ¶38. Many CAD programs used to design objects that would be printed utilize proprietary file formats. CAD files are thus typically converted into Standard Tesselation Language (.stl) format, which removes all model information except for surface geometry, and which 3D printers can recognize and process. ROA.961, ¶5.

output—i.e., what it will cause the mill to machine." ROA.976-77, ¶41.
The "expressive elements" of CAD and CNC files "are understandable
and, thus, editable by human beings to alter the physical
characteristics that affect the appearance and function of any item
created with the use of the files." ROA.978, ¶45.

4.    *Defendants' Imposition of a Prior Restraint Against Plaintiffs' Speech*

Plaintiff Defense Distributed was organized as a non-profit and is
operated for the purpose of promoting popular access to arms
guaranteed by the United States Constitution. It does so by facilitating
global access to, and the collaborative production of, information and
knowledge related to the 3D printing of arms; and by publishing and
distributing such information and knowledge on the Internet at no cost
to the public. ROA.13, ¶1; ROA.128, ¶2. Defense Distributed is
committed to making contributions to the body of free and public
knowledge.

Plaintiff Second Amendment Foundation, Inc. ("SAF"), a non-profit
membership organization, has over 650,000 members and supporters
nationwide. ROA.13-14, ¶2. SAF's purposes include promoting the
exercise of the right to keep and bear arms; and education, research,

publishing and legal action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control. *Id.*

SAF's members have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearm that they or others have created. ROA.21, ¶38; ROA.135, ¶4; ROA.136, ¶5; ROA.137, ¶4; ROA.138, ¶5. In particular, SAF members are interested in using Defense Distributed's files, among others, to manufacture and maintain operable firearms for their personal, lawful use. ROA.659, ¶3; ROA.661, ¶4; ROA.664, ¶4. In furtherance of SAF's mission, and to serve its members and the public, SAF would publish and promote, on the Internet, the free distribution of Defense Distributed's various files, and allow its members and others to collaborate on their own open-source 3D printing firearm-related files using SAF's servers as a forum for Internet publication. ROA.134, ¶4.

a.    *The Published Files*

Beginning in 2012, Defense Distributed privately generated, and posted on the Internet for free access by the public, technical

information about various gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun named "The Liberator" (the "Published Files"). ROA.128, ¶3. At the time, there were no publicly known DDTC enforcement actions for the posting of files of any kind on the Internet. *Id.*

The Published Files were downloaded hundreds of thousands of times. ROA.129, ¶4. The Liberator files in particular generated national media attention, with coverage in Forbes, CNN, NBC News, the Wall Street Journal, and even an episode of The Colbert Report. *Id.* Apart from their functional aspects, the Published Files have also proven to have artistic and political utility. For example, one artist has repurposed the Liberator schematics to create a statement protesting gun violence.[5] London's Victoria & Albert Museum purchased two 3D printed Liberators to display during its ongoing Design Festival.[6] And

---

[5]Mark Wilson, "Artist Warps 3-D Printed Gun Blueprints, Protests Gun Violence," *Fast Company* (April 15, 2014), http://www.fastcodesign. com/3028300/infographic-of-the-day/artist-warps-3-d-printed-gun-blueprints- protests-gun-violence (last visited Dec. 7, 2015).

[6]Andy Greenberg, "3D-Printed Guns As Art: London Design Museum Buys Two 'Liberator' Printed Pistols," *Forbes*, (Sep. 15, 2013), www.forbes.com/sites/andygreenberg/2013/09/15/3d-printed-guns-as-art-london-design-museum-buys-two-liberator-printed-pistols (last

the Liberator prompted the Museum of Modern Art in New York to

host a debate concerning the intersection of design and violence.[7]

On May 8, 2013, Defendants warned Defense Distributed that

DTCC/END is conducting a review of technical data made publicly
available by Defense Distributed through its 3D printing website,
DEFCAD.org, the majority of which appear to be related to items in
Category I of the USML. Defense Distributed may have released
ITAR-controlled technical data without the required prior
authorization from the Directorate of Defense Trade Controls
(DDTC), a violation of the ITAR . . . all such data should be removed
from public access immediately.

ROA.129, ¶5; ROA.140-41.

At the time it posted the Published Files, Defense Distributed did

not know that the Defendants would demand to pre-approve its speech.

Defense Distributed believed, and continues to believe, that the United

States Constitution guarantees a right to share truthful speech—

especially speech concerning fundamental constitutional rights—in

---

visited Dec. 7, 2015); Rachel Donadio, "A History of the Now, Found in
Politically Charged Objects," *New York Times* (July 6, 2014)
http://www.nytimes.com/2014/07/07/arts/design/victoria-and-albert-
museum-pushes-boundaries-of-collecting.html (last visited Dec. 7,
2015).

[7]Paola Antonelli, "Design and Violence Debate I: Open Source,"
*MOMA* (March 27, 2014), http://designandviolence.moma.org/design-
and-violence-debate-i-open-source (last visited Dec. 7, 2015).

public forums. ROA.129, ¶6. Moreover, as noted *supra*, ITAR specifically excludes from its coverage "technical data" appearing in the "public domain," 22 C.F.R. § 120.10(b), the latter term appearing to broadly encompass Defense Distributed's activities, which focus on sharing free open-sourced files for collaborative design with the public. *See* 22 C.F.R. § 120.11. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with Defendants' demands and removed all of the Published Files from its servers. ROA.129, ¶6.

Defendants further directed Defense Distributed to submit the Published Files to DDTC for review using the "commodity jurisdiction" procedure. ROA.129, ¶7; ROA.141. Defense Distributed complied with Defendants' request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013. ROA.129, ¶7; ROA.335-86. Nearly two years later, on June 4, 2015—six days before the first responsive pleading was due in this case—Defendants responded that six of the ten files, including the Liberator files, were ITAR-controlled. ROA.500-01.

b. *The "Ghost Gunner" Files*

On September 25, 2014, Defense Distributed requested DOPSR's prepublication approval for public release of files containing technical information on a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files"). ROA.130, ¶8; ROA.388-89.[8] On October 1, 2014, DOPSR informed Defense Distributed this request for review was refused because DOPSR was unsure whether the Ghost Gunner was subject to ITAR. DOPSR further recommended that Defense Distributed submit another commodity jurisdiction request to the Defendants. ROA.130, ¶8; ROA.391-92.

Defense Distributed submitted another commodity jurisdiction request on January 2, 2015, this time for the Ghost Gunner. ROA.130, ¶9; ROA.394-405. On April 15, 2015, Defendant DDTC determined that the Ghost Gunner machine, user manual, and operating software are

---

[8]Any milling machine can be modified to mill components that are unlawful to manufacture, just as any saw that may be purchased at a hardware store can be used to unlawfully shorten a shotgun. However, Ghost Gunner does not ship with the jigs and code to manufacture guns that cannot lawfully be manufactured for personal use, such as machine guns, and Defense Distributed has no intention of offering such items for sale. ROA.130, n.1.

not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [ITAR]." ROA.130, ¶9; ROA.407-08.[9]

    c.    *The CAD Files.*

Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain CAD files. ROA.130-31, ¶10; ROA.410-24. On December 31, 2014, nearly four months after the first such review request, DOPSR sent Defense Distributed two letters stating its refusal to review the CAD files. ROA.130-31, ¶10; ROA.426-31. The letters directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. *Id.* However, because this is not the DDTC division responsible for issuing licenses or other DDTC authorizations, on January 5, 2015, Defense Distributed

---

    [9]A "lower receiver" is the functional, regulated and serialized part of an AR-platform rifle, to which other non-regulated components may be added (barrel, grip, etc.) to assemble a working firearm. Lower receivers that are no more than 80% finished are unregulated. These "80% lower receivers" are often lawfully finished—the task that the Ghost Gunner CNC machine aids in performing—before being lawfully assembled into customized rifles.

requested Defendants' guidance on how to obtain authorization from DDTC Compliance for release of the CAD files. ROA.131, ¶11; ROA.433-56. To date, Defendants have not responded to Defense Distributed's request for guidance. ROA.131, ¶11.

d.   *Prior Restraint on Other Files*

This case concerns more than CAD and CNC files. Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to open public forums on the Internet. Many of these files are described in the USML. ROA.131, ¶13. SAF and its members would likewise create and develop such files, that they would share and access on the Internet. ROA.133-34, ¶¶3, 4; ROA.135-36, ¶¶4, 5; ROA.137-38, ¶¶4, 5.

e.   *The Prior Restraint's Impact*

But for Defendants' imposition of a prior restraint on "technical data," Plaintiffs would freely distribute Defense Distributed's purportedly ITAR-controlled files, and other files relating to Second Amendment arms. Plaintiffs refrain from doing so because they

reasonably fear that Defendants would pursue criminal and civil enforcement proceedings against them should they publish the files. ROA.131-32, ¶14; ROA.134, ¶4; ROA.136, ¶5; ROA.138, ¶5. Defendants' threats have thus silenced Plaintiffs; deprived Plaintiffs' customers, members, visitors, and patrons of access to Plaintiffs' speech; impeded their ability to likewise speak on the same subjects; and infringed their right to keep and bear arms.

But while Defendants have imposed their prior restraint against Defense Distributed, and while neither SAF nor at least some of its members will risk violating ITAR, others have continued to freely distribute Defense Distributed's files and similar gun-related "technical data" on the Internet without any action by the Defendants. ROA.131, ¶12; *see, e.g.*, PM522 Washbear 3D Printed .22LR Revolver Files, http://www.jamesrpatrick.com/p/pm522-washbear-3d-printed-22lr-pistol.html (last visited Dec. 4, 2015) ("Feel free to distribute these files, so long as attribution is given. Always obey all federal, state, and local laws. Use this information at your own risk and responsibility.").[10]

---

[10]This revolver has received massive media attention, and has been featured in countless technology blogs. Its CAD files are freely available on the Internet.

5.      *Relevant Procedural History*

On May 6, 2015, Plaintiffs brought this action in the United States District Court for the Western District of Texas, seeking declaratory and injunctive relief from Defendants' prior restraint. Plaintiffs asserted that Defendants' prior restraint is ultra vires, and also violates their First, Second, and Fifth Amendment rights. Defense Distributed further sought compensatory, as well as punitive and exemplary damages from Defendants Handelman, Peartree, Heidema, and Smith. ROA.12-26.

Plaintiffs thereafter moved for a preliminary injunction. ROA.80. The district court heard argument on Plaintiffs' motion on July 6, 2015, ROA.8; ROA.854-939, and denied the motion on August 4, 2015, ROA.703. Plaintiffs timely appealed. ROA.1045.

6.      *The District Court's Decision*

The district court "ha[d] little trouble concluding Plaintiffs have shown they face a substantial threat of irreparable injury." ROA.684. But it found that the importance of protecting constitutional rights is outweighed by national security concerns, suggesting that the Government's "authority . . . in matters of foreign policy and export"

are "largely immune" from judicial review. ROA.684-85 (quotations omitted). The court further held that because Defendants "clearly believe" that posting files to the Internet is an "export," Plaintiffs did not prove that allowing such posting serves the public interest. ROA.685.

Nonetheless, "in an abundance of caution," *id.*, the bulk of the court's opinion addressed whether Plaintiffs established a likelihood of success on the merits. The court's brief discussion of Plaintiffs' ultra vires claim apparently assumed, without discussion, the correctness of Defendants' contested view that Plaintiffs' speech constitutes an "export" of "defense articles." The court thus held that Defendants were authorized to bar such speech because it "facilitat[es] global access to firearms,"which the court further assumed, without discussion, "increase[s] the possibility of outbreak or escalation of conflict." ROA.686-87.

