Case No. 15-50759

# In the United States Court of Appeals for the Fifth Circuit

DEFENSE DISTRIBUTED;
SECOND AMENDMENT FOUNDATION, INCORPORATED,
Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,
Defendants-Appellees

Appeal from an Order of the United States District Court for the Western District of Texas, The Hon. Robert L. Pitman, District Judge
(Dist. Ct. No. 1:15-CV-372-RP)

## APPELLANTS' RECORD EXCERPTS

Matthew Goldstein
Matthew A. Goldstein, PLLC
1875 Connecticut Avenue, N.W.
10th Floor
Washington, DC 20009
202.550.0040/Fax 202.683.6679

Alan Gura
   Counsel of Record
GURA & POSSESSKY, PLLC
916 Prince Street, Suite 7
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

December 10, 2015

Counsel for Appellants
(Additional Counsel Inside Cover)

Additional Counsel for Appellants

William B. Mateja
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
214.747.5070/Fax 214.747.2091

Josh Blackman
1303 San Jacinto Street
Houston, TX 77002
202.294.9003/Fax 713.646.1766

# TABLE OF CONTENTS

## MANDATORY

| Record Excerpt | Tab |
|---|---|
| District Court Docket Sheet | 1 |
| District Court Order | 2 |
| Notice of Appeal | 3 |

## OPTIONAL

| Record Excerpt | Tab |
|---|---|
| Excerpts from 1978 Dept. of Justice Memorandum to Dr. Press | 4 |
| State Dept. Munitions Control Newsletter No. 80 | 5 |
| Excerpts from 1981 Dept. of Justice Memorandum to State Dept. | 6 |
| Excerpt from 1981 Dept. of Justice Memorandum to Commerce Dept. | 7 |
| Excerpt from 1984 Dept. of Justice Memorandum to State Dept. | 8 |
| Excerpts from 1997 Dept. of Justice Report to Congress | 9 |
| 2013 State Dept. Letter to Defense Distributed | 10 |
| Declaration of Cody Wilson | 11 |
| Supplemental Declaration of Alan Gottlieb | 12 |

Supplemental Declaration of Conn Williamson ..................................... 13

Supplemental Declaration of Peter Versnel ......................................... 14

* * *

Certificate of Service

TAB 1

# U.S. District Court [LIVE]
## Western District of Texas (Austin)
## CIVIL DOCKET FOR CASE #: 1:15-cv-00372-RP

| | |
|---|---|
| Defense Distributed et al v. United States Department of State et al | Date Filed: 05/06/2015 |
| Assigned to: Judge Robert Pitman | Date Terminated: 10/01/2015 |
| Case in other court:  USCA 5th Circuit, 15-50759 | Jury Demand: Plaintiff |
| Cause: 28:2201 Declaratory Judgment | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

| | | |
|---|---|---|
| **Defense Distributed** | represented by | **Alan Gura** |
| | | Gura & Possessky, PLLC |
| | | 105 Oronoco Street |
| | | Suite 305 |
| | | Alexandria, VA 22314 |
| | | 703-835-9085 |
| | | Fax: 703-997-7665 |
| | | Email: alan@gurapossessky.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **David S. Morris** |
| | | Fish & Richardson, P.C. |
| | | 111 Congress Avenue, Ste 810 |
| | | Austin, TX 78701 |
| | | 512-226-8116 |
| | | Fax: 512-320-8935 |
| | | Email: dmorris@fr.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Joshua Michael Blackman** |
| | | Josh Blackman LLC |
| | | 1303 San Jacinto St. |
| | | Houston, TX 77002 |
| | | 202-294-9003 |
| | | Fax: 713-646-1766 |
| | | Email: joshblackman@gmail.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Matthew A. Goldstein** |
| | | Matthew A. Goldstein, PLLC |
| | | 1875 Connecticut Ave NW, 10th Floor |
| | | Washington, DC 20009 |
| | | (202) 550-0040 |
| | | Fax: 202-683-6679 |
| | | Email: matthew@goldsteinpllc.com |
| | | *LEAD ATTORNEY* |

15-50759.1004

*ATTORNEY TO BE NOTICED*

**W. Thomas Jacks**
Fish & Richardson P.C.
111 Congress Avenue
Suite 810
Austin, TX 78701
(512) 472-5070
Fax: 512/320-8935
Email: jacks@fr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William B. Mateja**
Fish & Richardson
1717 Main Street, Suite 5000
Dallas, TX 75201
(214) 747-5070
Fax: (214) 747-2091
Email: mateja@fr.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Second Amendment Foundation, Inc.** | represented by | **Alan Gura** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David S. Morris**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Michael Blackman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**W. Thomas Jacks**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William B. Mateja**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **United States Department of State** | represented by | **Eric J. Soskin** |

U.S. Department of Justice, Civil Division

15-50759.1005

20 Massachusetts Ave. NW, Room 7116
Washington, DC 20002
(202)353-0533
Email: eric.soskin@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Justin Robinson**
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., N.W.
Washington, DC 20530
202-514-9239
Email: stuart.j.robinson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Secretary of State John F. Kerry**          represented by   **Eric J. Soskin**
*in his official capacity as the Secretary of*                  (See above for address)
*the Department of State*                                        *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Stuart Justin Robinson**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**Directorate of Defense Trade Controls**     represented by   **Eric J. Soskin**
*Department of State Bureau of Political*                       (See above for address)
*Military Affairs*                                              *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Stuart Justin Robinson**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**Kenneth B. Handelman**                       represented by   **Eric J. Soskin**
*individually and in his official capacity as*                  (See above for address)
*the Deputy Assistant Secretary of State for*                   *LEAD ATTORNEY*
*Defense Trade Controls in the Bureau of*                       *ATTORNEY TO BE NOTICED*
*Political-Military Affairs*
                                                                 **Stuart Justin Robinson**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Zachary Carl Richter**
                                                                 United States Attorney's Office
                                                                 Western District of Texas

15-50759.1006

816 Congress Ave., Suite 1000
Austin, TX 78701
(512)370-1254
Fax: (202)916-5854
Email: Zachary.C.Richter@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Director C. Edward Peartree**
*individually and in his official capacity as*
*the Director of the Office of Defense Trade*
*Controls Policy Division*

represented by **Eric J. Soskin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Justin Robinson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Zachary Carl Richter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Division Chief Sarah J. Heidema**
*individually and in her official capacity as*
*the Division Chief, Regulatory and*
*Multilateral Affairs, Office of Defense*
*Trade Controls Policy*

represented by **Eric J. Soskin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Justin Robinson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Zachary Carl Richter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Senior Advisor Glenn Smith**
*individually and in his official capacity as*
*the Senior Advisor, Office of Defense Trade*
*Controls*

represented by **Eric J. Soskin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Justin Robinson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Zachary Carl Richter**

15-50759.1007

| Date Filed | # | Docket Text |
|---|---|---|
| 05/06/2015 | 1 | COMPLAINT (*1:15-cv-372*) ( Filing fee $ 400 receipt number 0542-7425618). No Summons requested at this time, filed by Defense Distributed, Second Amendment Foundation, Inc.. (Attachments: # 1 Civil Cover Sheet)(Mateja, William) (Attachment 1 replaced on 10/9/2015 with flattened image) (os). (Entered: 05/06/2015) |
| 05/06/2015 | 2 | RULE 7 DISCLOSURE STATEMENT filed by Defense Distributed. (Mateja, William) (Entered: 05/06/2015) |
| 05/06/2015 | 3 | RULE 7 DISCLOSURE STATEMENT filed by Second Amendment Foundation, Inc.. (Mateja, William) (Entered: 05/06/2015) |
| 05/06/2015 | | Case Assigned to Judge Robert Pitman. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (afd) (Entered: 05/07/2015) |
| 05/06/2015 | | DEMAND for Trial by Jury by Defense Distributed. (afd) (Entered: 05/07/2015) |
| 05/07/2015 | 4 | Letters to Alan Gura, Matthew Goldstein and Josh BLackman re: Non-Admitted Status. (afd) (Entered: 05/07/2015) |
| 05/07/2015 | 5 | REQUEST FOR ISSUANCE OF SUMMONS by Defense Distributed, Second Amendment Foundation, Inc.. *OF U.S. DEPARTMENT OF STATE, JOHN F. KERRY, DIRECTORATE OF DEFENSE TRADE CONTROLS, KENNETH B. HANDELMAN, C. EDWARD PEARTREE, SARAH J. HEIDEMA, AND GLENN SMITH* (Mateja, William) (Entered: 05/07/2015) |
| 05/08/2015 | 6 | Summons Issued as to Directorate of Defense Trade Controls, Kenneth B. Handelman, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State.(dm) (Entered: 05/08/2015) |
| 05/11/2015 | 7 | MOTION for Preliminary Injunction by Defense Distributed, Second Amendment Foundation, Inc.. (Attachments: # 1 Proposed Order)(Mateja, William) (Entered: 05/11/2015) |
| 05/11/2015 | 8 | Memorandum in Support, filed by Defense Distributed, Second Amendment Foundation, Inc., re 7 MOTION for Preliminary Injunction filed by Plaintiff Second Amendment Foundation, Inc., Plaintiff Defense Distributed *MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION* (Attachments: # 1 Appendix Part 1 of 6, # 2 Appendix Part 2 of 6, # 3 Appendix Part 3 of 6, # 4 Appendix Part 4 of 6, # 5 Appendix Part 5 of 6, # 6 Appendix Part 6 of 6)(Mateja, William) (Entered: 05/11/2015) |
| 05/11/2015 | 9 | Unopposed MOTION for Leave to Exceed Page Limitation *FOR THEIR BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION* by Defense Distributed, Second Amendment Foundation, Inc.. (Attachments: # 1 Proposed Order)(Mateja, William) (Entered: 05/11/2015) |

15-50759.1008

| | | |
|---|---|---|
| 05/12/2015 | | Text Order GRANTING 9 Motion for Leave to File Excess Pages entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (aemp) (Entered: 05/12/2015) |
| 05/12/2015 | 10 | MOTION to Appear Pro Hac Vice by William B. Mateja *MOTION AND ORDER FOR ADMISSION PRO HAC VICE FOR ALAN GURA* ( Filing fee $ 100 receipt number 0542-7440640) by on behalf of Defense Distributed, Second Amendment Foundation, Inc.. (Mateja, William) (Entered: 05/12/2015) |
| 05/12/2015 | 11 | NOTICE *OF CERTIFICATE OF SERVICE* by Defense Distributed, Second Amendment Foundation, Inc. re 8 Memorandum in Support of Motion,, 6 Summons Issued as to USA, 1 Complaint, 7 MOTION for Preliminary Injunction , Order on Motion for Leave to File Excess Pages (Mateja, William) (Entered: 05/12/2015) |
| 05/13/2015 | 12 | ORDER GRANTING 10 Motion to Appear Pro Hac Vice as to Alan Gura. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Signed by Judge Robert Pitman. (dm) (Entered: 05/13/2015) |
| 05/13/2015 | 13 | MOTION to Appear Pro Hac Vice by William B. Mateja *MOTION FOR ADMISSION PRO HAC VICE - MATTHEW GOLDSTEIN* ( Filing fee $ 100 receipt number 0542-7446350) by on behalf of Defense Distributed, Second Amendment Foundation, Inc.. (Mateja, William) (Entered: 05/13/2015) |
| 05/15/2015 | 14 | SUMMONS Returned Executed by Defense Distributed, Second Amendment Foundation, Inc.. Directorate of Defense Trade Controls served on 5/14/2015, answer due 7/13/2015. (Mateja, William) (Entered: 05/15/2015) |
| 05/15/2015 | 15 | SUMMONS Returned Executed by Defense Distributed, Second Amendment Foundation, Inc.. United States Department of State served on 5/14/2015, answer due 7/13/2015. (Mateja, William) (Entered: 05/15/2015) |
| 05/15/2015 | 16 | SUMMONS Returned Executed by Defense Distributed, Second Amendment Foundation, Inc.. John F. Kerry served on 5/14/2015, answer due 7/13/2015. (Mateja, William) (Entered: 05/15/2015) |
| 05/15/2015 | 17 | SUMMONS Returned Executed by Defense Distributed, Second Amendment Foundation, Inc.. Kenneth B. Handelman served on 5/14/2015, answer due 7/13/2015. (Mateja, William) (Entered: 05/15/2015) |
| 05/15/2015 | 18 | SUMMONS Returned Executed by Defense Distributed, Second Amendment Foundation, Inc.. Sarah J. Heidema served on 5/14/2015, answer due 7/13/2015. (Mateja, William) (Entered: 05/15/2015) |
| 05/15/2015 | 19 | SUMMONS Returned Executed by Defense Distributed, Second Amendment Foundation, Inc.. C. Edward Peartree served on 5/14/2015, answer due 7/13/2015. (Mateja, William) (Entered: 05/15/2015) |
| 05/15/2015 | 20 | SUMMONS Returned Executed by Defense Distributed, Second Amendment Foundation, Inc.. Glenn Smith served on 5/14/2015, answer due 7/13/2015. (Mateja, William) (Entered: 05/15/2015) |
| 05/15/2015 | 21 | ORDER Setting Hearing on 7 MOTION for Preliminary Injunction : Motion Hearing set for 7/6/2015 09:30 AM before Judge Robert Pitman,. Signed by Judge Robert Pitman. (dm) (Entered: 05/15/2015) |

