# In the
# United States Court of Appeals
# for the Fifth Circuit

**DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED,**

PLAINTIFFS – APPELLANTS,

V.

**UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,**

DEFENDANTS – APPELLEES.

## On Appeal from the United States District Court
## for the Western District of Texas

## Brief of the Cato Institute
## as *Amicus Curiae* in Support of Plaintiffs-Appellants

Ilya Shapiro
 *Counsel of Record*
Randal J. Meyer (admission pending)
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, D.C. 20001
(202) 842-0200
ishapiro@cato.org
rmeyer@cato.org

**Supplemental Certificate of Interested Persons**

Case 15-50759, *Defense Distributed, et al., v. U.S. Dep't of State et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
| --- | --- |
| Ilya Shapiro | Counsel to *amicus* |
| Randal J. Meyer | Counsel to *amicus* |
| Cato Institute | *Amicus curiae* |

*Amicus curiae* Cato Institute is a Kansas nonprofit corporation. It has no parent companies, subsidiaries, or affiliates. It does not issue shares to the public.

/s/ Ilya Shapiro

# Table of Contents

Supplemental Certificate of Interested Persons ....................................1

Table of Contents ....................................................................2

Table of Authorities..................................................................3

Interest and Independence of *Amicus Curiae* ..........................................7

Summary of Argument...................................................................8

Argument..............................................................................9

  I.    Defense Distributed's Speech Does Not Lose First Amendment Protection Simply Because It Could Be Used Unlawfully ............9

      A. Defense Distributed's Files Constitute Protected Speech.........9

      B. Protected Speech Does Not Lose First Amendment Protection Simply Because It Could Be Used to Unlawful Ends ......12

  II.    The State Department's Categorical Ban on Distributing the CAD Files Via the Internet Is an Unlawful Prior Restraint on the Mass Dissemination of Protected Speech.............................24

      A. The Internet Is an Essential Method of Mass Dissemination, So a Prior Restraint on Its Use Is Suspect...................24

      B. Prior Restraint of the Mass Dissemination of Protected Speech Cannot Even Pass Rational Basis Review ...............26

Conclusion ...........................................................................31

Certificate of Compliance.............................................................32

Certificate of Filing and Service ....................................................32

# Table of Authorities

## Cases

*Ashcroft v. Free Speech Coalition,*
    535 U.S. 234 (2002)..................................................... *passim*

*Bartnicki v. Vopper,*
    532 U.S. 514 (2001)............................................... 22, 23, 30

*Brandenburg v. Ohio,*
    395 U.S. 444 (1969) (per curiam) ................................. 9, 15, 18, 19, 23

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973)............................................... 15, 26, 29

*Brown v. Entm't Merchants Ass'n,*
    131 S. Ct. 2729 (2011).......................................................10

*Butler v. Michigan,*
    352 U.S. 380 (1957)................................................... *passim*

*Chaplinsky v. New Hampshire,*
    315 U.S. 568 (1942).............................................................23

*Cohen v. California,*
    403 U.S. 15 (1971)...............................................................17

*Defense Distributed v. U.S. Dep't of State*, No. 1:15-CV-372 RP,
    2015 WL 4658921 (W.D. Tex. Aug. 4, 2015) .................................. 10, 26

*Hess v. Indiana,*
    414 U.S. 105 (1973) (per curiam) ........................................15

*Junger v. Daley,*
    209 F.3d 481 (6th Cir. 2000).......................................... 10, 12

*Kingsley Int'l Pictures Corp. v. Regents of Univ. of N.Y.*,
  360 U.S. 684 (1959).................................................................................30

*Miller v. California*,
  413 U.S. 15 (1973)..............................................................................23

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982)......................................................................20, 27

*New York Times Co. v. Unites States*,
  376 U.S. 254 (1964)..............................................................................19

*New York Times Co. v. Unites States*,
  403 U.S. 713 (1971) (per curiam) ..................................18, 19, 27-28, 30

*People v. Winters*,
  294 N.Y. 545 (1945) .............................................................................17

*Sable Communications of California, Inc. v. FCC*,
  492 U.S. 115 (1989)....................................................................21, 22, 28

*Scales v. United States*,
  367 U.S. 203 (1961)..............................................................................21

*Schneider v. State*,
  308 U.S. 147 (1939)........................................................16, 25, 27, 30

*Universal City Studios, Inc. v. Corley*,
  273 F.3d 429 (2d Cir. 2001) ................................................................10

