## No. 15-50759

## IN THE UNITED STATES COURT OF
## APPEALS FOR THE FIFTH CIRCUIT

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED

*Plaintiffs - Appellants*

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, in His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in his Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, individually and in his Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually a900nd in her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs; Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,

*Defendants – Appellees*

Appeal from the United States District Court
For the Western District of Texas, Austin Division
No. 15-cv-00372 (Hon. Robert Pitman)

## BRIEF OF REPRESENTATIVE THOMAS MASSIE AND CERTAIN MEMBERS OF THE U.S. HOUSE OF REPRESENTATIVES AS AMICI CURIAE IN SUPPORT OF APPELLANTS

Raffi Melkonian
WRIGHT & CLOSE, LLP
One Riverway, Ste. 2200
Houston, Texas 77056
713-572-4321
713-572-4320 (fax)

## SUPPLEMENTAL CERTIFICATE
## OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, in addition to those listed in Appellants' brief, that have a financial interest in the outcome of this litigation. All amici are individuals.

## TABLE OF CONTENTS

Page

INTEREST OF AMICI ........................................................................7

PRELIMINARY STATEMENT AND SUMMARY OF
ARGUMENT ....................................................................................8

I.    Congress did not delegate the power to ban the publication of
      lawful speech when it passed the Arms Export Control Act to
      regulate exports and imports of arms. ..........................................10

      A.    An Administrative Agency has only the power granted to
            it by Congress. .................................................................10

      B.    Congress did not grant the State Department authority to
            regulate domestic, public speech when it passed the
            AECA. ..............................................................................12

II.   If the AECA has the effect the Government claims, then it
      would   exceed Congress' limited and enumerated powers. ........18

III.  Interpreting the AECA in the way the State Department
      demands would chill technological innovation. ...........................22

CONCLUSION .................................................................................24

CERTIFICATE OF SERVICE ............................................................26

CERTIFICATE OF COMPLIANCE .....................................................26

ECF CERTIFICATION .......................................................................27

# TABLE OF AUTHORITIES

Page

**Cases**

*Adams Fruit Co. v. Barrett*,
494 U.S. 638 (1990) ......................................................................11

*Bernstein v. U.S. Dep't of State*,
922 F. Supp. 1426 (N.D. Cal. 1996) ...........................................16

*Bernstein v. U.S. Dep't of State*,
945 F. Supp. 1279 (N.D. Cal. 1996) ...........................................17

*Bond v. United States*,
131 S. Ct. 2355 (2011) ........................................................ 14, 21

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .....................................................................16

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007) .....................................................................11

*Louisiana Public Serv. Comm'n v. FCC*,
476 U.S 355 (1986) ......................................................................11

*MCI Telecommc'ns Corp. v. AT&T Co.*,
512 U.S. 218 (1994) .....................................................................16

*National Federation of Independent Business v. Sebelius*,
132 S. Ct. 2566 (2012) .................................................................19

*New York Times v. United States*,
443 U.S. 713 (1971) .....................................................................21

*New York v. United States*,
505 U.S. 144 (1992) .....................................................................21

*NFIB v. Sebelius*,
132 S. Ct. 2566, 2646 (2012) .......................................................20

*Samora v. United States*,
    406 F.2d 1095 (5th Cir. 1969)..................................................................14

*Swan v. Finch Co. v. U.S.*,
    190 U.S. 143 (1903) ..............................................................................13

*Texas Dep't of Housing and Community Affairs v. Inclusive*
    *Communities Project, Inc.*,
    135 S. Ct. 2507 (2015) ..........................................................................11

*U.S. v. 1903 Obscene Magazines, Customs Seizure*,
    907 F.2d 1338 (2d Cir. 1990)................................................................13

*U.S. v. Dien Duc Huynh*,
    246 F.3d 734 (5th Cir. 2001).................................................................13

*U.S. v. Ehsan*,
    163 F.3d 855 (4th Cir. 1998).................................................................13

*U.S. v. Gregg*,
    829 F.2d 1430 (8th Cir. 1987)...............................................................14

*U.S. v. Lee*,
    183 F.3d 1029 (9th Cir. 1999)...............................................................14

