# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION,
INCORPORATED,

*Plaintiffs-Appellants,*

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official
Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE
TRADE CONTROLS, Department of State Bureau of Political Military Affairs;
KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy
Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-
Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as
the Director of the Office of Defense Trade Controls Policy Division; SARAH J.
HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory
and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH,
Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade
Controls,

*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION
IN CASE NO. 15-CV-00372, THE HONORABLE ROBERT PITMAN

## BRIEF OF *AMICUS CURIAE* ELECTRONIC FRONTIER FOUNDATION
## IN SUPPORT OF PLAINTIFFS-APPELLANTS

Kit Walsh (CA SBN 303598)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel: (415) 436-9333
Fax: (415) 436-9993
kit@eff.org

December 17, 2015

*Counsel for Amicus Curiae*

## SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

Pursuant to this Court's Rule 29.2, the undersigned counsel of record for *amicus curiae* certifies that the following additional persons and entities have an interest in the outcome of this case.

1. Electronic Frontier Foundation, *amicus curiae*. Electronic Frontier Foundation is a nonprofit organization recognized as tax exempt under Internal Revenue Code § 501(c)(3). It has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

2. Kit Walsh, attorney for *amicus curiae*.

3. Adam Schwartz, attorney for *amicus curiae*.


Dated:     December 17, 2015          /s/ Kit Walsh_____
                                      Kit Walsh

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES ........................... i

INTEREST OF *AMICUS CURIAE* .......................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

ARGUMENT ................................................................................ 3

I.   The Government Has Imposed a Prepublication Review Regime for Technical Information with Military Applications. ............................. 3

II.  ITAR Restricts Protected Speech, Including the Defense Distributed Files. .......................................................................... 6

     A.   Publishing Technical Information is Protected Speech. ............... 6

     B.   Computer-Readable Documentation and Designs, Like Those of Defense Distributed, Are Protected Speech. ................................ 9

     C.   First Amendment Protection is Not Diminished For Speech That is Accessible to Foreigners. ............................................... 12

III. ITAR's Prepublication Review of Technical Data Is an Unlawful Prior Restraint on Speech. ................................................... 13

     A.   Speech-Licensing Regimes that Lack Procedural Safeguards are Invalid. ...................................................................... 13

     B.   ITAR's Prepublication Review Scheme Lacks the Required Safeguards. ................................................................... 16

     C.   The Government Incorrectly Argues that ITAR Prepublication Review is Not a Prior Restraint. ............................................ 17

IV.  The Government Cannot Show that the Speech Burdened by Prepublication Review Would Cause Direct, Immediate, and Irreparable Harm to National Security. ....................................... 19

V.   ITAR'S Ban on Publications IS a Content-Based Regulation that Fails Strict Scrutiny ................................................................. 21

A.   ITAR Is a Content-Based Regulation of Speech. ....................... 21

B.   ITAR Does Not Satisfy Strict Scrutiny. ...................................... 24

    1.   Less-Restrictive Means Are Available to Address ITAR's Goals. .................................................................................. 25

    2.   Most Speech Burdened by ITAR Does Not Threaten Any Concrete Government Interest. .......................................... 28

    3.   Alternative Channels for Speech Do Not Justify the Restraint. ........................................................................... 29

VI.   The Prepublication Review Scheme Is Invalid Even Under the Reduced Scrutiny the Government Advocates. ................................ 30

CONCLUSION .................................................................................. 31

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION .................................................................................. 33

CERTIFICATE OF SERVICE .............................................................. 34

# TABLE OF AUTHORITIES

## Cases

*Am. Booksellers Ass'n. v. Hudnut*,
   771 F.2d 323 (7th Cir. 1985) ................................................................ 8

*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002) .......................................................................... 8

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001) ...................................................................... 7, 8

*Bd. of Trs. of Leland Stanford Jr. Univ. v. Sullivan*,
   773 F. Supp. 472 (D.D.C. 1991) ........................................................ 7

*Bernstein v. U.S. Dep't of State*,
   922 F. Supp. 1426 (N.D. Cal. 1996) ........................................... 11, 16

*Bernstein v. U.S. Dep't of State*,
   974 F. Supp. 1288 (N.D. Cal. 1997) ................................................ 14

*Boehner v. McDermott*,
   484 F.3d 573 (D.C. Cir. 2007) ......................................................... 27

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ........................................................................... 24

*Bullfrog Films, Inc. v. Wick*,
   646 F. Supp. 492 (C.D. Cal. 1986) .................................................. 12

*Bullfrog Films, Inc., v. Wick*,
   847 F.2d 502 (9th Cir. 1988) ........................................................... 12

*Burson v. Freeman*,
   504 U.S. 191 (1992) ........................................................................ 22

*Cantwell v. Connecticut*,
   310 U.S. 296 (1940) ................................................................. 22, 23

*CBS Inc. v. Davis*,
   510 U.S. 1315 (1994) ...................................................................... 19

*Consolidated Edison Co. of N.Y. v. Public Service Comm'n of N.Y.*,
    447 U.S. 530 (1980) ........................................................................ 22

*Dambrot v. Cent. Mich. Univ.*,
    55 F.3d 1177 (6th Cir. 1995) ......................................................... 7

*Eu v. San Francisco County Democratic Cent. Committee*,
    489 U.S. 214 (1989) ........................................................................ 24

*FEC v. Mass. Citizens for Life, Inc.*,
    479 U.S. 238 (1986) ........................................................................ 24

*FEC v. Nat'l Conservative Political Action Comm.*,
    470 U.S. 480 (1985) ........................................................................ 24

*Fernandes v. Limmer*,
    663 F.2d 619 (5th Cir. 1981) .................................................. 16, 20

*First Nat'l Bank v. Bellotti*,
    435 U.S. 765 (1978) ........................................................................ 24

*Florida Star v. B.J.F.*,
    491 U.S. 524 (1989) .................................................................. 24, 28

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992) .................................................................. 22, 23

*Freedman v. Maryland*,
    380 U.S. 51 (1965) ................................................................. *passim*

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) .................................................................. 13, 15

*Globe Newspaper Co. v. Superior Court for Norfolk*,
    457 U.S. 596 (1982) ........................................................................ 24

