No. 15-50759

# United States Court of Appeals
## for the Fifth Circuit

Defense Distributed and
Second Amendment Foundation, Inc.,
*Plaintiffs-Appellants*,

~ *versus* ~

United States Department of State; John F. Kerry, in his official capacity as the Secretary of the Department of State; Directorate of Defense Trade Controls, Department of State Bureau of Political Military Affairs; Kenneth B. Handelman, individually and in his official capacity as Deputy Assistant Secretary of State for Defense Trade Controls Policy Division; Sarah J. Heidema, individually and in her official capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; and Glen Smith, individually and in his official capacity as the Senior Advisor, Office of Defense Trade Controls,
*Defendants-Appellees*.

On Appeal from the United States District Court
for the Western District of Texas

**Brief of the Madison Society Foundation, Inc.,
as *Amicus Curiae* in Support of Plaintiffs-Appellants**

David T. Hardy
8987 E. Tanque Verde No. 265
Tucson, Arizona 85749
(520) 749-0241
dthardy@mindspring.com

Leif A. Olson
The Olson Firm, PLLC
PMB 188
4830 Wilson Road, Suite 300
Humble, Texas 77396
(281) 849-8382
leif@olsonappeals.com

# Supplemental Certificate of Interested Persons

Case 15-50759, *Defense Distributed, et al., v. U.S. Dept. of State, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
| --- | --- |
| David T. Hardy | Counsel to *amicus* |
| Madison Society Foundation | Amicus curiae |
| Leif A. Olson | Lead counsel to *amicus* |

The Madison Society Foundation is a California nonprofit corporation. It has no parent companies, no subsidiaries, and no affiliates. It does not issue shares to the public.

/s/ Leif A. Olson

# Table of Contents

Supplemental Certificate of Interested Persons ................................. 1

Table of Authorities ........................................................................... 3

Interest and Independence of *Amicus Curiae* ........................................ 5

Argument: *The Second Amendment's right to keep and bear arms was premised on a society in which arms were created by individuals.* ............................................................................... 6

    A. During the Framing, firearms were created by individuals, not manufactured by corporations. .................... 6

    B. Many craftsmen sidelined as gunsmiths. .............................. 7

    C. The Framers understood gunsmithing to be a personal activity by which each man could make his own gun. ............ 9

Conclusion ....................................................................................... 13

Certificate of Compliance ................................................................ 14

Certificate of Filing and Service ...................................................... 14

# Table of Authorities

**Statutes**

1705 Va. Acts ch. 31
   3 Hening's Laws of Virginia 362 ........................................10

1775 Va. Acts Dec. Interreg. ch. 3
   9 Hening's Laws of Virginia 94 ..........................................10

Act of Jan. 25, 1758, ch. 18
   4 Acts and Resolves, Public and Private, of the
   Province of the Massachusetts Bay ............................ 11

Act of May 8, 1792, ch. 33
   1 Stat. 271.................................................................................. 12

**Books**

Gallay, Alan
   Colonial Wars of North America 1512–1763 (2015).... 11

Gill, Harold B.
   The Gunsmith in Colonial Virginia (1974).............. 9, 11

Hounshell, David A.
   From the American System to Mass Production
   1800–1932 (1984)..................................................................... 12

Kauffman, Henry J.
   Early American Gunsmiths 1650–1850 (1952) ..............8, 9

**Other sources**

American National Standards Institute
*Voluntary Industry Performance Standards for Pressure and Velocity of Centrefire Rifle Sporting Ammunition for the Use of Commercial Manufacturers* (1992) ........................................................................ 13

Brumfield, Gary
*Rifle Barrel Making: The 18th Century Process*
flintriflesmith.com/toolsandtechniques/barrel_making.htm .......... 6

Eli Whitney Museum
*The Factory*
www.eliwhitney.org/7/museum/about-eli-whitney/factory .......... 12

Letter from Joseph Hewes to Samuel Johnston (Feb. 13, 1776)
*in* 10 Colonial Records of N.C. 447 (William L. Saunders, ed., 1890) ............................................................................... 10

## Interest and Independence of *Amicus Curiae*

The Madison Society Foundation is a not-for-profit 501(c)(3) corporation based in California. It promotes and preserves the purposes of the Constitution of the United States, in particular the right to keep and bear arms.