Turning to the First Amendment claim, the court admitted that "the precise technical nature of the computer files at issue is not wholly clear to the Court," but considered the files to be protected by the First Amendment because they "are intended to be used by others as a

baseline to be built upon, altered and otherwise utilized." ROA.688. But the court then held that while ITAR "unquestionably regulates speech concerning a specific topic," it "does not regulate disclosure of technical data based on the message it is communicating." ROA.691. The court thus "conclude[d] the regulation is content-neutral and thus subject to intermediate scrutiny." *Id.* (citation omitted).

Purportedly applying intermediate scrutiny, the court asserted that Defendants' prior restraint would survive because Plaintiffs have other means of distributing their speech domestically, ROA.693, presumably by screening listeners' citizenship. The court also apparently rejected Plaintiffs' argument that prohibiting Americans from communicating on the Internet, while allowing other forms of domestic speech, does not materially advance the goal of barring foreigners' access to that speech. ROA.693-94. And notwithstanding the Government's findings that commodity jurisdiction timelines are routinely ignored, the fact that Defense Distributed waited nearly two years to receive word on its commodity jurisdiction requests, and the undisputed lack of procedural safeguards in Defendants' licensing process, the court held that Plaintiffs "have available a process for determining whether the speech

they wish to engage in is subject to the licensing scheme of the ITAR regulations." ROA.694.

In doing so, the court appeared to conflate and confuse Defendants' licensing process with the commodity jurisdiction process. It cited ITAR Section 120.4(e),which was not specifically addressed in the Parties' briefs, and which does not have the meaning the court apparently ascribed it. More specifically, the court's August 4, 2015 Order states that "[t[he regulations include a ten day deadline for providing a preliminary response, as well as a provision for requesing [sic] expedited processsing. [sic] 22 C.F.R. § 120.4(e) (setting deadlines)." ROA.694. But this "preliminary response" is merely an agency email acknowledging receipt of a commodity jurisdiction request and, while submitters can request expedited commodity jurisdiction determinations, final agency determinations take months and sometimes a year or more—a fact which is undisputed by the parties.

Further, while the Order states that a Presidential directive requires a license decision within 60 days of receipt, *id.*, the Federal Register notice implementing that requirement, as cited by the court, contains broad national security exceptions, which provide Defendants with

unbridled discretion to override the deadline "[w]hen a related export policy is under active review and pending final determination by the Department of State" and when "[t]he Department of Defense has not yet completed its review." 74 Fed. Reg. 63,497 (Dec. 3, 2009)

The court found that Defense Distributed's standing to assert a Second Amendment claim "is a very close question," but noted that the standing inquiry ceases if at least one plaintiff has standing. ROA.696, and found that SAF has standing to present a Second Amendment claim. ROA.697-98. Addressing the Second Amendment claim, the court was unsure whether the Second Amendment secures the right to manufacture guns, though it found the concept "appealing," presumed the right was implicated, and proceeded to a step-two Second Amendment inquiry. ROA.699. Purporting to apply intermediate scrutiny, the court perfunctorily upheld the scheme. ROA.700. Finally, the court held that ITAR does not violate the Fifth Amendment due to vagueness. ROA.702.

## SUMMARY OF ARGUMENT

Plaintiffs are entitled to a preliminary injunction. Nothing in the AECA's text or history suggests that Congress had in mind an

overbroad, standardless, and indefinite prior restraint on public speech bereft of procedural protection when it sought to control the export of arms. The Office of Legal Counsel all-but established Plaintiffs' likelihood of succeeding on their First Amendment claim when it first warned the State Department to refrain from establishing precisely this form of prior restraint in 1978. The DOJ issued similar warnings in 1981, 1984 and 1997, and nothing that has since transpired has diminished the constitutional reality then-acknowledged by the Government.

Judicial understanding of the Second Amendment is far less developed than that of the First. But even so, Plaintiffs' Second Amendment rights at-issue here should be acknowledged as deeply rooted. However the Government might regulate the ancient practice of making arms, it cannot be constitutional to bar Americans from creating and disseminating  information necessary to the manufacture and maintenance of basic arms whose possession the Second Amendment secures. And the Fifth Amendment's Due Process Clause cannot tolerate the Government's hopelessly vague definition of "technical data" as applied to public speech.

There being no significant dispute as to the irreparable harm visited by this prior restraint, the balance of the equities, or the public interest in securing fundamental rights, the district court's decision should be reversed.

## STANDARD OF REVIEW

"For a denial of a preliminary injunction, a district court's findings of fact are subject to a clearly-erroneous standard of review, while conclusions of law are subject to broad review and will be reversed if incorrect." *Lake Eugenie Land & Dev., Inc.* v. *BP Exploration & Prod. (In re Deepwater Horizon)*, 732 F.3d 326, 332 (5th Cir. 2013) (quotation and internal punctuation omitted).

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter* v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). Each factor weighs heavily in Plaintiffs' favor.

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

   A.    CONGRESS NEVER AUTHORIZED DEFENDANTS' CENSORSHIP
         OF PRIVATELY-GENERATED, UNCLASSIFIED SPEECH.

Defendants have aggrandized for themselves nothing less than a power to censor privately-generated, unclassified "technical data" on the Internet. Their apparent syllogism holds: (1) the Internet is available worldwide, and is also available to foreign persons within the United States; (2) all speech posted to the Internet is thus deemed "exported;" (3) the "export" of "technical data" may be licensed and reviewed under ITAR; therefore (4) all "technical data" posted to the Internet is subject to ITAR controls and procedures. Q.E.D.

But "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *King* v. *Burwell*, 135 S. Ct. 2480, 2495 (2015) (quoting *Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)) (citations omitted). Before asking whether this breathtakingly expansive regulatory regime could possibly be constitutional, the Court should ask whether Congress granted Defendants such authority. "[N]ormally the Court will not decide a constitutional question if there is some other ground upon which to

dispose of the case." *Bond* v. *United States*, 134 S. Ct. 2077, 2087 (2014) (quotation and citations omitted). "Where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States ex rel. Attorney Gen.* v. *Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909) (citation omitted).

"[T]he fact that one among alternative constructions would involve serious constitutional difficulties is reason to reject that interpretation in favor of another." 2A Norman J. Singer, SUTHERLAND ON STATUTORY CONSTRUCTION § 45.11, at 87 (7th ed. 2008) (collecting cases); see *United States* v. *Rehlander*, 666 F.3d 45, 49 (1st Cir. 2012) ("statutes are to be read to avoid serious constitutional doubts").

Accordingly, "[t]he question is not whether" an alternative statutory interpretation "is the most natural interpretation of the [law], but only whether it is a 'fairly possible' one. As we have explained, 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Nat'l Fed'n of Indep. Bus.* v. *Sebelius*, 132 S. Ct. 2566, 2594 (2012) (Roberts, C.J.) (quotations omitted).

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen* v. *Georgetown Univ. Hospital*, 488 U.S. 204, 208 (1988). This is "an inquiry familiar to the courts: interpreting a federal statute to determine whether executive action is authorized by, or otherwise consistent with, the enactment." *Gonzales* v. *Oregon*, 546 U.S. 243, 249 (2006). Agency action "is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review." *INS* v. *Chadha*, 462 U.S. 919, 953 n.16 (1983). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U.S. 355, 374 (1986). Such authority "may not be lightly presumed." *Michigan* v. *EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001). And "when a particular interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." *INS* v. *St. Cyr*, 533 U.S. 289, 299 (2001) (citation omitted).

The AECA supplies the only potential source of statutory authority for Defendants' conduct. To be sure, Plaintiffs do not suggest that

Defendants lack authority under the AECA to construct a narrowly-tailored regime regulating the export of certain technical data. Nor do Plaintiffs suggest that uploading files to the Internet cannot be viewed, in some sense, as an export. Defendants can bar individuals from emailing classified blueprints for secret weapons systems to a foreign agent or directly providing technical assistance to a foreign person on designing defense articles.

But that is a very far cry from supposing that the Cold War-era AECA authorizes the imposition of an indecipherable prior restraint against sharing *all* public speech containing "technical data" on the Internet. And Defendants' construction of the AECA contains no limiting principle, as such a broad grant of prior restraint authority would extend far beyond the Internet. Recall that Defendants have broadly defined "export" to encompass the act of "[d]isclosing (including oral or visual disclosure) . . . technical data to a foreign person . . . in the United States." 22 C.F.R. § 120.17(a)(4). Any other publication of "technical data," such as those appearing in countless scientific and academic publications, as well as on television and at the movies, would be subject to Defendants' prior restraint. No American could stand on a

street corner or public square of any town visited by foreign tourists and declaim "technical data" without being subject to Defendants' prior restraint.

This is doubtless not what Congress had in mind when it delegated authority to regulate the export of defense articles "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). In 1978, not long after the AECA's enactment, the Justice Department doubted that the Act authorized a prior restraint against cryptographic speech listed in the USML, and warned, "It is by no means clear from the language or legislative history of either statute [AECA and ITAR] that Congress intended that the President regulate noncommercial dissemination of information, or considered the problems such regulation would engender." ROA.229.

> [W]e wish to emphasize our doubts that the executive branch may validly provide for licensing or prior approval of exports of cryptographic information without more explicit Congressional authorization. The scope of the existing delegation of authority from Congress to the President, as we note above, is somewhat unclear. Before imposing a prior restraint on exports of public cryptographic information, we believe that a more clear cut indication of Congressional judgment concerning the need for such a measure is in order . . . further Congressional authorization would obviously be necessary in order to extend governmental controls to domestic as well as foreign disclosures of public cryptographic information.

ROA.240 (citations omitted); *cf.* ROA.242 ("we are uncertain whether the present legislative authority for the technical data provisions of ITAR is adequate.")). This refreshingly-candid analysis supplies a rare example of the Executive Branch acknowledging meaningful limitations on its powers.

Defendants might claim that Congress's statute is purposefully vague and indeterminate, leaving to them the task of creating regulations governing the export of defense articles—a task clothed with a fair degree of judicial deference under the rule of *Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). But *Chevron* deference applies only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States* v. *Mead Corp.*, 533 U.S. 218, 227-28 (2001). In other words, the agency action entitled to deference must involve the exercise of some delegated process. "[A]djudication or notice-and-comment rulemaking," for example, may carry the force of law. *Id*. at 228. But "[i]nterpretations such as those in opinion letters—like interpretations contained in

policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen* v. *Harris County*, 529 U.S. 576, 587 (2000) (citations omitted).

Defendants' prior restraint scheme as enforced against Plaintiffs is plainly not the product of their duly adopted rules. To the contrary, as noted *supra*, First Amendment concerns prompted the State Department to withdraw the only ITAR provision potentially authorizing a prior restraint regime, four years after advising that the offending provision "does not establish a prepublication review requirement." ROA.332. The prior restraint scheme has only been hinted at in Defendants' threatening letter to Defense Distributed. "[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the 'power to persuade.'" *Christensen*, 529 U.S. at 587 (parallel and other citations omitted).

> The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later

pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Mead*, 533 U.S. at 228.

Defendants' prior restraint scheme plainly fails the *Skidmore* test. There is no evidence that Defendants, unlike their predecessors and the Department of Justice, ever properly considered the implications of applying a prior restraint to all speech containing technical data that might be accessed or overheard by a foreigner. The practice is also starkly inconsistent with earlier pronouncements, wherein the government took steps to clarify that export controls did *not* amount to a prior restraint on public speech. Further, Defendants lack the requisite interpretive authority and "expertise" to resolve this "major question" of profound social, "economic and political significance"—the unprecedented censorship of all manners of public speech on all areas of public concern. *King*, 135 S. Ct. at 2489 (citing *Utility Air Regulatory Group* v. *EPA*, 134 S. Ct. 2427 (2014)); *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000).

Nor has this prior restraint been consistently applied. Defense Distributed appears to be the scheme's *only* target. Other websites

containing ITAR technical data, including the type of CAD files at issue in this case, are apparently unimpeded. ROA.131, ¶12. Defendants' imposition of a prior restraint on unclassified and public speech containing "technical data" lie beyond the authority delegated to them by Congress.