| 05/18/2015 | 22 | Joint MOTION for Extension of Time to File Response/Reply by Directorate of Defense Trade Controls, Kenneth B. Handelman, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State. (Attachments: # 1 Proposed Order)(Robinson, Stuart) (Entered: 05/18/2015) |
|---|---|---|
| 05/19/2015 | | Text Order GRANTING 13 Motion to Appear Pro Hac Vice by atty Matthew Goldstein. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jg) (Entered: 05/19/2015) |
| 05/19/2015 | 23 | NOTICE of Attorney Appearance by Stuart Justin Robinson on behalf of Directorate of Defense Trade Controls, Kenneth B. Handelman, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State. Attorney Stuart Justin Robinson added to party Directorate of Defense Trade Controls(pty:dft), Attorney Stuart Justin Robinson added to party Kenneth B. Handelman(pty:dft), Attorney Stuart Justin Robinson added to party Sarah J. Heidema(pty:dft), Attorney Stuart Justin Robinson added to party John F. Kerry(pty:dft), Attorney Stuart Justin Robinson added to party C. Edward Peartree(pty:dft), Attorney Stuart Justin Robinson added to party Glenn Smith(pty:dft), Attorney Stuart Justin Robinson added to party United States Department of State(pty:dft) (Robinson, Stuart) (Entered: 05/19/2015) |
| 05/19/2015 | 24 | DEFICIENCY NOTICE: re 22 Joint MOTION for Extension of Time to File Response/Reply (dm) (Entered: 05/19/2015) |
| 05/19/2015 | 25 | DEFICIENCY NOTICE: re 23 Notice of Appearance. (dm) (Entered: 05/19/2015) |
| 05/19/2015 | 26 | CERTIFICATE OF SERVICE by Directorate of Defense Trade Controls, Kenneth B. Handelman, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State *CORRECTED* 25 Deficiency Notice (Robinson, Stuart) (Entered: 05/19/2015) |
| 05/19/2015 | 27 | ORDER GRANTING 22 Motion for Extension of Time to File Response. Signed by Judge Robert Pitman. (dm) (Entered: 05/19/2015) |
| 06/05/2015 | 28 | NOTICE *of Supplemental Authority* by Defense Distributed, Second Amendment Foundation, Inc. re 7 MOTION for Preliminary Injunction (Gura, Alan) (Entered: 06/05/2015) |
| 06/08/2015 | 29 | NOTICE *RE: COMMODITY JURISDICTION RULINGS* by Defense Distributed re 7 MOTION for Preliminary Injunction (Goldstein, Matthew) (Entered: 06/08/2015) |
| 06/08/2015 | 30 | NOTICE *RE: DEFENDANTS RECENT PROPOSED RULES* by Defense Distributed re 7 MOTION for Preliminary Injunction (Goldstein, Matthew) (Entered: 06/08/2015) |
| 06/09/2015 | 31 | NOTICE of Attorney Appearance by Eric J. Soskin on behalf of Directorate of Defense Trade Controls, Kenneth B. Handelman, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State (Soskin, Eric) (Entered: 06/09/2015) |
| 06/10/2015 | 32 | Memorandum in Opposition to Motion, filed by Directorate of Defense Trade Controls, Kenneth B. Handelman, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State, re 7 MOTION for |

15-50759.1010

| | | |
|---|---|---|
| | | Preliminary Injunction filed by Plaintiff Second Amendment Foundation, Inc., Plaintiff Defense Distributed (Attachments: # 1 Exhibit A - Declaration of Lisa Aguirre, # 2 Proposed Order)(Soskin, Eric) (Entered: 06/10/2015) |
| 06/17/2015 | 33 | Unopposed MOTION *for Leave for Counsel to Appear Telephonically at Preliminary Injunction Hearing* by Defense Distributed, Second Amendment Foundation, Inc.. (Attachments: # 1 Proposed Order)(Mateja, William) (Entered: 06/17/2015) |
| 06/17/2015 | 34 | Unopposed MOTION for Leave to Exceed Page Limitation *FOR PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION* by Defense Distributed, Second Amendment Foundation, Inc.. (Attachments: # 1 Proposed Order)(Mateja, William) (Entered: 06/17/2015) |
| 06/18/2015 | | Text Order GRANTING 33 Motion for Leave for Counsel for Plaintiffs to Appear Telephonically at Preliminary Injunction Hearing entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (aemp) (Entered: 06/18/2015) |
| 06/18/2015 | | Text Order GRANTING 34 Motion for Leave to File Excess Pages entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jg) (Entered: 06/18/2015) |
| 06/22/2015 | 35 | NOTICE of Attorney Appearance by Zachary Carl Richter on behalf of Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith. Attorney Zachary Carl Richter added to party Kenneth B. Handelman(pty:dft), Attorney Zachary Carl Richter added to party Sarah J. Heidema(pty:dft), Attorney Zachary Carl Richter added to party C. Edward Peartree(pty:dft), Attorney Zachary Carl Richter added to party Glenn Smith(pty:dft) (Richter, Zachary) (Entered: 06/22/2015) |
| 06/24/2015 | 36 | Motion for leave to File Sealed Document (Attachments: # 1 Proposed Order, # 2 Sealed Document Exhibit 1-Supplemental Declaration of Cody Wilson) (Mateja, William) (Entered: 06/24/2015) |
| 06/24/2015 | 37 | REPLY to Response to Motion, filed by Defense Distributed, Second Amendment Foundation, Inc., re 7 MOTION for Preliminary Injunction filed by Plaintiff Second Amendment Foundation, Inc., Plaintiff Defense Distributed *MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANTS OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION* (Attachments: # 1 Exhibit 1 - slipsheet for Sealed Exhibit, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Mateja, William) (Additional attachment(s) added on 7/1/2015: # 5 Sealed Declaration) (dm). (Entered: 06/24/2015) |
| 06/30/2015 | | Text Order GRANTING 36 Motion for Leave to File Sealed Document entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (aemp) (Entered: 06/30/2015) |
| 07/03/2015 | 38 | NOTICE *Regarding Under Seal Filing* by United States Department of State (Soskin, Eric) (Entered: 07/03/2015) |
| 07/06/2015 | 39 | Minute Entry for proceedings held before Judge Robert Pitman: Motion Hearing held on 7/6/2015 re 7 MOTION for Preliminary Injunction filed by Second Amendment Foundation, Inc., Defense Distributed (Minute entry documents are not available electronically.). (Court Reporter Joe Reynosa.)(dm) (Entered: 07/06/2015) |
| 07/07/2015 | 40 | |

15-50759.1011

| | | NOTICE of Attorney Appearance by Joshua Michael Blackman on behalf of Defense Distributed, Second Amendment Foundation, Inc.. Attorney Joshua Michael Blackman added to party Defense Distributed(pty:pla), Attorney Joshua Michael Blackman added to party Second Amendment Foundation, Inc.(pty:pla) (Blackman, Joshua) (Entered: 07/07/2015) |
|---|---|---|
| 07/13/2015 | 41 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint by Directorate of Defense Trade Controls, Kenneth B. Handelman, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State. (Attachments: # 1 Proposed Order)(Soskin, Eric) (Entered: 07/13/2015) |
| 07/14/2015 | | Text Order GRANTING 41 Motion for Extension of Time to Answer entered by Judge Robert Pitman. Defendants' answer or responsive pleading is due within twenty-one days of the Court's ruling on Plaintiffs' motion for preliminary injuunction. (This is a text-only entry generated by the court. There is no document associated with this entry.) (aemp) (Entered: 07/14/2015) |
| 07/14/2015 | 42 | NOTICE *RE: GOVERNMENT'S STANDING CLAIMS* by Defense Distributed, Second Amendment Foundation, Inc. (Mateja, William) (Entered: 07/14/2015) |
| 08/04/2015 | 43 | ORDER DENYING 7 Motion for Preliminary Injunction. Signed by Judge Robert Pitman. (td) (Entered: 08/05/2015) |
| 08/13/2015 | 44 (p.1016) | Unopposed MOTION for Leave to Exceed Page Limitation by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith. (Attachments: # 1 Proposed Order, # 2 Individual Defendants' Motion To Dismiss)(Richter, Zachary) (Entered: 08/13/2015) |
| 08/13/2015 | 45 (p.1045) | Appeal of Order entered by District Judge 43 by Defense Distributed, Second Amendment Foundation, Inc..*denying motion for preliminary injunction* ( Filing fee $ 505 receipt number 0542-7697637) (Gura, Alan) (Entered: 08/13/2015) |
| 08/13/2015 | | NOTICE OF INTERLOCUTORY APPEAL as to 43 Order on Motion for Preliminary Injunction re: 45 (p.1045) Notice of Appeal (E-Filed) by Defense Distributed, Second Amendment Foundation, Inc.. Filing fee $ 505, receipt number 0542-7697637. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out Form DKT-13 (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (jk) (Entered: 08/14/2015) |
| 08/14/2015 | | Text Order GRANTING 44 (p.1016) Motion for Leave to File Excess Pages entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (aemp) (Entered: 08/14/2015) |
| 08/14/2015 | 46 (p.1048) | MOTION to Dismiss by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith. (jk) (Entered: 08/14/2015) |
| 08/21/2015 | 47 (p.1073) | AMENDED COMPLAINT against All Defendants amending 1 Complaint., filed by Defense Distributed, Second Amendment Foundation, Inc..(Gura, Alan) (Entered: 08/21/2015) |
| 08/21/2015 | 49 | TRANSCRIPT REQUEST by Defense Distributed for dates of July 6, 2015. Proceedings Transcribed: Preliminary Injunction Hearing. Court Reporter: Joe Reynosa. (os) (Entered: 08/26/2015) |

| 08/24/2015 | 48 (p.1091) | ORDER DISMISSING without Prejudice Defendants' 46 (p.1048) Motion to Dismiss. Signed by Judge Robert Pitman. (klw) (Entered: 08/24/2015) |
|---|---|---|
| 08/31/2015 | 50 | Transcript filed of Proceedings held on July 6, 2015, Proceedings Transcribed: Preliminary Injunction Hearing. Court Reporter/Transcriber: Joe Reynosa, Telephone number: 210-244-5038. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 9/21/2015, Redacted Transcript Deadline set for 10/1/2015, Release of Transcript Restriction set for 11/30/2015, Appeal Record due by 9/15/2015, (Reynosa, Joe) (Entered: 08/31/2015) |
| 08/31/2015 | 51 (p.1092) | Unopposed MOTION *For Order Setting Time For The U.S. Government Defendants To Answer Or Otherwise Respond to Plaintiffs' First Amended Complaint* by Directorate of Defense Trade Controls, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State. (Attachments: # 1 Proposed Order)(Soskin, Eric) (Entered: 08/31/2015) |
| 09/01/2015 | 52 (p.1098) | ORDER GRANTING 51 (p.1092) Motion to Set Time for U.S. Government Defendants to Answer First Amended Complaint. FURTHER ORDERED that the U.S. Government Defendants shall answer or otherwise respond to Plaintiffs' First Amended Complaint, ECF No. 47, no later than 21 days after a mandate issues from the United States Court of Appeals for the Fifth Circuit on Plaintiffs' pending interlocutory appeal. Signed by Judge Robert Pitman. (os) (Entered: 09/01/2015) |
| 09/01/2015 | 53 (p.1099) | Opposed MOTION for Extension of Time to File *Response To Amended Complaint* by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith. (Attachments: # 1 Proposed Order)(Richter, Zachary) (Entered: 09/01/2015) |
| 09/01/2015 | 54 (p.1103) | Memorandum in Opposition to Motion, filed by Defense Distributed, Second Amendment Foundation, Inc., re 53 (p.1099) Opposed MOTION for Extension of Time to File *Response To Amended Complaint* filed by Defendant Kenneth B. Handelman, Defendant Glenn Smith, Defendant Sarah J. Heidema, Defendant C. Edward Peartree (Attachments: # 1 Exhibit 1, # 2 Proposed Order)(Gura, Alan) (Entered: 09/01/2015) |
| 09/02/2015 | 55 (p.1117) | REPLY to Response to Motion, filed by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith, re 53 (p.1099) Opposed MOTION for Extension of Time to File *Response To Amended Complaint* filed by Defendant Kenneth B. Handelman, Defendant Glenn Smith, Defendant Sarah J. Heidema, Defendant C. Edward Peartree (Richter, Zachary) (Entered: 09/02/2015) |
| 09/02/2015 | 56 (p.1121) | ORDER GRANTING 53 (p.1099) Motion for Extension of Time to to Respond to Plaintiffs Amended Complaint. The Individual Defendants responsive pleading to Plaintiffs Amended Complaint is due on or before September 8, 2015. Any response Plaintiffs deem necessary to that pleading is due on or before October 16, 2015. Signed by Judge Robert Pitman. (os) (Entered: 09/02/2015) |
| 09/02/2015 | 57 | TRANSCRIPT REQUEST by Defense Distributed, Second Amendment Foundation, Inc. for dates of 7/6/15. Proceedings Transcribed: Preliminary Injunction Hearing. Court Reporter: Joe Reynosa. (os) (Entered: 09/02/2015) |
| 09/02/2015 | | |

| | 58<br>(p.1123) | AMENDED ORDER re 56 (p.1121) Order on Motion for Extension of Time to Respond to Plaintiffs Amended Complaint. The Individual Defendants responsive pleading to Plaintiffs Amended Complaint is due on or before September 14, 2015. Any response Plaintiffs deem necessary to that pleading is due on or before October 16, 2015. Signed by Judge Robert Pitman. (os) (Entered: 09/02/2015) |
|---|---|---|
| 09/09/2015 | 59<br>(p.1125) | NOTICE *(Vacation Letter)* by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith (Richter, Zachary) (Entered: 09/09/2015) |
| 09/14/2015 | 60<br>(p.1126) | Unopposed MOTION for Leave to Exceed Page Limitation by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith. (Attachments: # 1 Proposed Order)(Richter, Zachary) (Entered: 09/14/2015) |
| 09/14/2015 | 61<br>(p.1130) | MOTION to Dismiss by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith. (Attachments: # 1 Attachment A (Ex. 6 to Pls.' Mot. for Prelim. Inj.), # 2 Attachment B (Ex. 7 to Pls.' Mot. for Prelim. Inj.), # 3 Attachment C (Ex. 9 to Pls.' Mot. for Prelim. Inj.))(Richter, Zachary) (Entered: 09/14/2015) |
| 09/14/2015 | 62<br>(p.1205) | Unopposed MOTION for Extension of Time to File Response/Reply by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith. (Attachments: # 1 Proposed Order)(Richter, Zachary) (Entered: 09/14/2015) |
| 09/15/2015 | | Text Order GRANTING 60 (p.1126) Motion for Leave to File Excess Pages entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (aemp) (Entered: 09/15/2015) |
| 09/15/2015 | | Text Order GRANTING 62 (p.1205) Motion for Extension of Time to File Response/Reply entered by Judge Robert Pitman. Any reply the Individual Defendants wish to file in support of their motion to dismiss shall be be filed on or before November 20, 2016. (This is a text-only entry generated by the court. There is no document associated with this entry.) (aemp) (Entered: 09/15/2015) |
| 09/22/2015 | 63 | MOTION to Stay Case by Defense Distributed. (Attachments: # 1 Proposed Order, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9)(Goldstein, Matthew) (Entered: 09/22/2015) |
| 09/29/2015 | 64 | Response in Opposition to Motion, filed by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith, re 63 MOTION to Stay Case filed by Plaintiff Defense Distributed (Attachments: # 1 Proposed Order)(Richter, Zachary) (Entered: 09/29/2015) |
| 09/29/2015 | 65 | Response in Opposition to Motion, filed by Directorate of Defense Trade Controls, John F. Kerry, United States Department of State, re 63 MOTION to Stay Case filed by Plaintiff Defense Distributed (Attachments: # 1 Proposed Order)(Soskin, Eric) (Entered: 09/29/2015) |
| 10/01/2015 | 66 | ORDER GRANTING 63 Motion to Stay Proceedings Pending Appeal is hereby GRANTED and the above-styled action is ordered STAYED during the pendency of Plaintiffs interlocutory appeal. The District Clerks Office is directed to administratively close this case until the termination of the appeal proceedings. Signed by Judge Robert Pitman. (os) Modified on 10/15/2015 to add text (klw). (Entered: 10/01/2015) |
| 10/01/2015 | | Case Stayed pursuant to 66 Order. (os) (Entered: 10/01/2015) |