*Winters v. New York*,
  333 U.S. 507 (1948).............................................................................17

**Statutes**

18 U.S.C. § 2256(B), (D) (2000) ........................................................14-15

22 U.S.C. §§ 2771-82 (2015) ...................................................... 8

22 U.S.C. § 2778(a)-(e) (2014) ................................................ 30

Michigan Penal Code § 343 (1955) ......................................... 18

N.Y Penal Law § 1141(2) (McKinney's 1947) ......................... 17

## Other Authorities

22 C.F.R. 120.1(a) (2015) ......................................................... 8

49 Fed. Reg. 47,682, 47,683 (Dec. 6, 1984) .............................. 9

55 Cong. Rec. 2009 (1917) (remarks of Sen. Henry F. Ashurst) ........... 20

Aaron Mamiit, *3.2 Billion: Number Of People Using The Internet Today*, Tech Times (May 28 2015), http://www.techtimes.com/articles/55773/20150528/3-2-billion-number-of-people-using-the-internet-today.htm ................................ 24

Andy Greenberg, *3D-Printed Guns As Art: London Design Museum Buys Two 'Liberator' Printed Pistols*, Forbes (Sept. 15, 2013), http://www.forbes.com/sites/andygreenberg/2013/09/15/3d-printed-guns-as-art-london-design-museum-buys-two-liberator-printed-pistols ........................................................................... 12, 22

Defendant's Opposition to Plaintiff's Motion For a Preliminary Injunction, Defense Distributed v. U.S. Dep't of State, No. 1:15-CV-372 RP, 2015 WL 4658921 (W.D. Tex. Aug. 4, 2015) .......................... 13

D.J. Pangburn, *3D-Printed 'Liberator' Guns Become a Chandelier Sculpture*, The Creators Project (Aug. 6, 2015), http://thecreatorsproject.vice.com/blog/3d-printed-liberator-guns-become-a-chandelier-sculpture ........................................................... 11

Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1096 (2005) ............................................................................. 13-14

*How Americans Get Their News*, American Press Inst., (Mar. 17, 2014), http://www.americanpressinstitute.org/publications/reports/ survey-research/how-americans-get-news ........................................... 25

*Internet 2012 in Numbers*, Pingdom.com (January 16, 2013), http://royal.pingdom.com/2013/01/16/internet-2012-in-numbers ........ 24

*Internet Users*, Internet Live Statistics (last updated July 1, 2014), http://www.internetlivestats.com/internet-users .................................. 24

Natasha Lennard. *The Pirate Bay Steps in to Distribute 3-D Gun Designs*, Salon (May 10, 2013), http://www.salon.com/2013/05/10/ the_pirate_bay_steps_in_to_distribute_3d_gun_designs .................... 31

Scott J. Grunewald, *American Gun Show Uses Art and 3D Printing to Start a Conversation about Guns*, 3D Print.com (Nov. 11, 2015), http://3dprint.com/104975/american-gun-show-art ............................. 11

St. George Tucker, 2 Blackstone's Commentaries on the Laws of England with Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States, and the Commonwealth of Virginia (1803) ....................................................... 28

## Interest and Independence of *Amicus Curiae*

The Cato Institute is a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Center for Constitutional Studies was established in 1989 to help restore the principles of constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and publishes the annual *Cato Supreme Court Review*.

This case concerns *amicus* because protecting the fundamental rights to freedom of expression and armed self-defense lies at the heart of Cato's mission. It is not for the State Department to abrogate lawful First Amendment speech as a vehicle for suppressing the disfavored exercise of Second Amendment rights.

No one other than the *amicus* and its counsel wrote this brief in whole or in part. The cost of its preparation was paid solely by *amicus*.

The parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

Defense Distributed, a nonprofit organization that promotes popular access to constitutionally protected firearms, generates and disseminates information over the Internet for a variety of scientific, artistic, and political reasons. The State Department has required Defense Distributed to submit to a regulatory prior restraint on Internet distribution of certain CAD (Computer-Aided Drafting) files—complex three-dimensional printing files with no intellectual-property protection—even domestically, under the Arms Export Control Act (AECA) and International Trafficking in Arms Regulations (ITAR). *See generally* 22 U.S.C. §§ 2771-82 (2015); 22 C.F.R. 120.1(a) (2015).