*U.S. v. Mead Corp.*,
    533 U.S. 218 (2001) ..............................................................................10

*U.S. v. Swarovski*,
    592 F.2d 131 (2d Cir. 1979)..................................................................14

*United States v. Van Hee*,
    531 F.3d 352 6th Cir. 1976) ..................................................................15

*United States v. Clark*,
    435 F.3d 1100 (9th Cir. 2006)...............................................................20

*United States v. Comstock*,
    130 S. Ct. 1949 (2010) ..........................................................................19

*United States v. Edler Industries*,
    579 F.2d 516 (9th Cir. 1978)..................................................................15

*United States v. Morrison*, 529 U.S. 598 (2000) ......................................................19

*Whitman v. American Trucking Assns.,Inc.*, 531 U.S. 457, 468 (2001). .................11

**Statutes**

22 U.S.C. § 2751 ......................................................................................20

22 U.S.C. § 2778 ............................................................................... 12, 20

U.S. Const. Art. I §8.......................................................................... 19, 20

**INTEREST OF AMICI**

*Amici* are current Members of the House of Representatives whose names are listed in the Appendix. Members of Congress have a particular interest in seeing that federal statutes are properly interpreted and implemented. Moreover, Members of Congress are bound by oath to support and defend the Constitution. Thus, this Court's interpretation of the First, Second and Fifth Amendments—as well as this Court's decisions construing the reach of the foreign commerce clause—are at the core of Amici's duties and responsibilities.

Representative Thomas Massie, of Kentucky—an MIT-trained engineer and inventor—is a Member of the Committee on Science, Space & Technology. His views are particularly relevant because the State Department's improper and unconstitutional interpretation of federal law is likely to chill scientific and technological advancement in the United States.

No party or counsel for a party authored or paid for this brief in whole or in part, or made a monetary contribution to fund the brief's preparation or submission. All parties have consented to the filing of this brief.

## PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

This case can be resolved, as Appellants state, on constitutional grounds. Appellees' decision to impose a prior restraint on the mere publication of unclassified public speech in the United States violates the First, Second, and Fifth Amendments to the United States Constitution, for all the reasons set forth in Appellants' brief. Amici would be entirely satisfied with such a ruling.

Amici—who are duty-bound to preserve and defend the Constitution and ensure the Executive's adherence to statute—write to emphasize two additional points. First, even if Congress was empowered to pass a statute regulating domestic, public, speech through the foreign commerce clause, which is doubtful, the AECA is *not* that statute. The State Department's expansive interpretation of the AECA to permit regulating the online publication of unclassified public speech departs entirely from the statutory text and is due no deference whatsoever. Indeed, the Department of Justice has long rejected the very reading the State Department adheres to now.

Second, it is doubtful that the AECA, which was promulgated by Congress under the foreign commerce clause to regulate foreign commerce, can constitutionally be applied to purely domestic publication. The federal government is a government of limited, enumerated powers, set within a federalist framework.

Appellees' conception of the AECA permits the foreign commerce clause to reach deep into the United States to regulate domestic public speech.

To be sure, Amici understand the State Department's duty to protect national security. That is a valid concern in this time of numerous foreign threats. But even if Appellants' speech constituted some kind of risk to national security, which Appellants amply demonstrate it does not, the solution to that problem is not to stretch the meaning of a clear statute to the breaking point or to violate the Constitution's limitations on federal power. Congress is the actor that can pass common sense legislation to foster the growth of an important technology while also protecting national security. The State Department should work with Congress to pass new legislation, if necessary, rather than unilaterally breaking the bounds of a Cold War-era statute.

Simply put, the State Department has violated Appellants' rights, and it has done so by trampling on the plain meaning of the AECA and on the wise restrictions imposed on the federal government by the Framers. The judgment below should be reversed.