*Herceg v. Hustler Magazine, Inc.*,
    814 F.2d 1017 (5th Cir. 1987) ........................................................ 8

*Jean v. Mass. State Police*,
    492 F.3d 24 (1st Cir. 2007) ........................................................... 27

*Junger v. Daley,*
    209 F.3d 481 (6th Cir. 2000) .......................................................... 7, 11

*Kaplan v. California,*
    413 U.S. 115 (1973) ............................................................................ 9

*Lakewood v. Plain Dealer Pub. Co.,*
    486 U.S. 750 (1988) ................................................................ *passim*

*Marks v. United States,*
    430 U.S. 188 (1977) .......................................................................... 20

*McCullen v. Coakley,*
    134 S. Ct. 2518 (2014) ..................................................................... 31

*Meyer v. Grant,*
    486 U.S. 414 (1988) .......................................................................... 24

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,*
    460 U.S. 575 (1983) .......................................................................... 23

*N.Y. Times Co. v. United States,*
    403 U.S. 713 (1971) .................................................................... 19, 20

*Nat. Socialist Party of Am. v. Skokie,*
    432 U.S. 43 (1977) ............................................................................ 15

*Nebraska Press Ass'n v. Stuart,*
    427 U.S. 539 (1975) ............................................................ 19, 20, 21

*R. A. V. v. City of St. Paul,*
    505 U.S. 377 (1992) .......................................................................... 24

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) ............................................................... 22, 23

*Reno v. ACLU,*
    521 U.S. 844 (1997) ............................................................ 24, 29, 30

*Riley v. Nat'l Fed'n of Blind of N.C., Inc.,*
    487 U.S. 781 (1988) .......................................................................... 17

*Se. Promotions, Ltd. v. Conrad,*
   420 U.S. 546, 553 (1975) ................................................................. 13

*Shuttlesworth v. City of Birmingham, Ala.,*
   394 U.S. 147 (1969) ........................................................................ 14

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
   502 U.S. 105 (1991) ................................................................... 22, 24

*Sorrell v. IMS Health Inc.,*
   131 S. Ct. 2653 (2011) ............................................................. 6, 7, 21

*Turner Broad. Sys., Inc. v. F.C.C.,*
   512 U.S. 622 ..................................................................................... 31

*U.S. v. Playboy Entm't Grp., Inc.,*
   529 U.S. 803 (2000) ........................................................................ 24

*United States v. Chi Mak,*
   683 F.3d 1126 (9th Cir. 2012) ........................................................ 18

*United States v. Edler Indus., Inc.,*
   579 F.2d 516 (9th Cir. 1978) .......................................................... 18

*Universal City Studios, Inc. v. Corley,*
   273 F.3d 429 (2d Cir. 2001) ........................................................... 11

*Winter v. G.P. Putnam's Sons,*
   938 F.2d 1033 ..................................................................................... 8

## Federal Regulations

22 C.F.R. § 120.10 ................................................................... 4, 6, 9

22 C.F.R. § 120.11 ........................................................... 18, 25, 26

22 C.F.R. § 120.17 .................................................... 3, 6, 12, 30

22 C.F.R. § 120.4 ................................................................... 5

22 C.F.R. § 121.1 ................................................................... 4

22 C.F.R. § 123.1 ................................................................... 5

22 C.F.R. § 126.7 ................................................................... 5, 16, 17, 23

22 C.F.R. § 127.1 ............................................................................... 3

22 C.F.R. § 128.1 ........................................................................ 5, 17, 18

22 U.S.C. § 2778 ........................................................................ 3, 5, 18

**Legislative Materials**

Undetectable Firearms Modernization Act, H.R. 3643, 113th Cong. (2013) ......... 27

Undetectable Firearms Reauthorization Act, S.1774, 113th Cong (2013). ............ 27

**Other Authorities**

*Commodity Jurisdiction Final Determinations*, U.S. Dep't of State, Dir. of Def.
Trade Controls ................................................................................. 4

*DOJ Memos on ITAR Prior Restraint*, Defense Trade Law Blog, July 9, 2015 .... 25

Elise Dalley, *Bypassing Geo-blocked Sites*, Choice, Aug. 13, 2014 ..................... 30

hroncok, *Statue of Liberty with Base Building*, Thingiverse (Mar. 25, 2013) ........ 10

Information Policy & Access Center, 2014 Digital Inclusion Survey (2015) ........ 26

Kasie Hunt & Carrie Dann, *Senate Extends Ban on Undetectable Guns But Nixes
Tighter Restrictions*, NBC News, Dec. 9, 2013 .................................................. 27

Kathryn Zickuhr, et al., *Library Services in the Digital Age*, Pew Internet, Jan. 22,
2013 ............................................................................................. 26

Policy on Review Time for License Applications, 74 Fed. Reg. 63,497 (Dec. 3,
2009) .......................................................................................... 5, 17

Slic3r Home Page ........................................................................... 10

Solid Cube, http://cpansearch.perl.org/src/EWILHELM/CAD-Format-STL-
v0.2.1/files/cube.stl. ........................................................................ 10

U.S. Dep't of State, *Munitions Control Newsletter* ............................... 25

Wai Hon Wah, *Introduction to STL format*, (June 1999) ....................... 10

# INTEREST OF *AMICUS CURIAE*[1]

*Amicus Curiae* is non-profit public interest organizations seeking to protect speech and innovation on the Internet.

The Electronic Frontier Foundation ("EFF") is a non-profit, member-supported civil liberties organization that works to protect free speech, innovation, and privacy in the online world. With more than 22,000 dues-paying members, EFF represents the interests of technology users in both court cases and broader policy debates regarding the application of law in the digital age. EFF actively encourages and challenges industry and government to support free expression, innovation, privacy, and openness in the information society. EFF frequently participates, either as counsel of record or amicus, in cases involving the First Amendment and new technologies.