The Framers understood this right to encompass not just the ability to use arms, but the ability to construct them. The Foundation comes as a friend of the Court to explain how this understanding should inform the Court's analysis of the arms regulations challenged by the plaintiffs and how affirming those restrictions would diminish the rights protected by the First and Second Amendments.

No one other than the Foundation and its counsel wrote or paid for this brief or parts of it.

The parties consent to the Foundation's filing this brief.

**Argument:**
*The Second Amendment's right to keep and bear arms was premised on a society in which arms were created by individuals.*

## A. During the Framing, firearms were created by individuals, not manufactured by corporations.

When the Second Amendment was framed, creation of firearms was very much a "home brew" operation. There were no firearms manufacturers as such; the field was dominated by individual blacksmiths who created firearms as part of their calling. The concept of "gun manufacturing" as a distinct form of industry did not originate until after the Framing, and it didn't take hold until well into the 19th century. Remington Arms, which boasts of being America's first gun manufacturer, was founded in 1816—in a blacksmith's shop. Colt, Winchester, and Smith & Wesson all were founded in the mid-1850s, long after the Framers were gone.[1]

Any blacksmith could create a firearm's barrel by hammering a heated sheet of iron around a round mandrel, welding the resulting seam, and reaming the inside to the desired diameter. Gary Brumfield, *Rifle Barrel Making: The 18th Century Process*, flintriflesmith.com/toolsandtechniques/barrel_making.htm. The gun's stock was carved from

---

[1] *See* bit.ly/1lUdIUA (Remington); bit.ly/1k5k1CY (Colt); bit.ly/1RUQJVE (Winchester); bit.ly/1k5jPDH (Smith & Wesson) (each page last visited December 17, 2015).

wood; the lock—the firing mechanism—was formed from iron, purchased, or recycled from an older firearm. Anyone who cares to learn (and employ) the process can still do so today: Wallace Gusler, retired Master Gunsmith at Colonial Williamsburg, began as a sawmill worker and later turned to creating custom flintlock firearms. His workshop was made from a chicken coop. His primary tools were a blacksmith's forge and wood chisels. *See* Gary Brumfield, Muzzle Blasts, *Wallace Gusler, Master Gunsmith* (Jan. 2004) (available at [flintriflesmith.com/WritingandResearch/Published/wallaceretires_mb.htm](flintriflesmith.com/WritingandResearch/Published/wallaceretires_mb.htm)).

### B. Many craftsmen sidelined as gunsmiths.

Contemporary newspaper advertisements and similar records make it clear that gunsmithing was most often a sideline of blacksmithing. But blacksmiths weren't a gunsmithing monopoly:

- Edward Annely of New York in 1748 advertised that he "engraves Coats of Arms on Plate, etc." and "likewise makes guns and pistols as any gentleman shall like…."

- Francis Brooks of Philadelphia in 1791 advertised himself as a "pistol maker" and seller of "Jewelry, Cutlery, and Hardware."

- Anthony Jankofsky of South Carolina in 1777 advertised that he "follows the different branches of a Locksmith, Gunsmith, and all sorts of Copper and Brass work; likewise all manner of iron work."

- Ralph Atmar of Charleston, a "Goldsmith and Engraver," advertised in 1800 that "[a]ny part of gun-work shall be finished, that he undertakes."

- Samuel Bonsall of South Carolina advertised himself in 1768 as a whitesmith[2] who also produced stove and kitchen grates, repaired clocks and house bells, and did "also Gunsmith's and Locksmith's work in general."

Henry J. Kauffman, EARLY AMERICAN GUNSMITHS 1650–1850 at 4–5, 10, 14, 55 (1952).