B.     DEFENDANTS ARE VIOLATING PLAINTIFFS' FIRST AMENDMENT RIGHTS.

1.    *Plaintiffs' Files Constitute Protected Speech.*

"The First Amendment protects works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent." *Miller* v. *California*, 413 U.S. 15, 34 (1973). "[C]omputer code conveying information is 'speech' within the meaning of the First Amendment . . . ." *Universal City Studios, Inc.* v. *Corley*, 273 F.3d 429, 449-50 (2d Cir. 2001); *see also Junger* v. *Daily*, 209 F.3d 481, 485 (6th Cir. 2000) ("Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment."); *Bernstein IV*, 176 F.3d at 1141 ("encryption software . . .

must be viewed as expressive for First Amendment purposes, and thus is entitled to the protections of the prior restraint doctrine").

To be sure, Plaintiffs' speech might be used to facilitate crime,[11] but that much is true of virtually all protected speech. "The prospect of crime . . . by itself does not justify laws suppressing protected speech." *Ashcroft* v. *Free Speech Coalition*, 535 U.S. 234, 245 (2002).

> The constitutional protection accorded to the freedom of speech and of the press is not based on the naive belief that speech can do no harm but on the confidence that the benefits society reaps from the free flow and exchange of ideas outweigh the costs society endures by receiving reprehensible or dangerous ideas.

*Herceg* v. *Hustler Magazine, Inc.*, 814 F.2d 1017, 1019 (5th Cir. 1987). Thus, while speech may be regulated for its hazardous aspects, "first amendment protection is not eliminated simply because publication of an idea creates a potential hazard." *Id.* at 1020. *See* Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1103 (2005).

Furthermore, Defendants bear the burden of proving that Plaintiffs' speech is somehow unprotected. *See Freedman* v. *Maryland*, 380 U.S.

---

[11]It is less obvious that Plaintiffs' files would be particularly useful to foreign governments. A prior restraint is justified only where the disclosure will "surely result in *direct, immediate, and irreparable damage* to our Nation or its people." *New York Times* v. *United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring) (emphasis added).

51, 58 (1965); *Speiser* v. *Randall*, 357 U.S. 513, 526 (1958). This they

cannot do. Plaintiffs' files do not fall into a category of protected speech,

such as fraud or libel. *Cf. United States* v. *Alvarez*, 132 S. Ct. 2537,

2547 (2012). And Plaintiffs' collaboration with other Americans in

public forums, that may incidentally be viewed by foreigners, cannot

constitutionally amount to materially supporting criminal activity. *See*

*Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 39 (2010) ("In

particular, we in no way suggest that a regulation of *independent*

*speech* would pass constitutional muster, even if the Government were

to show that such speech benefits foreign terrorist organizations. We

also do not suggest that Congress could extend the same prohibition on

material support at issue here to *domestic organizations*.") (emphasis

added).

Even were Plaintiffs' files purely functional and devoid of expressive

content, Americans enjoy a fundamental right to possess the items

described in and that can be created with the assistance of Plaintiffs'

files, said items which are perfectly legal to possess under federal law.

Bureau of Alcohol, Tobacco, Firearms & Explosives, *Top 10 Frequently*

*Asked Firearms Questions and Answers*, at 5 (Question 9), https://www.
atf.gov/file/61721/download (last visited Dec. 9, 2015).

>2.    *ITAR's Application to All Public, Unclassified Speech
>       Containing Technical Data Is Unconstitutionally Overbroad.*

"A statute is overbroad if in banning unprotected speech, a

substantial amount of protected speech is prohibited or chilled in the

process." *United States* v. *Scruggs*, 714 F.3d 258, 267 (5th Cir. 2013)

(quotation omitted). A speech restriction is unconstitutional if "no set of

circumstances exists under which [the law] would be valid or . . . the

statute lacks any plainly legitimate sweep." *Catholic Leadership

Coalition of Texas* v. *Reisman*, 764 F.3d 409, 426 (5th Cir. 2014)

(quoting *United States* v. *Stevens*, 559 U.S. 460, 472 (2010)). A

restriction is also unconstitutionally overbroad if "a substantial

number of [the law's] applications are unconstitutional, judged in

relation to the statute's plainly legitimate sweep." *Id.* (quoting *Stevens*,

559 U.S. at 473).

Given Defendants' sweeping views of what constitutes an "export"—

virtually all speech in the presence of foreigners, including all Internet

speech—and their equally broad definition of "technical data," ITAR cannot withstand constitutional scrutiny as a prior restraint.

The rare federal law that criminalizes speech typically require that the targeted speech be made with intent or knowledge that the information would be used to facilitate criminal conduct, or with knowledge that a particular recipient of the information intends to use it in the furtherance of criminal activity. The Espionage Act, for example, only punishes those who seek to communicate "with intent or reason to believe that [the information] is to be used to the injury of the United States or to the advantage of a foreign nation." 18 U.S.C. § 794(a); see *Gorin* v. *United States*, 312 U.S. 19, 28 (1941) (upholding Espionage Act's constitutionality owing to scienter requirement).

And it is not a crime to provide material support or resources to terrorists, unless one "know[s] or intend[s] that they are to be used in preparation for, or in carrying out, a violation" of various laws. 18 U.S.C. § 2339A(a); *see Holder*; *United States* v. *Featherston*, 461 F.2d 1119, 1121 (5th Cir. 1972) (upholding convictions for teaching the use or making of explosives or incendiary devices, as statute "requires those prosecuted to have acted with intent or knowledge that the

information disseminated would be used in the furtherance of a civil disorder.").

A scienter requirement should likewise limit ITAR's reach in restricting speech, as the Ninth Circuit held in *Edler*, *supra*, 579 F.2d 516, and as the Office of Legal Counsel once advocated, ROA.255; *see also* DOJ 1997 Report to Congress, ROA.309 ("the person who disseminates the information must either have the specific purpose of facilitating criminal conduct, or must have knowledge that a <u>particular</u> recipient intends to make improper use of the material."). But while it remains "obvious" that "the best legal solution for the overbreadth problem is for the Department of State, not the courts, to narrow the regulations," ROA.256, the State Department's uncooperative posture makes judicial correction imperative.

Plaintiffs are not seeking to help foreigners build controlled weapons of war. Rather, they are merely communicating with their fellow Americans, through a website, information regarding simple arms of the kind in common use for traditional lawful purposes that are themselves constitutionally protected. If Defendants can prohibit this information, they can similarly prohibit public speech concerning

anything conceivably covered by the USML, and even discussions about articles not enumerated on the USML. *See, e.g.*, 22 C.F.R. § 121.1 at USML paragraph XXI ("Articles, Technical Data, and Defense Services Not Otherwise Enumerated"). There is simply no telling where Defendants' censorship might end, unless it ends here.

3. *Defendants Impose an Unconstitutional Prior Restraint Against Plaintiffs' Lawful Public Speech.*

"The classic prior restraint, of course, is an 'administrative [or] judicial order[] forbidding certain communications when issued in advance of the time that such communications are to occur.'" *Catholic Leadership Coalition*, 764 F.3d at 437 (quotation omitted). Prior restraints are, "in other words, laws which require a speaker 'to obtain prior approval for any expressive activities.'" *Gibson* v. *Tex. Dep't of Ins.–Div. of Workers' Comp.*, 700 F.3d 227, 235 (5th Cir. 2012) (quotation omitted). "Prior restraints face a well-established presumption against their constitutionality." *Marceaux* v. *Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013) (quotation omitted).

> In general, a prior restraint . . . will be upheld only if the
> government can establish that the activity restrained poses either a

clear and present danger or a serious and imminent threat to a protected competing interest. The government must also establish that the order has been narrowly drawn and is the least restrictive means available.

*United States* v. *Brown*, 218 F.3d 415, 425 (5th Cir. 2000) (quotations omitted).

"Constitutional invalidity of prior restraints may result from one or both of 'two evils . . .: (1) the risk of censorship associated with the vesting of unbridled discretion in government officials; and (2) 'the risk of indefinitely suppressing permissible speech' when a licensing law fails to provide for the prompt issuance of a license." *East Brooks Books, Inc.* v. *Shelby County*, 588 F.3d 360, 369 (6th Cir. 2009) (quotation omitted); *FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 225-27 (1990) (plurality opinion). Defendants' prior restraint inflicts both evils.

a.    Unbridled Discretion to Censor Speech.

"Statutes or policies" affording government officials "unbridled discretion" to determine "who may speak and who may not . . . are unconstitutional." *City of Lakewood* v. *Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988) (citations omitted). "[E]ven if the government may constitutionally impose content-neutral prohibitions on a particular

manner of speech, it may not *condition* that speech on obtaining a license or permit from a government official in that official's boundless discretion." *Id.* at 763-64. Accordingly, standards governing prior restraints must be "narrow, objective and definite." *Shuttlesworth* v. *Birmingham*, 394 U.S. 147, 151 (1969). Standards involving "appraisal of facts, the exercise of judgment, [or] the formation of an opinion" are unacceptable. *Forsyth County* v. *Nationalist Movement*, 505 U.S. 123, 131 (1992) (quotation omitted). "Unbridled discretion naturally exists when a licensing scheme does not impose adequate standards to guide the licensor's discretion." *Chesapeake B & M, Inc.* v. *Harford County*, 58 F.3d 1005, 1009 (4th Cir. 1995) (en banc).

ITAR does not meaningfully limit Defendants' discretion. Reasonable persons must guess at what "specially designed" or "military application" truly mean. Informed opinions guided by experienced counsel are no help, as DDTC's claims of what falls under USML Category XXI are unconstrained by any specified limits or precedent. If Defendants had any objective criteria for making these determinations, perhaps Defense Distributed's commodity jurisdiction requests would not have remained outstanding for nearly two years.

"'Technical data' is perhaps the most confusing category of items regulated by the ITAR since it is defined separately and in relation to defense articles, 22 C.F.R. § 120.10, but is also defined as a defense article when it is covered by the USML. *See* 22 C.F.R. § 120.6." *Bernstein I*, 945 F. Supp. at 1284.

Indeed, the regulations explicitly bar publication of a "Not Otherwise Enumerated" class of "technical data." 22 C.F.R. § 121.1 at USML paragraph XXI(b). An unenumerated prior restraint supplies the very definition of unbridled discretion.

Respectfully, "if doubt exists as to whether [speech] is covered by the U.S. Munitions List," the solution should not be found in Defendants' inscrutable and often interminable "commodity jurisdiction" procedures. 22 C.F.R. § 120.4(a). Rather, the solution is  to be found in a judicial declaration that ITAR's control of public speech does not conform to First Amendment requirements.

> b.    Lengthy Delays and the Lack of Procedural Safeguards.

"[T]he Supreme Court established three procedural safeguards to protect against the suppression of constitutionally protected speech by a censorship board." *Fantasy Ranch, Inc.* v. *City of Arlington*, 459 F.3d

546, 563 (5th Cir. 2006) (citing *Freedman*).

> First, any restraint before judicial review occurs can be imposed only for a specified brief period during which the status quo must be maintained; second, prompt judicial review of that decision must be available; and third, the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof in court.

*Id.* (quotation omitted).

"The ITAR scheme, a paradigm of standardless discretion, fails on every count." *Bernstein I*, 945 F. Supp. at 1289. The DOPSR review process contains no publicly-known timelines in which the agency must complete its review. Aggravating this situation, in cases where DOPSR refuses to perform its review because of uncertain export control jurisdiction, as noted above, the period of time it takes to obtain a commodity jurisdiction request to enable DOPSR review can take months to a year or more. Defense Distributed's ten commodity jurisdiction requests regarding the previously Published Files were pending at DDTC for nearly two years—a long time throughout which Defense Distributed has been threatened with criminal enforcement should it republish the files, four of which were eventually deemed to be uncontrolled by ITAR.