15-50759.1014

| | | |
|---|---|---|
| 10/16/2015 | | Certification of the Electronic Record on Appeal has been accepted by the 5th Circuit re Notice of Appeal - Interlocutory,,. Attorneys are advised that they may now download the EROA from the Fifth Circuit CM/ECF site by following these instructions here (os) (Entered: 10/16/2015) |
| 11/05/2015 | 67 (p.1209) | Copy of ORDER of USCA regarding Sealed Documents ; re Notice of Appeal - Interlocutory. (os) (Entered: 11/06/2015) |

15-50759.1015

TAB 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | 1-15-CV-372  RP |
| | § | |
| UNITED STATES DEPARTMENT OF | § | |
| STATE, ET AL., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court are Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's Dkt. #7), Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's Dkt. #8) and the responsive pleadings thereto.  The Court conducted a hearing on the motion on July 6, 2015.  Having considered the motion, responsive pleadings, record in the case, and the applicable law, the Court is of the opinion that Plaintiffs' motion for a preliminary injunction should be denied.  *See* Fed. R. Civ. P. 65(b).

### I.  BACKGROUND

Plaintiffs Defense Distributed and the Second Amendment Foundation ("SAF") bring this action against defendants the United States Department of State, Secretary of State John Kerry, the Directorate of Defense Trade Controls ("DDTC"), and employees of the DDTC  in their official and individual capacities, challenging implementation of regulations governing the "export" of "defense articles."

Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services."  22 U.S.C. § 2778(a)(1).  The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations,

15-50759.679

including monetary fines and imprisonment.  *Id*. § 2278(c) & (e).  The President has delegated his authority to promulgate implementing regulations to the Secretary of State.  Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC and its employees.  22 C.F.R. 120.1(a).

The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List."  22 U.S.C. § 2278(a)(1).  The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles."  *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States*, 134 S. Ct. 365 (2013).  Put another way, the Munitions List contains "attributes rather than names."  *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing).  The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List.  22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC.  *See* 22 C.F.R. § 120.4 (describing process).  The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction."  *Id*. § 120.4(e).  If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing."  *Id*.

According to Plaintiffs, Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public, as well as generating revenue.  Specifically, in December 2012 Defense Distributed made available for free on the Internet privately generated technical information regarding a number of gun-related

15-50759.680

items (the "Published Files"). (Compl. ¶¶ 22-24). Plaintiffs allege that, on May 8, 2013, Defendants

sent Defense Distributed a letter stating:

> DTCC/END is conducting a review of technical data made publicly available by
> Defense Distributed through its 3D printing website, DEFCAD.org, the majority of
> which appear to be related to items in Category I of the [Munitions List]. Defense
> Distributed may have released ITAR-controlled technical data without the required
> prior authorization from the Directorate of Defense Trade Controls (DDTC), a
> violation of the ITAR.

(*Id.* ¶ 25).

Plaintiffs state they promptly removed the Published Files from the Internet. Further, per

instruction in the May 2013 letter, Plaintiffs submitted commodity jurisdiction requests covering the

Published Files on June 21, 2013. According to Plaintiffs, they have not received a response to

the requests from Defendants. (*Id.* ¶¶ 26-29).

Plaintiffs further allege that, on September 25, 2014, Defense Distributed sent a request

for prepublication approval for public release of files containing technical information on a machine

named the "Ghost Gunner" that can be used to manufacture a variety of items, including gun parts

(the "Ghost Gunner Files").[1] Following resubmission of the request, on April 13, 2015, DDTC

determined that the Ghost Gunner machine, including the software necessary to build and operate

the Ghost Gunner machine, is not subject to ITAR, but that "software, data files, project files,

coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are

subject to the jurisdiction of the Department of State in accordance with [ITAR]." (*Id.* ¶¶ 28-33).

In addition, Plaintiffs allege that since September 2, 2014, Defense Distributed has made

multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD")

files. In December 2014, DOPSR informed Defense Distributed that it refused to review the CAD

files. The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement

---

[1] According to Plaintiffs, Defendants identify the Department of Defense Office of Prepublication Review and
Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of
privately generated technical information subject to ITAR control. (Compl. ¶ 28).

15-50759.681

Division for further questions on public release of the CAD files.  Defense Distributed has sought additional guidance on the authorization process, but to date, Defendants have not responded.  (*Id.* ¶¶ 34-36).

Plaintiffs filed this action on April 29, 2015, raising five separate claims.  Specifically, Plaintiffs assert that the imposition by Defendants of a prepublication approval requirement for "technical data" related to "defense articles" constitutes: (1) an ultra vires government action; (2) a violation of their rights to free speech under the First Amendment; (3) a violation of their right to keep and bear arms under the Second Amendment; and (4) a violation of their right to due process of law under the Fifth Amendment.  Plaintiffs also contend the violations of their constitutional rights entitled them to monetary damages  under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Plaintiffs now seek a preliminary injunction enjoining the enforcement of any prepublication approval requirement against unclassified information under the ITAR, specifically including all files Defense Distributed has submitted for DOPSR review.  The parties have filed responsive pleadings.  The Court conducted a hearing on July 6, 2015 and the matter is now ripe for review.

## II.  STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule.  *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1050 (5th Cir. 1997). The party seeking a preliminary injunction may be granted relief *only* if the moving party establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest.  *See Hoover v. Morales,* 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 325 (5th Cir. 1997); *Cherokee*

15-50759.682

*Pump & Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir. 1994).  To show a substantial likelihood of success, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment."  *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).  *See also Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (same, citing CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.")).  The party seeking a preliminary injunction must clearly carry the burden of persuasion on all four requirements to merit relief.  *Mississippi Power & Light Co.,* 760 F.2d 618, 621 (5th Cir. 1985).

### III.  ANALYSIS

Defendants maintain Plaintiffs have not established any of the four requirements necessary to merit grant of a preliminary injunction.  Plaintiffs, of course, disagree.  The Court will briefly address the parties' arguments concerning the final three requirements before turning to the core, and dispositive question, whether Plaintiffs have shown a likelihood of success on the merits of their claims.

### A.  Injury and Balancing of Interests

Defendants suggest Plaintiffs' contention that they face irreparable injury absent immediate relief is rebutted by their delay in filing this lawsuit.  However, the Supreme Court has stated that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009) (the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction.").  The Second Amendment protects "similarly intangible and unquantifiable interests" and a deprivation is thus considered irreparable.  *Ezell v. City of Chicago*, 651 F.3d 684,

15-50759.683

699 (7th Cir. 2011) ("for some kinds of constitutional violations, irreparable harm is presumed"). The Court thus has little trouble concluding Plaintiffs have shown they face a substantial threat of irreparable injury.

The Court has much more trouble concluding Plaintiffs have met their burden in regard to the final two prongs of the preliminary injunction inquiry.  Those prongs require weighing of the respective interests of the parties and the public.  Specifically, that the threatened injury out-weighs any damage that the injunction may cause the opposing party and that the injunction will not disserve the public interest.  In this case, the inquiry essentially collapses because the interests asserted by Defendants are in the form of protecting the public by limiting access of foreign nationals to "defense articles."

Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations).  They further assert that an injunction would not bar Defendants from controlling the export of classified information.

The Court finds neither assertion wholly convincing.  While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24-25 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 826 (2nd Cir. 2015) (characterizing maintenance of national security as "public interest of the highest order").  It also fails to account for the interest – and authority – of the President and Congress in matters of foreign policy and export.  *See Haig v. Agee*, 453 U.S. 280, 292 (1981) (matters relating to

6

15-50759.684

conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *United States v. Pink*, 315 U.S. 203, 222–23 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp constrast to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims

**B.  Ultra Vires**

Plaintiffs first argue Defendants are acting beyond the scope of their authority in imposing a prepublication requirement on them under the AECA. A federal court has no subject matter jurisdiction over claims against the United States unless the government waives its sovereign immunity and consents to suit. *Danos v. Jones*, 652 F.3d 577, 581 (5th Cir. 2011) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)). The ultra vires exception to sovereign immunity provides that "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions," or "ultra vires his authority," and thus not

15-50759.685

protected by sovereign immunity.  *Larson v. Domestic & Foreign Commerce Corp*., 337 U.S. 682, 689 (1949).  To fall within the ultra vires exception to sovereign or governmental immunity, a plaintiff must "do more than simply allege that the actions of the officer are illegal or unauthorized." *Danos*, 652 F.3d at 583.  Rather, the complaint must allege facts sufficient to establish that the officer was acting "without any authority whatever," or without any "colorable basis for the exercise of authority."  *Id*. (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)).

The statute at issue provides:

> In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services.

22 U.S.C. § 2778(a)(1).  "Export" is defined, in pertinent part, as including "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person whether in the United States or abroad."  22 C.F.R. § 120.17(a)(4).  Plaintiffs argue this definition falls outside Congressional intent in authorizing restriction of export of defense articles because, as interpreted by Defendants, it includes public speech within the United States.

Notably, Plaintiffs do not suggest Defendants lack authority under the AECA to regulate export of defense articles.  Further, under the AECA, decisions are required to

> take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements.

22 U.S.C. § 2778(a)(2).  Defense Distributed admits its purpose is "facilitating *global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms."  (Compl. ¶ 1) (emphasis added).  Facilitating global access to firearms

8

undoubtedly "increase[s] the possibiliity of outbreak or escalation of conflict."  Defense Distributed, by its own admission, engages in conduct which Congress authorized Defendants to regulate. Plaintiffs have not, therefore, shown Defendants are acting without any "colorable basis for the exercise of authority."  Accordingly, they have not shown a likelihood of success on their ultra vires challenge.

## C.  First Amendment

Plaintiffs next argue Defendants' interpretation of the AECA violates their First Amendment right to free speech.  In addressing First Amendment claims, the first step is to determine whether the claim involves protected speech, the second step is to identify the nature of the forum, and the third step is to assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard.  *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

As an initial matter, Defendants argue the computer files at issue do not constitute speech and thus no First Amendment protection is afforded.  First Amendment protection is broad, covering "works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent." *Miller v. California*, 413 U.S. 15, 34 (1973).  *See also Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) (video games' communication of ideas and social messages suffices to confer First Amendment protection).   Defendants, however, maintain the computer files at the heart of this dispute do not warrant protection because they consist merely of directions to a computer.  In support, they rely on a Second Circuit opinion which held that computer instructions that "induce action without the intercession of the mind or the will of the recipient" are not constitutionally protected speech. *Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 111 (2nd Cir. 2000).

15-50759.687

As Plaintiffs point out, one year later, the Second Circuit addressed the issue of whether computer code constitutes speech at some length in *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2nd Cir. 2001).[2]   The court made clear the fact that computer code is written in a language largely unintelligible to people was not dispositive, noting Sanskrit was similarly unintelligible to many, but a work written in that language would nonetheless be speech.  Ultimately, the court concluded "the fact that a program has the capacity to direct the functioning of a computer does not mean that it lacks the additional capacity to convey information, and it is the conveying of information that renders instructions 'speech' for purposes of the First Amendment."  *Id*. at 447 (discussing other examples of "instructions" which qualified as speech under First Amendment).  Similarly, the Sixth Circuit has found "[b]ecause computer source code is an expressive means for the exchange of information and ideas about computer programming . . . it is protected by the First Amendment," even though such code "has both an expressive feature and a functional feature."  *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000).

Although the precise technical nature of the computer files at issue is not wholly clear to the Court, Plaintiffs made clear at the hearing that Defense Distributed is interested in distributing the files as "open source."  That is, the files are intended to be used by others as a baseline to be built upon, altered and otherwise utilized.  Thus, at least for the purpose of the preliminary injunction analysis, the Court will consder the files as subject to the protection of the First Amendment.

In challenging Defendants' conduct, Plaintiffs urge this Court to conclude the ITAR's imposition of a prepublication requirement constitutes an impermissible prior restraint.  Prior restraints "face a well-established presumption against their constitutionality."  *Marceaux v. Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013).  *See also Organization for*

_____

[2]  Defendants are correct that the *Corley* court did not overrule the decision in *Vartuli*.  However, the *Corley* court itself distinguished the decision in *Vartuli* as limited, because it was based on the manner in which the code at issue was marketed.  That is, the defendants themselves marketed the software as intended to be used "mechanically" and "without the intercession of the mind or the will of the recipient."  *Corley*, 273 F.3d at 449 (quoting *Vartuli*, 228 F.3d at 111).  Plaintiffs here have not so marketed or described the files at issue.