But Defense Distributed's protected speech cannot be suppressed merely because the lawful CAD files may potentially be used for unlawful purposes by foreign third parties. Such a prior restraint cannot even pass rational basis review. This court should reverse the district court and grant a preliminary injunction.

**ARGUMENT**

## I. DEFENSE DISTRIBUTED'S SPEECH DOES NOT LOSE FIRST AMENDMENT PROTECTION SIMPLY BECAUSE IT COULD BE USED UNLAWFULLY

The government concedes that Defense Distributed's files are protected speech under ITAR. *See* 49 *Fed. Reg.* 47,682, 47,683 (Dec. 6, 1984) (addressing congressional "[c]concerns" over "[ITAR] licensing requirements as they relate[] to the First Amendment," and noting that there is no "prepublication review requirement" under AECA or ITAR for technical information distributed domestically). Because foreign persons may *potentially* download the files and use them for *potentially* illegal ends, however, the State Department imposed a prior restraint against Defense Distributed's sharing of certain files with Americans. But the Supreme Court has made clear that speech does not lose First Amendment protection merely because it might be used to further criminal ends. *See generally, e.g., Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002); *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

### A. Defense Distributed's Files Constitute Protected Speech

Defense Distributed is not in the business of distributing arms. What it distributes—as recognized by the court below—is computer code and other expressive files. Such code and files are speech for First

9

Amendment purposes. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 447 (2d Cir. 2001); *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000). The Supreme Court has also held that the First Amendment protects the expression rendered by videogame computer code. *See Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) ("Like the protected books, plays, and movies that preceded them, video game [code] communicate[s] ideas—and even social messages . . . through features distinctive to the medium . . . . That suffices to confer First Amendment protection."). When information is distributed in an open-source format, as Defense Distributed's is, it is a public work that users are encouraged to improve and modify. *Defense Distributed v. U.S. Dep't of State*, No. 1:15-CV-372 RP, 2015 WL 4658921, at *6 (W.D. Tex. Aug. 4, 2015) ("[T]he files are intended to be used by others as a baseline to be built upon, altered and otherwise utilized.").

Taken as a whole, the files distributed by Defense Distributed have lead to significant political, scientific, and artistic expression, including driving the novel field of 3D-printed art. Computer code, including in the form of CAD files, is simply a medium through which expres-

sion occurs—and open-source code provides an open canvas for artists and technicians to improve upon.

Artists have even exhibited 3D-printed modifications of Defense Distributed's "Liberator" model, "attempting to start a conversation about the United States' obsession with guns, not by focusing on one side of the issue, but by bringing artists from both sides together and exposing the entirety of the complexity of the issue." Scott J. Grunewald, *American Gun Show Uses Art and 3D Printing to Start a Conversation about Guns*, 3D Print.com (Nov. 11, 2015), http://3dprint.com/104975/american-gun-show-art. At another show, one artist, Addie Wagenknecht, took 13 3D-printed Liberator models and "assemble[d] them into a striking sculpture [a chandelier] that is equal parts futuristic, menacing, and comically absurd." D.J. Pangburn, *3D-Printed 'Liberator' Guns Become a Chandelier Sculpture,* The Creators Project (Aug. 6, 2015), http://thecreatorsproject.vice.com/blog/3d-printed-liberator-guns-become-a-chandelier-sculpture.[1]

---

[1] In fact, Wagenknecht "didn't have a 3D printer so I had a friend print them for me in Germany" from a "torrent" of the CAD file (a special "mirrored" type of file that contains metadata but not content). *Id.* If the State Department's argument is correct, she thus unwittingly became an international arms trafficker.

Indeed, London's Victoria & Albert Museum of Art and Design purchased two Liberator pistols from Defense Distributed for a design festival. Andy Greenberg, *3D-Printed Guns As Art: London Design Museum Buys Two 'Liberator' Printed Pistols*, Forbes (Sept. 15, 2013), http://www.forbes.com/sites/andygreenberg/2013/09/15/3d-printed-guns-as-art-london-design-museum-buys-two-liberator-printed-pistols. Cody Wilson, Defense Distributed's founder, told a reporter "that he's happy to see his 3D-printed gun recognized by the museum as the incendiary political symbol he's always intended it to be." *Id.*

As courts have properly recognized, computer code "has both an expressive feature and a functional feature." *Junger*, 209 F.3d at 485. Open-source CAD files, like the Liberator's, are a unique medium of expression and are integral to the development of the burgeoning field of 3D-design art, as well as 3D technical design itself. Accordingly, the open-source CAD files are protected speech.