# ARGUMENT

**I.     Congress did not delegate the power to ban the publication of lawful speech when it passed the Arms Export Control Act to regulate exports and imports of arms.**

Even assuming that Congress has the theoretical power to ban domestic speech through a law designed to control the import and export of defense articles—which it does not for the reasons set forth in Part II, *infra*—it has not done so. The State Department's interpretation of the Arms Export Control Act permitting such regulation through the International Traffic in Arms Regulations ("ITAR") is inconsistent with the text of the AECA, inconsistent with the AECA's legislative history and purpose, and is inconsistent with the way the Department of Justice itself has interpreted and litigated the AECA in the past. This is not a question of due deference to an administrative agency: the State Department's interpretation boldly (and impermissibly) departs from Congress's intent to the detriment of all Americans' First, Second, and Fifth Amendment rights. The district court adopted the Executive's argument wholesale in its judgment. It cannot be upheld.

**A.     An Administrative Agency has only the power granted to it by Congress.**

This case is not about deference to the State Department. It is about the very power of that agency to act in the way that it has, a core question of law entrusted to the courts. *See U.S. v. Mead Corp.*, 533 U.S. 218, 233 (2001) (question is

"beyond the *Chevron* pale"). The question here is whether Congress has delegated to the State Department the power to impose a ban against the otherwise lawful online publication of unclassified data. In the absence of such delegation, the State Department "literally has no power to act." *See Louisiana Public Serv. Comm'n v. FCC*, 476 U.S 355, 374 (1986). Or, as the Supreme Court has explained, "[a] precondition to deference under *Chevron* is a congressional delegation of administrative authority." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990). *See also Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173 (2007) ("[T]he ultimate question is whether Congress would have intended, and expected, courts to treat an agency's rule, regulation or application of a statute, or other agency action as within, or outside, its delegation to the agency of 'gap-filling' authority."). Such power must be clearly granted. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms of ancillary provisions—it does not, one might say, hide elephants in mouse holes." *Whitman v. American Trucking Assns.,Inc.*, 531 U.S. 457, 468 (2001).

The proper form of analysis begins with the text of the statute, and asks whether the AECA permits the regulation of domestic public speech. *See Texas Dep't of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2516 (2015) (rejecting Solicitor General's reliance on *Chevron*

deference and instead deciding whether, "under a proper interpretation of the FHA, housing decisions with a disparate impact are prohibited").

## B. Congress did not grant the State Department authority to regulate domestic, public speech when it passed the AECA.

As both the Government and the court below agree, the only source of congressional authority for Defendants' conduct is the AECA. But that statute says nothing about the regulation of domestic public speech. Rather, the statute authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States . . . to control the *import* and *export* of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1).

This straightforward statutory language does not permit the State Department to ban the domestic publication of unclassified public speech through its current expansive interpretation of the word "export" and application of ITAR.

First, the State Department's actions clash directly with text of the AECA and particularly its exclusive application to "export" and "import." The word "export" in particular, which is the entire basis of the State Department's position, simply cannot be stretched to mean domestic publication with incidental receipt by foreign persons. Dictionaries uniformly cabin exportation to "the sending of commodities out of a country," or a "severance of goods from [the] mass of things

12

belonging to [the] United States with [the] intention of uniting them to [the] mass of things belonging to some foreign country." *U.S. v. Ehsan*, 163 F.3d 855, 858 (4th Cir. 1998) (collecting dictionary definitions). Common-law decisions too have observed that exportation "involves the transit of goods from one country to another for the purpose of trade." *Id.* This Court, for example, has held (albeit in the context of the arms embargo against Iran, not in an AECA case) that "exportation occurs when the goods are shipped to another country with the intent that they will join the commerce of that country." *U.S. v. Dien Duc Huynh*, 246 F.3d 734, 741 (5th Cir. 2001). And the Supreme Court, echoing the words of the Attorney General, has long ago held agreed that the "legal notion . . . of exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to the mass of things belonging to some foreign country or another." *Swan v. Finch Co. v. U.S.*, 190 U.S. 143, 145 (1903); *see also U.S. v. 1903 Obscene Magazines, Customs Seizure*, 907 F.2d 1338, 1342 (2d Cir. 1990) (discussing long history of the word import, all of which define importation as "bringing an article into a country from the outside").