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(c), EFF certifies that no person or entity, other than amicus, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. Both Plaintiffs-Appellants and Defendants-Appellees consent to the filing of this brief. In the interest of full disclosure: EFF previously counseled Defense Distributed in regard to its first set of commodity jurisdiction requests, relating to certain files at issue in this case identified in Appellants' brief as the "Published Files," but EFF has not represented any party in connection with this litigation.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The First Amendment does not permit the government to presumptively criminalize online speech on a certain topic, and then decide on a case-by-case basis which speech to license, without any binding standards, fixed deadlines, or judicial review. Yet that is the regime advanced by the government in this case, criminalizing Americans who use the Internet to publish lawfully-obtained, nonclassified technical information relating to firearms and other technologies with military applications.

The licensing regime at issue in this case is a prior restraint that lacks the procedural safeguards required by the First Amendment to prevent discriminatory censorship decisions. It flies in the face of Supreme Court decisions that dictate how free speech interests are balanced with national security, such that speech is restrained only where absolutely necessary to prevent proven, immediate threats to concrete national security interests.

Beyond its flaws as a prior restraint, ITAR is a content-based regulation of speech that cannot survive strict scrutiny (or even the lesser scrutiny urged by the government) because it unnecessarily criminalizes a vast amount of protected speech that poses no risk to the putative goals of the regulatory regime. The regulation impermissibly sacrifices speech for the convenience of the government,

broadly criminalizing speech and putting the onus on speakers to seek leave to publish.

The Department of Justice warned the administrators of ITAR over thirty years ago that the First Amendment would not allow such a prepublication review regime. Yet, rather than developing appropriately-tailored regulations, the government has revived the overbroad scheme of prior restraint it once disavowed. The government will be unable to establish that this scheme is consistent with the First Amendment.

## **ARGUMENT**

### I.   **The Government Has Imposed a Prepublication Review Regime for Technical Information with Military Applications.**

The International Traffic in Arms Regulations (ITAR) criminalize "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad" without a license. 22 C.F.R. §§ 120.17(a)(4), 127.1; 22 U.S.C. § 2778(c). Violations carry massive penalties: up to 20 years imprisonment and a $1,000,000 fine. 22 U.S.C. § 2778(c).

Because the government considers electronic publication to be an "export," it requires that Internet users submit publications for review by agency officials before they may electronically publish information that is considered "technical data." 22 C.F.R. § 127.1. Technical data includes "[i]nformation . . . which is required for the design, development, production, manufacture, assembly,

operation, repair, testing, maintenance or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1). Technical data also includes software. § 120.10 (a)(4). "Defense articles" refers to a list of technologies designated at the discretion of the Department of State in consultation with the Department of Defense, listed at 22 C.F.R. § 121.1 (the "United States Munitions List" or USML). In addition to firearms, the USML includes a range of medical, chemical, electronic, and mechanical engineering categories, and the open-ended provision that "[a]ny article not enumerated on the U.S. Munitions List may be included in this category" by the Director of the Office of Defense Trade Controls Policy. Category XXI(a).

Those who desire to publish information relating to controlled technologies must determine whether a license is needed for their disclosure. The scope of the regulation is sufficiently ambiguous that nearly four thousand "commodity jurisdiction" requests have been made since 2010 to clarify whether a particular technology would require a license.[2] These determinations are made "on a case-by-case basis, taking into account" nonbinding considerations such as "the nature, function and capability" of the civil and military applications of items described in

---

[2] *Commodity Jurisdiction Final Determinations*, U.S. Dep't of State, Dir. of Def. Trade Controls, https://www.pmddtc.state.gov/commodity_jurisdiction/determination.html

the technical data. 22 C.F.R. § 120.4(d). There are no firm deadlines for a final determination or resolution of an administrative appeal. 22 C.F.R. §§ 120.4 (e), (g). The decision "shall not be subject to judicial review." 22 U.S.C. § 2778(h).

If the government decides that information is subject to ITAR, then the speaker must apply for a license to publish online. 22 C.F.R. § 123.1(a). No firm standards govern this process: "Any application for an export license or other approval under this subchapter may be disapproved . . . whenever: (1) The Department of State deems such action to be in furtherance of *world peace, the national security or the foreign policy* of the United States, *or is otherwise advisable*." 22 C.F.R. § 126.7(a) (emphasis added). While the President has imposed a 60-day deadline to adjudicate applications, broad and open-ended exceptions swallow the rule. Policy on Review Time for License Applications, 74 Fed. Reg. 63,497 (Dec. 3, 2009). Adjudication may be indefinitely delayed whenever "[t]he Department of Defense has not yet completed its review" or "a related export policy is under active review and pending final determination by the Department of State." *Id.* If a license is denied, an applicant may request reconsideration, but there is *no firm deadline* for action. *See* 22 C.F.R. § 126.7(c). There is also no opportunity for judicial review. 22 C.F.R. § 128.1.

II.   **ITAR Restricts Protected Speech, Including the Defense Distributed Files.**

A major constitutional problem with the ITAR scheme is that its definition of "export" prohibits general publication, public discussion, and scientific and academic exchange. *See* 22 C.F.R. § 120.17(a)(4). The government cannot censor these protected speech activities merely by relabeling them as the "conduct" of export. The regime is manifestly a direct regulation of expression, not mere conduct.

ITAR criminalizes the publication of "information in the form of blueprints, drawings, photographs, plans, instructions or documentation" or software, when that information relates to any of the wide range of technologies on the United States Munitions List. 22 C.F.R. § 120.10(a). Like paper documentation and blueprints, the digital documentation and design files such as Computer-Aided Design (CAD) files are speech that benefits from the full protection of the First Amendment. The government will be unable to establish otherwise. *See Freedman v. Maryland,* 380 U.S. 51, 58 (1965) ("the burden of proving that the film is unprotected expression must rest on the censor").

A.    **Publishing Technical Information is Protected Speech.**

It is settled that "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011) (collecting cases). As the Supreme Court has explained, "if the

acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (citation omitted). The expression of "'all ideas having even the slightest redeeming social importance,' including those concerning 'the advancement of truth, science, morality, and arts' have *the full protection* of the First Amendment." *Junger v. Daley*, 209 F.3d 481, 484 (6th Cir. 2000) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)) (emphasis added).