Gunsmithing was sufficiently small-scale that much more unusual combinations of crafts also appeared. For instance, besides their "Gun Work," the Geddy Brothers of Williamsburg in 1751 advertised their production of buckles, hinges, nails, house bells, sundials, surgical instruments—and hernia belts (in the vernacular of the time, "Rupture Bands of different Sorts"). *Id.* at 34. Even learned professionals maintained their skill at the craft: Ignatius Leitner in 1800 advertised a new office in Yorktown, Pennsylvania:

> Where he continues to draw deeds, mortgages, Power of Attorney, apprentice indentures, Bills, Notes, [E]state executor and administrators accounts.... N.B. He still continues and keeps hands at work in his former branches as making rifles, still cocks, casting rivets, gun mountings, etc. at the lowest prices.

*Id.* at 61.

---

[2] A tinsmith.

The breadth of talents that could be applied to gunsmithing was reflected in the business of gunsmithing. Gunsmiths who received a large order, particularly a state contract for militia muskets, would often subcontract. Cabinet makers might be deputed to make stocks; cutlers, to make springs. Harold B. Gill, THE GUNSMITH IN COLONIAL VIRGINIA 21 (1974). Some smiths didn't care which tradesman, craftsman, or laborer was making the components as long as they came in: "Peter Brong, Gunsmith" advertised in 1801 that he would pay "20 shillings, cash, for every musket-barrel which is proven, and of the size directed by law, and 19 shillings, cash, for each good musket-lock." Kauffman at xvi.

## C. The Framers understood gunsmithing to be a personal activity by which each man could make his own gun.

The small-scale nature of gunsmithing informed Revolution-era governments' analysis of Revolution-era problems. Joseph Hewes, a North Carolina delegate to the Continental Congress, worried over the British blockade's effect on the new nation's acquisition of guns and powder. Part of the solution he devised was to rely on the nature of contemporary gunsmithing:

> Americans ought to be more industrious in *making those articles at home*, every Family should make saltpeter, every Province have powder Mills and every body encourage the making of Arms.

9

Clayton Cramer, Firearms Ownership and Manufacturing in Early America 214 (2001) (*quoting* letter from Joseph Hewes to Samuel Johnston (Feb. 13, 1776), *in* 10 Colonial Records of N.C. 447 (William L. Saunders, ed., 1890)) (emphasis added).

Colonial-era statutes commonly recognized, just as Hewes did, that in time of need, virtually anyone who could work metal or wood could function as a gunsmith. In 1705, the Virginia General Assembly authorized officials to conscript "any smith, wheel-right, carpenter or other artificer whatsoever, which shall be thought usefull for the fixing of arms and making of carriages for great guns…." 1705 Va. Acts ch. 31, 3 Hening's Laws of Virginia 362, 363. At the outbreak of the Revolution, that same Assembly ordered its Committee of Safety to "contract, upon the best terms they can, with such gunsmiths, *or others*, as they may approve, for manufacturing or supplying such quantity of arms as they shall judge proper for the defence of this colony." 1775 Va. Acts Dec. Interreg. ch. 3, 9 Hening's Laws of Virginia 94 (emphasis added). The colony's government explicitly recognized that those who called themselves "gunsmiths" might not be able to supply enough arms; the contingency plan was to contract with "others"—anyone who could work on a firearm. And contract they did:

> With the beginning of the revolutionary war many local blacksmiths turned gunsmiths, and other gunsmiths came to

10

> Williamsburg to be employed in repairing and making arms in local shops. John Draper, a Williamsburg farrier, for example, repaired pistols for the state in 1776.

Gill at 21.

One side effect of the informal production of firearms was that there were no standardized calibers. The bore size of a firearm reflected whatever mandrel and reamer the maker had at hand, and he would commonly provide his purchaser with a bullet mold suited to his product. Alan Gallay, Colonial Wars of North America 1512–1763, at 786 (2015). ("Provincial soldiers carried a bewildering array of firearms…. The calibers of provincial firearms varied as much as the weapons themselves."). These variations created military- and militia-supply problems, which militia statutes dealt with by requiring militiamen to show up with their own ammunition. A Massachusetts statute is typical: militiamen were to show up with a powder-horn, one pound of powder, and "forty bullets fit for his gun." Act of Jan. 25, 1758, ch. 18, 4 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, at § 3.