And in cases where DOPSR refuses to allow publication and requires that a license be obtained from Defendants, nothing requires DDTC to issue a licensing decision within a specific and reasonable period of time. Relevant here, a "Policy on Review Time for License Applications" established under a 2008 National Security Decision Directive requires that DDTC "complete the review and adjudication of license applications within 60 days of receipt." *See* 74 Fed. Reg. 63,497 (Dec. 3, 2009). A two-month delay on the right to speak is per se unreasonable under the First Amendment. But even were a two-month delay constitutional, this policy contains broad "national security exceptions" allowing the government plenary authority to override the timeline. This exception effectively swallows the two month rule, as it applies where "[t]he Department of Defense has not yet completed its review" and "[w]hen a related export policy is under active review and pending final determination by the Department of State." *Id.* A prior restraint that "permits a delay without limits" is unconstitutional. *Riley* v. *Nat'l Fed. of Blind of N.C.*, 487 U.S. 781, 802 (1988).

"[O]nly a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure

requiring a judicial determination suffices to impose a valid final restraint." *Freedman*, 380 U.S. at 59. But judicial review of DDTC or DOPSR actions is non-existent. In fact, ITAR expressly provides that Defendants' licensing determinations are *not* subject to judicial review under the Administrative Procedures Act. 22 C.F.R. § 128.1. And the AECA provides that "[t]he designation . . . of items as defense articles or defense services for purposes of this section shall not be subject to judicial review." 22 U.S.C. § 2778(h). This insulation from judicial review is plainly unconstitutional under *Freedman* when ITAR censors public speech, without any procedural protections.

4. *Defendants' Speech Regulation of Plaintiffs' Speech Fails Any Level of First Amendment Scrutiny.*

"Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United* v. *FEC*, 558 U.S. 310, 340 (2010) (citations omitted). "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Stevens*, 559 U.S. at 468 (quotation omitted).

But this is exactly what the Defendants have done—prohibited Plaintiffs' speech based on "its content." *Id.* This aptly describes Defendants' prior restraint. Plaintiffs are free to publish whatever they want, on the Internet or anywhere else, unless Defendants deem the content of Plaintiffs' speech to be ITAR-controlled.

The court below found that ITAR "unquestionably regulates speech concerning a specific topic." ROA.691. Yet, it nonetheless found that Defendants' prior restraint is not content-based, *id.*, relying on cases such as *Asgeirsson* v. *Abbott*, 696 F.3d 454 (5th Cir. 2012), which had held that "[c]ontent- neutrality has continued to be defined by the justification of the law or regulation." *Id.* at 460 (footnote omitted). But last term, the Supreme Court clarified that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Reed* v. *Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015) (quotation omitted). "[A] speech regulation targeted at a specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 2230 (quotation omitted).

Two other circuits have since recognized that *Reed* overruled their understandings of content-discrimination as requiring viewpoint-discrimination. *See Cahaly* v. *Larosa*, 796 F.3d 399, 405 (4th Cir. 2015); *Norton* v. *City of Springfield*, 612 Fed. Appx. 386, 387 (7th Cir. 2015). As the Seventh Circuit observed,

> The majority opinion in *Reed* effectively abolishes any distinction between content regulation and subject-matter regulation. Any law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification.

*Id*.

To be sure, the court below gave *Reed* a more limited reading. But Plaintiffs would not concede that Defendants' prior restraint is viewpoint-neutral—it applies, after all, to speech based on whether it promotes or advances the acquisition of arms, not merely to speech about arms.

In any event, this much is now clear: "the crucial first step in the content-neutrality analysis [is] determining whether the law is content neutral on its face." *Reed*, 135 S. Ct. at 2228. A speech restriction is "content based if it require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a

violation has occurred." *McCullen* v. *Coakley*, 134 S. Ct. 2518, 2531 (2014) (quotation omitted). Without question, Defendants' prior restraint is based on the speech's content—only speech deemed to contain "technical data" is subject to the pre-publication approval requirement.

"Since [Defendants' practice] is a content-based speech restriction, it can stand only if it satisfies strict scrutiny." *United States* v. *Playboy Entm't Group*, 529 U.S. 803, 813 (2000) (citation omitted); *Reed*, 135 S. Ct. at 2228. This much, it cannot do. While Defendants may have a compelling interest in controlling the export of sensitive data related to certain defense articles, the restriction is not narrowly tailored.

The Defendants' enforcement of ITAR fails under the narrow-tailoring element of free speech analysis because it is simultaneously overinclusive and underinclusive. *Simon & Schuster, Inc.* v. *Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 120-21 (1991) (invalidating law due to overinclusiveness); *Florida Star* v. *B.J.F.*, 491 U.S. 524, 540 (1989) (invalidating law due to underinclusiveness). First, the Defendants' regime censors vastly more speech than needed to advance the regulatory interest, and captures vastly more speech

than that intended for a foreign audience. Eugene Volokh, *Freedom of Speech, Permissible Tailoring and Transcending Strict Scrutiny*, 144 U. Pa. L. Rev. 2417, 2422 (1997) ("If the government can serve the interest while burdening less speech, it should."). Second, the fact that *only* Plaintiff's speech has been targeted for enforcement—even while others have published the *exact* same files—suggests that Defendants are not evenly pursuing the purported compelling governmental interests. *Id.* at 2423 ("[A] law is not narrowly tailored if it fails to restrict a significant amount of speech that harms the government interest to about the same degree as does the restricted speech"). This combination of over-inclusiveness and under-inclusiveness is fatal for purposes of strict scrutiny.

The court below turned aside Plaintiffs' content-based First Amendment challenge in reliance on *United States* v. *Chi Mak*, 683 F.3d 1126 (9th Cir. 2012), which had affirmed a conviction for the sharing of stolen military secrets. But *Chi Mak* is wholly inapposite. Notably, Mak's First Amendment claims were raised initially on appeal, and were thus reviewed only for plain error. *Id.* at 1134. Moreover, Mak's China-bound CD containing encrypted "export-

controlled naval technology," *id.* at 1131, was not public speech, and the defendant was not a public speaker. The *Chi Mak* court also instructed the jury that the Government bore the burden of proving that the contested technical data was not in the public domain, *id.* at 1132, not a difficult task considering the nature of the military secrets there at issue.

In contrast,  the government seeks to improperly shift the burden to Plaintiffs, who seek to publish information lawfully possessed by them on the Internet. Far from questioning the scheme's application to the theft of classified information as a matter of plain-error review, Plaintiffs properly raised the same First Amendment problems that the Government has warned against for decades.

C.      DEFENDANTS' PRIOR RESTRAINT IS VOID FOR VAGUENESS.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned* v. *City of Rockford*, 408 U.S. 104, 108 (1972). Vagueness doctrine applies with particular force in review of laws dealing with speech. "[S]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the

less be required to act at his peril here, because the free dissemination of ideas may be the loser." *Hynes* v. *Mayor & Council of Oradell*, 425 U.S. 610, 620 (1976) (quotations omitted). "Under the First and Fifth Amendments, speakers are protected from arbitrary and discriminatory enforcement of vague standards.'" *Nat'l Endowment for the Arts* v. *Finley*, 524 U.S. 569, 588 (1998) (citation omitted).

Defendants' prepublication approval requirement is by no means self-evident to reasonable people reading the ITAR. If anything, ITAR's exclusion of information in the public domain suggests a variety of avenues by which people might avoid ITAR's strictures by publishing their information. The regulatory regime has even been amended to remove the suggestion of a pre-publication review requirement, the validity of which the Justice Department has repeatedly questioned. The existence of a catch-all provision, and the need to submit to the opaque commodity jurisdiction procedures, confirm that persons of "common intelligence must necessarily guess at [ITAR's] meaning and differ as to its application." *Connally* v. *General Const. Co.*, 269 U.S.

385, 391 (1926) (citations omitted). It thus "violates the first essential of due process of law." *Id.*[12]

D.  DEFENDANTS ARE VIOLATING PLAINTIFFS' SECOND AMENDMENT RIGHTS.

1.  *The Government Bears the Burden of Proving that Laws Burdening Second Amendment Rights Pass Heightened Scrutiny.*

The Second Amendment functions as a normal constitutional right. As the Supreme Court demonstrated, laws that conflict with the right's core guarantee will be struck down without employing any balancing test. *District of Columbia* v. *Heller*, 554 U.S. 570 (2008). In *Heller*, once it was determined that the Second Amendment secures a right to have handguns for self-defense, city ordinances banning handguns and the keeping of functional firearms simply could not survive. "The Court invalidated the laws because they violated the central right that the

---

[12]The district court endorsed two wholly inapposite cases to reject the vagueness challenge. ROA.701 (citing *United States* v. *Wu*, 711 F.3d 1 (1st Cir. 2013); *United States* v. *Hsu*, 364 F.3d 192 (4th Cir. 2004)). Neither case involved "technical data," speech, or the First Amendment. *See, e.g.*, *Hsu*, 364 F.3d at 196 ("Defendants do not maintain that the AECA or its implementing regulations implicate First Amendment freedoms"). Moreover, in both cases, the Government proved willful criminal violations, undermining any vagueness claims. *Id.* at 197; *Wu*, 711 F.3d at 15.

Second Amendment was intended to protect . . . ." *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 193 (5th Cir. 2012) ("*NRA*"). Other cases lend themselves to different constitutional tests, *e.g.*, gun licensing laws affording unbridled discretion could be viewed as prior restraints, and disarmed individuals may raise as-applied challenges based on their personal circumstances.

But in large part, when Second Amendment claims arise,

> [a] two-step inquiry has emerged as the prevailing approach: the first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment— that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny.

*NRA*, 700 F.3d at 194 (citations omitted). This Court follows the two-step approach in appropriate cases, *id.*, and this case appears to be well-suited to this approach.

"To determine whether a law impinges on the Second Amendment right, we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* (citations omitted). "If the challenged law burdens conduct that falls

outside the Second Amendment's scope, then the law passes constitutional muster. If the law burdens conduct that falls within the Second Amendment's scope, we then proceed to apply the appropriate level of means-ends scrutiny." *Id.* at 195 (citations omitted).

"[T]he appropriate level of scrutiny depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *NRA*, 700 F.3d at 195 (citations omitted). Rational basis review is unavailable. Means-ends scrutiny in Second Amendment cases must always be heightened scrutiny—strict or intermediate. *Id.*

2. *The Second Amendment Secures the Right to Produce Firearms, and to Exchange Technical Data Concerning Firearms.*

The Second Amendment secures a right to possess firearms, including handguns. *See Heller.* The Liberator may be manufactured using technology unavailable in 1791, but that is true of most arms today, and Defense Distributed's pistol is functionally indistinguishable from the sorts of handguns Americans have used for over two centuries. The Second Amendment also guarantees the right to other firearms and firearm components burdened by the Government's restriction.

But there must be more. "[C]ertain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555, 579-80 (1980). Because there is a right to possess firearms, there is, necessarily, a right to acquire them. And the most basic means of acquiring something, is to make it. Surely, the Second Amendment secures the right to make the arms that might then be kept or carried. *Cf. Martin* v. *Harrington & Richardson, Inc.*, 743 F.2d 1200, 1204 (7th Cir. 1984) (adopting tort doctrines "which would in practice drive [handgun] manufacturers out of business, would produce a handgun ban by judicial fiat in the face of" a constitutional right to handgun possession."). If "restricting the ability to purchase an item is tantamount to restricting that item's use," *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738, 743 (5th Cir. 2008) (footnote omitted), the same must be said of restricting the ability to manufacture that item.[13]

---

[13]In *United States* v. *Henry*, 688 F.3d 637 (9th Cir. 2012), the Ninth Circuit rejected a Second Amendment claim to a homemade machine gun. Notably, the court did not address, let alone deny that the Second Amendment secures the right to make firearms. Rather, the court held that this particular type of firearm lies outside the Second

The fact that manufactured arms might cross the Nation's borders does not diminish the right to arms. "Our citizens have always been free to make, vend and export arms. It is the constant occupation and livelihood of some of them." 3 THE WRITINGS OF THOMAS JEFFERSON 230 (T.J. Randolph, ed., 1830). "With organized armories inaccessible to the frontier and low barriers to entering the trade in all regions, the [early American] public could reasonably have understood a right to acquire arms through self-production." Peter Jensen-Haxel, *3D Printers, Obsolete Firearm Supply Controls, and the Right to Build Self-Defense Weapons Under Heller*, 42 Golden Gate U. L. Rev. 447, 478 (2012); *see also* Josh Blackman, *The 1st Amendment, 2nd Amendment, and 3D Printed Guns*, 81 Tenn. L. Rev. 479, 491-499 (2014).