15-50759.688

*a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) ("Any prior restraint on expression comes ... with a 'heavy presumption' against its constitutional validity"); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969) (noting "the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional"). "[A] system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004) (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975)).

The "heavy presumption" against constitutional validity of prior restraint is not, however, "a standard of review, and judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014). *See, e.g.*, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) (order prohibiting dissemination of discovered information before trial "is not the kind of classic prior restraint that requires exacting First Amendment scrutiny"); *Perry v. McDonald*, 280 F.3d 159, 171 (2nd Cir. 2001) (context in which prior restraint occurs affects level of scrutiny applied);, 192 F.3d 742, 749 (7th Cir. 1999) ("We note initially that the [plaintiff] is simply wrong in arguing that all prior restraints on speech are analyzed under the same test.").

No party suggests posting of information on the Internet for general free consumption is not a public forum. The next inquiry is thus the applicable level of protection afforded to the files at issue. Content-neutral restrictions on speech are examined under intermediate scrutiny, meaning they are permissible so long as they are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the information. *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 213–14 (1997); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Content-based restrictions are examined under strict scrutiny, meaning they must be

11

15-50759.689

narrowly drawn to effectuate a compelling state interest.  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

Not surprisingly, the parties disagree as to whether the ITAR imposes content-based restrictions.  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015).  Plaintiffs here argue, because the regulations restrict speech concerning the entire topic of "defense articles" the regulation is content-based.  "A regulation is not content-based, however, merely because the applicability of the regulation depends on the content of the speech."  *Asgeirsson v. Abbott*, 696 F.3d 454, 459 (5th Cir. 2012).  Rather, determination of whether regulation of speech is content-based "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."  *Reed*, 135 S. Ct. at 2227.  *See also Ward*, 491 U.S. at 791 (principal inquiry in determining content-neutrality, "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys").

Employing this inquiry, the Supreme Court has found regulations to be content-neutral where the regulations are aimed not at suppressing a message, but at other "secondary effects." For example, the Supreme Court upheld a zoning ordinance that applied only to theaters showing sexually-explicit material, reasoning the regulation was content-neutral because it was not aimed at suppressing the erotic message of the speech but instead at the crime and lowered property values that tended to accompany such theaters.  *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48 (1986).  The Supreme Court similarly upheld a statute establishing buffer zones only at clinics that performed abortions, concluding the statute did not draw content-based distinctions as enforcement authorities had no need to examine the content of any message conveyed and the stated purpose of the statute was public safety.  *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (noting violation of statute depended not "on what they say," but "simply on where they say it").  The

15-50759.690

Fifth Circuit has likewise found regulations content-neutral, even where the regulation governed a specific topic of speech.  *See Kagan v. City of New Orleans*, 753 F.3d 560, 562 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1403 (2015) (upholding regulation requiring license for a person to charge for tours to City's points of interest and historic sites, "for the purpose of explaining, describing or generally relating the facts of importance thereto," finding regulation "has no effect whatsoever on the content of what tour guides say"); *Asgeirsson*, 696 F.3d at 461 (holding Texas' Open Meeting Act, prohibiting governmental body from conducting closed meetings during which public business or public policy over which the governmental body has supervision or control is discussed, to be content-neutral, because closed meetings: (1) prevent transparency; (2) encourage fraud and corruption; and (3) foster mistrust in government).

The ITAR, on its face, clearly regulates disclosure of "technical data" relating to "defense articles."  The ITAR thus unquestionably regulates speech concerning a specific topic.  Plaintiffs suggest that is enough to render the regulation content-based, and thus invoke strict scrutiny.  Plaintiffs' view, however, is contrary to law.  The Fifth Circuit rejected a similar test, formulated as "[a] regulatory scheme that requires the government to 'examine the content of the message that is conveyed' is content-based regardless of its motivating purpose," finding the proposed test was contrary to both Supreme Court and Fifth Circuit precedent.  *Asgeirsson*, 696 F.3d at 460.

The ITAR does not regulate disclosure of technical data based on the message it is communicating.  The fact that Plaintiffs are in favor of global access to firearms is not the basis for regulating the "export" of the computer files at issue.  Rather, the export regulation imposed by the AECA is intended to satisfy a number of foreign policy and national defense goals, as set forth above.  Accordingly, the Court concludes the regulation is content-neutral and thus subject to intermediate scrutiny.  *See United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012) (finding the AECA and its implementing regulations are content-neutral).

The Supreme Court has used various terminology to describe the intermediate scrutiny

13

15-50759.691

standard.  *Compare Ward*, 491 U.S. at 798 ("a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so"), with *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (requiring "the government goal to be substantial, and the cost to be carefully calculated," and holding "since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require"), and *Turner*, 520 U.S. at 189 (regulation upheld under intermediate scrutiny if it "further[s] an important or substantial governmental interest unrelated to the suppression of free speech, provided the incidental restrictions d[o] not burden substantially more speech than is necessary to further those interests").  The Court will employ the Fifth Cicuit's most recent enunciation of the test, under which a court must sustain challenged regulations "if they further an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 641 (5th Cir. 2012)

The Court has little trouble finding there is a substantial governmental interest in regulating the dissemination of military information.  Plaintiffs do not suggest otherwise.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (noting all parties agreed government's interest in combating terrorism "is an urgent objective of the highest order").  Nor do Plaintiffs suggest the government's regulation is directed at suppressing free expression.  Rather, they contend the regulations are not sufficiently tailored so as to only incidentally restrict their freedom of expression.

The only circuit to address whether the AECA and ITAR violate the First Amendment has concluded the regulatory scheme survives such a challenge.  In so doing, the Ninth Circuit concluded the technical data regulations substantially advance the government's interest, unrelated to the suppression of expression, because the regulations provide clear procedures for seeking

14

necessary approval.  *Chi Mak*, 683 F.3d at 1135 (citing 22 C.F.R § 120.10(a) (the determination of designation of articles or services turns on whether an item is "specifically designed, developed, configured, adapted, or modified for a military application, and has significant military or intelligence applicability such that control under this subchapter is necessary")).  The Ninth Circuit also concluded the regulations were not more burdensome than necessary, noting the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers."  *Id.* (citing *Humanitarian Law Project*, 561 U.S. at 29 (upholding material support statute against First Amendment challenge where the statute provided narrowing definitions to avoid infringing upon First Amendment interests)).[3]

Plaintiffs' challenge here is based on their contention that Defendants have applied an overbroad interpretation of the term "export."  Specifically, Plaintiffs argue that viewing "export" as including public speech, including posting of information on the Internet, imposes a burden on expression which is greater than is essential to the furtherance of the government's interest in protecting defense articles.

But a prohibition on Internet posting does not impose an insurmountable burden on Plaintiffs' domestic communications.  This distinction is significant because the AECA and ITAR do not prohibit domestic communications.  As Defendants point out, Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally.

Nor is the Court convinced by Plaintiffs' suggestion that the ban on Internet posting does not prevent dissemination of technical data outside national borders, and thus does not further the

---

[3]  The Ninth Circuit has also rejected a First Amendment challenge to the AECA's predecessor, the Mutual Security Act of 1954.  *See United States v. Edler Indus., Inc.*, 579 F.2d 516, 521 (9th Cir. 1978) (holding statute and regulations not overbroad in controlling conduct of assisting foreign enterprises to obtain military equipment and related technical expertise and licensing provisions of statute not an unconstitutional prior restraint on speech).

15-50759.693

government's interests under the AECA.  The Ninth Circuit addressed and rejected a similar

suggestion, namely that the only way the government can prevent technical data from being sent

to foreign persons is to suppress the information domestically as well, explaining:

> This outcome would blur the fact that national security concerns may be more
> sharply implicated by the export abroad of military data than by the domestic
> disclosure of such data.  Technical data that is relatively harmless and even socially
> valuable when available domestically may, when sent abroad, pose unique threats
> to national security. It would hardly serve First Amendment values to compel the
> government to purge the public libraries of every scrap of data whose export abroad
> it deemed for security reasons necessary to prohibit.

*United States v. Posey*, 864 F.2d 1487, 1496-97 (9th Cir. 1989).

The Court also notes, as set forth above, that the ITAR provides a method through the

commodity jurisdiction request process for determining whether information is subject to its export

controls.  *See* 22 C.F.R. § 120.4 (describing process).  The regulations include a ten day deadline

for providing a preliminary response, as well as a provision for requesing expedited processsing.

22 C.F.R. § 120.4(e) (setting deadlines).  Further, via Presidential directive, the DDTC is required

to "complete the review and adjudication of license applications within 60 days of receipt." 74 Fed.

Reg. 63497 (December 3, 2009).  Plaintiffs thus have available a process for determining whether

the speech they wish to engage in is subject to the licensing scheme of the ITAR regulations.

Accordingly, the Court concludes Plaintiffs have not shown a substantial likelihood of

success on the merits of their claim under the First Amendment.

**D.  Second Amendment**

Plaintiffs also argue the ITAR regulatory scheme violates their rights under the Second

Amendment.  Defendants contend Plaintiffs cannot succeed on this claim, both because they lack

standing to raise it, and because the claim fails on the merits.  As standing is jurisdictional, the

Court will turn to that issue first.

16

15-50759.694

### a.  Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies.  *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395 (1980).  "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997).  This requirement, like other jurisdictional requirements, is not subject to waiver and demands strict compliance.  *Raines*, 521 U.S. at 819; *Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996).  To meet the standing requirement a plaintiff must show (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Consol. Cos., Inc. v. Union Pacific R.R. Co.*, 499 F.3d 382, 385 (5th Cir. 2007); *Fla. Dep't of Ins. v. Chase Bank of Tex. Nat'l Ass'n*, 274 F.3d 924, 929 (5th Cir. 2001) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Lujan*, 504 U.S. at 561.

Defendants correctly point out Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment.[4]  Plaintiffs maintain Defense Distributed nonetheless has standing because it is "entitled to assert the Second Amendment rights of [its] customers and website visitors."  (Plf. Brf. at 27).  A litigant is generally limited to asserting standing only on behalf of himself.  *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").  The

---

[4] No party addressed whether a corporation such as Defense Distributed itself possesses Second Amendment rights.

17

15-50759.695

Supreme Court has recognized a limited exception when the litigant seeking third-party standing has suffered an "injury in fact" giving him a "sufficiently concrete interest" in the outcome of the issue, the litigant has a "close" relationship with the third party on whose behalf the right is asserted and there is a "hindrance" to the third party's ability to protect his own interests.  *Powers v. Ohio*, 499 U.S. 400, 411 (1991).

Plaintiffs argue they meet this test, asserting Defense Distributed acts as a "vendor" or in a like position by way of offering the computer files for download to visitors of its website.  *See Carey v. Population Servs. Int'l*, 431 U.S. 678, 684 (1977) ("vendors and those in like positions . . . have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function"); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008) (Supreme Court precedent holds providers of product have standing to attack ban on commercial transactions involving product).  As an initial matter, it is not at all clear that distribution of information for free via the Internet constitutes a commercial transaction.[5]  Moreover, Plaintiffs do not explain how visitors to Defense Distributed's website are hindered in their ability to protect their own interests.  In fact, the presence of SAF as a plaintiff suggests to the contrary.  Thus, whether Defense Distributed has standing to assert a claim of a violation of the Second Amendment is a very close question.

Lack of standing by one plaintiff is not dispositive, however.  *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) (court need not decide third-party standing question, "[f]or we have at least one individual plaintiff who has demonstrated standing to assert these rights as his own").  And SAF's standing presents a much less difficult question.  It asserts it has standing, as an association, to assert the rights of its members.  *See Warth v.*

---

[5]  Defense Distributed describes itself as organized and operated "for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution" through "facilitating global access to" information related to 3D printing of firearms, and specifically "to publish and distribute, *at no cost to the public*, such information and knowledge on the Internet in promotion of the public interest."  (Compl. ¶ 1) (emphasis added).

15-50759.696

*Seldin*, 422 U.S. 490, 511 (1975) ("[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members").  Associational standing requires showing: (1) the association's members have standing to sue in their own right; (2) the interests at issue are germane to the association's purpose; and (3) the participation of individual members in the lawsuit is not required.  *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550-51 (5th Cir. 2010) (citing *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  "The first prong requires that at least one member of the association have standing to sue in his or her own right."  *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191 (5th Cir. 2012).

Defendants limit their challenge to SAF's standing solely to whether any of its members have standing to sue in their own right.  Specifically, Defendants contend SAF has merely asserted a conjectural injury, by suggesting its members would access computer files in the future.  In response, SAF has provided affidavit testimony from two of its members stating they would access the computer files at issue via the Defense Distributed website, study, learn from and share the files, but are unable to do so due to Defendants' interpretation of the ITAR regulatory scheme.  (Plf. Reply Exs. 3-4).  This testimony satisfies the "injury in fact" portion of the standing inquiry.

Defendants further contend any injury is not fairly traceable to their conduct.  They argue the ITAR does not prevent SAF members in the United States from acquiring the files directly from Defense Distributed.  But this argument goes to the burden imposed on SAF members, which is a question aimed at the merits of the claim, not standing.  *See Davis v. United States*, 131 S. Ct. 2419, 2434, n.10 (one must not "confus[e] weakness on the merits with absence of Article III standing").  In this case, the inability of SAF members to download the computer files at issue off the Internet is the injury in fact of the SAF members, and is clearly traceable to the conduct of Defendants.  The Court therefore finds SAF has standing to assert a claim of a violation of the Second Amendment.  *See Nat'l Rifle Ass'n*, 700 F.3d at 192 (NRA had standing, on behalf of its

19

15-50759.697

members under 21, to bring suit challenging laws prohibitingfederal firearms licensees from selling handguns to 18-to-20-year-olds); *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (SAF and Illinois Rifle Association had associational standing to challenge city ordinances requiring one hour of firing range training as prerequisite to lawful gun ownership and prohibiting all firing ranges in city)*; Mance v. Holder*, 2015 WL 567302, at *5 (N.D. Tex. Feb. 11, 2015) (non-profit organization dedicated to promoting Second Amendment rights had associational standing to bring action challenging federal regulatory regime as it relates to buying, selling, and transporting of handguns over state lines).