## B. Protected Speech Does Not Lose First Amended Protection Simply Because It Could Be Used to Unlawful Ends

The government defends its prior restraint of domestic public speech on the Internet with the vague-at-best claim that Defense Distributed's files *could* produce weapons that *could* be used to commit

crimes *outside* the United States. Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction 10, *Defense Distributed*, 2015 WL 4658921 ("The unrestricted provision of such undetectable firearms by U.S. persons to individuals in other countries . . . presents a serious risk of acts of violence in those countries . . . [such as] an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerilla groups, or to compromise aviation security . . . ."). Just because lawful computer code can be used in a potentially unlawful manner by foreign persons does not constitutionally permit the executive to impose a prior restraint on Americans' expression. *See, e.g.*, *Free Speech Coalition*, 535 U.S. at 245 ("The prospect of crime, however, by itself does not justify laws suppressing protected speech."); *see also* the slew of Supreme Court precedents discussed *infra* in this section.

"[R]estrictions on [lawful] . . . speech [that could potentially be used unlawfully] can't be easily justified under existing First Amendment doctrine." Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1096, 1105 (2005). Consider that "[a] textbook, magazine, Web site, or seminar describ[ing] how people can make bombs (conventional or nuclear), make guns, make drugs . . . painlessly and reliably commit su-

icide . . . pick locks . . . or more effectively resist arrest during civil diso-bedience" has academic and scientific speech value, but could potential-ly be used for unlawful conduct. *See id.* at 1097, 1111-14. Indeed,

> Books about explosives can teach students principles of chemistry, and can help engineers use explosives for lauda-ble purposes. Books that explain how to investigate arson, homicide, or poisoning can help detectives and would-be de-tectives, though they can also help criminals learn how to avoid detection.

*Id.* at 1112. And "[s]cientific research," like the computer science and 3D engineering research developed in modifying and examining open source code for computer CAD files, "is generally thought to advance more quickly when scientists and engineers are free to broadly discuss their work." *Id*. To enact a prior restraint on all of these because of po-tential and non-specific unlawful uses by foreign individuals is "[s]urely . . . to burn the house to roast a pig." *Butler v. Michigan*, 352 U.S. 380, 383 (1957). Numerous Supreme Court cases have agreed, in-cluding several *per curiam* opinions.

In *Free Speech Coalition*, for example, the Court struck down a prior restraint on pornography that "appears to be" or "conveys the im-pression" that the actors in the work are minors, whether or not those actors were in fact consenting adults. 535 U.S. at 258; 18 U.S.C.

§ 2256(B), (D) (2000). The government justified its prior restraint on the "ground that it may encourage pedophiles to engage in illegal conduct." *Free Speech Coalition*, 535 U.S. at 254. The Court struck down the ban in light of the fact that "[t]he harm does not necessarily follow from the speech, but depends on some unquantified potential for subsequent criminal acts," and that "the government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite time in the future.'" *Id.* at 250, 253 (quoting *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (per curiam) and citing *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)).

As the *Free Speech Coalition* Court declared: "the mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it," and that "[p]rotected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse." *Id.* at 253, 255 (quoting and citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). Similarly, Defense Distributed's speech is significantly attenuated from the potential harm and, accordingly, the government may not prohibit it.

The principle employed in *Free Speech Coalition* comes from a long line of Supreme Court precedent, dating back to the 1930s. In 1939, the Court addressed the question of municipal prior restraints on the distribution of handbills in public areas. Four municipalities argued that handbills could thus be restrained because of their potential to contribute to littering. *Schneider v. State*, 308 U.S. 147, 162 (1939) ("The motive of the legislation under attack . . . is held by the courts below to be the prevention of littering of the streets and, although the alleged offenders were not charged with themselves scattering paper in the streets, their convictions were sustained upon the theory that distribution by them encouraged or resulted in such littering."). The Court held that "the purpose to keep the streets clean and of good appearance is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it." *Id.* at 163. In other words, the Court stopped on First Amendment grounds the restriction of an essential method of mass dissemination of speech whose sole justification had been to prevent unlawful behavior.

In 1948, the Court faced an overbreadth challenge to New York's anti-crime literature law, a prior restraint that made it a misdemeanor

to publish media "'principally made up of criminal news, police reports, or accounts of criminal deeds, or pictures, or stories of deeds of bloodshed, lust or crime.'" *Winters v. New York*, 333 U.S. 507, 508 (1948) (quoting N.Y. Penal Law § 1141(2) (McKinney's 1947)). New York argued that crime literature could become "'vehicles for inciting violent and depraved crime'" at some future time among some indefinite individuals. *Id.* at 513 (quoting *People v. Winters*, 294 N.Y. 545, 550 (1945)).