The State Department's rule, however, captures purely domestic discussions between Americans *in* America simply because those discussions were undertaken by means of the internet rather than on paper, or orally, or by any other method. To interpret "export" to mean "publish on the internet to the general public" simply

does not comport with the common meaning of the word. As the Supreme Court held in *Bond v. United States*, "[s]aying that a person 'used a chemical weapon' conveys a very different idea than saying the person 'used a chemical in a way that caused some harm." 134 S. Ct. 2077, 2090 (2014). Similarly, saying a person "exported" arms conveys a very different meaning than saying that they "published legal information in the United States that might be accessed by people outside the United States."

Moreover, the State Department's position clashes with courts' repeated holdings that the purpose of the AECA—the conduct of foreign commerce and foreign policy—is clear and easy to understand. As this Court long ago held, the Mutual Security Act of 1954, AECA's predecessor, was "directed to the conduct of international affairs." *See Samora v. United States*, 406 F.2d 1095 (5th Cir. 1969); *see also U.S. v. Lee*, 183 F.3d 1029 (9th Cir. 1999) ("The regulation at issue is directed to a relatively small group of sophisticated international businessmen"); *U.S. v. Gregg*, 829 F.2d 1430, 1437 (8th Cir. 1987) ("There is no unconstitutional vagueness [in the AECA]. It is as simple a matter as forbidding a passenger to ride on a train without a valid ticket"); *U.S. v. Swarovski*, 592 F.2d 131, 133 (2d Cir. 1979) ("We are dealing here with a regulation of limited scope aimed at a small and relatively sophisticated group of persons") (interpreting prior legislation). A statute that has an obvious purpose, and survived vagueness challenges precisely

because it was easy to understand and applied to easily ascertainable business activities, cannot be now interpreted to mean something entirely different simply because the State Department perceives a phantom threat of arms proliferation through 3D printing.

*United States v. Edler Industries*, 579 F.2d 516 (9th Cir. 1978), which the State Department insists justifies its position here, is far afield. In that case, there was no dispute whatsoever that the technical data at issue was *exported*. Defendants there provided (and admitted providing) direct technical assistance to foreign companies concerning technology used in missile manufacture. *Id.* at 518. The issue, rather, was to what extent the Mutual Security Act of 1954 could limit the export of non-classified materials with simultaneously military and civilian uses abroad. The *Edler* court construed ITAR's reach narrowly to "control the conduct of assisting foreign enterprises to obtain military equipment and related technical expertise." *Id.* at 521. Similarly, the case on which the *Edler* court relied, *United States v. Van Hee*, 531 F.3d 352, 356 (6th Cir. 1976) involved the sale of plans to make amphibious military vehicles to Portugal—squarely in the heart of the AECA's and the Mutual Security Act's export restrictions. Congress does not delegate "decision[s] of . . . economic and political significance"—such as the applicability of a statute regulating the export of arms to foreigners to domestic speech—in "cryptic . . . fashion," *FDA v. Brown & Williamson Tobacco Corp.*,

529 U.S. 120, 160 (2000) or through "subtle device[s]," *MCI Telecommc'ns Corp. v. AT&T Co.*, 512 U.S. 218, 231 (1994).

The State Department's basic misconception in this case is betrayed by a hypothetical it used below. Adopting Appellants' theory, it warned, would allow scofflaws to skirt the AECA by "creating a digital model, sending that digital version abroad, and thereby enabling foreign recipients" to automatically create arms. This is fanciful. If a party intentionally created an automatically replicating model and purposefully sent it abroad in exchange for money, that might properly be captured by the AECA. What *actually* happened here is that an American organization published information in America, just as if it had put that information on television or in a book. That foreigners might look at it is irrelevant to a proper understanding of the State Department's power to ban it under the existing statute.

It is telling that the State Department's position today is starkly inconsistent with the Department of Justice's consistent public and litigation statements that the AECA and ITAR do not cover domestic speech. Appellants' brief describes these in full, *see, e.g.,* Appellants' Br. at 39, but they are worth repeating because the State Department's 180 degree pivot from its previous statements is so startling. The litigation position the Department of Justice took in *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426 (N.D. Cal. 1996) (*Bernstein I*) and *Bernstein v. U.S. Dep't*