This protection encompasses factual information such as technical data: "the First Amendment protects scientific expression and debate just as it protects political and artistic expression." *Bd. of Trs. of Leland Stanford Jr. Univ. v. Sullivan*, 773 F. Supp. 472, 474 (D.D.C. 1991). "Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." *Sorrell*, 131 S. Ct. at 2667. And "[t]he purpose of the free speech clause . . . is to protect the market in ideas, broadly understood as the public expression of ideas, narratives, concepts, imagery, opinions—scientific, political or aesthetic." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1188 (6th Cir. 1995) (alterations in original) (quoting *Swank v. Smart*, 898 F.2d 1247, 1250 (7th Cir. 1990)).

Even instructions on how to conduct potentially dangerous activities are protected speech. *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1019 (5th Cir. 1987). In *Herceg*, this Court held that the First Amendment shielded Hustler Magazine from liability for the death of a young man who engaged in "autoerotic asphyxiation" after reading how to do it in the magazine. *Id.* The Court explained that "first amendment protection is not eliminated simply because publication of an idea creates a potential hazard." *Id.* at 1020; *accord Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991) (publisher not liable for illness from eating mushrooms described in its *Encyclopedia of Mushrooms*).

The Supreme Court explained in *Bartnicki* that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." 532 U.S. at 529-30. After all, "[m]uch speech is dangerous. Chemists whose work might help someone build a bomb, political theorists whose papers might start political movements that lead to riots, speakers whose ideas attract violent protesters, all these and more leave loss in their wake." *Am. Booksellers Ass'n. v. Hudnut*, 771 F.2d 323, 333 (7th Cir. 1985), *aff'd mem.*, 475 U.S. 1001 (1986), *reh'g denied*, 475 U.S. 1132 (1986). Yet "[t]he prospect of crime…, by itself does not justify laws suppressing protected speech." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002).

**B.     Computer-Readable Documentation and Designs, Like Those of Defense Distributed, Are Protected Speech.**

Defense Distributed's design files exemplify the protected speech burdened by ITAR's ban on Internet publication. They are informational documents that directly communicate technical ideas such as the dimensions and specifications of objects. *See* ROA.335-36.

The files fall into two main categories: general documentation and Computer-Aided Design (CAD) files. ROA.335-36. The first category includes traditional media such as image files and Microsoft Word documents describing objects. *Id.* Visual and written descriptions are traditional formats for protected expression. *E.g.*, *Kaplan v. California*, 413 U.S. 115, 119–120 (1973) (explaining that photographs, like printed materials, are protected by the First Amendment). ITAR clearly burdens protected speech by prohibiting the disclosure of "blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1).

The other, equally-protected, category of documents at issue here consists of CAD files. *See* ROA.335-36 (describing four CAD file formats). CAD files are specifications describing the shape and sometimes the physical makeup of three-dimensional objects. A CAD file might describe a solid cube by specifying its corners as coordinates in three dimensions: (0, 0, 0); (0, 1, 0); (1, 1, 0); and so on.

In the common .stl CAD language, the definition of this "solid cube" would begin as follows and repeat until each facet of the shape is defined:[3]

> **solid cube**
>   **facet normal 0 0 0**
>     **outer loop**
>       **vertex 0 0 0**
>       **vertex 0 1 0**
>       **vertex 1 1 0**
>     **endloop**
>   **endfacet**

More elaborate .stl shapes, such as the Statue of Liberty[4] or a firearm, are described the same way: listing coordinates that define the object's surface.[5]

To create a physical object based on a CAD file, a third party must supply additional software to read these files and translate them into the motions of a 3D print head,[6] the 3D printer itself, and the necessary physical materials.

The government incorrectly argues that technical data files lose First Amendment protection because of their "function." Defs.' Opp'n Prelim. Inj. 16. However, "[t]he fact that a medium of expression has a functional capacity should

---

[3] *See* Solid Cube, http://cpansearch.perl.org/src/EWILHELM/CAD-Format-STL-v0.2.1/files/cube.stl.

[4] hroncok, *Statue of Liberty with Base Building*, Thingiverse (Mar. 25, 2013), http://www.thingiverse.com/thing:65869/#files.

[5] Wai Hon Wah, *Introduction to STL format*, (June 1999) http://download.novedge. com/Brands/FPS/Documents/Introduction_To_STL_File_Format.pdf

[6] Slic3r Home Page, http://slic3r.org/ (last visited Dec. 15, 2015) ("Slic3r is the tool you need to convert a digital 3D model into printing instructions for your 3D printer. It cuts the model into horizontal slices (layers), generates toolpaths to fill them and calculates the amount of material to be extruded.")

not preclude constitutional protection." *Junger v. Daley*, 209 F.3d 481, 484-85 (6th Cir. 2000) (discussing computer source code); *see Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1435-36 (N.D. Cal. 1996) (same). Computer software consistently receives First Amendment protection because code, like a written musical score, "is an expressive means for the exchange of information and ideas." *Junger*, 209 F.3d at 485; *see Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) (decryption software). The functional consequences of speech are considered not as a bar to protection, but to whether a regulation burdening the speech is appropriately tailored. *Junger*, 209 F.3d at 485.

Further, ITAR does not restrict itself to executable computer software that some courts have described as "functional" (and which they have *protected* nonetheless). The design files at issue here, for example, are not "functional" software that can be "run," "launched," or "executed." They are storage files for text, images, and three-dimensional shapes, having "functional" consequences only after a third party interprets and implements them with software, hardware (such as a 3D printer), and raw materials. Even under the government's flawed view that "functionality" diminishes First Amendment protection, files here are, if anything, less "functional," and at least as protected, as the computer instructions for encrypting data at issue in *Bernstein* and *Junger* or the decryption instructions at issue in *Corley*.