In 1792, the First Congress attempted to phase in a national standard for militia muskets. Initially, every militiaman was to provide himself with "a good musket or firelock" and twenty-four bullets "suited to the bore" of his gun. But within five years, the those muskets were to be

"of bores sufficient for balls of the eighteenth part of a pound."[3] Act of May 8, 1792, ch. 33, 1 Stat. 271, 271–272, at § 1. There is no indication that the latter provision was ever enforced, or enforceable.

"Standard-issue" military arms were made in specified calibers, but they were otherwise created in this same informal manner. Congress in 1798 awarded contracts for weapons to 27 gunmakers, each of whom received a sample of the musket the government expected him to create. *See* Eli Whitney Museum, *The Factory*, www.eliwhitney.org/7/museum/about-eli-whitney/factory. Eli Whitney received a contract for 10,000 of those muskets and began to create the first American assembly line, using water-driven mills and standardized filing jigs. *Id.* True mass production of standard-issue muskets—where the parts from one manufacturer might be interchanged with those from another—wasn't achieved until 1850. David A. Hounshell, From the American System to Mass Production 1800–1932, at 3–4 (1984). That interchangeability, and the greater precision necessary to manufacture firearms that shot metallic cartridges,[4] combined to cause the decline of individually made firearms following the Civil War.

---

[3] Roughly 0.69 caliber. This would be compatible with French "Charleville" muskets, with which the American regular military was liberally supplied.

[4] As one example: with a metallic cartridge firearm, the "chamber," the part of the barrel that holds the cartridge when it is fired, must be built to tolerances measured in thousandths of an inch – hardly something a blacksmith could do. *See* Am. Natl. Stds. Inst., *Voluntary Indus. Performance Stds. for Pressure & Velocity of Centrefire Rifle Sporting Ammunition for the Use of Commercial Mfrs.*, at

## Conclusion

The Framing generation had no concept of mass production of arms or of a firearms market dominated by a few national companies. To them, firearms were hand-made by local blacksmiths and other craftsmen. Anyone competent with forge and hammer might make a barrel; anyone competent with chisels might make a gun stock. Far from being an oddity or eccentricity, individual and even homemade firearms—what a marketer today might call artisanal firearms—were the state of the art.

The Society offers this background to assist the Court with its interpretation of the scope of the right to bear arms, which the society suggests requires the Court to reverse and remand with instructions to enter a preliminary injunction barring the enforcement of the challenged regulations.

Respectfully submitted,

THE OLSON FIRM, PLLC

/s/ Leif A. Olson
Leif A. Olson
  Texas Bar No. 24032801
  leif@olsonappeals.com
PMB 188
4830 Wilson Road, Suite 300
Humble, Texas 77396

---

23–83, 85–90 (1992) (requiring chamber dimensions to be accurate to within at least 0.002 inches); *id.* at 84 (requiring accuracy within 0.004 inches).

(281) 849-8382

David T. Hardy
8987 E. Tanque Verde No. 265
Tucson, Arizona 85749
(520) 749-0241
dthardy@mindspring.com
*Counsel for amicus*

## Certificate of Compliance

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, according to the word-count function of Word 2013, it contains _____ words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Word 2013 and uses proportionally spaced typefaces (Equity Text B, Equity Caps B, and Optima) in 14-point type for body text and 12-point type for footnotes.

/s/ Leif Olson

## Certificate of Filing and Service

On December 17, 2015, I served this *Brief of the Madison Society Foundation, Inc., as Amicus Curiae in Support of Plaintiffs-Appellants* upon all counsel of record through the Court's CM/ECF system.

/s/ Leif Olson