In keeping with the familiar rule "vendors and those in like positions . . . have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function," *Carey* v. *Pop. Servs. Int'l*, 431 U.S. 678, 684 (1977) (quotation omitted); *Reliable Consultants*, 517

───────────────

Amendment's scope. Plaintiffs do not claim a right in any arms or arms components that would lack Second Amendment protection.

F.3d at 743, Plaintiffs are entitled to assert the Second Amendment rights of their customers and website visitors. "[O]perating a business that provides Second Amendment services is generally protected by the Second Amendment." *Mance* v. *Holder*, 74 F. Supp. 3d 795, 807 n.8 (N.D. Tex. 2015); *Ezell* v. *City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) ("Action Target, as a supplier of firing-range facilities, is harmed by the firing-range ban"). And as the district court found, ROA.696-98, SAF has associational standing to assert its members Second Amendment rights. *Mance*, 74 F. Supp. 3d at 802.

3.  *Defendants' Regulations Fail Any Level of Second Amendment Scrutiny.*

The prior restraint and prohibition of speech relating to the manufacture of firearms and related components is very much "a salient outlier in the historical landscape of gun control." *NRA*, 700 F.3d at 205. Never mind the Framing Era—nothing like this has existed in the United States until Defendants ordered the Liberator files taken down. As the record shows, ITAR was long ago amended specifically to remove the suggestion of such prior restraints. And while the Government's various opinions over the years have focused on the

scheme's First Amendment problems, the fact remains that this type of regulation lies well outside American tradition and accepted legal norms.

"A regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family—triggers strict scrutiny." *NRA*, 700 F.3d at 195; *see also United States* v. *Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny"). Defendants' restrictions squarely fit this description, though the outcome would be no different under intermediate scrutiny, which "requires the government to demonstrate a 'reasonable fit' between the challenged regulation and an 'important' government objective," *NRA*, 700 F.3d at 195, and "may not burden more [conduct] than is reasonably necessary," *United States* v. *Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010).

Again, Plaintiffs do not question that the Government has a compelling interest in regulating arms exports. But this interest cannot

68

effectively override the traditional, centuries-old American craft of making arms of the kind to which individuals in this country enjoy a fundamental right. If allowing Americans to exchange information useful in the manufacture of Second Amendment arms carries some risk that the information might be gleaned by a foreign government, there are nonetheless real limits on the Government's ability to mitigate that (theoretical) harm. The later-enacted Second Amendment acts as a limitation on Congress's authority to regulate foreign commerce, and not the other way around.

* * *

Plaintiffs are substantially likely to prevail on at least some if not all of their claims.

## II.   DEFENDANTS' LICENSING SCHEME IRREPARABLY HARMS PLAINTIFFS.

A finding that a constitutional right "'is either threatened or in fact being impaired'. . . mandates a finding of irreparable injury." *Deerfield Med. Center* v. *City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (quoting *Elrod* v. *Burns*, 427 U.S. 347, 373 (1976)). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373-

74 (citations omitted). And no constitutional right is so directly linked to one's immediate physical well-being as is the right to keep and bear arms. The interest in self-defense is the "*central component* of the [Second Amendment] right itself," *Heller*, 554 U.S. at 599 (emphasis original). As the Seventh Circuit explained,

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on "the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." The Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. Infringements of this right cannot be compensated by damages.

*Ezell*, 651 F.3d at 699 (citations and footnote omitted).

III.   THE BALANCE OF EQUITIES FAVORS GRANTING INJUNCTIVE RELIEF.

While Plaintiffs suffer irreparable harm when their fundamental rights are violated, an injunction would not harm Defendants at all. First, it appears that Defendants have thus far targeted only Defense Distributed's website with a prior restraint on unclassified technical data. Defendants are not apparently taking action to control all technical data, or even just unclassified technical data relating to arms, present throughout the public domain. Indeed, Defendants are not even

70

moving against anyone else who published the Liberator files. And an injunction would not bar Defendants from restricting exports of the sort Congress intended to control under the AECA.

The equities especially favor permitting the continued dissemination of the already-published files. Where "publication has already begun and a substantial part of the threatened damage has already occurred," and "access to the documents by many unauthorized people is undeniable . . . the efficacy of equitable relief against these or other newspapers to avert anticipated damage is doubtful at best." *New York Times*, 403 U.S. at 733 (White, J., concurring).

IV. THE PUBLIC INTEREST WARRANTS INJUNCTIVE RELIEF.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org.* v. *Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quotation omitted); *De Leon* v. *Perry*, 975 F. Supp. 2d 632, 665 (W.D. Tex. 2014).

V. NO BOND OR OTHER SECURITY IS REQUIRED AS A CONDITION OF INJUNCTIVE RELIEF.

The security requirement of Fed. R. Civ. P. 65(c) may be dispensed with when there is no risk of financial harm to the enjoined party. "In

holding that the amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court,' we have ruled that the court 'may elect to require no security at all.'" *Kaepa, Inc.* v. *Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quotation and citations omitted). Even courts that view Rule 65(c) as mandatory are open to the idea of the mandatory bond being set at zero. *See Hoechst Diafoil Co.* v. *Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). As an injunction would not financially harm Defendants, the Court should dispense with the bond requirement.

CONCLUSION

The District Court's order should be reversed, and the case remanded with instructions to enter a preliminary injunction against ITAR's enforcement as a prior restraint.

Dated:   December 10, 2015          Respectfully submitted,

/s/ Matthew Goldstein            /s/ Alan Gura
Matthew Goldstein                Alan Gura
Matthew A. Goldstein, PLLC          Counsel of Record
1875 Connecticut Avenue, N.W.    GURA & POSSESSKY, PLLC
10th Floor                       916 Prince Street, Suite 7
Washington, DC 20009             Alexandria, VA 22314
202.550.0040/Fax 202.683.6679    703.835.9085/Fax 703.997.7665

/s/ William B. Mateja
William B. Mateja
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
214.747.5070/Fax 214.747.2091

/s/ Josh Blackman
Josh Blackman
1303 San Jacinto Street
Houston, TX 77002
202.294.9003/713.646.1766

*Counsel for Appellants*

# CERTIFICATE OF SERVICE

On this, the 10th day of December, 2015, I electronically filed the attached Brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users who will be served by the CM/ECF system on December 10, 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 10th day of December, 2015.

/s/ Alan Gura
Alan Gura

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 13,693 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using WordPerfect X4 in 14 point Century Schoolbook font.


/s/ Alan Gura
Alan Gura
Attorney for Plaintiffs-Appellants
Dated: December 10, 2015

# Addendum

# Addendum Table of Contents

22 U.S.C. § 2278(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

22 U.S.C. § 2278(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

22 U.S.C. § 2278(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

22 U.S.C. § 2278(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22 C.F.R. § 120.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 C.F.R. § 120.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

22 C.F.R. § 120.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

22 C.F.R. § 120.6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

22 C.F.R. § 120.10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

22 C.F.R. § 120.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

22 C.F.R. § 120.17. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

22 C.F.R. § 120.41. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

22 C.F.R. § 121.1, Category I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

22 C.F.R. § 121.1, Category XXI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

22 C.F.R. § 127.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

22 C.F.R. § 128.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Public Records:
Docket, *Bernstein* v. *U.S. Dep't of State*, N.D. Cal. C-95-0582-MHP

Excerpts, Second Decl. of Dr. William J. Lowell
    (July 26, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Excerpts, Memorandum of Points & Authorities in Support of
    Defendants' Motion for Summary Judgment (July 26, 1996). . . 25

Excerpts, Defendants' Opposition to Plaintiffs' Motion for
    Summary Judgment (Aug. 30, 1996).. . . . . . . . . . . . . . . . . . . . . 28

## 22 U.S.C. § 2778 - Control of arms exports and imports

### § 2778(a)

a) Presidential control of exports and imports of defense articles and services, guidance of policy, etc.; designation of United States Munitions List; issuance of export licenses; negotiations information

(1) In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

(2) Decisions on issuing export licenses under this section shall take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements.

(3) In exercising the authorities conferred by this section, the President may require that any defense article or defense service be sold under this chapter as a condition of its eligibility for export, and may require that persons engaged in the negotiation for the export of defense articles and services keep the President fully and currently informed of the progress and future prospects of such negotiations.

## § 2778(c)

(c) Criminal violations; punishment

    Any person who willfully violates any provision of this section, section 2779 of this title, a treaty referred to in subsection (j)(1)(C)(i), or any rule or regulation issued under this section or section 2779 of this title, including any rule or regulation issued to implement or enforce a treaty referred to in subsection (j)(1)(C)(i) or an implementing arrangement pursuant to such treaty, or who willfully, in a registration or license application or required report, makes any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined for each violation not more than $1,000,000 or imprisoned not more than 20 years, or both.

## § 2778(e)

(e) Enforcement powers of President

    In carrying out functions under this section with respect to the export of defense articles and defense services, including defense articles and defense services exported or imported pursuant to a treaty referred to in subsection (j)(1)(C)(i), the President is authorized to exercise the same powers concerning violations and enforcement which are conferred upon departments, agencies and officials by subsections (c), (d), (e), and (g) of section 11 of the Export Administration Act of 1979 [50 U.S.C. 4610(c), (d), (e), and (g)], and by subsections (a) and (c) of section 12 of such Act [50 U.S.C. 4614(a) and (c)], subject to the same terms and conditions as are applicable to such powers under such Act [50 U.S.C. 4601 et seq.], except that section 11(c)(2)(B) of such Act shall not apply, and instead, as prescribed in regulations issued under this section, the Secretary of State may assess civil penalties for violations of this chapter and regulations prescribed thereunder and further may commence a civil action to recover such civil penalties, and except further that the names of the countries and

the types and quantities of defense articles for which licenses are issued under this section shall not be withheld from public disclosure unless the President determines that the release of such information would be contrary to the national interest. Nothing in this subsection shall be construed as authorizing the withholding of information from the Congress. Notwithstanding section 11(c) of the Export Administration Act of 1979, the civil penalty for each violation involving controls imposed on the export of defense articles and defense services under this section may not exceed $500,000.

**§ 2778(h)**

(h) Judicial review of designation of items as defense articles or services

The designation by the President (or by an official to whom the President's functions under subsection (a) have been duly delegated), in regulations issued under this section, of items as defense articles or defense services for purposes of this section shall not be subject to judicial review.

# TITLE 22—FOREIGN RELATIONS
## CHAPTER I—DEPARTMENT OF STATE
### SUBCHAPTER M—INTERNATIONAL TRAFFIC IN ARMS REGULATIONS
### PART 120—PURPOSE AND DEFINITIONS

## §120.2  Designation of defense articles and defense services.

The Arms Export Control Act (22 U.S.C. 2778(a) and 2794(7)) provides that the President shall designate the articles and services deemed to be defense articles and defense services for purposes of import or export controls. The President has delegated to the Secretary of State the authority to control the export and temporary import of defense articles and services. The items designated by the Secretary of State for purposes of export and temporary import control constitute the U.S. Munitions List specified in part 121 of this subchapter. Defense articles on the U.S. Munitions List specified in part 121 of this subchapter that are also subject to permanent import control by the Attorney General on the U.S. Munitions Import List enumerated in 27 CFR part 447 are subject to temporary import controls administered by the Secretary of State. Designations of defense articles and defense services are made by the Department of State with the concurrence of the Department of Defense. The scope of the U.S. Munitions List shall be changed only by amendments made pursuant to section 38 of the Arms Export Control Act (22 U.S.C. 2778). For a designation or determination on whether a particular item is enumerated on the U.S. Munitions List, see §120.4 of this subchapter.