**b.  Merits**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  The Supreme Court has recognized that the Second Amendment confers an individual right to keep and bear arms.  *See District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).  The Fifth Circuit uses a two-step inquiry to address claims under the Second Amendment.  The first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee.  The second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny. *Nat'l Rifle Ass'n*, 700 F.3d at 194.

In the first step, the court is to "look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee."  *Id*. (citing *Heller*, 554 U.S. at 577-628).  Defendants argue at some length that restriction by a sovereign of export of firearms and other weapons has a lengthy historical tradition.  Plaintiffs do not contest otherwise.  Rather, Plaintiffs contend the conduct regulated here impinges on the ability to manufacture one's own

firearms, in this case, by way of 3D printing.

While the founding fathers did not have access to such technology,[6] Plaintiffs maintain the ability to manufacture guns falls within the right to keep and bear arms protected by the Second Amendment.  Plaintiffs suggest, at the origins of the United States, blacksmithing and forging would have provided citizens with the ability to create their own firearms, and thus bolster their ability to "keep and bear arms."  While Plaintffs' logic is appealing, Plaintiffs do not cite any authority for this proposition, nor has the Court located any.  The Court further finds telling that in the Supreme Court's exhaustive historical analysis set forth in *Heller*, the discussion of the meaning of "keep and bear arms" did not touch in any way on an individual's right to manufacture or create those arms.  The Court is thus reluctant to find the ITAR regulations constitute a burden on the core of the Second Amendment.

The Court will nonetheless presume a Second Amendment right is implicated and proceed with the second step of the inquiry, determining the appropriate level of scrutiny to apply. Plaintiffs assert strict scrutiny is proper here, relying on their contention that a core Second Amendment right is implicated.  However, the appropriate level of scrutiny "depends on the nature of the conduct being regulated *and* the degree to which the challenged law burdens the right."  *Nat'l Rifle Ass'n*, 700 F.3d at 195 (emphasis added).

The burden imposed here falls well short of that generally at issue in Second Amendment cases.  SAF members are not prevented from "possess[ing] and us[ing] a handgun to defend his or her home and family."  *Id*. at 195 (citations omitted).  The Fifth Circuit's decision in *National Rifle Association* is instructive.  At issue was a regulatory scheme which prohibited federally licensed firearms dealers from selling handguns to persons under the age of twenty-one. The court reasoned that only intermediate scrutiny applied for three reasons: (1) an age qualification on

---

[6] Nonetheless, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *Heller*, 554 U.S. at 582.

15-50759.699

commercial firearm sales was significantly different from a total prohibition on handgun possession; (2) the age restriction did not strike at the core of the Second Amendment by preventing persons aged eighteen to twenty from possessing and using handguns for home defense because it was not a historical outlier; and (3) the restriction only had temporary effect because the targeted group would eventually age out of the restriction's reach. *Id*. at 205–07. In this case, SAF members are not prohibited from manufacturing their own firearms, nor are they prohibited from keeping and bearing other firearms. Most strikingly, SAF members in the United States are not prohibited from acquiring the computer files at issue directly from Defense Distributed. The Court thus concludes only intermediate scrutiny is warranted here. *See also Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 347-48 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1365 (2014) (applying intermediate scrutiny to constitutional challenge to state statute prohibiting 18-20-year-olds from carrying handguns in public).

As reviewed above, the regulatory scheme of the AECA and ITAR survives an intermediate level of scrutiny, as it advances a legitimate governmental interest in a not unduly burdensome fashion. *See also McCraw*, 719 F.3d at 348 (statute limiting under 21-year-olds from carrying handguns in public advances important government objective of advancing public safety by curbing violent crime); *Nat'l Rifle Ass'n*, 700 F.3d at 209 ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted."). Accordingly, the Court finds Plaintiffs have not shown a substantial likelihood of success on the merits.

**E. Fifth Amendment**

Plaintiffs finally argue the prior restraint scheme of the ITAR is void for vagueness and thus in violation of their right to due process. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Fifth Amendment prohibits the enforcement of vague criminal laws, but

the threshold for declaring a law void for vagueness is high.  "The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."  *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963).  Rather, it is sufficient if a statute sets out an "ascertainable standard."  *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921).  A statute is thus void for vagueness only if it wholly "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).

Plaintiffs here assert broadly that ITAR is unconstitutionally vague because "persons of ordinary intelligence" must guess as to whether their speech would fall under its auspices.  As an initial matter, the Court notes at least two circuits have rejected due process challenges to the AECA and ITAR, and upheld criminal convictions for its violation.  *See Zhen Zhou Wu*, 711 F.3d at 13 (rejecting defendants' argument "that this carefully crafted regulatory scheme—which has remained in place for more than a quarter century—is unconstitutionally vague" as applied to them); *United States v. Hsu*, 364 F.3d 192, 198 (4th Cir. 2004) (holding the AECA and its implementing regulations not unconstitutionally vague as applied to defendants).  Plaintiffs neither acknowledge those decisions nor explain how their rationale is inapplicable to their situation.

The Supreme Court has recently noted its precedent generally limits such challenges to "statutes that tied criminal culpability" to conduct which required "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings."  *Humanitarian Law Project*, 561 U.S. at 20 (quoting *Williams*, 553 U.S. at 306).  Plaintiffs' challenge here is additionally hampered because they have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague.

To the degree Plaintiffs contend "defense articles" is vague, as Defendants point out, the

15-50759.701

term "defense articles" is specifically defined to include items on the Munitions List, which contains twenty-one categories of governed articles, as well as information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles" which additionally "includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." *See* 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10 (a) (defining technical data) & 121.1 (Munitions List).  Although lengthy, the cited regulations do not themselves include subjective terms, but rather identify items with significant specificity.  For example, the first category "Firearms, Close Assault Weapons and Combat Shotguns" includes eight subcategories such as "Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," as well as six interpretations of the terms.  22 C.F.R. § 121.1.  The Court has little trouble finding these provisions survive a vagueness challenge.

The term "export" is also defined in the ITAR, although at lesser length.  At issue here, "export" is defined to include "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad."  22 C.F.R. § 120.17(a)(4).  Plaintiffs here admit they wish to post on the Internet, for free download, files which include directions for the 3D printing of firearms.  Persons of ordinary intelligence are clearly put on notice by the language of the regulations that such a posting would fall within the defintion of export.

Accordingly, the Court concludes Plaintiffs have not shown a likelihood of success on the merits of their claim under the Fifth Amendment.

**IV.  CONCLUSION**

Plaintiffs' Motion for Preliminary Injunction (Clerk's Dkt. #7) is hereby **DENIED**.

**SIGNED** on August 4, 2015.

ROBERT L. PITMAN
UNITED STATES DISTRICT JUDGE

25

TAB 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and | § | Case No. 15-CV-372-RP |
| SECOND AMENDMENT FOUNDATION, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

NOTICE OF APPEAL

PLEASE TAKE NOTICE that Plaintiffs Defense Distributed and Second Amendment

Foundation, Inc. hereby appeal to the United States Court of Appeals for the Fifth Circuit from the

Court's order entered August 5, 2015, denying their motion for a preliminary injunction [ECF 43].

Dated: August 13, 2015                    Respectfully submitted,

GURA & POSSESSKY, PLLC            FISH & RICHARDSON P.C.

*/s/ Alan Gura*                               */s/ William B. Mateja*
Alan Gura                                      William T. "Tommy" Jacks
Virginia Bar No. 68842*                   Texas State Bar No. 10452000
Gura & Possessky, PLLC                  William B. Mateja
105 Oronoco Street, Suite 305          Texas State Bar No. 13185350
Alexandria, Virginia 22314               David S. Morris
703.835.9085 / Fax 703.997.7665     Texas State Bar No. 24032877
alan@gurapossessky.com                 FISH & RICHARDSON P.C.
                                                One Congress Plaza, Suite 810
Matthew Goldstein                          111 Congress Avenue
D.C. Bar No. 975000*                       Austin, Texas 78701
Matthew A. Goldstein, PLLC            (512) 472-5070 (Telephone)
1012 14th Street NW, Suite 620        (512) 320-8935 (Facsimile)
Washington, DC 20005                      jacks@fr.com
202.550.0040/Fax 202.683.6679        dmorris@fr.com
matthew@goldsteinpllc.com              mateja@fr.com

1

Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Admitted pro hac vice

15-50759.1046

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on August 13, 2015, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

/s/ Alan Gura
Alan Gura

15-50759.1047

TAB 4

268

Department of Justice
Washington, D.C. 20530

MEMORANDUM TO DR. FRANK PRESS
Science Advisor to the President

Re:   Constitutionality Under the First Amendment
of ITAR Restrictions on Public Cryptography

The purpose of this memorandum is to discuss the con-
stitutionality under the First Amendment of restrictions
imposed by the International Traffic in Arms Regulation
(ITAR), 22 C.F.R. § 121 et seq. (1977), the regulation imple-
menting § 38 of the Arms Export Control Act, 22 U.S.C.A.
§ 2778 (1977), on dissemination of cryptographic informa-
tion developed independent of government supervision or
support by scientists and mathematicians in the private
sector.1/ Our discussion is confined to the applicability
of the regulation to the speech elements of public cryptography,
and does not address the validity of the general regulatory
controls over exports of arms and related items.  We have
undertaken our review of the First Amendment issues raised
by the ITAR as an outgrowth of our role in implementing
Presidential Directive NSC-24.2/

---

1/    The cryptographic research and development of scientists
and mathematicians in the private sector is known as
"public cryptography."  As you know, the serious concern ex-
pressed by the academic community over government controls
of public cryptography, see, e.g., 197 Science 1345 (Sept.
30, 1977), led the Senate Select Committee on Intelligence
to conduct a recently concluded study of certain aspects of
the field.

2/    Our research into the First Amendment issues raised by
government regulation of public cryptography led tan-
gentially into broader issues of governmental control over
dissemination of technical data.  Those questions are numerous,
complex, and deserving of extensive study, but are beyond
the scope of this memorandum.

277

340 U.S. 268 (1951); Kunz v. New York, 340 U.S. 290 (1951)
Hague v. C.I.O., 307 U.S. 496 (1939).15/

Even if it is assumed that the government's interest
in regulating the flow of cryptographic information is
sufficient to justify some form of prior review process,
the existing ITAR provisions we think fall short of satis-
fying the strictures necessary to survive close scrutiny
under the First Amendment.  There are at least two funda-
mental flaws in the regulation as it is now drawn:  first,
the standards governing the issuance or denial of licenses
are not sufficiently precise to guard against arbitrary
and inconsistent administrative action; second, there is
no mechanism established to provide prompt judicial review
of State Department decisions barring disclosure.  See, e.g.,
Blount v. Rizzi, supra; Freedman v. Maryland, supra; Hague
v. C.I.O., supra.  The cases make clear that before any
restraint upon protected expression may become final it
must be subjected to prompt judicial review in a proceeding
in which the government will bear the burden of justifying
its decisions.  The burden of bringing a judicial proceed-
ing cannot be imposed upon those desiring export licenses
in these circumstances.  The ITAR as presently written fails
to contemplate this requirement.16/

---

15/   In Freedman, 380 U.S. at 58-59, the Court summarized
      the procedural protections necessary to sustain a scheme
of prior review:
      1.  A valid final restraint may be imposed only upon
a judicial determination;
      2.  The administrator of a licensing scheme must act
within a specified brief period of time;
      3.  The administrator must be required either to issue
a license or go to court to seek a restraint;
      4.  Any restraint imposed in advance of a final judicial
determination on the merits must be limited to preservation
of the status quo for the shortest period compatible with
sound judicial resolution;
      5.  The licensing scheme must assure a prompt final
judicial decision reviewing any interim and possibly erroneous
denial of a license.

16/   The government's argument to the Ninth Circuit in Edler,
      that the impact of the ITAR upon protected communications
is merely incidental, and that the ITAR should be viewed as
                              (Cont. on p. 11)

- 10 -

App. 108
15-50759.235

278

    For these reasons it is our conclusion that the present
ITAR licensing scheme does not meet constitutional standards.
There remains the more difficult question whether a licens-
ing scheme covering either exports of or even purely domestic
publications of cryptographic information might be devised
consistent with the First Amendment.  Recent Supreme Court
decisions certainly suggest that the showing necessary to
sustain a prior restraint on protected expression is an
onerous one.  The Court held in the Pentagon Papers case
that the government's allegations of grave danger to the
national security provided an insufficient foundation for
enjoining disclosure by the Washington Post and the New
York Times of classified documents concerning United States
activities in Vietnam.  New York Times Co. v. United States,
supra.17/  The Court also invalidated prior restraints when
justified by such strong interests as the right to fair
trial, Nebraska Press Ass'n, supra, and the right of a
homeowner to privacy, Organization for a Better Austin v.
Keefe, supra.  Such decisions raise a question whether a

---

16/  (Cont.)
a regulation of conduct not speech, deserves note.  According
to that argument, the less rigorous constitutional standard
of United States v. O'Brien, 391 U.S. 367 (1968), would
govern the validity of the ITAR.  Although that may be true
with respect to certain portions of the ITAR, even a cursory
reading of the technical data provisions reveals that those
portions of the ITAR are directed at communication.  A more
stringent constitutional analysis than the O'Brien test is
therefore mandated.

17/  The Pentagon Papers case produced a total of ten opinions
     from the Court, a per curiam and nine separate opinions.
All but Justices Black and Douglas appeared willing to accept
prior restraints on the basis of danger to the national security
in some circumstances.  There was, however, no agreement among
the Justices on the appropriate standard.  Justice Brennan
stated his view that a prior restraint on publication was
justified only upon:

    "proof that publication must inevitably, directly,
    and immediately cause the occurrence of an event
    kindred to imperiling the safety of a transport
    already at sea. . . ."
                                    (Cont. on p. 12)

                    - 11 -

App. 109
15-50759.236

284

submission requirement any information, such as that which
is publicly available or which poses no substantial security
threat, that the government has no legitimate interest in
keeping secret.23/  Failure to draft provisions narrowly
might well invite overbreadth challenges for inclusion of
protected communication.  See, e.g., NAACP v. Alabama, 357
U.S. 449 (1958).  And a precisely drawn scheme is also
necessary to avoid objections of vagueness.  See, e.g.,
Smith v. Goguen, 415 U.S. 566 (1974).24/

     In conclusion, it is our view that the existing provisions
of the ITAR are unconstitutional insofar as they establish
a prior restraint on disclosure of cryptographic ideas and
information developed by scientists and mathematicians in
the private sector.  We believe, however, that a prepublica-
tion review requirement for cryptographic information might
meet First Amendment standards if it provided necessary
procedural safeguards and precisely drawn guidelines.