The Court made short work of New York's argument, noting that "[w]hat is one man's amusement, teaches another doctrine . . . [the works at issue] are as much entitled to the protection of free speech as the best of literature." *Id.* at 510; *see also Cohen v. California*, 403 U.S. 15, 25 (1971) ("[I]t is nevertheless often true that one man's vulgarity is another's lyric."). The Court continued: "On its face, the subsection here involved violates the rule . . . that statutes which include prohibitions of acts fairly within the protection of a free press are void. It covers detective stories, treatises on crime, reports of battle carnage, et cetera." *Id.* at 512. Even an authoritative limiting construction by the New York Court of Appeals was not sufficient to save the statute from the overbreadth challenge. *Id.* at 514-516, 518-20.

In 1957, Justice Frankfurter wrote for the Court to strike down a Michigan ban on disseminating literature that could have a "potentially deleterious influence upon youth," such as "'tending to incite minors to violent or depraved or immoral acts.'" *Butler*, 352 U.S. at 381, 383 (quoting Michigan Penal Code § 343 (1955)). The legislation in that case was "not reasonably restricted to the evil with which it is said to deal." *Id.* at 383. It "arbitrarily curtails" the freedom of speech, something that "history has attested as the indispensable condition for the maintenance and progress of a free society." *Id.* at 384. Again the Court made clear that the mere potential for lawful speech to facilitate unlawful acts was an insufficient justification by itself for a prior restraint.

Two of the most important precedents in this line of cases followed: *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam), and *New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam). *Brandenburg* provides a baseline for judging statutes that prohibit protected speech because of the chance it could encourage crime. In that case, a Klansman was charged with violating Ohio's Criminal Syndicalism Statute for a political speech encouraging an armed march on Congress. *Brandenburg*, 395 U.S. at 444-47. The Court held that, unless

such encouragement is "inciting or producing imminent lawless action and is likely to incite or produce such action," it is protected by the First Amendment. *Id.* at 447.

In *New York Times*, the Court held that a prior restraint injunction was not justified on the printing of the then-classified Pentagon Papers by the *Times* and the *Washington Post*. *New York Times*, 403 U.S. at 714. Individual justices had much more to say about suppressing lawful speech to stop potential and non-specific unlawful uses. Justice Black, joined by Justice Douglas, wrote a concurrence to note that public discourse should be "uninhibited, robust, and wide-open." *Id.* at 724 (Black, J., concurring) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 269-70 (1964)). Moreover, "[t]he word 'security' is a broad, vague generality" that cannot simply be used as a talismanic incantation to permit a prior restraint on speech. *Id.* at 719.

Justice Brennan noted that the "First Amendment tolerates absolutely no prior judicial restraints . . . predicated upon surmise or conjecture that untoward consequences may result." *Id.* at 725-26 (Brennan, J., concurring). Justice Stewart, joined by Justice White, evoked the *Brandenburg* majority when he noted that because he "cannot say that

disclosure of any of them will surely result in direct, immediate, and irreparable damage," the First Amendment protects the distribution of the then-classified information. *Id.* at 730 (Stewart, J., concurring). Justice White, joined in turn by Justice Stewart, contrasted the blanket prior restraint in the case with the criminal sanctions imposed by statutes that relate to imminently harmful information like "movements of the fleet, the troops, the aircraft, the location of powder factories, the location of defense works, and all that sort of thing." *Id.* at 734-35 (White, J., concurring) (quoting 55 Cong. Rec. 2009 (1917) (remarks of Sen. Henry F. Ashurst)). Accordingly, Justice White found that the prior restraint in that case could not pass constitutional muster because it was not sufficiently narrow to touch on those circumstances of actual imminent harm and there were sufficient criminal statutes to deter bad conduct. *See id.* at 735-40.