*of State*, 945 F. Supp. 1279 (N.D. Cal. 1996) (*Bernstein II*) is particularly

probative. In those cases, as Appellants carefully detail, the State Department

affirmatively argued that it "does not seek to control the various means by which

information is placed in the public domain" or "review scientific information to

determine whether it may be offered for sale at newsstands and bookstores,

through subscriptions, second-class mail, or made available at libraries, or

distributed at a conference or seminar in the United States." (Appellants' Br. at

15). Yet, now, the State Department arrogates itself the power to deem all domestic

speech that might be taken abroad to be exports subject to prior restraints. This is

astonishing.[1]

As Appellants also note, the Department of Justice has also consistently

warned that the AECA and ITAR do not give the State Department limitless

authority:

- On May 11, 1978, the Department of Justice issued a memorandum to the White House, titled "Constitutionality under the First Amendment of ITAR Restrictions on Public Cryptography." That memo made clear DOJ's "doubt" that

---

[1] The State Department claimed, below, that the legislative history of the Arms Export Control Act supports its reading of the statute because Congress expressed its view that "arms transfers cannot become an automatic, unregulated process." *See* H.R. Rep. No. 94-1144, at 12 (1976), *reprinted in* 1976 U.S.C.C.A.N. 1378, 1388. Putting aside the point, for the moment, that an appeal to legislative history cannot alter the plain text of the statute, nothing in that House Report supports the State Department's position. The cited section of the House Report concerned Congress's role in deciding the propriety of future arms transfers—"because of the importance which arms transfers have for our own national security, such decisions should be understood by, and have the support of, the Congress and the American people"—not the scope of the term "export" of the reach of the AECA into domestic affairs.

Congress "intended that the President regulate noncommercial dissemination or information." *See* Letter from John M. Harmon, Assistant Attorney General at the Office of Legal Counsel for the Department of Justice, to Dr. Frank Press, Senior Advisor to the President, at p. 4, n. 7.

- On July 1, 1981, the Department of Justice issued another memorandum, this time to the State Department Office of Munitions Control, regarding concerns with the State Department proposed revisions to ITAR. OLC stated that, given the deep constitutional concerns and the overbreadth of ITAR given the statutory context, "the best legal solution is for the Department of State, not the courts, to narrow the ITAR so as to make it less likely that they will apply to protected speech in constitutionally impermissible circumstances." ROA.256.

- On July 1, 1981, the Department of Justice issued a memorandum noting its concern that ITAR could have "a number of unconstitutional applications." *See* Department of Justice, *Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations* (1981).

- In April 1997, DOJ issued a report discussing the availability of bombmaking information. This report made clear the real limits on the "publication of true, lawfully obtained information." *See* Department of Justice, *Report on the Availability of Bombmaking* (1997). (ROA.287)

The State Department has stretched the AECA beyond its breaking point because it fears new technology. It does not have the authority to make that decision absent new Congressional action permitting it to do so.

## II.     If the AECA has the effect the Government claims, then it would exceed Congress' limited and enumerated powers.

Even if the AECA can be read as authorizing the State Department to ban Appellants' speech, such action is unconstitutional absent a close nexus to foreign commerce. That is so under the First, Second, and Fifth Amendments, as set forth in the Appellants' brief; but it is also true because no enumerated power permits

Congress to pass legislation banning the domestic publication of information. The only constitutional basis for the AECA, the foreign commerce clause, does not and cannot reach entirely domestic activity.

The Federal government is a government of limited and enumerated powers. "With its careful enumeration of federal powers and explicit statement that all powers not granted to the Federal Government are reserved, the Constitution cannot realistically be interpreted as granting the Federal Government an unlimited license to regulate." *United States v. Morrison*, 529 U.S. 598, 618 n.8 (2000). Because its powers are limited, Congress does not have the power to regulate domestic public speech unless a specific enumerated power so states. The police power "belongs to the States and the States alone." *United States v. Comstock*, 130 S. Ct. 1949, 1967 (2010) (Kennedy, J. concurring).

The determinative question, then, is to identify *which* enumerated power was exercised in enacting the AECA, and to determine whether that enumerated power permits Congress to regulate domestic public speech. *See, e.g., National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566, 2577 (2012) ("If no enumerated power authorized Congress to pass a certain law, that law may not be enacted"); *Comstock*, 560 U.S. at 163 (Thomas, J., dissenting) (noting Government's failure to identify the "specific enumerated power or powers" that were the constitutional predicate for statute at issue).