### C. First Amendment Protection is Not Diminished For Speech That is Accessible to Foreigners.

The Ninth Circuit, in *Bullfrog Films, Inc. v. Wick*, invalidated regulations regarding the export of educational, scientific, and cultural materials as being facially inconsistent with the First Amendment, overly broad, and vague. 847 F.2d 502, 509-14 (9th Cir. 1988). The court held that "the First Amendment protects communications with foreign audiences to the same extent as communication within our borders." *Id.* at 509 n.9, 511-512 (declining to revisit this "well-reasoned conclusion" of the district court, which further explained that "there is no 'sliding scale' of First Amendment protection under which the degree of scrutiny fluctuates in accordance with the degree to which the regulation touches on foreign affairs. Rather, the only permissible non-neutral inquiry into the content of the speech is whether the statements adversely affect foreign policy interests to such a degree that the speech is completely unprotected." *Bullfrog Films, Inc. v. Wick*, 646 F. Supp. 492, 502-04 (C.D. Cal. 1986)). Besides, ITAR burdens speech to a foreigner within the United States. 22 C.F.R. § 120.17(a)(4). With the rise of the Internet, it is all the more crucial that the free speech rights of Americans are not diminished merely because online speech is accessible to foreigners.

In sum, ITAR burdens protected speech, including the design files at issue in this case. Only under an appropriately-tailored regime with adequate First

Amendment safeguards could the government restrict the publication of such information.

### III. ITAR's Prepublication Review of Technical Data Is an Unlawful Prior Restraint on Speech.

#### A. Speech-Licensing Regimes that Lack Procedural Safeguards are Invalid.

Licensing schemes that create a system of pre-publication review for protected speech are unconstitutional unless the review process is bounded by stringent procedural safeguards. *Freedman v. Maryland*, 380 U.S. 51, 58–59 (1965). A scheme making the "freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990) (plurality opinion) (quoting *Shuttlesworth v. Birmingham*, 395 U.S. 147, 151 (1969)); *see also Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Human nature creates an unacceptably high risk that excessive discretion will be used unconstitutionally, and such violations would be very difficult to prove on a case-by-case basis. *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 758 (1988). Furthermore, "[b]ecause the censor's business is to censor, there inheres the danger that he may well be less responsive than a court—part of an independent branch of

government—to the constitutionally protected interests in free expression." *Freedman*, 380 U.S. at 57-58.

A regulation "subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150-51 (1969); *accord Lakewood*, 486 U.S. at 770-72. The Supreme Court warned in *Lakewood*, where a license could be denied for not being in the "public interest," that "[t]o allow these illusory 'constraints' to constitute the standards necessary to bound a licensor's discretion renders the guaranty against censorship little more than a high-sounding ideal." *Lakewood*, 486 U.S. at 769-70; *see also Bernstein v. U.S. Dep't of State*, 974 F. Supp. 1288, 1308 (N.D. Cal. 1997) (holding that "national security and foreign policy interests" are "illusory constraints").

Speech licensing schemes are also invalid when they lack certain procedural protections:

1) the licensing decision must be prompt;

2) there must be prompt judicial review; and

3) when a censor denies a license, it must go to court to obtain a valid gag order and once there bears the burden to prove the gag is justified. *See Freedman*, 380 U.S. at 58-60.

As the Supreme Court has explained, "because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint." *Id.* at 58. "Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution. . . . [T]he procedure must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license." *Id.* at 59. Even a court-ordered prior restraint on speech must be stayed if appellate review is not expedited. *Nat. Socialist Party of Am. v. Skokie*, 432 U.S. 43, 43-44 (1977) (per curiam). The Court has not specified precisely when a final judicial decision must come, but it must be faster than the four months for initial judicial review and six months for appellate review in *Freedman*, 380 U.S. at 55, 61. The regime it cited with approval required "a hearing one day after joinder of issue; the judge must hand down his decision within two days after." *Id.* at 60.

Even content-neutral licensing schemes are unconstitutional if they lack these safeguards. *Lakewood*, 486 U.S. at 763-64; *see FW/PBS*, 493 U.S. at 227 (plurality opinion) (city did not pass judgment on content of protected speech, but impermissibly had indefinite amount of time to issue license). Licensing schemes create a heightened risk of discriminatory application; the newsrack permitting

scheme in *Lakewood* was neither facially content-based nor justified in terms of content, but it was still struck down because it could be applied discriminatorily. *Lakewood*, 486 U.S. at 757-59.

**B.   ITAR's Prepublication Review Scheme Lacks the Required Safeguards.**

The prepublication review process lacks *every single one* of the required safeguards. *See Bernstein v. U.S. Dep't of State*, 945 F. Supp. 1279, 1289 (N.D. Cal. 1996) ("The ITAR scheme, a paradigm of standardless discretion, fails on every count.").

First, the regulatory scheme fails to provide binding standards. A license may be denied whenever the Department of State deems it "advisable." 22 C.F.R. § 126.7(a)(1). The regime is even more egregious than those that purport to be bounded by "illusory constraints," *Lakewood*, 486 U.S. at 769, such as "national security and foreign policy interests." *Bernstein*, 974 F. Supp. at 1307. It is even more vague than the one rejected by this Court in *Fernandes v. Limmer*, where the agency could refuse permission to speak "when there is good reason to believe that the granting of the permit will result in a direct and immediate danger or hazard to the public security, health, safety or welfare." 663 F.2d 619, 631 (5th Cir. 1981). Rather than putting the public on notice of what is prohibited, ITAR's prepublication review regime invites the public to ask on a case-by-case basis and reserves the right to deny a license at the pleasure of the agency.

Second, the scheme does not guarantee prompt adjudication. There are no binding deadlines for adjudication of a commodity jurisdiction request, and while Presidential guidance requires that license applications be adjudicated within 60 days, the deadline is swallowed by broad exemptions and does not require that administrative appeals adhere to any deadline. Policy on Review Time for License Applications, 74 Fed. Reg. 63,497 (Dec. 3, 2009); *see* 22 C.F.R. § 126.7(c). Here, a commodity jurisdiction decision took nearly two years. App. Br. 23.

Third, the ITAR regime fails to provide for prompt judicial review of licensing determinations: because an ITAR determination "is highly discretionary, it is excluded from review under the Administrative Procedure Act." 22 C.F.R. § 128.1. The complete lack of judicial safeguards means that the ITAR speech-licensing scheme cannot satisfy *Freedman's* requirements that such a regime provide for prompt judicial review and "that the licensor will, within a specified brief period, either issue a license or go to court." *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 802 (1988) (*quoting Freedman,* 380 U.S. at 59). The executive branch may not create a speech-licensing regime independent of judicial checks and balances.