## §120.3  Policy on designating or determining defense articles and services on the U.S. Munitions List.

(a) For purposes of this subchapter, a specific article or service may be designated a defense article (see §120.6 of this subchapter) or defense service (see §120.9 of this subchapter) if it:

(1) Meets the criteria of a defense article or defense service on the U.S. Munitions List; or

(2) Provides the equivalent performance capabilities of a defense article on the U.S. Munitions List.

(b) For purposes of this subchapter, a specific article or service shall be determined in the future as a defense article or defense service if it provides a critical military or intelligence advantage such that it warrants control under this subchapter.

Note to paragraphs (a) and (b): An article or service determined in the future pursuant to this subchapter as a defense article or defense service, but not currently on the U.S. Munitions List, will be placed in U.S. Munitions List Category XXI until the appropriate U.S. Munitions List category has been amended to provide the necessary entry.

(c) A specific article or service is not a defense article or defense service for purposes of this subchapter if it:

(1) Is determined to be under the jurisdiction of another department or agency of the U.S. Government (see §120.5 of this subchapter) pursuant to a commodity jurisdiction determination (see §120.4 of this subchapter) unless superseded by changes to the U.S. Munitions List or by a subsequent commodity jurisdiction determination; or

(2) Meets one of the criteria of §120.41(b) of this subchapter when the article is used in or with a defense article and specially designed is used as a control criteria (see §120.41 of this subchapter).

Note to §120.3: The intended use of the article or service after its export (i.e., for a military or civilian purpose), by itself, is not a

factor in determining whether the article or service is subject to the controls of this subchapter.

## §120.4   Commodity jurisdiction.

(a) The commodity jurisdiction procedure is used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List. It may also be used for consideration of a redesignation of an article or service currently covered by the U.S. Munitions List. The Department must provide notice to Congress at least 30 days before any item is removed from the U.S. Munitions List. Upon electronic submission of a Commodity Jurisdiction (CJ) Determination Form (Form DS-4076), the Directorate of Defense Trade Controls shall provide a determination of whether a particular article or service is covered by the U.S. Munitions List. The determination, consistent with §§120.2, 120.3, and 120.4, entails consultation among the Departments of State, Defense, Commerce, and other U.S. Government agencies and industry in appropriate cases.

(b) Registration with the Directorate of Defense Trade Controls as defined in part 122 of this subchapter is not required prior to submission of a commodity jurisdiction request. If it is determined that the commodity is a defense article or defense service covered by the U.S. Munitions List, registration is required for exporters, manufacturers, and furnishers of such defense articles and defense services (see part 122 of this subchapter), as well as for brokers who are engaged in brokering activities related to such articles or services.

(c) Requests shall identify the article or service, and include a history of this product's design, development, and use. Brochures, specifications, and any other documentation related to the article or service should be submitted as electronic attachments per the instructions for Form DS-4076.

(d)

    (1) [Reserved]

    (2) A designation that an article or service meets the criteria of a defense article or defense service, or provides the equivalent performance capabilities of a defense article on the U.S. Munitions List set forth in this subchapter, is made on a case-by-case basis by the Department of State, taking into account:

        (i) The form and fit of the article; and

        (ii) The function and performance capability of the article.

    (3) A designation that an article or service has a critical military or intelligence advantage such that it warrants control under this subchapter is made, on a case-by-case basis, by the Department of State, taking into account:

        (i) The function and performance capability of the article; and

        (ii) The nature of controls imposed by other nations on such items (including the Wassenaar Arrangement and other multilateral controls).

Note 1 to paragraph (d): The form of a commodity is defined by its configuration (including the geometrically measured configuration), material, and material properties that uniquely characterize it. The fit of a commodity is defined by its ability to physically interface or connect with or become an integral part of another commodity. The function of a commodity is the action or actions it is designed to perform. Performance capability is the measure of a commodity's effectiveness to perform a designated function in a given environment (e.g., measured in terms of speed, durability, reliability, pressure, accuracy, efficiency).

Note 2 to paragraph (d): For software, the form means the design, logic flow, and algorithms. The fit is defined by its ability to interface or connect with a defense article. The function means the action or actions the software performs directly related to a defense article or as a standalone application.

Performance capability means the measure of the software's effectiveness to perform a designated function.

(e) The Directorate of Defense Trade Controls will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction. If after 45 days the Directorate of Defense Trade Controls has not provided a final commodity jurisdiction determination, the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing.

(f) State, Defense and Commerce will resolve commodity jurisdiction disputes in accordance with established procedures. State shall notify Defense and Commerce of the initiation and conclusion of each case.

(g) A person may appeal a commodity jurisdiction determination by submitting a written request for reconsideration to the Deputy Assistant Secretary of State for Defense Trade Controls. The Deputy Assistant Secretary's determination of the appeal will be provided, in writing, within 30 days of receipt of the appeal. If desired, an appeal of the Deputy Assistant Secretary's decision can then be made to the Assistant Secretary for Political-Military Affairs.

## §120.6  Defense article.

Defense article means any item or technical data designated in §121.1 of this subchapter. The policy described in §120.3 is applicable to designations of additional items. This term includes technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in §121.1 of this subchapter. It also includes forgings, castings, and other unfinished products, such as extrusions and machined bodies, that have reached a stage in manufacturing where they are clearly identifiable by mechanical properties, material composition, geometry, or function as defense articles. It does not include basic marketing information on function or purpose or general system descriptions.

## §120.10   Technical data.

(a) Technical data means, for purposes of this subchapter:

(1) Information, other than software as defined in §120.10(a)(4), which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation.

(2) Classified information relating to defense articles and defense services on the U.S. Munitions List and 600-series items controlled by the Commerce Control List;

(3) Information covered by an invention secrecy order; or

(4) Software (see §120.45(f)) directly related to defense articles.

(b) The definition in paragraph (a) of this section does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain as defined in §120.11 of this subchapter or telemetry data as defined in note 3 to Category XV(f) of part 121 of this subchapter. It also does not include basic marketing information on function or purpose or general system descriptions of defense articles.

## §120.11   Public domain.

(a) Public domain means information which is published and which is generally accessible or available to the public:

(1) Through sales at newsstands and bookstores;

(2) Through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information;

(3) Through second class mailing privileges granted by the U.S. Government;

(4) At libraries open to the public or from which the public can obtain documents;

(5) Through patents available at any patent office;

(6) Through unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States;

(7) Through public release (i.e., unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency (see also §125.4(b)(13) of this subchapter);

(8) Through fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community. Fundamental research is defined to mean basic and applied research in science and engineering where the resulting information is ordinarily published and shared broadly within the scientific community, as distinguished from research the results of which are restricted for proprietary reasons or specific U.S. Government access and dissemination controls. University research will not be considered fundamental research if:

(i) The University or its researchers accept other restrictions on publication of scientific and technical information resulting from the project or activity, or

(ii) The research is funded by the U.S. Government and specific access and dissemination controls protecting information resulting from the research are applicable.


## §120.17   Export.

(a) Export means:

(1) Sending or taking a defense article out of the United States in any manner, except by mere travel outside of the United States by a person whose personal knowledge includes technical data; or

(2) Transferring registration, control or ownership to a foreign person of any aircraft, vessel, or satellite covered by the U.S. Munitions List, whether in the United States or abroad; or

(3) Disclosing (including oral or visual disclosure) or transferring in the United States any defense article to an embassy, any agency or subdivision of a foreign government (e.g.,

diplomatic missions); or

(4) Disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad; or

(5) Performing a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad.

(6) A launch vehicle or payload shall not, by reason of the launching of such vehicle, be considered an export for purposes of this subchapter. However, for certain limited purposes (see §126.1 of this subchapter), the controls of this subchapter may apply to any sale, transfer or proposal to sell or transfer defense articles or defense services.

(b) [Reserved]

## §120.41   Specially designed.

(a) Except for commodities or software described in paragraph (b) of this section, a commodity or software (see §120.45(f)) is specially designed if it:

(1) As a result of development, has properties peculiarly responsible for achieving or exceeding the controlled performance levels, characteristics, or functions described in the relevant U.S. Munitions List paragraph; or

(2) Is a part (see §120.45 (d)), component (see §120.45(b)), accessory (see §120.45(c)), attachment (see §120.45(c)), or software for use in or with a defense article.

(b) For purposes of this subchapter, a part, component, accessory, attachment, or software is not specially designed if it:

(1) Is subject to the EAR pursuant to a commodity jurisdiction determination;

(2) Is, regardless of form or fit, a fastener (e.g., screws, bolts, nuts, nut plates, studs, inserts, clips, rivets, pins), washer, spacer, insulator, grommet, bushing, spring, wire, or solder;

(3) Has the same function, performance capabilities, and the same or "equivalent" form and fit as a commodity or software used

in or with a commodity that:

      (i) Is or was in production (i.e., not in development); and

      (ii) Is not enumerated on the U.S. Munitions List;

    (4) Was or is being developed with knowledge that it is or would be for use in or with both defense articles enumerated on the U.S. Munitions List and also commodities not on the U.S. Munitions List; or

    (5) Was or is being developed as a general purpose commodity or software, i.e., with no knowledge for use in or with a particular commodity (e.g., a F/A-18 or HMMWV) or type of commodity (e.g., an aircraft or machine tool).

Note to paragraphs (a) and (b): The term "commodity" refers to any article, material, or supply, except technology/technical data or software.

Note to paragraph (a)(1): An example of a commodity that as a result of development has properties peculiarly responsible for achieving or exceeding the controlled performance levels, functions, or characteristics in a U.S. Munitions List category would be a swimmer delivery vehicle specially designed to dock with a submarine to provide submerged transport for swimmers or divers from submarines.

Note to paragraph (b): The term "enumerated" refers to any article on the U.S. Munitions List or the Commerce Control List and not in a "catch-all" control. A "catch-all" control is one that does not refer to specific types of parts, components, accessories, or attachments, but rather controls unspecified parts, components, accessories, or attachments only if they were specially designed for an enumerated item.

Note 1 to paragraph (b)(3): For the purpose of this definition, "production" means all production stages, such as product engineering, manufacture, integration, assembly (mounting), inspection, testing, and quality assurance. This includes "serial production" where commodities have passed production readiness testing (i.e., an approved, standardized design ready for large

scale production) and have been or are being produced on an assembly line for multiple commodities using the approved, standardized design.

Note 2 to paragraph (b)(3): For the purpose of this definition, "development" is related to all stages prior to serial production, such as: design, design research, design analyses, design concepts, assembly and testing of prototypes, pilot production schemes, design data, process of transforming design data into a product, configuration design, integration design, layouts.

Note 3 to paragraph (b)(3): Commodities in "production" that are subsequently subject to "development" activities, such as those that would result in enhancements or improvements only in the reliability or maintainability of the commodity (e.g., an increased mean time between failure (MTBF)), including those pertaining to quality improvements, cost reductions, or feature enhancements, remain in "production." However, any new models or versions of such commodities developed from such efforts that change the basic performance or capability of the commodity are in "development" until and unless they enter into "production."

Note 4 to paragraph (b)(3): The form of a commodity is defined by its configuration (including the geometrically measured configuration), material, and material properties that uniquely characterize it. The fit of a commodity is defined by its ability to physically interface or connect with or become an integral part of another commodity. The function of a commodity is the action or actions it is designed to perform. Performance capability is the measure of a commodity's effectiveness to perform a designated function in a given environment (e.g., measured in terms of speed, durability, reliability, pressure, accuracy, efficiency). For software, the form means the design, logic flow, and algorithms. The fit is defined by its ability to interface or connect with a defense article. The function means the action or actions the software performs directly related to a defense article or as a standalone application. Performance capability means the measure of the software's effectiveness to perform a designated function.