                              John M. Harmon
                         Assistant Attorney General
                         Office of Legal Counsel

---

23/  As we noted above, at n.4, supra, the present ITAR pro-
     visions attempt to exempt publicly available information.
But the scope of that exemption and the procedures for invok-
ing it, particularly with respect to oral communications,
are somewhat clear.

24/  Although we mention questions of overbreadth and vague-
     ness raised by the technical data provisions of the
ITAR previously in this memorandum, we have not attempted
to identify and analyze particular problems for several
reasons.  First, our opinion that a prior restraint on public
cryptography might survive First Amendment scrutiny is a
limited one and does not purport to apply to the many other
types of technical data covered by the ITAR.  Second, we
believe that public cryptography presents special considera-
tions warranting separate treatment from other forms of
technical data, and that a precise and narrow regulation
or statute limited to cryptography would be more likely to
receive considered judicial attention.  Finally, we are
uncertain whether the present legislative authority for the
technical data provisions of the ITAR is adequate.

                         - 17 -

TAB 5



**DEPARTMENT OF STATE**

Washir. .  D C  20520

## MUNITIONS CONTROL NEWSLETTER

NO. 80

2/80

### CRYPTOGRAPHY/TECHNICAL DATA

Concern has been voiced that ITAR provisions relating to the export of technical data as applied to cryptologic equipment can be so broadly interpreted as to restrict scientific exchanges of basic mathematical and engineering research data.  The Office of Munitions Control wishes to clarify the application of the technical data provisions of Section 121.01, Category XVIII, of the ITAR as applied to equipment found in Categories XI(c) and XIII(b) of the Munitions List.

Cryptologic technical data for which a license is required under Section 121.01, Category XVIII, is interpreted by this office with respect to information relating to Munitions List items in Categories XI(c) and XIII(b) to include only such information as is designed or intended to be used, or which reasonably could be expected to be given direct application, in the design, production, manufacture, repair, overhaul, processing, engineering, development, operation, maintenance or reconstruction of items in such categories.  This interpretation includes, in addition to engineering and design data, information designed or reasonably expected to be used to make such equipment more effective, such as encoding or enciphering techniques and systems, and communications or signal security techniques and guidelines, as well as other cryptographic and cryptanalytic methods and procedures. It does not include general mathematical, engineering or statistical information, not purporting to have or reasonably expected to be given direct application to equipment in such categories.  It does not include basic theoretical research data.  It does, however, include algorithms and other procedures purporting to have advanced cryptologic application.

The public is reminded that professional and academic presentations and informal discussions, as well as demonstrations of equipment, constituting disclosure of cryptologic technical data to foreign nationals, are prohibited without the prior approval of this office.  Approval is not required for publication of data within the United States as described in Section 125.11(a)(1).  Footnote 3 to section 125.11 does not establish a prepublication review requirement.

263

> The interpretation set forth in this newsletter should exclude from the licensing provisions of the ITAR most basic scientific data and other theoretical research information, except for information intended or reasonably expected to have a direct cryptologic application.  Because of concerns expressed to this office that licensing procedures for proposed disclosures of cryptologic technical data contained in professional and academic papers and oral presentations could cause burdensome delays in exchanges with foreign scientists, this office will expedite consideration as to the application of ITAR to such disclosures.  If requested, we will, on an expedited basis provide an opinion as to whether any proposed disclosure, for other than commercial purposes, of information relevant to cryptology, would require licensing under the ITAR.

William B. Robinson, Director
Office of Munitions Control

Mr. INGRAM. The bottom line is that the regulations themselves have not been amended.

Mr. FOY. That is correct.

Mr. INGRAM. Let me call your attention to a letter of August 29, 1978, from your colleague, Larry Hammond, Deputy Assistant Attorney General, Office of Legal Counsel, to Col. Wayne Kay, Senior Policy Analyst, Office of Science and Technology Policy, Executive Office of the President.

The letter discusses the *Edler* case that you mentioned, which did present a first amendment challenge to the Munitions Control Act of 1954 and the ITAR. As Hammond notes, his letter to Kay is a followup to the Department's memorandum of 3 months previous to Dr. Press on public cryptography and the ITAR. Hammond goes on to conclude, at page 2 of his letter,

While the ninth circuit's decision in Edler is helpful in resolving first amendment issues with respect to blueprints and similar types of technical data used as a basis for producing military equipment, we do not believe that it either resolves the first amendment issues presented by restrictions on the export of cryptographic ideas or eliminates the need to reexamine the ITAR.

[The material follows:]

App. 206

15-50759.333

TAB 6

# Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations

Proposed revision of the "technical data" provision of the International Traffic in Arms Regulations (ITAR) redefines and narrows the class of transactions that are subject to a licensing requirement under the Arms Export Control Act of 1976, in an attempt to avoid imposing a prior restraint on speech protected by the First Amendment; however, even as revised the ITAR can have a number of constitutionally impermissible applications.

The licensing requirement in the ITAR may constitutionally be applied to transactions involving arrangements entered into by exporters to assist foreign enterprises in the acquisition or use of technology; it may also be applied to transactions involving the dissemination of technical data for the purpose of promoting the sale of technical data or items on the Munitions List, since the prior restraint doctrine has only limited applicability to "commercial speech." However, insofar as it could be applied to persons who have no connection with any foreign enterprise, who disseminate technical data in circumstances in which there is no more than a belief or a reasonable basis for believing that the data might be taken abroad by foreign nationals and used there in the manufacture of arms, the licensing requirement is presumptively unconstitutional as a prior restraint on speech protected by the First Amendment.

It is not certain whether a court would find that the revised ITAR are so substantially overbroad as to be void and unenforceable in all their applications, or decide to save the regulations through a narrowing construction. The best legal solution is for the Department of State, not the courts, to narrow the ITAR so as to make it less likely that they will apply to protected speech in constitutionally impermissible circumstances.

July 1, 1981

## MEMORANDUM OPINION FOR THE OFFICE OF MUNITIONS CONTROL, DEPARTMENT OF STATE

   The views of this Office have been requested concerning the constitutionality of a proposed revision of the "technical data" provisions of the International Traffic in Arms Regulations (ITAR). 45 Fed. Reg. 83,970 (December 19, 1980). On the basis of the analysis set forth below, we conclude that from a constitutional standpoint, the revised ITAR is a significant improvement over the prior version, but that even as revised, it can have a number of unconstitutional applications. We recommend that the proposed revision be modified to minimize or eliminate the number of impermissible applications. Our views are set forth in more detail below.

purpose of assisting the foreign enterprise in the acquisition of use of technology; (2) transactions involving the dissemination of technical data for the purpose of promoting or proposing the sale of technical data of items on the Munitions List; and (3) transactions in which an "exporter" who is not otherwise connected or concerned with any foreign enterprise transmits technical data knowing, or having reason to know, that the data may be taken abroad and used by someone there in the manufacture or use of arms.

We have concluded that the application of the revised technical data provisions to transactions in the first two categories described above will not violate the First Amendment prohibition against prior restraint. However, the application of these provisions to transactions in the third category will raise serious constitutional questions. Our ultimate conclusions about the constitutionality of the technical data provisions are set forth, together with our recommendations for revision, in section III below.

(1) *Transactions involving arrangements entered into by exporters to assist foreign enterprises in the acquisition or use of technology.* At its core, the ITAR is designed to control United States firms and individuals who undertake to assist foreign enterprises in the acquisition and use of arms. The purpose of the technical data provisions is to extend that control to transactions in which assistance takes the form of technical advice. Perhaps the most common example of a transaction of that kind is a straightforward commercial arrangement in which an American firm agrees to provide technical information or advice to a foreign firm engaged in the manufacture of an item or items on the Munitions List.[3]

The leading case involving the constitutionality of the ITAR arose in precisely that context. *See United States* v. *Edler Industries, Inc.,* 579 F.2d 516 (9th Cir. 1978). In *Edler,* an American firm specializing in aerospace technology, Edler Industries, agreed to provide a French firm with technical assistance and data relating to a tape wrapping program. The Office of Munitions Control denied Edler's application for export licenses on the ground that exportation of the information in question would violate United States policy as established by the Act. During the pendency of the license applications, and after the denial, Edler proceeded to perform the contract and transmitted the information to the French firm. Edler was then prosecuted under the Act. Edler defended on the ground, among others, that the transmission of technical information under the contract with the French firm was constitutionally protected "speech" and that the government could not require such "speech" to be licensed in advance. The trial court rejected that contention and Edler was convicted.

---

[3] We can imagine more exotic examples that would proceed upon essentially the same legal footing, *e.g.,* a transaction in which an American agent (an "industrial spy") transmits sensitive technical information to his foreign principal.

In accordance with these principles, we conclude that, in general, the revised technical data provisions cannot constitutionally be applied to the dissemination of technical data by persons having no direct connection with foreign conduct in settings in which there is no more than belief or a reasonable basis for believing (1) that a foreign national may take the technical data abroad and (2) that the data could be used by someone there in the manufacture or use of items on the Munitions List.[10] In the absence of special circumstances that would justify prior restraint, such speech is arguably protected and, as a general rule, cannot be subjected constitutionally to the revised licensing requirement.

### III. Conclusion and Recommendation

We have concluded that the revised technical data provisions can have constitutional and unconstitutional applications. As a matter of constitutional doctrine, that conclusion would require a court to consider whether the provisions are so substantially overbroad that they are void and unenforceable in all their applications. *See Broadrick* v. *Oklahoma*, 413 U.S. 601 (1973). For the present, however, we will forgo that inquiry in favor of three more pragmatic considerations.

First, *Edler* itself demonstrates that the problems presented by facial overbreadth do not necessarily prevent the enforcement of a licensing requirement in cases in which such a requirement can otherwise be constitutionally enforced. The *Edler* court saw its task as one of saving a necessary system of regulation, and it therefore chose to "construe" the statute and the applicable regulations narrowly to avoid the overbreadth problem and to preserve the possibility of enforcing the system against a criminal defendant (Edler) whose "speech" may not have been constitutionally protected. That approach was consistent with the approach that the Supreme Court itself has taken in some First Amendment cases. *See Civil Service Commission* v. *Letter Carriers*, 413 U.S. 548 (1972). It is an approach that may be taken when new cases arise under the revised technical data provisions.

Second, there is no absolute guarantee that other courts will be as concerned with saving the regulations as the *Edler* court was. The decision whether to enforce the overbreadth doctrine or to save the regulation through narrow "construction" is in part a matter of judicial discretion; and we cannot exclude the possibility that a court would

---

[10] As *Edler* suggests, a different conclusion may be appropriate if the data have only military applications, or if the defendant knows such an application is intended. Even in such contexts, however, there may be situations in which the First Amendment bars a prior restraint consider, for example, a lecture on technical data having exclusively military uses when nationals of American allies are in the audience We do not, however, conclude that the ITAR is unconstitutional with respect to all transactions falling within this category; we merely suggest it has a number of unconstitutional applications.

hold the technical data provisions substantially overbroad, and therefore void.

For obvious reasons, the best legal solution for the overbreadth problem is for the Department of State, not the courts, to narrow the regulations. In our judgment, the regulations should be narrowed to make it less likely that they will apply, or be seen to apply, to protected speech falling within the general category described in part 3 of section II above. We would respectfully recommend that an effort be undertaken along that line.[11]

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[11] We also recommend the legislative changes referred to in note 7, *supra.*

214

TAB 7

# Constitutionality of Proposed Revisions of
the Export Administration Regulations

Proposed revisions of the Export Administration Regulations dealing with the export of technical data to foreign nationals apply a prior restraint, in the form of a licensing requirement, to a wide variety of speech protected by the First Amendment. There is thus a considerable likelihood that in their current form the regulations would be invalidated as unconstitutionally overbroad. The regulations would also be vulnerable to constitutional attack on grounds of vagueness. If the regulations were cast not as a licensing scheme but as a form of subsequent punishment, they could cover a far broader range of conduct.

A licensing system is likely to be held constitutional only if it applies narrowly to exports which are likely to produce grave harm under the test set forth in *New York Times Co. v. United States,* 403, U.S. 713 (1971).

July 28, 1981

## MEMORANDUM OPINION FOR THE DIRECTOR,
## CAPITAL GOODS PRODUCTION MATERIALS DIVISION,
## DEPARTMENT OF COMMERCE

This will respond to your request for the views of this Office on the constitutional issues raised by your draft revision of Part 379 of the Export Administration Regulations. Those regulations clarify the circumstances in which a license is required for the export of technical data to foreign nationals. We believe that the regulations, as currently drafted, have a number of unconstitutional applications, and that they should therefore be substantially revised in order to meet the constitutional objections. In the discussion below, we offer a general statement of our reasoning, together with some suggestions for possible revision.