A decade later, the Court held that, despite the fact there were individual acts of violence involved in the political speech of the seven-year boycott of white-owned businesses in Claiborne County, Mississippi, the boycott's overall speech was protected by the First Amendment. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 915 (1982). While the

lawful speech tangentially encouraged unlawful acts by virtue of the tension created by the boycott itself, the speech was nevertheless protected. *Id.* at 933 ("The use of speeches, marches, and threats of social ostracism cannot provide the basis for a damages award. But violent conduct is beyond the pale of constitutional protection.") The Court took into account that "'blanket prohibition of association with a group having both legal and illegal aims' would present 'a real danger that legitimate political expression or association would be impaired.'" *Id.* at 919 (quoting *Scales v. United States*, 367 U.S. 203, 229 (1961)).

In 1989, the Court again protected lawful speech from indefinite and vague claims that it could be used for unlawful purposes. *Sable Communications of Calif., Inc. v. FCC*, 492 U.S. 115 (1989). In *Sable Communications*, a federal ban on obscene telephone communications via interstate commerce criminalized all commercial phone-sex lines. *Id.* at 123 (quoting 47 U.S.C § 223(b) (1988)). The reason for the blanket prior restraint was to "restrict access to minors" to phone-sex services. *Id.* at 122-23. In striking down the ban, the Court expressly relied on *Butler. See, e.g., id.* at 131 (quoting *Butler*, 352 U.S. at 383).

Similar to the restraint struck down in *Claiborne Hardware*, the Liberator files should not be subject to blanket prohibition of Internet dissemination, lest legitimate expression be chilled. *See* Greenberg, *3-D Printed Guns as Art*; *supra* Part I.A (noting artistic, scientific, and political uses of the computer-code speech). And similar to the restrictions in *Butler* and *Sable Communications*, the prior restraint on Americans' viewing Defense Distributed's files online impermissibly limits U.S. audiences to speech suitable for foreign audiences. *Cf. Sable*, 492 U.S. at 127 ("The Court found the law to be insufficiently tailored since it denied adults their free speech rights by allowing them to read only what was acceptable for children.") (quoting *Butler*, 352 U.S. at 380)); *Butler*, 352 U.S. at 383-84 ("The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children. It thereby arbitrarily curtails one of those liberties of the individual . . .").

The Court has even more recently reaffirmed the basic principle that lawful speech cannot be suppressed in order to prevent potential unlawful uses. In *Bartnicki v. Vopper*, the Court was "firmly convinced" that "a stranger's illegal conduct does not suffice to remove the First Amendment protection shield from speech." 532 U.S. 514, 518, 535

(2001); *see also id.* at 529-30 ("[I]t would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party."). *Bartnicki* asked whether the First Amendment protected a radio station from suit when it broadcasted the results of illegally intercepted communications. *Id.* at 519-20. The government's interest in allowing the private action against the publisher rested in discouraging illegal conduct such as eavesdropping. *See id.* at 521-24. Yet again, the interest in discouraging potential illegal conduct was not sufficient to warrant restricting protected First Amendment expression. Such an interest is likewise insufficient to restrain the distribution of open-source files.

In sum, while the government certainly has the power to constraint certain categories of speech, like obscenity and the urging of imminent violence, those categories are specific and narrowly drawn. *See generally Miller v. California*, 413 U.S. 15 (1973) (obscenity); *Brandenburg*, 395 U.S. at 444 (instigating violence); *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) (fighting words). Here the government has presented no evidence to demonstrate the instigation of imminent violence or invoke any other categorical prohibition.

## II. THE STATE DEPARTMENT'S CATEGORICAL BAN ON DISTRIBUTING THE CAD FILES VIA THE INTERNET IS AN UNLAWFUL PRIOR RESTRAINT ON THE MASS DISSEMINATION OF PROTECTED SPEECH

The Internet is an essential method of mass dissemination beyond the scale of newspapers and television. A prior restraint on lawful speech uploaded online cannot even pass rational basis review when the harm of potential unlawful action is attenuated and non-specific.

### A. The Internet Is an Essential Method of Mass Speech Dissemination, So a Prior Restraint on Its Use Is Suspect

It has quickly become axiomatic that a prior restraint on Internet communications cuts off an incomparably important avenue for American expression. Consider the following data points, all of which have become quickly dated:

- The total number of Internet users worldwide has reached over 3.2 billion. Aaron Mamiit, *3.2 Billion: Number of People Using the Internet Today*, Tech Times (May 28, 2015), http://www.techtimes.com/articles/55773/20150528/3-2-billion-number-of-people-using-the-internet-today.htm.

- Of the total American population, 86.75 percent have Internet access, about 280 million users. *Internet Users*, Internet Live Statistics (last updated July 1, 2014), http://www.internetlivestats.com/internet-users.