The AECA's text and context give us the answer to the first of those questions. A statute's reference to foreign commerce triggers the foreign commerce clause, which gives Congress a broad grant of power to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. For example, the Ninth Circuit has held that a reference to the phrase "travels in foreign commerce" unequivocally invoked the foreign commerce clause. *See, e.g., United States v. Clark*, 435 F.3d 1100, 1114 (9th Cir. 2006). The text of the AECA, which authorizes the President to "control the *import* and *export* of defense articles and defense services," 22 U.S.C. § 2778, is a clear reference to foreign commerce. In addition, the structure of the statute supports its plain meaning. First, the AECA constitutes Chapter 39 of Title 22 ("*Foreign* Relations and Intercourse") and is codified at 22 U.S.C. § 2751. Moreover, the prefatory sections of the AECA found at 22 USC § 2751 make clear the goals that Congress had in seeking to control the export of weapons in service of foreign policy. Namely, the goals and purposes found therein relate exclusively to "world peace" and foreign policy. The AECA is thus grounded exclusively in Congress' foreign commerce power found in U.S. Const. Art. I §8.[2]

---

[2]     The necessary and proper clause can provide no basis for the application of the AECA to domestic speech through the foreign commerce clause power. As a majority of the members of the Supreme Court have stated, "the Necessary and Proper Clause is exceeded not only when the congressional action directly violates the sovereignty of States but also when it violates the background principle of enumerated (and hence limited) federal power." *NFIB v. Sebelius*, 132 S. Ct. 2566, 2646 (2012) (joint dissent); *accord id.*, at 2592 (Roberts, C.J.)

Nor could it be otherwise. The Government itself concedes that the AECA does not reach domestic speech delivered person-to-person, or domestic speech published in a book or newspaper. That is because the Constitution does not create a national police power. The basic "allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States . . . in part, [as] an end in itself, to ensure that States function as political entities in their own right." *Bond*, 131 S. Ct. at 2364. The Constitution also divides authority between federal and state governments for the protection of individuals." *New York v. United States*, 505 U.S. 144, 181 (1992). "By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Bond v. United States*, 131 S. Ct. 2355, 2364 (2011). Imagine, for example, an American giving a speech that, if the contents were distributed abroad, could aid a foreign enemy. Congress could not ban such speech by prior restraint even if a foreign agent happened to be standing in the public square listening intently. *See, e.g., New York Times v. United States*, 443 U.S. 713, 735 (1971). Such action is beyond any conceivable domestic power granted to the Government by the Constitution other than the vague inherent powers the Supreme Court rejected in the Pentagon Papers case.

But, fundamentally, exactly that far-reaching power is the power the State

(noting that the necessary and proper clause is "narrow in scope" and operates to permit laws that are "incidental" to the exercise of enumerated powers).

Department claims here. The State Department's chosen interpretation of the AECA—that publishing information domestically on an open forum like the internet is the equivalent of exporting products—would capture almost any domestic publication of supposedly controlled information. Nor would simply limiting the rule to publication on the internet limit the intrusion on the Constitution in any serious way. The internet is today the pervasive and dominant way of communicating information. Just as the Supreme Court would not countenance speech restrictions that would violate the First Amendment if they were limited to the internet, so too this Court should not permit a violation of limited nature of the government simply because the government imposes an arbitrary limit on its unlawful actions.

## III. Interpreting the AECA in the way the State Department demands would chill technological innovation.

The United States should be a leader in 3D printing, a scientific innovation that has the potential to dramatically change the world and benefit the United States. In The Economist's words, 3D printing "may have as profound an impact on the world as the coming of the factory did. . . Just as nobody could have predicted the impact of the steam engine in 1750—or the printing press in 1450, or the transistor in 1950—it is impossible to foresee the long-term impact of 3D printing. But the technology is coming, and it is likely to disrupt every field it touches." Leaders, *Print me a Stradivarius*, THE ECONOMIST, February 2011.