### C. The Government Incorrectly Argues that ITAR Prepublication Review is Not a Prior Restraint.

The government attempts to characterize the prepublication review requirement as something other than a prior restraint. It relies on two Ninth Circuit

cases that considered the lawfulness of export controls. *United States v. Chi Mak*, 683 F.3d 1126 (9th Cir. 2012); *United States v. Edler Indus., Inc.*, 579 F.2d 516, 521 (9th Cir. 1978). Yet until very recently, the government had disavowed the prepublication review requirement, giving those panels no occasion to consider it. ROA.332 ("Approval is not required for publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to Section 125.11 does not establish a prepublication review requirement."). The government also had not asserted that the "public domain" exception of § 120.11(a) excludes publication on the Internet, now the nation's dominant medium for speech. In *Chi Mak*, the court relied on that public domain exception to protect "the types of information that are subject to the highest levels of First Amendment protection." 683 F.3d at 1136. *Edler* also predated the provisions eliminating judicial review for ITAR and the bulk of Supreme Court caselaw elaborating *Freedman*. 22 C.F.R. § 128.1 (effective Sept. 17, 1996); 22 U.S.C. § 2778(h). Further, it adopted a narrowing construction that is not clearly reflected in the statute: rather than *Edler*'s specific knowledge requirement, the statute merely requires that violations be willful. *Compare* 22 U.S.C. § 2778(c) *with Edler*, 579 F.2d at 521.

Whatever an appropriately-tailored export control regime may be, it cannot involve, as here, a broad prior restraint against Internet publication, subject to unbounded agency discretion lacking any judicial review. The Court should

conclude on this basis alone that plaintiff-appellants are likely to prevail on their First Amendment claim.

## IV.   The Government Cannot Show that the Speech Burdened by Prepublication Review Would Cause Direct, Immediate, and Irreparable Harm to National Security.

The Supreme Court has repeatedly held that prior restraints may be sustained only in extraordinary circumstances: prior restraints must be strictly *necessary* to further a governmental interest of the highest magnitude. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562 (1975); *accord CBS Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) ("Even where questions of allegedly urgent national security or competing constitutional interests are concerned . . . we have imposed this most extraordinary remedy only where the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive measures.") (quotations and citations omitted).

A prior restraint is considered justifiable only if: (1) the harm to the governmental interest will definitely occur; (2) the harm will be irreparable; (3) no alternative exists for preventing the harm; and (4) the prior restraint will actually prevent the harm. *Nebraska Press*, 427 U.S. at 562.

This exacting scrutiny applies even if the asserted governmental interest is national security. In the *Pentagon Papers* case, *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam), the Supreme Court the government failed to

carry the "heavy burden of showing justification for the imposition of [] a restraint" against publishing a classified report on Vietnam. 403 U.S. at 714. The narrowest concurrence[7] rejected the prior restraint because the Justices "[could not] say that disclosure of any of [the documents] will surely result in direct, immediate, and irreparable damage to our Nation or its people." 403 U.S. at 730 (Stewart, J., concurring); *see Fernandes*, 663 F.2d at 631 (adopting "direct, immediate, and irreparable damage" standard of the Stewart concurrence).

ITAR's prepublication review scheme cannot satisfy these requirements. Here, prior restraint is imposed without any showing of harm, let alone the required showing that disclosure will "surely result" in "direct, immediate, and irreparable damage." *Pentagon Papers*, 403 U.S. at 730 (Stewart, J., concurring). A prior restraint that operates in the absence of proven harm fails the *Nebraska Press* requirements of "the requisite degree of certainty to justify the restraint," that there be no alternative measures, and that the restraint "effectively . . . operate to prevent the threatened danger." 427 U.S. at 569-70, 562.

The regime here also makes no effort to tailor restrictions to individual, case-by-case circumstances. The ban categorically forbids online speech about

---

[7] The "narrowest grounds" for concurring are regarded as the Court's holding. *See Marks v. United States*, 430 U.S. 188, 193 (1977).; *see also Fernandes v. Limmer*, 663 F.2d 619, 631 (5th Cir. 1981).

science and technologies that potentially implicate ITAR, whether or not specific speech poses a particular risk.

The government merely argues that the designs here "could be used" to create and use a weapon against U.S. interests. Defs.' Opp'n Prelim. Inj. 10. This falls far short of the required showing under *Nebraska Press*. Even if the designs did communicate information that "could be used" in a harmful way, the government has not demonstrated that prior restraint is so strictly necessary to a concrete, critical interest that the First Amendment will allow it.

## V.  ITAR'S Ban on Publications IS a Content-Based Regulation that Fails Strict Scrutiny.

Independent of its defects as a prior restraint, the prepublication review scheme fails to satisfy the strict First Amendment scrutiny required of restrictions on content. *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2664 (2011). Because the government cannot show the regulations are narrowly tailored to advance a compelling state interest, they cannot permissibly be enforced in the overbroad manner it urges.

### A.  ITAR Is a Content-Based Regulation of Speech.

ITAR regulations are triggered by the topic of speech, namely the communication of information about technologies governed by ITAR. The Supreme Court recently reiterated that "defining regulated speech by particular subject matter" is an "obvious" content-based regulation. *Reed v. Town of Gilbert*,

135 S. Ct. 2218, 2227 (2015). More "subtle" content-based distinctions involve "defining regulated speech by its *function or purpose*." *Id.* (emphasis added). And it has long been recognized that "the First Amendment's hostility to content based regulation extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic." *Burson v. Freeman*, 504 U.S. 191, 197 (1992); *accord Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (statute restricting speech about crime is content-based); *Consolidated Edison Co. of N.Y. v. Public Service Comm'n of N.Y.*, 447 U.S. 530, 537-38 (1980).

A regulation that involves a licensor in appraising facts, exercising judgment, and forming opinions is also a content-driven scheme. *See, e.g.*, *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 135-36 (1992) (permit fee based on the capacity for a march to cause violence was content-based); *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940) (censor asked to determine whether a cause is "religious").