Note 5 to paragraph (b)(3): With respect to a commodity, "equivalent" means its form has been modified solely for fit purposes.

Note 1 to paragraphs (b)(4) and (5): For a defense article not to be specially designed on the basis of paragraph (b)(4) or (5) of this section, documents contemporaneous with its development, in their totality, must establish the elements of paragraph (b)(4) or (5). Such documents may include concept design information, marketing plans, declarations in patent applications, or contracts. Absent such documents, the commodity may not be excluded from being specially designed by either paragraph (b)(4) or (5).

Note 2 to paragraphs (b)(4) and (5): For the purpose of this definition, "knowledge" includes not only the positive knowledge a circumstance exists or is substantially certain to occur, but also an awareness of a high probability of its existence or future occurrence. Such awareness is inferred from evidence of the conscious disregard of facts known to a person and is also inferred from a person's willful avoidance of facts.

TITLE 22—FOREIGN RELATIONS
CHAPTER I—DEPARTMENT OF STATE
SUBCHAPTER M—INTERNATIONAL TRAFFIC IN ARMS
REGULATIONS
PART 121—THE UNITED STATES MUNITIONS LIST

## §121.1 The United States Munitions List

## Category I—Firearms, Close Assault Weapons and Combat Shotguns

*(a) Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm).

*(b) Fully automatic firearms to .50 caliber inclusive (12.7 mm).

*(c) Firearms or other weapons (e.g. insurgency-counterinsurgency, close assault weapons systems) having a special military application regardless of caliber.

*(d) Combat shotguns. This includes any shotgun with a barrel length less than 18 inches.

*(e) Silencers, mufflers, sound and flash suppressors for the articles in (a) through (d) of this category and their specifically designed, modified or adapted components and parts.

(f) Riflescopes manufactured to military specifications (See category XII(c) for controls on night sighting devices.)

*(g) Barrels, cylinders, receivers (frames) or complete breech mechanisms for the articles in paragraphs (a) through (d) of this category.

(h) Components, parts, accessories and attachments for the articles in paragraphs (a) through (g) of this category.

(i) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a) through (h) of this category. Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(j) The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so.

(2) A rifle is a shoulder firearm which can discharge a bullet through a rifled barrel 16 inches or longer.

(3) A carbine is a lightweight shoulder firearm with a barrel under 16 inches in length.

(4) A pistol is a hand-operated firearm having a chamber integral with or permanently aligned with the bore.

(5) A revolver is a hand-operated firearm with a revolving cylinder containing chambers for individual cartridges.

(6) A submachine gun, "machine pistol" or "machine gun" is a firearm originally designed to fire, or capable of being fired, fully automatically by a single pull of the trigger.

Note: This coverage by the U.S. Munitions List in paragraphs (a) through (i) of this category excludes any non-combat shotgun with a barrel length of 18 inches or longer, BB, pellet, and muzzle loading (black powder) firearms. This category does not cover riflescopes and sighting devices that are not manufactured to military specifications. It also excludes accessories and attachments (e.g., belts, slings, after market rubber grips, cleaning kits) for firearms that do not enhance the usefulness, effectiveness, or capabilities of the firearm, components and parts. The Department of Commerce regulates the export of such items.

See the Export Administration Regulations (15 CFR parts 730-799). In addition, license exemptions for the items in this category are available in various parts of this subchapter (e.g., §§123.17, 123.18 and 125.4).

## Category XXI—Articles, Technical Data, and Defense Services Not Otherwise Enumerated

*(a) Any article not enumerated on the U.S. Munitions List may be included in this category until such time as the appropriate U.S. Munitions List category is amended. The decision on whether any article may be included in this category, and the designation of the defense article as not Significant Military Equipment (see §120.7 of this subchapter), shall be made by the Director, Office of Defense Trade Controls Policy.

(b) Technical data (see §120.10 of this subchapter) and defense services (see §120.9 of this subchapter) directly related to the defense articles covered in paragraph (a) of this category.

# TITLE 22—FOREIGN RELATIONS
## CHAPTER I—DEPARTMENT OF STATE
### SUBCHAPTER M—INTERNATIONAL TRAFFIC IN ARMS REGULATIONS
### PART 127—VIOLATIONS AND PENALTIES

## §127.1  Violations.

(a) Without first obtaining the required license or other written approval from the Directorate of Defense Trade Controls, it is unlawful:

(1) To export or attempt to export from the United States any defense article or technical data or to furnish or attempt to furnish any defense service for which a license or written approval is required by this subchapter;

(2) To reexport or retransfer or attempt to reexport or retransfer any defense article, technical data, or defense service from one foreign end-user, end-use, or destination to another foreign end-user, end-use, or destination for which a license or written approval is required by this subchapter, including, as specified in §126.16(h) and §126.17(h) of this subchapter, any defense article, technical data, or defense service that was exported from the United States without a license pursuant to any exemption under this subchapter;

(3) To import or attempt to import any defense article whenever a license is required by this subchapter;

(4) To conspire to export, import, reexport, retransfer, furnish or cause to be exported, imported, reexported, retransferred or furnished, any defense article, technical data, or defense service for which a license or written approval is required by this subchapter; or

(5) To possess or attempt to possess any defense article with intent to export or transfer such defense article in violation of 22 U.S.C. 2778 and 2779, or any regulation, license, approval, or order issued thereunder.

(b) It is unlawful:

(1) To violate any of the terms or conditions of a license or approval granted pursuant to this subchapter, any exemption contained in this subchapter, or any rule or regulation contained in this subchapter;

(2) To engage in the business of brokering activities for which registration and a license or written approval is required by this subchapter without first registering or obtaining the required license or written approval from the Directorate of Defense Trade Controls. For the purposes of this subchapter, engaging in the business of brokering activities requires only one occasion of engaging in an activity as reflected in §129.2(b) of this subchapter.

(3) To engage in the United States in the business of either manufacturing or exporting defense articles or furnishing defense services without complying with the registration requirements. For the purposes of this subchapter, engaging in the business of manufacturing or exporting defense articles or furnishing defense services requires only one occasion of manufacturing or exporting a defense article or furnishing a defense service.

(c) Any person who is granted a license or other approval or acts pursuant to an exemption under this subchapter is responsible for the acts of employees, agents, brokers, and all authorized persons to whom possession of the defense article, which includes technical data, has been entrusted regarding the operation, use, possession, transportation, and handling of such defense article abroad. All persons abroad subject to U.S. jurisdiction who obtain custody of a defense article exported from the United States or produced under an agreement described in part 124 of this subchapter, and regardless of the number of intermediate transfers, are bound by the regulations of this subchapter in the same manner and to the same extent as the original owner or transferor.

(d) A person who is ineligible pursuant to §120.1(c)(2) of this subchapter, or a person with knowledge that another person is ineligible pursuant to §120.1(c)(2) of this subchapter, may not, directly or indirectly, in any manner or capacity, without prior disclosure of the facts to and written authorization from the

Directorate of Defense Trade Controls:

(1) Apply for, obtain, or use any export control document as defined in §127.2(b) for such ineligible person; or

(2) Order, buy, receive, use, sell, deliver, store, dispose of, forward, transport, finance, or otherwise service or participate in any manner in any transaction subject to this subchapter that may involve any defense article, which includes technical data, defense services, or brokering activities, where such ineligible person may obtain any benefit therefrom or have any direct or indirect interest therein.

(e) No person may knowingly or willfully attempt, solicit, cause, or aid, abet, counsel, demand, induce, procure, or permit the commission of any act prohibited by, or the omission of any act required by 22 U.S.C. 2778, 22 U.S.C. 2779, or any regulation, license, approval, or order issued thereunder.

TITLE 22—FOREIGN RELATIONS
CHAPTER I—DEPARTMENT OF STATE
SUBCHAPTER M—INTERNATIONAL TRAFFIC IN ARMS
REGULATIONS
PART 128—ADMINISTRATIVE PROCEDURES

## §128.1  Exclusion of functions from the Administrative Procedure Act.

The Arms Export Control Act authorizes the President to control the import and export of defense articles and services in furtherance of world peace and the security and foreign policy of the United States. It authorizes the Secretary of State to make decisions on whether license applications or other written requests for approval shall be granted, or whether exemptions may be used. It also authorizes the Secretary of State to revoke, suspend or amend licenses or other written approvals whenever the Secretary deems such action to be advisable. The administration of the Arms Export Control Act is a foreign affairs function encompassed within the meaning of the military and foreign affairs exclusion of the Administrative Procedure Act and is thereby expressly exempt from various provisions of that Act. Because the exercising of the foreign affairs function, including the decisions required to implement the Arms Export Control Act, is highly discretionary, it is excluded from review under the Administrative Procedure Act.

1   FRANK W. HUNGER
    Assistant Attorney General
2   MICHAEL J. YAMAGUCHI
    United States Attorney
3   MARY BETH UITTI
    Assistant United States Attorney
4       450 Golden Gate Avenue
      San Francisco, California 94102
5       Telephone: (415) 436-7198
  VINCENT M. GARVEY
6   ANTHONY J. COPPOLINO
  Department of Justice
7   Civil Division, Room 1084
      901 E Street, N.W.
8       Washington, D.C. 20530
      Tel. (Voice): (202) 514-4782
9       (FAX): (202) 616-8470 or 616-8460

FILED

JUL 26 1996

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

10   Attorneys for the Defendants

11

12           IN THE UNITED STATES DISTRICT COURT

13         FOR THE NORTHERN DISTRICT OF CALIFORNIA

14   DANIEL J. BERNSTEIN         )
                    )   C 95-0582 MHP
15        Plaintiff,        )
                    )
16   v.                   )
                    )
17   UNITED STATES DEPARTMENT OF   )   **SECOND DECLARATION OF**
    STATE et al.,          )   **WILLIAM J. LOWELL**
18                     )   **DEPARTMENT OF STATE**
        Defendants.    )   **OFFICE OF DEFENSE TRADE**
19                     )   **CONTROLS**
  _____)

20

21       I, William J. Lowell, do hereby state and declare as follows:

22       1. I am the Director of the Office of Defense Trade Controls

23   ("ODTC"), Bureau of Political-Military Affairs, United States

24   Department of State. I have held this position since November 27,

25   1994. I am the same William J. Lowell who submitted a declaration

26   to this Court filed on August 5, 1995, in connection with

27   defendants' motion to dismiss. I submit this declaration in support

28   of defendants' motion for summary judgment. This declaration will

  describe the State Department's actions in connection with the

public domain if it is made generally available to the public
"through unlimited distribution at a conference, meeting, seminar,
trade show or exhibition, generally accessible to the public, in the
United States" or "through fundamental research in science and
engineering at accredited institutions of higher learning in the
U.S. where the resulting information is ordinarily published and
shared broadly in the scientific community."  22 C.F.R.
§ 120.11(a)(6), (8).

    22.  The regulatory exemptions set forth above describe
categories of information that are specifically excluded from the
technical data definition.  As the regulations provide, the State
Department does not seek to regulate information which is available
in the public domain through the various means set forth in the
regulations described above.  Moreover, the Department does not seek
to regulate the means themselves by which information is placed in
the public domain.  The Department does not review in advance
scientific information to determine whether it may be offered for
sale at newsstands and bookstores, through subscriptions, second-
class mail, or made available at libraries open to the public, or
distributed at a conference or seminar in the United States.  These
clear examples are included in the ITAR to enable individuals to
determine for themselves whether particular information is subject
to the regulations as technical data.  Indeed, individuals rarely --
if ever -- seek a determination from the Department as to whether
information is in the public domain, and the regulations are not
applied to establish a prepublication review requirement for the
general publication of scientific information in the United States.

11

I declare under penalty of perjury that the foregoing is true and correct.