### I. Background

The general purpose of the regulations is to require a license before the "export" of "technical data," subject to two exceptions discussed below. Under the regulations, technical data is defined as "information and know-how of any kind that can be used, or adapted for use, in the design, production, manufacture, repair, overhaul, processing, engineering, development, operation, maintenance, or reconstruction of commodities." The term "commodity" encompasses a wide range of articles compiled on the Commodities Control List. Many of the articles fall generally in the broad category of "high technology" items, including,

230

TAB 8



**U.S. Department of Justice**

Office of Legal Counsel

Office of the
Deputy Assistant Attorney General

*Washington, D.C. 20530*

JUL 5 - 1984

MEMORANDUM FOR DAVIS R. ROBINSON
LEGAL ADVISER
DEPARTMENT OF STATE


Re:  Revised Proposed International Traffic in
Arms Regulations (ITAR)


     This responds to a memorandum of June 5, 1984, from Mr.
Cummings of your Office, requesting the views of this Office
on a proposed revision of the International Traffic in Arms
Regulations (ITAR), recently prepared by the Department of
State (hereinafter "current draft").  This Office has previously
provided extensive comments on an earlier proposed revision
of the ITAR (hereinafter "prior draft"). 1/  See Memorandum for
William B. Robinson, Office of Munitions Control, Department
of State, from Theodore B. Olson, Assistant Attorney General,
Office of Legal Counsel (July 1, 1981) (hereinafter "1981 ITAR

---

1/  This Office first addressed constitutional issues related
to the ITAR in 1978 in a memorandum for Dr. Frank Press, the
Science Adviser to President Carter.  That opinion considered
the constitutionality of the restrictions on the dissemination
of cryptographic information developed by scientists and
mathematicians in the private sector independent of government
supervision or support.  We concluded that the ITAR's prohibi-
tion of disclosure of these "public" cryptographic ideas and
information amounted to an unconstitutional prior restraint.
See Memorandum for Dr. Frank Press, Science Adviser to the
President, from John M. Harmon, Assistant Attorney General,
Office of Legal Counsel (May 11, 1978) (attached).

important to note that, in our judgment, the constitutional principles upon which we relied remain intact. 3/

## III.   DISCUSSION

The current draft of the ITAR circulated by your Office was apparently intended to remedy the constitutional defects

---

3/  In Metromedia, Inc. v. San Diego, 453 U.S. 490 (1981) (plurality opinion), the Court considered a city ordinance which permitted onsite commercial advertising but prohibited offsite commercial advertising and noncommercial advertising with limited exceptions.  The plurality opinion concluded that the ordinance was constitutional as applied to commercial speech because it satisfied the standards of Central Hudson Gas & Electric Corp. v. Public Service Comm'n, 447 U.S. 557 (1981), upon which we relied in our prior opinion.  The substantial government interests in improved traffic safety and appearance of the city were directly served by the ordinance, which was no broader than necessary to accomplish those ends.  (The ban was invalidated as applied to noncommercial speech, however, because the Government's asserted interests were insufficient to justify the ban, given that commercial advertising was permitted.)  In Bolger v. Youngs Drug Products Corp., 103 S. Ct. 2875 (1983), the Court struck down a federal statute which prohibited unsolicited mailing of contraceptive advertisements.  The Court held that the statute was an unconstitutional restriction on commercial speech because the Government's interests in shielding recipients from unwanted mail which they might find offensive and aiding parents in controlling the information which their children received about birth control were insufficient to overcome the protection afforded to speech that was truthful and related to activity protected from unwanted state interference and also to important social issues.  City of Los Angeles v. Taxpayers for Vincent, No. 82-975, 52 U.S.L.W. 4594 (U.S. May 15, 1984), is a sort of sequel to Metromedia, although it is not a commercial speech case.  In Taxpayers, the Court upheld a city ordinance which prohibited the posting of signs on public property.  The Court held that the content-neutral prohibition was justified by the city's substantial esthetic interests, even as applied to signs which carried political messages.  Of course, the ordinance was directed against--and prohibited --only the use of the signs.  Speech itself was not regulated and could be continued to be conveyed on public property by a speaker or distributor of leaflets.

-4-

App. 140
15-50759.267

consent of the Office of Munitions Control.  Under this sub-
section, an exemption would be provided for full time, regular
employees of a single corporation or university to discuss
technical data among themselves.  What is not exempt, however,
without the prior written consent of the Office of Munitions
Control, is a disclosure of the information by an employee of
a corporation or university to a foreign national who is a
part-time or temporary employee of that corporation or univer-
sity; a full time employee of another corporation or univer-
sity; another professional person attending a conference or
a seminar at the corporation or university; a student; or a
friend.

        We recognize the attempt made to address the concerns
raised in our prior opinion, and, as we stated with regard to
the new exemptions provided in subsections (9) and (12), to the
extent that subsection (10) constricts the area of application
of the licensing requirement, the additional exemption reduces
the area of potential unconstitutional application of that
requirement.  We have identified, however, a number of circum-
stances in which the prior written consent of the Office of
Munitions Control would be required for disclosure of the
technical data.  As noted above, with regard to subsection
(11), which requires the written consent of that Office for
export of certain technical data pursuant to an arrangement
with the Department of Defense or NASA, we do not believe
that there is a constitutionally significant distinction
between the requirement of obtaining prior written consent
and obtaining a license.  See note 11, supra.  In some of
these circumstances, as well as others, we believe that the
ITAR may still be read to operate as a prior restraint on the
speech of "persons having no direct connection with foreign
conduct in settings in which there is no more than belief or
a reasonable basis for believing (1) that a foreign national
may take the technical data abroad and (2) that the data
could be used by someone there in the manufacture or use of
items on the Munitions List."  1981 ITAR Memorandum at 14.
As we concluded in that memorandum, "[i]n the absence of
special circumstances that would justify prior restraint,
such speech is arguably protected and, as a general rule,
cannot be subjected constitutionally to the . . . licensing
requirement."  Id.

        We are aware of the case law interpreting 22 U.S.C. § 2778,
the statutory authority for the ITAR, which requires a specific
intent willfully to export particular goods on the Munitions
List without a license.  See, e.g., United States v. Hernandez,
662 F.2d 289, 292 (5th Cir. 1981) ("statute's requirement of
willfulness connote[s] a voluntary and intentional violation

-13-

of a known legal duty," that is, "that the defendant knew
that he was unlawfully exporting weapons on the Munitions
List"); United States v. Beck, 615 F.2d 441, 449-50 (7th Cir.
1980) (conviction requires "proof that the defendants (1)
exported or attempted to export (2) goods on the United
States Munitions List (3) without first having obtained a
license for the export (4) willfully"); and United States v.
Wieschenberg, 604 F.2d 326, 331 (5th Cir. 1979) (to sustain a
conviction for conspiracy to violate the statute, "government
must prove that the defendants agreed to and specifically
intended to export without a license particular property
that is restricted by the Munitions List").  It may be that
the standard of knowledge and intent that is imposed by these
cases with regard to the export of defense articles might,
as applied to technical data, be sufficient to broaden, in
effect, the scope of the exemption under subsection (10)
to the extent consistent with the constitutional standard
articulated in our previous memorandum and reaffirmed here.

     We remain of the opinion, however, that on their face,
the ITAR still present some areas of potentially unconstitu-
tional application, and, moreover, that we cannot be certain
whether existing case law would be sufficient to narrow the
range of application to a constitutionally sufficient extent.
In any event, as we advised in our 1981 Memorandum with
regard to the overbreadth present in the prior draft, we
believe that "the best legal solution . . . is for the Depart-
ment of State, not the courts, to narrow the regulations."
See 1981 ITAR Memorandum at 15.


                    IV.  CONCLUSION

     We have carefully examined the definitions of "export"
and of "technical data," as well as the exemptions provided
from the licensing requirement, under the current draft of
the ITAR, and we believe that the scope of the exemptions is
broader, and the coverage of the licensing requirement there-
fore narrower, in at least three specific areas of importance
to private persons:  exports by disclosures to certain
employees of U.S. corporations overseas (subsection (9));
certain exports to Canada (subsection (12)); and exports by
disclosure of technical data by U.S. corporations and academic
institutions to foreign nationals who are their full time,
regular employees, subject to certain conditions (subsection
(10)).  Notwithstanding these additional exemptions, however,
we have identified certain areas which still appear to us to

                          -14-

present sensitive constitutional issues.  As we previously
recommended, this remaining overbreadth should be eliminated
by more narrowly drafted regulations.


Larry D. Simms
Deputy Assistant Attorney General
Office of Legal Counsel


Attachments:

    Appendix of regulations
    Memorandum of May 11, 1978, for Dr. Frank Press
    Memorandum of July 28, 1981, for Henry D. Mitman


-15-

App. 151
15-50759.278

TAB 9

This web site was copied prior to January 20, 2005. It is now a Federal record managed by the National Archives and Records Administration. External links, forms, and search boxes may not function within this collection. Learn more.   [hide]



# 1997 REPORT ON THE AVAILABILITY OF BOMBMAKING INFORMATION



PREPARED BY THE UNITED STATES DEPARTMENT OF JUSTICE
AS REQUIRED BY SECTION 709(a) IF THE
ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

SUBMITTED TO:

THE UNITED STATES HOUSE OF REPRESENTATIVES
AND THE UNITED STATES SENATE

APRIL 1997

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY

BACKGROUND

I.   THE PUBLIC AVAILABILITY OF INFORMATION ON THE MANUFACTURE
     OF BOMBS, DESTRUCTIVE DEVICES, AND WEAPONS OF MASS DESTRUCTION

     A.   Books, Pamphlets and Other Printed Material

     B.   The Internet

     C.   Summary

II.  THE EXTENT TO WHICH PUBLISHED BOMBMAKING INFORMATION HAS
     FACILITATED THE MANUFACTURE AND USE OF EXPLOSIVES IN ACTS OF
     TERRORISM AND OTHER CRIMINAL ACTIVITY

III. THE LIKELIHOOD THAT PUBLISHED BOMBMAKING INFORMATION WILL
     CONTINUE TO BE USED TO FACILITATE ACTS OF TERRORISM AND OTHER
     CRIMINAL ACTIVITY

impermissibly restrict the wholly legitimate publication and teaching of such information, or otherwise violate the First Amendment.

The First Amendment would impose substantial constraints on any attempt to proscribe indiscriminately the dissemination of bombmaking information. The government generally may not, except in rare circumstances, punish persons either for advocating lawless action or for disseminating truthful information -- including information that would be dangerous if used -- that such persons have obtained lawfully. However, the constitutional analysis is quite different where the government punishes speech that is an integral part of a transaction involving conduct the government otherwise is empowered to prohibit; such "speech acts" -- for instance, many cases of inchoate crimes such as aiding and abetting and conspiracy -- may be proscribed without much, if any, concern about the First Amendment, since it is merely incidental that such "conduct" takes the form of speech.

Accordingly, we have concluded that Senator Feinstein's proposal can withstand constitutional muster in most, if not all, of its possible applications, if such legislation is slightly modified in several respects that we propose at the conclusion of this Report. As modified, the proposed legislation would be likely to maximize the ability of the Federal Government -- consistent with free speech protections -- to reach cases where an individual disseminates information on how to manufacture or use explosives or weapons of mass destruction either (i) with the intent that the information be used to facilitate criminal conduct, or (ii) with the knowledge that a particular recipient of the information intends to use it in furtherance of criminal activity.

## BACKGROUND

In order fully to understand the issues we have been asked to address, it is helpful first to describe the legislative proceedings that prompted enactment of section 709 of the AEDPA.

On May 11, 1995, less than one month after the Oklahoma City terrorist bombing, in testimony before the Subcommittee on Terrorism, Technology and Government Information of the Senate Judiciary Committee, Deputy Assistant Attorney General Robert Litt, of the Justice Department's Criminal Division, explained that "how to" guides for the manufacture of explosives are readily available on the Internet, in bookstores and even in public libraries.[1] To illustrate the point, he observed that, according to a news article, only hours after the Oklahoma City bombing, someone posted on the Internet directions -- including a diagram -- explaining how to construct a bomb of the type that was used in that tragic act of terrorism. Another Internet posting offered not only information concerning how to build bombs, but also instructions as to how the device used in the Oklahoma City bombing could have been improved.

Mr. Litt explained that "expansion of the scope of federal criminal laws dealing with the violent, terrorist activity will permit the Department of Justice to prosecute those who engage in efforts to assist violence and terrorism over the Internet." Mr. Litt observed, however, that despite the dangers posed by the dissemination of such information and the callous disregard of human life shown by those who are responsible for such action, the First Amendment imposes significant constraints on the ability of the federal government to proscribe and penalize such activity.

On June 5, 1995, Senator Feinstein proposed an amendment to a bill (S. 735) that later became the AEDPA. 141 Cong. Rec. S7682 (daily ed. June 5, 1995). The purpose of the amendment was to address the problem of the increasingly widespread "distribution of bombmaking information for criminal purposes." Id. Following some debate in the Senate, Senator Feinstein's amendment was slightly modified, and the full Senate unanimously approved it by voice vote. Id. at S7686. The Senate passed S. 735 on June 7, 1995. 141

weapons.  For example, on August 28, 1996, one participant of a Usenet newsgroup inquired whether anyone had a recipe for C-4 and detonation techniques.  The following day, someone responded to the inquiry by posting a detailed formula, explaining that "[t]he production of C-4 is probably beyond what can [be] done in the kitchen, but here is something to get you started."  On August 16, 1996, another Usenet participant complained that he had "recently attempted to follow the recipe [for an explosive] posted earlier . . . and nearly blew my arms off!"  This prompted the following response:

> So what do you want, sympathy?  Let me clue you in here. Actually building any of this stuff is illegal, immoral,
> anti-social, and just plain wrong.  But then, so are a lot of other fun things.  The point is, if you do it, and you blow
> yourself up, it's your own fault.  So quit sniveling.  [N]ext time, don't cook at home.

**C.** <u>Summary</u>.  It is readily apparent from our cursory examination that anyone interested in manufacturing a bomb, dangerous weapon or weapon of mass destruction can easily obtain detailed instructions for fabricating and using such a device.  Available sources include not only publications from the so-called underground press but also manuals written for legitimate purposes, such as military, agricultural, industrial and engineering purposes.  Such information is also readily available to anyone with access to a home computer equipped with a modem.

# II.
## THE EXTENT TO WHICH PUBLISHED BOMBMAKING INFORMATION HAS FACILITATED THE MANUFACTURE AND USE OF EXPLOSIVES IN ACTS OF TERRORISM AND OTHER CRIMINAL ACTIVITY

Recent law enforcement experience demonstrates that persons who attempt or plan acts of terrorism often possess literature that describes the construction of explosive devices and other weapons of mass destruction (including biological weapons).  Although in some cases there is no hard evidence demonstrating that such individuals actually employed such information in furtherance of their crimes, possession of such information often is strong circumstantial evidence from which such usage can be inferred.