- In 2012, there were 634 million websites, with 50 million new sites added per month. *Internet 2012 in Numbers*, Pingdom.com (January 16, 2013), http://royal.pingdom.com/2013/01/16/internet-2012-in-numbers.

- The U.S. hosted 43 percent of the top million websites that year. *Id.*

- Sixty-nine percent of Americans get news from the Internet. *How Americans Get Their News*, American Press Inst. (Mar. 17, 2014), www.americanpressinstitute.org/publications/ reports/survey-research/how-americans-get-news.

Suffice it to say, the Internet is a revolutionary means of mass communications, so speech restrictions must be drawn with surgical precision.

In striking down municipal ordinances prohibiting the distribution of handbills in *Schneider*, for example, the Supreme Court was not persuaded that laws should be upheld "because their operation is limited to streets and alleys and leaves persons free to distribute printed matter in other public places." *Schneider*, 308 U.S. at 163. "[T]he streets," wrote the Court, "are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Id.* Meanwhile, pamphlets deserve special solicitude because they are "effective instruments in the dissemination of opinion." *Id.* at 164.

In the rare cases where the Court has upheld prior restraints, these restrictions were narrowly tailored rather than applied to broad

channels of speech dissemination. In *Broadrick v. Oklahoma*, for example, the Court sustained an Oklahoma law that "restricts the political activities of the State's classified civil servants in much the same manner that the Hatch Act proscribes partisan political activities of federal employees." 413 U.S. 601, 602 (1973). The statute focused on electioneering activities and not the "right as a citizen privately to express his opinion and to cast his vote," so the Court upheld the restriction because it "seeks to regulate political activity in an even-handed and neutral manner." *Id.* at 606, 616.

In other words, a blanket prior restraint on an important channel of mass dissemination like the Internet is highly suspect.

## B. Prior Restraint of the Mass Dissemination of Protected Speech Cannot Even Pass Rational Basis Review

Applying intermediate scrutiny, the court below found that Defense Distributed has "not shown a substantial likelihood of success on the merits of their claim under the First Amendment." *Defense Distributed*, 2015 WL 4658921, at *10. Even though "the AECA and ITAR do not prohibit domestic communications," under the ITAR, the dissemination of the open source CAD files is an "export" of technical arms information according to the government, and thus subject to prepublication

commodity jurisdiction review and prior restraint without agency approval. *See id.* Even if the government were correct in its view on what constitutes an "export," however, such a prior restraint on protected speech cannot even pass rational basis review.

As discussed more fully *supra* at I.B, the Supreme Court has overturned prior restraints similar to the one in this case. In *Schneider*, the Supreme Court disagreed with the court below that a prohibition on distributing handbills in public fora "does not transgress the bounds of reasonableness." 308 U.S. at 155. In *Butler*, the Court found that a prior restraint on adult-appropriate obscene literature in order to avoid potential unlawful use by minors was "[s]urely . . . to burn the house to roast the pig." 352 U.S. at 381-83.

A blanket prior restraint that sweeps in the online dissemination of protected public domestic speech lacks the "precision of regulation" sufficient to pass even rational basis review. *See Claiborne Hardware*, 458 U.S. at 916 (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)); *Butler*, 352 U.S. at 381-83; *Schneider,* 308 U.S. at 155; *see also Free Speech Coalition*, 535 U.S. at 252 (affirming the same under heightened scrutiny). *New York Times* subsequently upheld the "heavy presump-

tion" against prior restraints on lawful speech has the potential for unlawful uses. *See New York Times Co.*, 403 U.S. at 731, 733 (White, J., concurring).[2] In several subsequent cases the Court made specific note of its strong distaste for prior restraints. In *Sable Communications*, the Court took its conclusion directly from *Butler* in striking down the federal phone-sex ban, referencing the rational basis standard: "As Justice Frankfurter said in that case, '[s]urely, this is to burn the house to roast the pig.' In our judgment, this case, like *Butler*, presents us with 'legislation not reasonably restricted to the evil with which it is said to deal.'" 492 U.S. at 127 (quoting and citing *Butler*, 352 U.S. at 383). In *Free Speech Coalition*, the Court again clarified that "[t]he evil in question

---

[2] A "heavy presumption" against prior restraints is as old as the nation itself:

> That where absolute freedom of discussion is prohibited, or restrained, responsibility vanishes. That any attempt to prohibit, or restrain that freedom, may well be construed to proceed from conscious guilt. That the people of America have always manifested a most jealous sensibility, on the subject of this inestimable right, and have ever regarded it as a fundamental principle in their government, and carefully engrafted in the constitution.