3D printing is disruptive because it fundamentally changes how goods are manufactured. For example, rather than importing parts from far away, goods may be able to be custom-produced on-demand locally. Even if local production by 3D printing is initially more expensive, the elimination of shipping expenses will dramatically change how business is done. 3D printing also allows goods to be tailored to the consumer in a wide range of industries, from medicine to electronics. These advantages, among others, mean that the "factors that have made China the workshop of the world will lose much of their force" in a world in which 3D printing is at the fore. *See, e.g*., Richard A. D'Aveni, HARVARD BUSINESS REVIEW, 3-D Printing Will Change the World, March 2013. 3D printing gives America the opportunity to revolutionize the way its businesses make and sell products domestically and abroad.

Chilling the speech of actors like Defense Distributed by imposing export controls on them that were never meant to apply domestically will slow innovation in the United States and leave the field to other countries. *See, e.g.,* Michael L. Smith, *The Second Amendment Implications of Regulating 3D Printed Firearms*, 31 SYRACUSE J. OF SCIENCE & TECH. L. REPORTER 60, 95 (2015) (recognizing that "laws that would criminalize the distribution of digital blueprints for firearms" might "unduly constrain technological development"). It is precisely the kind of experimentation and public discussion that Appellants foster that brings the most

unexpected and powerful developments in technology. The digital revolution was forged by individuals working in Silicon Valley garages, not governments. And many innovations that are broadly applicable take root first in the context of arms. *See generally* STUART W. LESLIE, THE COLD WAR AND AMERICAN SCIENCE: THE MILITARY-INDUSTRIAL-ACADEMIC COMPLEX AT MIT AND STANFORD (1993) (explaining how military needs drove innovation in engineering and computing).

Given these powerful reasons to allow technological innovation in 3D printing to grow and flourish, the State Department's insistence that its idiosyncratic interpretation of the AECA should shut down scientific progress is inexplicable. If Appellants' speech is to be regulated—and in reality there is no basis for any such regulation—that work should be done by Congress, not by an administrative agency making it up as it goes along.

## CONCLUSION

For the foregoing reasons, the Court should adhere to the text of the AECA and the Constitution, and therefore reverse the district court's order and remand with instructions to enter a preliminary injunction against ITAR's enforcement as a prior restraint.

Respectfully Submitted,

*/s/ Raffi Melkonian* _____
Raffi Melkonian
State Bar No. 24090587
WRIGHT & CLOSE, LLP
One Riverway, Suite 2200
Houston, Texas 77056
713-572-4321
713-572-4320 (fax)
melkonian@wrightclose.com

**Counsel for Amici Curiae**

## CERTIFICATE OF SERVICE

This is to certify that on December 17, 2015, a true and correct copy of the foregoing document was filed with the clerk of the court for the United States Court of Appeals for the Fifth Circuit, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means. I also certify that a true and correct copy of the foregoing document was served on opposing counsel by mail and e-mail.

*/s/ Raffi Melkonian*
Raffi Melkonian

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,386 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2007 in Times New Roman (Scalable) 14 pt. for text and Times New Roman (Scalable) 12pt for footnotes.

*/s/ Raffi Melkonian*
Raffi Melkonian

**ECF CERTIFICATION**

I hereby certify (i) the required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (ii) the electronic submission is an exact copy of any paper document submitted pursuant to 5th Cir. R. 25.2.1; (iii) the document has been scanned for viruses and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues, pursuant to 5th Cir. R. 25.2.9.

*/s/ Raffi Melkonian*
Raffi Melkonian

## APPENDIX A
## LIST OF AMICUS CURIAE

Representative Thomas Massie (Kentucky)
Representative Brian Babin (Texas)
Representative K. Mike Conaway (Texas)
Representative Jeff Duncan (South Carolina)
Representative Blake Farenthold (Texas)
Representative John Fleming (Louisiana)
Representative Paul Gosar (Arizona)
Representative Walter Jones (North Carolina)
Representative Mike Kelly (Pennsylvania)
Representative Steve King (Iowa)
Representative Raúl Labrador (Idaho)
Representative Jeff Miller (Florida)
Representative Bill Posey (Florida)
Representative Todd Rokita (Indiana)
Representative Daniel Webster (Florida)