In ITAR's prepublication review scheme, regulation of speech is triggered when it describes covered subject matter. In both the commodity jurisdiction and licensing processes, the government analyzes the content of the particular speech to decide whether it discusses subject matter that should be controlled under ITAR, judge its communicative impact, and determine whether blocking the disclosure is

"in furtherance of world peace, the national security or the foreign policy of the United States, or is otherwise advisable." 22 C.F.R. § 126.7. Just like the regulators in *Forsyth County*, who evaluated the capacity of a message to lead to violence, ITAR regulators are engaged in the content-based regulation of speech when they make individualized censorship decisions.

The government argues that a "content-neutral purpose" underlies the regulations, but that is irrelevant here.[8] Defs.' Opp'n Prelim. Inj. 15-16. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 135 S. Ct. at 2228 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). The government here has chosen content-based *means* to achieve its purpose, requiring strict scrutiny. *See Lakewood*, 486 U.S. at 759 (striking down a newsrack ordinance because of censorial effects, without discussing governmental purpose for enacting the ordinance); *see also Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 592 (1983) (illicit legislative intent is not necessary for a First Amendment violation); *Cantwell*, 310 U.S. at 304-05 (assuming a proper purpose, "the question remains whether the method adopted by Connecticut to that end transgresses the liberty safeguarded by the Constitution").

_____

[8] Besides, preventing the spread of information on certain topics is hardly "content-neutral."

### B. ITAR Does Not Satisfy Strict Scrutiny.

The government bears the burden of showing that the regulations are necessary to serve a compelling state interest and are narrowly tailored to serve that interest. *U.S. v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). A regulation is not narrowly tailored if:

- it fails to advance the relevant interest,[9]

- it burdens substantially more speech than is necessary to vindicate the interest,[10]

- less-restrictive means were available to achieve the same ends,[11] or

- it is underinclusive and thus burdens speech without advancing the asserted interest.[12]

Just as "the Government may not reduce the adult population to only what is fit for children," *Reno v. ACLU*, 521 U.S. 844, 875 (1997), neither may it reduce the online speech of Americans to only what is fit for foreign consumption.

---

[9] *See, e.g.*, *Eu v. San Francisco County Democratic Cent. Committee*, 489 U.S. 214, 226, 228-29 (1989); *Meyer v. Grant*, 486 U.S. 414, 426 (1988); *Globe Newspaper Co. v. Superior Court for Norfolk*, 457 U.S. 596, 609-10 (1982); *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 789-90 (1978); *Buckley v. Valeo*, 424 U.S. 1, 45-47, 53 (1976).

[10] *See, e.g.*, *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 120-21 (1991); *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 500-01 (1985).

[11] *U.S. v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000); *R. A. V. v. City of St. Paul*, 505 U.S. 377, 395 (1992); *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986).

[12] *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989).

Banning Internet publication prevents valuable domestic debate and sharing of information, and represents a radical departure from traditional export controls.

### 1. Less-Restrictive Means Are Available to Address ITAR's Goals.

The history of ITAR further demonstrates that prepublication review is not necessary to achieve the government's goals. In 1980, the State Department responded to First Amendment concerns by repudiating the existence of a prepublication review requirement: "Approval is not required for publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to section 125.11 does not establish a prepublication review requirement."[13] The State Department revised the regulations several times to clarify that it was *not* purporting to impose an unconstitutional licensing regime, in response to concerns from the Department of Justice.[14]

ITAR has long recognized that it is inappropriate and unnecessary to constrain the publication of unclassified information into the public domain. *See* 22 C.F.R. § 120.11. Yet the government now takes the position that the Internet does not qualify as the "public domain." Defs.' Opp'n Prelim. Inj. 3 n.3.[15] The arbitrary

---

[13] U.S. Dep't of State, *Munitions Control Newsletter*,
https://app.box.com/s/ohqvn3b6tawz9d65g12s3ri2gpxo8fdp.
[14] *DOJ Memos on ITAR Prior Restraint*, Defense Trade Law Blog, July 9, 2015,
http://defensetradelaw.com/2015/07/09/doj-memos-on-itar-prior-restraint/.
[15] This position is contrary to the plain meaning of "public domain" and 22 C.F.R.
§ 120.11 (a)(4), which includes information available at public libraries. Among

distinction between electronic publication and other media is irrational and untenable. ITAR recognizes that the public domain includes information available "[a]t libraries open to the public or from which the public can obtain documents." 22 C.F.R. § 120.11(a)(4). ITAR also defines the public domain to include publications sold at newsstands and bookstores and subscriptions that "are available without restriction to any individual who desires to obtain or purchase the published information." *See* 22 C.F.R. §§ 120.11 (a)(1), (2). These media are freely available to foreign persons, and the exact same information could be published electronically or in print form. If these media need not be restricted to achieve the government's ends, the entire medium of Internet publication need not be presumptively off-limits for communication about defense-related technologies.

A substantial body of law provides alternative means for securing sensitive defense information, including the government clearance system and contractual restraints on disclosure. These approaches reflect the traditional First Amendment

---

public libraries, 99% have public Internet connections, averaging nineteen computers per location. Information Policy & Access Center, 2014 Digital Inclusion Survey (2015), http://digitalinclusion.umd.edu/sites/default/files/uploads/2014DigitalInclusionSur veyFinalRelease.pdf. Americans consider Internet access at public libraries to be just as important as providing access to books. Kathryn Zickuhr, et al., *Library Services in the Digital Age*, Pew Internet, Jan. 22, 2013, http://libraries.pewinternet.org/2013/01/22/part-4-what-people-want-from-their-libraries/. The exception for subscriptions also applies: an Internet user can subscribe to the content of any website (many websites make this effortless with "feeds"). *See* 22 C.F.R. § 120.11(a)(2).

distinction between restraints on disclosure of information that one has a duty to keep secret as a result of a sensitive position or agreement, as opposed to information one has independently discovered or generated. *See United States v. Aguilar*, 515 U.S. 593, 606 (1995) ("Government officials in sensitive confidential positions may have special duties of nondisclosure."). *Compare Boehner v. McDermott*, 484 F.3d 573, 579 (D.C. Cir. 2007) (en banc) (punishing disclosure of information obtained by defendant in his role as member of House Ethics Committee), *with Jean v. Mass. State Police*, 492 F.3d 24, 32 (1st Cir. 2007) (protecting similar disclosure, and noting that the court in *Boehner* would have done the same "if McDermott had been a private citizen, like Jean").