DATE: _7/25/96_          _Wm Lowell_
                         WILLIAM J. LOWELL

ORIGINAL

1  FRANK W. HUNGER
   Assistant Attorney General
2  MICHAEL J. YAMAGUCHI
   United States Attorney
3  MARY BETH UITTI
   Assistant United States Attorney
4      450 Golden Gate Avenue
       San Francisco, California 94102
5      Telephone: (415) 436-7198
   VINCENT M. GARVEY
6  ANTHONY J. COPPOLINO
   Department of Justice
7  Civil Division, Room 1084
       901 E Street, N.W.
8      Washington, D.C.  20530
       Tel. (Voice): (202) 514-4782
9          (FAX):   (202) 616-8470 or 616-8460

10 Attorneys for the Defendants

11
              IN THE UNITED STATES DISTRICT COURT
12
          FOR THE NORTHERN DISTRICT OF CALIFORNIA
13

14 DANIEL J. BERNSTEIN,                )  C 95-0582 MHP
                                       )
15       Plaintiff,                    )  **MEMORANDUM OF POINTS**
                                       )  **AND AUTHORITIES IN**
16 v.                                  )  **SUPPORT OF DEFENDANTS'**
                                       )  **MOTION FOR SUMMARY JUDGMENT.**
17 UNITED STATES DEPARTMENT OF         )
   STATE, et al.,                      )
18                                     )  Hearing: September 20, 1996
         Defendants.                   )  Time:    12:00 Noon
19                                     )  Judge Marilyn Hall Patel
   _____)

20

21

22

23

24

25

26

27

28

FILED

JUL 26 1996

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1    particular publication can be placed in the public domain. See Compl. ¶ 141, 156 (claiming

2    information not already in the public domain can be placed there). This is not how the

3    regulations are applied, nor a reasonable reading of the provisions at issue.

4            In fact, the State Department does not seek to control the various means by which

5    information is placed in the public domain. Lowell Decl. ¶ 22. The Department does not

6    review scientific information to determine whether it may be offered for sale at newsstands

7    and bookstores, through subscriptions, second-class mail, or made available at libraries, or

8    distributed at a conference or seminar in the United States. Id.

9                    These clear examples are included in the ITAR to enable
10                   individuals to determine for themselves whether particular
                     information is subject to regulation as technical data. Indeed,
                     individuals rarely -- if ever -- seek a determination from the
11                   Department as to whether information is in the public domain,
                     and the regulations are not applied to establish a prepublication
12                   review requirement for the general publication of scientific
                     information in the United States.

13   Id.
14
15           Similarly, the State Department does not try to substitute its judgment for that of a

16   university or academic scholars as to whether certain ideas constitute general scientific of

     mathematical principles commonly taught in colleges and universities, 22 C.F.R.
17
     § 120.10(a)(5) or fundamental research in science at institutions of higher learning in the
18
     United States. Id. § 121.11(a)(8). Lowell Decl. ¶ 23.
19
                     Rather, the specific mention of these exemptions in the ITAR is
20                   intended as an assurance to the academic community as to the
                     general non-applicability of the ITAR to a university setting -- and
21                   not for the purpose of establishing a role for the Department in
                     regulating scientific publication, academic exchanges of
22                   information, or fundamental research in the United States.

23   Id.

24           Dr. Bernstein's assertion that all scientific speech about cryptology is excluded from

25   the definition of what could be in the public domain, Compl. ¶ 157, is belied by a wealth of

26   academic exchanges and conferences that routinely occur in the field of cryptology. See

27   Declaration of William P. Crowell of the National Security Agency, ¶¶ 22-32 and Tabs 1 to

28

                                                - 8 -

1    newsletters setting forth information on the CJ procedures. <u>See</u> Tab 2 to Lowell Declaration.

2 CONCLUSION

3      For the foregoing reasons, defendants' motion for summary judgment should be

4 granted.

5                  Respectfully Submitted,

6                  FRANK W. HUNGER
                 Assistant Attorney General

7

8                  MICHAEL J. YAMAGUCHI
                 United States Attorney

9                  MARY BETH UITTI
                 Assistant United States Attorney

10                  450 Golden Gate Avenue
                 San Francisco, California 94102

11                  Telephone: (415) 436-7198

12           *Anthony J. Coppolino*   *by M.B. Uitti Per Telephone Authorization*

13                  VINCENT M. GARVEY
                 ANTHONY J. COPPOLINO

14                  Department of Justice
                 Civil Division, Room 1084

15                  901 E Street, N.W.
                 Washington, D.C. 20530

16                  Tel. (Voice): (202) 514-4782
                 (FAX): (202) 616-8470 or 616-8460

17

18                  Attorneys for the Defendants

19

20

21

22

23

24

25

26

27

28

- 39 -

ORIGINAL

1  FRANK W. HUNGER
    Assistant Attorney General
2  MICHAEL J. YAMAGUCHI
    United States Attorney
3  MARY BETH UITTI
    Assistant United States Attorney
4       450 Golden Gate Avenue
       San Francisco, California 94102
5       Telephone: (415) 436-7198
  VINCENT M. GARVEY
6  ANTHONY J. COPPOLINO
    Department of Justice
7  Civil Division, Room 1084
       901 E Street, N.W.
8       Washington, D.C.  20530
       Tel. (Voice): (202) 514-4782
9          (FAX):   (202) 616-8470 or 616-8460

10  Attorneys for the Defendants

11

12          IN THE UNITED STATES DISTRICT COURT

13        FOR THE NORTHERN DISTRICT OF CALIFORNIA

14           SAN FRANCISCO HEADQUARTERS

15  DANIEL J. BERNSTEIN,       )  C 95-0582 MHP
                         )
16      Plaintiff,       )  **DEFENDANTS' OPPOSITION**
                         )  **TO PLAINTIFF'S MOTION FOR**
17  v.                   )  **SUMMARY JUDGMENT AND IN**
                         )  **FURTHER SUPPORT OF**
18  UNITED STATES DEPARTMENT OF )  **DEFENDANTS' MOTION FOR**
  STATE, et al.,          )  **SUMMARY JUDGMENT**
19                         )
      Defendants.      )  Hearing: September 20, 1996
20                         )  Time:    12:00 Noon
21  ————————————————————————)  Judge Marilyn Hall Patel

22

23

24

25

26

27

28

FILED

AUG 3 0 1996

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Add.28

commonly taught in schools, colleges and universities or information that is in the public domain." 22 C.F.R. § 120.10(a)(5). Information in the "public domain" includes information publicly available through unlimited distribution at a conference in the United States generally accessible to the public, and through fundamental research in science and engineering at institutions of higher learning in the United States that is ordinarily published and shared broadly in the scientific community. 22 C.F.R. § 120.11(a)(6), (8).

Moreover, the regulations are not applied to regulate the means by which such information is placed in the public domain. Def. Mem. at 7-8; Lowell Decl. ¶ 22-23. Rather, consistent with Edler, ITAR controls on technical data are applied to regulate the export of non-public, proprietary or classified information sought to be disclosed to a foreign person or entity in connection with a defense service (technical assistance and training) or the development or maintenance of a defense article. Id. ¶ 26-27. This is the typical scenario in which parties seek to export technical data, not academics applying for a license to publish their ideas.[9]

For these reasons, plaintiff's claim that all disclosures of scientific information on cryptography in the United States constitutes an export of technical data, since inevitably a foreign person might receive it in class or through publication, is wrong. Even more so than the provisions at issue in Edler, the ITAR can readily be construed to carve out from regulation basic First Amendment activities.[10]

_____

[9] Plaintiff's contention that information exempt from technical data provisions through the public domain exception is nonetheless "recontrolled" as a "defense service," Pl. Mem. at 7, n.12, misses a key distinction which the court of appeals has twice recognized. Information in the public domain is not technical data subject to export controls. However, providing technical assistance to a foreign entity with the intent to aid, inter alia, the design, development, operation, or maintenance of a munition, even through the use of publicly available information, is conduct that the government can control consistent with the First Amendment. Edler, 570 F.2d at 522; United States v. Posey, 864 F.2d 1487, 1496-97 (9th Cir. 1989).

[10] Plaintiff's reliance on a 1981 memorandum from the Office of Legal Counsel of the Department of Justice ("OLC"), Pl. Mem. at 13, is misplaced. OLC's analysis was quite similar to the court's in Edler, which the State Department stated in 1984 it would

Defs' Opp. to Plf's Motion for
Summary Judgment and in Further
Support of Defs' Motion for Summary Judgment
C95-0582 MHP                                         9                                  Add.29

in connection therewith (defense services). While such controls may be cross-referenced in the regulations, there are distinct regulatory provisions for each including, of most pertinence, a separate definition of technical data with its various exceptions.

### 3. The Exemptions To The Definition Of Technical Data Are Not Vague.

Plaintiff challenges as vague the very exceptions that exclude a host of information from export controls. These exemptions are far from vague. Plaintiff claims first that the exception for "scientific, mathematical, and engineering principles commonly taught in schools, colleges and universities" is vague, based solely on the notion that one school might not teach what another does. Pl. Mem. at 35. This argument can be quickly passed over. The ITAR does not purport to require uniformity in what schools teach. The obvious purpose of the exception is to indicate that technical data does not include information exchanged in the common, everyday occurrence of a university lecture. The ITAR does not indicate that the government must pass judgment on what can or cannot be deemed a "common" academic principle, nor is it so applied. Lowell Decl. ¶ 23.

Plaintiff's attack on the "public domain" exemption is also meritless. That provision contains several specific exceptions as to what is controlled as technical that any ordinary person can understand -- information in bookstores, newsstands, or disclosed at conferences. Plaintiff sees a "Catch-22" "lurking" in the provision that, unless something is already published, it is subject to export controls. He would construe the definition to mean, in other words, that nothing can be published without the government's approval. Not only is this wrong as a factual matter, see Lowell Decl. ¶ 22, it is by far the most un-reasonable interpretation of the provision, one that people of ordinary intelligence are least likely to assume is the case.[32]

---

[32] Plaintiff's discussion of the public domain provision is also highly confusing. He claims that "software" should be treated as in the public domain because that exception refers to "information," not "technical data." Pl. Mem. at 35-36. The public domain provision is a clear and express exception to the definition of "technical data." 22 C.F.R. § 120.10(a)(4) (technical data does "not include . . .information in the public

Defs' Opp. to Plf's Motion for
Summary Judgment and in Further
Support of Defs' Motion for Summary Judgment
C95-0582 MHP

25

Add.30

more than inform, but has a practical use -- in the case of Snuffle to provide for zero-delay encrypted conversations. Moreover, what plaintiff seeks to do is not merely "publish ideas" but export, without limitation to anywhere in the world, a commodity that he and his declarants have explained has a practical cryptographic function. To describe this merely as "publishing" an "idea" is disingenuous. The government's action is fully consistent with how Edler and several other courts, see Def. Mem. at 20, have upheld the application of export controls to matters that have national security and foreign policy significance.

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment should be granted, plaintiff's motion for summary judgment should be denied, and this action should be dismissed with  prejudice.

Respectfully Submitted,

FRANK W. HUNGER
Assistant Attorney General

MICHAEL J. YAMAGUCHI
United States Attorney

MARY BETH UITTI
Assistant United States Attorney
450 Golden Gate Avenue
San Francisco, California 94102
Telephone: (415) 436-7198

*by MB Uitti*

*Anthony J. Coppolino*

VINCENT M. GARVEY
ANTHONY J. COPPOLINO
Department of Justice
Civil Division, Room 1084
901 E Street, N.W.
Washington, D.C.  20530
Tel. (Voice): (202) 514-4782
(FAX): (202) 616-8470 or 616-8460

Attorneys for the Defendants

Defs' Opp. to Plf's Motion for
Summary Judgment and in Further
Support of Defs' Motion for Summary Judgment
C95-0582 MHP

36

Add.31