During the execution of a search warrant at the Rex, Georgia residence of Walter Leroy Moody, Jr., the convicted bombing murderer of Judge Robert S. Vance and attorney Robert Robinson, investigators discovered a copy of the <u>Anarchist's Cookbook</u>.

In November 1995, Oklahoma residents Ray and Cecilia Lampley, along with one John "J.D." Baird, began construction of an ammonium nitrate bomb, utilizing a manual for the making of "Homemade C-4," a military plastic explosive.  The group intended to destroy either the Jewish Anti-Defamation League building in Houston, Texas, or the Southern Poverty Law Center in Birmingham, Alabama.  Following the recipe from the manual, the Lampleys "cooked" the ammonium nitrate, and obtained accelerants, such as nitromethane and powdered aluminum.  Additionally, Ray Lampley learned that he needed an initial detonating charge to properly detonate the "homemade C-4," and attempted to make a triacetone triperoxide detonator utilizing instructions from <u>Ragnar's Big Book of Explosives</u>.  When the three co-conspirators were arrested by the FBI, law enforcement agents recovered the <u>Anarchist's Cookbook and Homemade Weapons</u>, in addition to the "homemade C-4" text, from the Lampley residence.[8]

TAB 10



United States Department of State

*Bureau of Political-Military Affairs*
*Office of Defense Trade Controls Compliance*
*Washington, D.C. 20522-0112*

MAY 08 2013

In reply refer to


Mr. Cody Wilson
Defense Distributed

Dear Mr. Wilson:

    The Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance, Enforcement Division (DTCC/END) is responsible for compliance with and civil enforcement of the Arms Export Control Act (22 U.S.C. 2778) (AECA) and the AECA's implementing regulations, the International Traffic in Arms Regulations (22 C.F.R. Parts 120-130) (ITAR). The AECA and the ITAR impose certain requirements and restrictions on the transfer of, and access to, controlled defense articles and related technical data designated by the United States Munitions List (USML) (22 C.F.R. Part 121).

    DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

    Technical data regulated under the ITAR refers to information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles, including information in the form of blueprints, drawings, photographs, plans, instructions or documentation. For a complete definition of technical data, see § 120.10 of the ITAR. Pursuant to § 127.1 of the ITAR,

App. 13
15-50759.140

it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC.  Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR.

The Department believes Defense Distributed may not have established the proper jurisdiction of the subject technical data.  To resolve this matter officially, we request that Defense Distributed submit Commodity Jurisdiction (CJ) determination requests for the following selection of data files available on DEFCAD.org, and any other technical data for which Defense Distributed is unable to determine proper jurisdiction:

1. Defense Distributed Liberator pistol
2. .22 electric
3. 125mm BK-14M high-explosive anti-tank warhead
4. 5.56/.223 muzzle brake
5. Springfield XD-40 tactical slide assembly
6. Sound Moderator – slip on
7. "The Dirty Diane" 1/2-28 to 3/4-16 STP S3600 oil filter silencer adapter
8. 12 gauge to .22 CB sub-caliber insert
9. Voltlock electronic black powder system
10. VZ-58 front sight.

DTCC/END requests that Defense Distributed submit its CJ requests within three weeks of receipt of this letter and notify this office of the final CJ determinations.  All CJ requests must be submitted electronically through an online application using the DS-4076 Commodity Jurisdiction Request Form.  The form, guidance for submitting CJ requests, and other relevant information such as a copy of the ITAR can be found on DDTC's website at http://www.pmddtc.state.gov.

Until the Department provides Defense Distributed with final CJ determinations, Defense Distributed should treat the above technical data as ITAR-controlled.  This means that all such data should be removed from public access immediately.  Defense Distributed should also review the remainder of the data made public on its website to

determine whether any additional data may be similarly controlled and proceed according to ITAR requirements.

Additionally, DTCC/END requests information about the procedures Defense Distributed follows to determine the classification of its technical data, to include the aforementioned technical data files. We ask that you provide your procedures for determining proper jurisdiction of technical data within 30 days of the date of this letter to Ms. Bridget Van Buren, Compliance Specialist, Enforcement Division, at the address below:

Office of Defense Trade Controls Compliance



We appreciate your full cooperation in this matter. Please note our reference number in any future correspondence.

Sincerely,

Glenn E. Smith
Chief, Enforcement Division

App. 15
15-50759.142

TAB 11

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and | § | Case No. 15-CV-372 |
| SECOND AMENDMENT FOUNDATION, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

DECLARATION OF CODY WILSON

I, Cody Wilson, declare:

1.       I am a citizen of the United States and a resident of Texas.

2.       I co-founded and now lead Defense Distributed, a Texas non-profit corporation. Defense Distributed is organized and operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution through facilitating global access to, and the collaborative production of, information and knowledge related to the 3D printing of arms; and to publish and distribute, at no cost to the public, such information and knowledge on the Internet in promotion of the public interest.

3.       Beginning in 2012, Defense Distributed privately generated, and posted on the Internet for free access by the public, technical information about various gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun named "The Liberator" (the "Published Files"). At the time it did so, there were no publicly known DDTC enforcement actions for the posting of files on the Internet.

4.      The Published Files were downloaded hundreds of thousands times. The Liberator files in particular generated national media attention, with coverage in Forbes, CNN, NBC News, the Wall Street Journal, and even an episode of The Colbert Report.

5.      In May 2013, Defense Distributed received a letter dated May 8, 2013, from Glenn Smith, Chief of Defendant DDTC's Enforcement Division. The letter warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR . . . all such data should be removed from public access immediately.

Exhibit 1 is a true and correct copy of that letter.

6.      At the time it posted the Published Files, Defense Distributed did not know that the government would demand to pre-approve its speech. Defense Distributed believed, and continues to believe, that the United States Constitution guarantees a right to share truthful speech—especially speech concerning fundamental constitutional rights—in open forums. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with Defendants' demands and removed all of the Published Files from its servers.

7.      Defendants' letter further directed Defense Distributed to submit the Published Files to DDTC for review using the "commodity jurisdiction" procedure. Defense Distributed complied with Defendants' request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013. Exhibit 13 is a true and correct copy of those requests (without attachments). Nearly two years later, Defendants have still not responded to the requests.

8.      On September 25, 2014, Defense Distributed requested DOPSR's prepublication approval for public release of files containing technical information on a milling machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").[1] Exhibit 14 is a true and correct copy of that request (without attachments). On October 1, 2014, DOPSR informed Defense Distributed this request for review was refused because DOPSR was unsure whether the Ghost Gunner was subject to ITAR. DOPSR further recommended that Defense Distributed submit another commodity jurisdiction request to the Defendants. Exhibit 15 is a true and correct copy of DOPSR's October 1, 2014 correspondence to Defense Distributed.

9.      Defense Distributed submitted another commodity jurisdiction request for the Ghost Gunner to Defendants on January 2, 2015. Exhibit 16 is a true and correct copy of that request (without attachments). On April 15, 2015, Defendant DDTC determined that the Ghost Gunner machine, user manual, and operating software are not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [ITAR]." Exhibit 17 is a true and correct copy of DOPSR's April 15, 2015 correspondence to Defense Distributed.

10.     Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files. Exhibits 18 through 21 are true and correct copies of these requests (without attachments). On December 31,

_____

[1]Any milling machine can be modified to mill components that are unlawful to manufacture, just as any saw that may be purchased at a hardware store can be used to unlawfully shorten a shotgun. However, Ghost Gunner does not ship with the jigs and code to

2014, nearly four months after the first such review request, DOPSR sent Defense Distributed two letters dated December 22, 2014, stating its refusal to review the CAD files. The letters directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. Exhibit 22 is a true and correct copy of DOPSR's December 31, 2014 correspondence to Defense Distributed.

11.     However, because this is not the DDTC division responsible for issuing licenses or other DDTC authorizations, on January 5, 2015, Defense Distributed requested Defendants' guidance on how to obtain authorization from DDTC Compliance for release of the CAD files. Exhibit 23 is a true and correct copy of that request (without attachments). To date, Defendants have not responded to Defense Distributed's request for guidance.

12.     Defense Distributed appears to be the ITAR prior restraint scheme's *only* target. Other websites containing similar firearm-related parts, such as GrabCAD.com, Weaponeer.com, Thingiverse.com, Ak-builder.com, AR15.com, Scribd.com, CNCguns.com, we are apparently unimpeded.

13.     Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to open forums on the Internet. Many of these files are described in the USML.

14.     But for Defendants' impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Defense Distributed would freely distribute the Subject Files and other files relating to

———————————

manufacture machine guns, and Defense Distributed has no intention of offering such items for sale.

Second Amendment arms. Defense Distributed refrains from distributing the Subject Files because I fear that Defendants would pursue criminal and civil enforcement proceedings against me and the company for doing so.

I declare under penalty of perjury that the foregoing is true and correct.

This the 8th day of May, 2015.

Cody Wilson

Scanned by CamScanner

TAB 12

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and | § | Case No. 15-CV-372-RP |
| SECOND AMENDMENT FOUNDATION, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

**SUPPLEMENTAL DECLARATION OF ALAN GOTTLIEB**

I, Alan Gottlieb, declare:

1.      I am a citizen of the United States and a resident of the state of Washington.  I make this declaration as a supplement to the declaration I provided earlier for use in the above-referenced case.  I make this declaration based on my personal knowledge and, if called upon to do so, could and would testify competently to the matters set forth below.

2.      I am the Executive Vice President of the Second Amendment Foundation, Inc. (SAF). SAF is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including Texas. The purposes of SAF include education, research, publishing, and legal action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control.

3.      The issues raised by, and consequences of, Defendants' policies restricting the sharing of firearms-related files over the Internet are of great interest to SAF's constituency.

15-50759.658

Were Defense Distributed not prohibited by Defendants from sharing on the Internet its files related to lawful firearms, countless law-abiding, responsible adult SAF members and supporters would access, study, share, modify, and learn from Defense Distributed's various files, and use them to build lawful firearms for self-defense and to keep such firearms operable for self-defense.  They would also do this with similar firearms-related CAD files that they or others have created. But for the threats from Defendants of criminal and civil liability, SAF members would create and share CAD files relating to lawful firearms—again, in connection with the building of lawful firearms for self-defense and with maintaining lawful firearms operable for purposes of self-defense.

4.      In furtherance of SAF's mission, and to serve its members and the public, SAF would publish and promote, on the Internet, the free distribution of Defense Distributed's various files, and allow its members and others to upload their own firearm-related CAD files to SAF's servers for Internet publication, for purposes of the construction of lawful firearms for self-defense. SAF is presently refraining from doing so only owing to Defendants' interpretation of ITAR, including threats against Defense Distributed of potential criminal and civil liability.

5.      SAF is proud to bring this action on behalf of its members.  Conn Williamson and Peter Versnel are two of the many members of SAF.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 23RD day of June, 2015.

_____
Alan Gottlieb

15-50759.659

TAB 13

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and<br>SECOND AMENDMENT FOUNDATION, INC., | § | Case No. 15-CV-372-RP |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

**SUPPLEMENTAL DECLARATION OF CONN WILLIAMSON**

I, Conn Williamson, declare:

1.      I am a citizen of the United States and a resident of the State of Washington.  I make this declaration as a supplement to the declaration I provided earlier for use in the above-referenced case.  I make this declaration based on my personal knowledge and, if called upon to do so, could and would testify competently to the matters set forth below.

2.      I am a member of the Second Amendment Foundation (SAF).

3.      I am not prohibited from owning lawful firearms by any local, state, or federal law, regulation, or court order.

4.      But for the threats of criminal and civil liability made to Defense Distributed by the above-referenced Defendants, and those Defendants' related interpretation of ITAR, I would access online, study, share online, and learn from Defense Distributed's various firearms-related files, including files related to the Liberator handgun, as well as similar files related to firearms that Defense Distributed or others have created, for various purposes, including the manufacture and maintenance of lawful firearms that I would use for self-defense.  I would access these files

via the Defense Distributed web site and via the SAF web site and download them from those sites, when posted there.  I would also upload and share such files via the SAF web site, so that other United States citizens could download them and use them for constructing and maintaining lawful firearms for self-defense.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 24 day of June, 2015.

_____
Conn Williamson

15-50759.662

TAB 14

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and<br>SECOND AMENDMENT FOUNDATION, INC., | §<br>§<br>§ | Case No. 15-CV-372-RP |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | |
| U.S. DEPARTMENT OF STATE, et al., | §<br>§ | |
| Defendants. | §<br>§<br>§ | |

**SUPPLEMENTAL DECLARATION OF PETER VERSNEL**

I, Peter Versnel, declare:

1.      I am a citizen of the United States and a resident of the State of Washington.  I make this declaration as a supplement to the declaration I provided earlier for use in the above-referenced case.  I make this declaration based on my personal knowledge and, if called upon to do so, could and would testify competently to the matters set forth below.

2.      I am a member of the Second Amendment Foundation (SAF).

3.      I am not prohibited from owning lawful firearms by any local, state, or federal law, regulation, or court order.

4.      But for the threats of criminal and civil liability made to Defense Distributed by the above-referenced Defendants, and those Defendants' related interpretation of ITAR, I would access online, study, share online, and learn from Defense Distributed's various firearms-related files, including files related to the Liberator handgun, as well as similar files related to firearms that Defense Distributed or others have created, for various purposes, including the manufacture and maintenance of lawful firearms that I would use for self-defense.  I would access these files

1

15-50759.664

via the Defense Distributed web site and via the SAF web site and download them from those sites, when posted there.  I would also upload and share such files via the SAF web site, so that other United States citizens could download them and use them for constructing and maintaining lawful firearms for self-defense.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 13 day of June, 2015.

Peter Versnel

2

15-50759.665

CERTIFICATE OF SERVICE

On this, the 10th day of December, 2015, I electronically filed the attached Record Excerpts with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users who will be served by the CM/ECF system on December 10, 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 10th day of December, 2015.


/s/ Alan Gura
Alan Gura