St. George Tucker, 2 Blackstone's Commentaries on the Laws of England with Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States, and the Commonwealth of Virginia App. at Note G, 16-17. (1803); *see also id.* at 17 (noting that even for proponents of the Alien and Sedition Acts of 1798, "[T]he liberty of the press consists not in a license for every man to publish what he pleases . . . but in a permission to publish without previous restraint.").

depends upon the actor's unlawful conduct, conduct defined as criminal quite apart from any link to the speech in question. This established that the speech ban is not narrowly drawn." 535 U.S. at 252.

Even in cases approving of prior restraints, the Court is very careful to note the *extremely* narrow nature and impact of the holding. For example, in *Broadrick*, the Court upheld a prior restraint on election activities by civil servants. 413 U.S. 601. The Court there specifically noted that petitioner's activities (fundraising for their own superior at work) fell "squarely within the 'hard core' of the statute," and that the state regulator and attorney general had "construed 818's explicit approval of private political expression to include virtually any expression not within the context of active partisan political campaigning." *Id.* at 608, 617. Indeed, the Court pointed out that the prior restraint was not so broad as to cover "the wearing of political buttons or the use of bumper stickers"—thus substantially keeping open the marketplace of ideas. *See id.* at 618.

Moreover, blanket prior restraints like this one are typically appropriate only in the absence of a criminal statute. *See, e.g.*, *Free Speech Coalition*, 535 U.S. at 245 ("'Among free men, the deterrents ordinarily

to be applied to prevent crime are education and punishment for viola-
tions of the law, not abridgement of the rights of free speech.'") (quoting
*Kingsley Int'l Pictures Corp. v. Regents of Univ. of N.Y.*, 360 U.S. 684,
689 (1959)); *Bartnicki*, 532 U.S. at 529 ("the normal method of deterring
unlawful conduct is to impose an appropriate sanction on the person
who engages in it. If the sanctions that presently attach to a viola-
tion . . . do not provide sufficient deterrence, perhaps those sanctions
should be made more severe.); *Schneider*, 308 U.S. at 162 ("There are
obvious methods of preventing littering. Amongst these is punishment
of those who actually throw paper on the streets."); *New York Times
Co.*, 403 U.S. at 734-40 (White, J., concurring). To justify a prior re-
straint, those criminal statutes must be shown to be incapable of pre-
venting the evil at which it is aimed.

Here, all of the potential harms that concern the government are
already criminalized. There is an applicable criminal law that targets
the foreign export of arms-constructing information, with penalties of
up to 20 years' imprisonment and a million dollar fine. 22 U.S.C. §
2778(a)-(e) (2014). To justify its prior restraint, the government must
show that it would be the only effective method to prevent such ex-

ports—as compared to the criminal statute and any narrower regulations. The government has not met and cannot meet that burden.[3]

## CONCLUSION

For the foregoing reasons, *amicus* urges the court to reverse the district court and grant the motion for a preliminary injunction.

Respectfully submitted,

/s/ Ilya Shapiro
Ilya Shapiro
    *Counsel of Record*
Randal J. Meyer (admission pending)
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, D.C. 20001
(202) 842-0200
ishapiro@cato.org
rmeyer@cato.org

---

[3] The government especially cannot meet this burden when an artist—decidedly not a sophisticated arms dealer—can evade the prior restraint by otherwise acquiring the file that is purportedly made unavailable and sending it to a foreign friend to 3D-print. *See supra* note 1 and accompanying text. The CAD files that Defense Distributed is restrained from distributing online are now widely available as downloadable torrent files. Natasha Lennard, *The Pirate Bay Steps in to Distribute 3-D Gun Designs*, Salon (May 10, 2013), http://www.salon.com/2013/05/10/the_pirate_bay_steps_in_to_distribute_3d_gun_designs.

## Certificate of Compliance

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,975 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Word 2010 and uses a proportionally spaced typeface, Century Schoolbook, in 14-point type for body text and 12-point type for footnotes.


/s/ Ilya Shapiro


## Certificate of Filing and Service

On December 17, 2015, I filed this *Brief of the Cato Institute as Amicus Curiae* using the CM/ECF System, which will send a Notice of Filing to all counsel of record.


/s/ Ilya Shapiro