Similarly, Congress considered (and rejected) changes to the Undetectable Firearms Act that would have addressed the creation, transport, or sale of any 3D printed firearm that was not detectable by standard means.[16] This approach demonstrates that protected speech need not be burdened to vindicate a government interest in preventing the use of certain weaponry.

---

[16] Kasie Hunt & Carrie Dann, *Senate Extends Ban on Undetectable Guns But Nixes Tighter Restrictions*, NBC News, Dec. 9, 2013, http://www.nbcnews.com/news/other/senate-extends-ban-undetectable-guns-nixes-tighter-restrictions-f2D11717122; Undetectable Firearms Modernization Act, H.R. 3643, 113th Cong. (2013); Undetectable Firearms Reauthorization Act, S.1774, 113th Cong (2013).

### 2. Most Speech Burdened by ITAR Does Not Threaten Any Concrete Government Interest.

The scope of ITAR's prohibition on speech could apply to members of the press republishing newsworthy technical data, professors educating the public on scientific and medical advances of public concern, enthusiasts sharing otherwise lawful information about firearms, domestic activists trading tips about how to treat tear gas or resist unlawful surveillance, and gun control opponents expressing a point about proliferation of weapons. Innocent online publication on certain topics is prohibited simply because a hostile foreign person could conceivably locate that information, use it to create something harmful, and use a harmful device against US interests. Speech cannot permissibly be repressed for such an attenuated and hypothetical government end.

Similarly, ITAR forbids the re-publication of information that is already available on the public Internet, because the government does not recognize the Internet as "public domain." Defs.' Opp'n Prelim. Inj. 3 n.3; *see* ROA.335-38. Banning this re-publication does not meaningfully advance any government interest: "punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." *Florida Star v. B.J.F.*, 491 U.S. 524, 535 (1989).

### 3. Alternative Channels for Speech Do Not Justify the Restraint.

The government incorrectly asserts that the restraint on speech is justified because alternative channels of communication are left intact. Defs.' Opp'n Prelim. Inj. 22. However, supposed alternative channels cannot overcome the challenged program's content discrimination. As the Supreme Court explained in *Reno*:

> This argument is unpersuasive because the CDA regulates speech on the basis of its content. A "time, place, and manner" analysis is therefore inapplicable. … The Government's position is equivalent to arguing that a statute could ban leaflets on certain subjects as long as individuals are free to publish books. In invalidating a number of laws that banned leafletting on the streets regardless of their content--we explained that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."

*Reno*, 521 U.S. at 879-80 (quoting *Schneider v. N.J. Twp. of Irvington*, 308 U.S. 147, 163 (1939).

Furthermore, even if there were no content discrimination here, there *are* no adequate alternative channels of communication. There is no medium of expression that is equivalent to Internet publication, enabling Americans to engage with strangers and colleagues who agree or vehemently disagree with their views in real time from thousands of miles away—yet is inaccessible to foreigners. *See Reno*, 521 U.S. at 868-69 (describing the "vast democratic forums of the Internet"). Even if online platforms restricted themselves to domestic access, a user still could not speak freely because the regulations prohibit disclosure to foreign persons *in*

*the United States*. 22 C.F.R. § 120.17(a)(4). It would also be a trivial matter for any person abroad to obtain the information using commonly-available "virtual private network" services that pipe traffic through a computer located in the US. This is an overwhelmingly common practice among those who are frustrated by geo-blocking of media content or location-based discrimination.[17] And regardless of the technology at issue, an overbroad regulation of speech simply cannot be justified by the theory that publishers could take on the burden of policing their readership to make sure they are not foreign; the Supreme Court explained in *Reno* the chilling effects that would result from such a regime. *Reno*, 521 U.S. at 865-67 (discussing access by minors).

The government will be unable to prove that the regulations at issue satisfy strict First Amendment scrutiny.

## VI. The Prepublication Review Scheme Is Invalid Even Under the Reduced Scrutiny the Government Advocates.

Even if the prepublication review scheme were subject to intermediate scrutiny, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664

---

[17] *See, e.g.*, Elise Dalley, *Bypassing Geo-blocked Sites*, Choice, Aug. 13, 2014, https://www.choice.com.au/electronics-and-technology/internet/internet-privacy-and-safety/articles/bypass-geo-blocking.

(1994). The regulation also may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 665.

> The tailoring requirement does not simply guard against an impermissible desire to censor. The government may attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience. Where certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency.

*McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014) (internal quotation omitted).

ITAR demonstrates exactly the preference for "mere convenience" that *McCullen* called out as impermissible. The overbreadth and poor tailoring discussed above are so egregious that the lesser standard of intermediate scrutiny cannot save the regime. The regulations sacrifice informed public debate and scientific learning, even where the disclosures at issue pose no threat to US interests. The government has done no more than "posit the existence of the disease sought to be cured" and assert that the regulations will cure it – not enough to carry its burden. *See Turner*, 512 U.S. at 664.

## CONCLUSION

For the foregoing reasons, plaintiff-appellants are likely to prevail on their First Amendment claim.

Dated: December 17, 2015                Respectfully submitted,

By:  /s/ Kit Walsh
        Kit Walsh (CA SBN 303598)

        ELECTRONIC FRONTIER FOUNDATION
        815 Eddy Street
        San Francisco, CA 94109
        Tel: (415) 436-9333
        Fax: (415) 436-9993
        kit@eff.org

        *Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(A)(7)(C)**

I hereby certify as follows:

1.     The foregoing Brief of *Amici Curiae* complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  The brief is printed in proportionally spaced 14-point type, and there are 6,999 words in the brief according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)).

2.     The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and with the type style requirements of Fed. R. App. P. 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Mac 2011 in 14-point Times New Roman font.


Dated:  December 17, 2015                    /s/ Kit Walsh
                                             Kit Walsh

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeal for the Fifth Circuit by using the appellate CM/ECF System on December 17, 2015. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 17, 2015                   /s/ Kit Walsh
                                           Kit Walsh