NO. 15-50759

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

IN THE MATTER OF
DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION,
INCORPORATED

Plaintiffs – Appellants

v.

UNITED STATES DEPARTEMENT OF STATE; JOHN F. KERRY, in His Official
Capacity as the Secretary of the Department of State;
DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State
Bureau of Political Military Affairs; KENNETH B. HANDELMAN,
Individually and in His Official Capacity as the Deputy
Assistant Secretary of State for Defense Trade Controls in the
Bureau of Political-Military Affairs; C. EDWARD PEARTREE,
Individually and in His Official Capacity as the Director of the
Office of Defense Trade Controls Policy Division; SARAH J.
HEIDEMA, Individually and in Her Official Capacity as the
Division Chief, Regulatory and Multilateral Affairs, Office of
Defense Trade Controls Policy; GLENN SMITH, Individually and in
His Official Capacity as the Senior Advisor, Office of Defense
Trade Controls,

Defendants - Appellees
_____

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
No. 15-cv-00372 (Hon. Robert Pitman)
_____

**Brief of Texas Public Policy Foundation as Amicus Curiae in Support of Defense
Distributed**
_____

Counsel listed on inside cover

ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
JOEL STONEDALE
Texas Bar No. 24079406
jstonedale@texaspolicy.com
Texas Public Policy Foundation
Center for the American Future
901 Congress Avenue
Austin, TX 78701
PHONE: (512) 472-2700
FAX: (512 472-2728
*Attorneys for Texas Public Policy Foundation, as Amicus Curiae for Defense Distributors*

## CERTIFICATE OF INTERESTED PERSONS

Amicus Curiae certify that they are a non-profit 501(c)(3) organization.

Undersigned counsel of record certifies that no person or entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualifications or recusal.

Dated: December 18, 2015

_____
ROBERT HENNEKE

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ……………………………..……. i

TABLE OF CONTENTS …………………………………………………..…. ii

TABLE OF AUTHORITIES ………………………………………………..…… iv

STATEMENT OF AMICUS CURIAE ………………………………………….. vi

STATEMENT REGARDING ORAL ARGUMENT …………………….....…… vii

INTRODUCTION …………………………………………………….…….. 1

ARGUMENT …………………………………………………………….…….. 1

I.     REGULATORY BACKGROUND ………………………….……………….. 1

II.    ITAR VIOLATES THE FIRST AMENDMENT ………………...……….. 3

       A.     ITAR Is A Content-Based Restriction On Speech ……………...…… 4

             a.     The District Court Improperly Looked To The ITAR's Purpose To Determine Whether They Are Content-Based …………………………………………… 4

             b.     Even If It Is Proper To Consider The ITAR's Purpose, Their Purpose Is To Restrict Information Because Of Its Content………………………………………….. 6

       B. ITAR is an Unconstitutional Prior Restraint on Speech …………….......... 9

             a.     Open-Ended Licensing…………………………………….... 10

             b.     Lack of Procedural Safeguards ……………………….…..… 11

III.    ISSUING THE TEMPORARY INJUNCTION WILL NOT HARM THE PUBLIC INTEREST …………………………………………………....… 13

IV.    CONCLUSION …………………………………………………………....… 15

CERTIFICATE OF COMPLIANCE ……………………………………...…….. 16

CERTIFICATE OF SERVICE ……………………………………………….. 17

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. United States*, 509 U.S. 544 (1993) ………………………………… 9

*Asgeirsson v. Abbott*, 696 F. 3d 454 (5th Cir. 2012) ………………....………. 7, 8

*Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015) …………………..……………. 7

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 US 750 (1988) …….. 10, 11

*Defense Distributed v. United States Dept. of State*, Dkt. No. 32
    at 10, 15-CV-372-RP (W.D. Tex. June 10, 2015) ...............4, 6, 8, 9, 12, 14

*Freedman v. Maryland*, 380 U.S. 51 (1965) ……………………………….….. 11

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) …………………………………….. 13

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) ...……………… 11

*Kagan v. City of New Orleans*, 753 F.3d 560 (5th Cir. 2014) ………………….. 7, 8

*Kunz v. New York*, 340 U.S. 290 (1951) …………………………....………. 11

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) …………………………..…….. 3, 7

*New York Times v. United States*, 403 U.S. 713 (1971) …………………..12, 14, 15

*Norton v. City of Springfield*, 612 Fed. Appx. 386 (7th Cir. 2015) ………..…….. 7

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) …………………………….…… 3

*Reed v. Town of Gilbert,* 135 S. Ct. 2218 (2015) …………………….... 5, 6, 7, 9

*Renton v. Playtime Theatres, Inc.*, 475 U.S. 41(1986) ………………..…….. 6, 7, 8

*Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969) ……………………..…….. 11

iv

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991) …………………………………….……… 3

*Southeastern Promotions, Ltd. v. Conrad*, 420 US 546 (1975) …………...……… 9

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) …………………….….. 6, 7

**Statutes**

22 C.F.R § 120.4 ……………………………………………….….……………….. 9

22 C.F.R. § 120.4(a) ..…………………………………………………..……… 12

22 C.F.R. § 120.10(a)(1) ……………………………………………….……… 2, 5

22 C.F.R. § 120.10(b) …………………………………………………………… 5

22 C.F.R. § 120.10(d) ………………………………………………………… 2

22 C.F.R. § 120.17(a)(4) …………………………………………………… 1

22 C.F.R. § 121.1 …...……………………………………………….…. 2, 4, 5, 12

22 C.F.R. § 127.1 …………………………………………………………… 1, 5

22 U.S.C. § 2778(c), (e) ……………………………………………..……… 2

22 U.S.C. § 2778(h) …...………………………………………………… 12

**Other Authorities**

Forbes, "3D-Printed Gun's Blueprints Downloaded 100,000 Times In Two Days
    (With Some Help From Kim Dotcom),"
    http://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-
    blueprints-downloaded-100000-times-in-two-days-with-some-help-from-
    kim-dotcom/ (last visited December 9, 2015)……………………..……… 13

"Defiant Pirate Bay to continue hosting banned 3D printer gun designs,"
    https://www.rt.com/news/liberator-gun-defcad-pirate-bay-122/ (last visited
    December 9, 2015) ………………………………………..……….... 13

## STATEMENT OF AMICUS CURIAE

Pursuant to Fed. R. App. P. 29(c), this Brief is filed on behalf of the Texas Public Policy Foundation (Foundation), a Texas-based nonprofit policy organization. The Texas Public Policy Foundation's mission is to promote and defend liberty, personal responsibility, and free enterprise in Texas and the nation by educating and affecting policymakers and the Texas public policy debate with academically sound research and outreach.

The Texas Public Policy Foundation believes that freedom of speech is fundamental to its guiding principles of liberty, personal responsibility and free enterprise.

This Brief is filed in support of the Defense Distributed. The Foundation was not paid for its preparation and the Foundation did not pay another entity or attorney for doing so. The Foundation adopts by reference the Statement of the Case and Statement of the Issues by Plaintiffs and appreciates the opportunity to submit this Brief to the Court.

## STATEMENT REGARDING ORAL ARGUMENT

Amicus requests oral argument.

# INTRODUCTION

The Texas Public Policy Foundation urges the Court to reverse the decision below. The International Traffic in Arms Regulations (ITAR) should not and cannot be used to regulate unclassified, privately developed information. The State Department's broad assertion of authority to regulate any information that could potentially be used to create a weapon is both a content-based restriction on speech and an unconstitutional prior restraint. ITAR restricts the free flow of ideas, hindering technological development and chilling the freedom of expression. Furthermore, the files that are the subject of this suit are already available on the Internet. The district court was thus incorrect to find that enjoining the use of ITAR to prevent the files from being disseminated would harm the public interest. The court's order should therefore be reversed.

# ARGUMENT

## I. REGULATORY BACKGROUND

ITAR criminalizes the "export"[1] of "technical data"[2] about "defense articles"[3] without authorization from the government. *See* 22 C.F.R. § 127.1. These terms are

---

[1]  ITAR's definition of "export" includes putting the information on the Internet (since foreigners might access) it or even sharing it domestically with a foreign person. *See* 22 C.F.R. § 120.17(a)(4). (defining "export" to include ""Disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad."). Given the breadth of the information considered "technical data" and "defense articles," ITAR criminalizes innocent discussions on technical topics in Internet forums or in person. If a model rocket hobbyist provides technical information on a forum on the Internet, and a State Department official believes that the information is required for production of an unmanned aerial vehicle, the hobbyist could

defined broadly enough to encompass everyday technology not typically thought of as posing a military danger. Though called the International Traffic in Arms Regulations, they regulate information that is wholly domestic and cannot be considered "arms."

Put together, these definitions cover so much speech that the State Department saw fit to exclude information "concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities…." 22 C.F.R. 120.10(d). That implies that the State Department thinks that such basic principles would be illegal to discuss online if they were not "general" or not commonly taught in schools. The ITAR's need to exclude math and physics from their restrictions on speech is perhaps the best demonstration of their

---

be incarcerated for 20 years. *See* 22 U.S.C. § 2778(c), (e). If a reporter publishes an article on a new technical development constituting "technical data," he too could be imprisoned.

[2] The State Department's definition of "technical data," extends the already broad list of "defense articles" into common, nonmilitary items. It includes, "Information … required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." 22 C.F.R. § 120.10(a)(1). A great deal of nonmilitary information is required for the "production," of military equipment (to say nothing of "operation" and "development"). For example, the production of a tank requires information about how to improve the strength of steel. The production of a rifle requires knowledge of how to make a spring for the trigger. An improvement in making propellers for ships may be used for a battleship. Discussion of these nonmilitary subjects can land Americans in federal prison.

[3] The list of items and technology considered "defense articles" are enumerated on the United States Munitions List (USML). The USML includes many military items, such as tanks, battleships and bombs, as well as "technical data" about them. 22 C.F.R. § 121.1 at Category IV-VII. But it also includes virtually every firearm imaginable—even single shot hunting or target rifles—as well as "technical data" about those firearms. *See Id.*, Category I at (a), (b), and (i). Only black powder muzzle-loaders and non-combat shotguns are excluded. Even more concerning, it contains an open-ended catchall provision, allowing the State Department to impose ITAR control over "Any article not enumerated on the U.S. Munitions List." *Id.,* Category XXI. Read literally, the Munitions List contains everything on it, and anything not on it that the State Department feels like regulating. In simpler terms, this could be expressed as "anything the State Department wants to regulate."

overbreadth and overinclusiveness. *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 120-21 (1991) (invalidating law due to overinclusiveness).

## II.    ITAR VIOLATES THE FIRST AMENDMENT

The district court erred primarily because it failed to recognize that ITAR is a content-based restriction on speech. A speech restriction is "content based if it require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (quotation omitted). ITAR does just that. By regulating only speech that conveys "technical data" about "defense articles," the regulations' application directly depends on the content of the speech in question. Indeed, their explicit purpose is to suppress such speech in order to keep it out of the hands of foreign militaries.

As a content-based restriction, ITAR is presumptively invalid. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). It can only withstand strict scrutiny if the government proves it is narrowly tailored to serve compelling government interests. *Id.* at 395. That Defendants cannot do. While restricting our enemies' access to military technology is certainly a compelling government interests, ITAR reaches far beyond actual defense articles into information about everyday items and single-shot pistols—guidance that would not aid even the most ill-equipped militants. Furthermore, much of the ITAR-controlled information is already on the Internet.

There can be no compelling government interest in restricting publication of technical information that is already publicly available. The regulations are therefore not narrowly tailored.

### A.     ITAR Is A Content-Based Restriction On Speech

ITAR only applies to "technical data" about "defense articles." If someone wants to post designs for a weapon not on the USML, such as a non-combat shotgun, they can. *See* 22 C.F.R. § 121.1 at Category I. If that same person wants to post designs for a single-shot pistol, they cannot. *See Id*. The difference in treatment is based on the information or message communicated: how to create a non-combat shotgun versus how to create a pistol. The District Court recognized that much. *Defense Distributed v. United States Dept. of State*, Dkt. No. 32 at 13 15-CV-372-RP (W.D. Tex. June 10, 2015) (noting that ITAR "unquestionably regulates speech concerning a specific topic"). But, it failed to recognize that government suppression of the pistol instructions but not the shotgun instructions—because of the content of the message conveyed—renders the regulation content-based.

The regulation is content-based for two separate reasons. First, the regulation is content based on its face because it treats information differently based on the message conveyed. Second, the government's purpose in regulating based on content is to suppress the information about "defense articles." Each of these flaws alone renders ITAR content-based.

### a.    The District Court Improperly Looked To ITAR's Purpose To Determine Whether They Are Content-Based

As clarified by the Supreme Court, "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."[4] *Reed v. Town of Gilbert,* 135 S. Ct. 2218, 2227 (2015). Therefore, regulation is content-based if it is content-based on its face regardless of its purpose. *Id.* at 2228 (noting that "an innocuous justification cannot transform a facially content-based law into one that is content neutral").

ITAR is facially content-based because it applies only to speech about "technical data" or "defense articles" – both defined based on their content. *See* 22 C.F.R. § 127.1. Information is considered "technical data" if it is about an item listed on the USML but not if it is on another topic. *See* 22 C.F.R. § 120.10(a) (defining "technical data" as certain information relating to "defense articles"); 22 C.F.R. § 121.1 (USML, listing "defense articles"). A webpage disclosing designs for water tanks would not be covered, but a webpage disclosing designs for military tanks would be—because of the content of the webpage. Furthermore, there is an exception for certain "information concerning general scientific, mathematical, or engineering principles commonly taught in schools...." 22 C.F.R. § 120.10(b). Messages containing common engineering principles are excepted, but messages

---

[4]    The Court rejected the 9th Circuit's approach of looking to the purpose of the regulation, noting that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 2228 (internal citations omitted).

containing obscure engineering principles are not. That is also because of their content. ITAR's application to certain topics is sufficient to render it content-based. 135 S. Ct. at 2227 ("Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter…").

The district court noted that "on its face" ITAR "unquestionably regulates speech concerning a specific topic." *Defense Distributed v. United States Dept. of State*, Dkt. No. 32 at 13. However, it failed to see that fact as dispositive because it misread *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), in precisely the same way as the Ninth Circuit did in *Reed. Defense Distributed v. United States Dept. of State*, Dkt. No. 32 at 12. As the Court explained in *Reed*,

> The Court of Appeals and the United States misunderstand our decision in *Ward* as suggesting that a government's purpose is relevant even when a law is content based on its face. That is incorrect. *Ward had nothing to say about facially content-based restrictions* because it involved a facially content-neutral ban on the use, in a city-owned music venue, of sound amplification systems not provided by the city.

135 S. Ct. at 2228 (emphasis added). Accordingly, this Court should reverse the holding that ITAR is content-neutral.

### b. Even If It Is Proper To Consider ITAR's Purpose, Its Purpose Is To Restrict Information Because Of Its Content

As explained above, the district court erred by looking to ITAR's purpose to determine whether it is content-based. It cited three cases to support its approach of looking to a regulation's purpose even when it is facially content-based: *Renton v.*

*Playtime Theatres, Inc.*, 475 U.S. 41(1986); *Asgeirsson v. Abbott*, 696 F. 3d 454 (5th Cir. 2012); and *Kagan v. City of New Orleans*, 753 F.3d 560 (5th Cir. 2014).[5] All three cases predate *Reed* and should no longer be followed to the extent they conflict with *Reed*'s express holding that facially content-based regulations must meet strict scrutiny regardless of their purpose.[6] However, even if the cases cited by the lower court are still good law, they do not counsel in favor of upholding ITAR because ITAR's purpose is to suppress the information contained in "technical data" about "defense articles" because of its content.

All three cases cited by the district court inquire whether the government's interest in regulating speech is due to the message it contains. In *Renton*, the Court upheld a zoning ordinance that only applied to theaters showing sexually explicit material. But it did so because the ordinance was aimed at reducing so-called "secondary effects," such as crime and lowered property values that accompany such theaters rather than suppressing the message conveyed by sexually explicit material. *See Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986). Similarly, this Court held in *Asgeirsson* that the Texas Open Meetings Act (TOMA) was content-neutral because the purpose was to facilitate transparency by requiring

---

[5]     The district court also cited *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) and *McCullen v. Coakley*, 134 S. Ct. 2518 (2014), but the Court looked to the regulations' purpose in those cases because the regulations were facially content-neutral. They are therefore consistent with *Reed*'s holding.

[6]     Other circuits have recognized that *Reed* rejected previous precedents concerning content discrimination. *See Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015); *Norton v. City of Springfield*, 612 Fed. Appx. 386, 387 (7th Cir. 2015).

a quorum of a governing body to discuss policy only at public meetings. *See* 696 F. 3d 454 at 461. *Asgeirsson* stressed that the purpose of TOMA was unrelated to the suppression of messages expressed at closed meetings, just as the lower property values and crime at issue in *Renton* were not a result of the sexually explicit messages.[7] *Id.* at 461-62. Thus, even if these cases are still good law, the Fifth Circuit's test of regulatory purpose is whether the harm from the regulated activity is a result of the content of the message.

Likewise in *Kagan,* this Court upheld a licensing regime for tour guides, again finding that the regime had no relationship to regulating messages because it had no effect whatsoever on what a tour guide could say. *See Kagan v. City of New Orleans*, 753 F.3d 560 at 562. All the examples of cases finding a facially content-based regulation to be content-neutral did so because the harm from the speech was not a result of its content.

Not so with ITAR. The government seeks to regulate the dissemination of "technical data" because it considers that information harmful. *Defense Distributed v. United States Dept. of State*, Dkt. No. 32 at 10, 15-CV-372-RP (W.D. Tex. June

---

[7]    "This situation is analogous to *Playtime Theatres,* in which only adult movie theaters attracted crime and lowered property values — but not because the ideas or messages expressed in adult movies caused crime… Here, government is not made less transparent because of the message of private speech about public policy: Transparency is furthered by allowing the public to have access to government decisionmaking. This is true whether those decisions are made by cogent empirical arguments or coin-flips. The private speech itself makes the government less transparent regardless of its message. The statute is therefore content-neutral." *Id.* at 461-62.

10, 2015). ITAR's purpose and effect is to suppress information because of its content. It is therefore content-based even if *Reed* does not apply.

## B.    ITAR is an Unconstitutional Prior Restraint on Speech

In addition to being a content-based restriction, ITAR constitutes an unconstitutional prior restraint. The State Department's solution to the broad and blurry scope of its regulations is to require government approval before speech can be put on the Internet. 22 C.F.R § 120.4. Instead of providing clear limits to the information that may not be discussed, the Department relies on the "commodity jurisdiction" regime, in which it grants permission to speak "if doubt exists." *Id*. That is not a solution but rather a prior restraint on speech—perhaps the most clearly unconstitutional of all speech regulations. *Southeastern Promotions, Ltd. v. Conrad*, 420 US 546, 558-59 (1975) ("The presumption against prior restraints is heavier— and the degree of protection broader—than that against limits on expression imposed by criminal penalties… a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand.").

The term "prior restraint" is used "to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993). The commodity jurisdiction procedure does just that by requiring an advance license to post information on the Internet.

Due to the lack of clear standards in its definitions of "defense articles" and "technical data," citizens must often first submit their proposed speech for a "determination" of whether the information is subject to the State Department's license requirements for public speech. After the State Department claims the speech is subject to the ITAR in a final commodity jurisdiction determination, the citizens must then apply for a license to speak under an entirely separate Department of State process. As the instant case demonstrates, the commodity jurisdiction process can take years for a State Department determination of whether the speech requires a license (as even the State Department has difficulty applying its own standards). Thereafter, citizens, like Defense Distributed, must then still apply for the license to speak, which can take several months or more to obtain under another State Department process that does not contain any true deadline. In the meantime, the free flow of ideas and research are halted. While the commodity jurisdiction procedure may be constitutional when determining whether objects and weapons may be exported, it is not constitutional when determining whether speech may be posted on the Internet.

### a.     Open-ended licensing

Open-ended licensing for speech is not permitted under the First Amendment. The Supreme Court has continuously held that "[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of*

*Lakewood v. Plain Dealer Publishing Co.*, 486 US 750, 757 (1988). The government "cannot vest restraining control over the right to speak … in an administrative official where there are no appropriate standards to guide his action." *Kunz v. New York*, 340 U.S. 290, 295 (1951). Accordingly, standards governing prior restraints must be "narrow, objective and definite." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969). Standards involving "appraisal of facts, the exercise of judgment, [or] the formation of an opinion" are unacceptable. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (quotation omitted). Given that the literal definitions of "technical data" and "defense article" are so broad that they cover instructions on making steal or boat propellers, the open-ended commodity jurisdiction procedure does not satisfy these requirements and may therefore not be applied to speech.

### b. Lack of procedural safeguards

The commodity jurisdiction procedure is independently unconstitutional because it lacks procedural safeguards against abuses of discretion. The following procedural safeguards are required of even content-neutral prior restraints:

- The burden of proving the speech may be regulated must rest on the censor;

- The determination must be prompt; and

- Judicial review must be available for all permit denials. *Freedman v. Maryland*, 380 U.S. 51, 58 (1965) ("Only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression.").

None of these procedural safeguards are available here. The State Department requires individuals to apply for permission to speak "if doubt exists" as to whether their speech falls under ITAR. 22 C.F.R. § 120.4(a). The determination can take years. For example, the State Department only ruled on the Defense Distributed's commodity jurisdiction request after being sued in this case, which was almost two years after the requests were first submitted.[8] *Defense Distributed v. United States Dept. of State*, Dkt. No. 29, 15-CV-372-RP (W.D. Tex. June 8, 2015). And finally, the underlying statute purports to make the "designation…of items as defense articles" unreviewable in court. 22 U.S.C. 2778(h).

The broad prohibition on prior restraints is no less applicable in the area of national security. In *New York Times v. United States*, 403 U.S. 713 (1971), the Supreme Court rejected the government's authority to stop the publication of the Pentagon Papers—classified information pertaining to American military activities in the then-ongoing Vietnam War. In the face of that decision, the State Department cannot claim to have the authority to license the discussion of basic firearms, engineering principles, or springs online—even if it would help prevent the Islamic State from obtaining the latest in American deer rifle technology. 22 C.F.R. § 121.1 Category I at (a) and (i). The district court's order should therefore be reversed.

---

[8] In this matter, it is likely Defense Distributed would have never received a final commodity jurisdiction, no less an opportunity to then apply for a license to speak, without the filing of this case.

## III.   ISSUING THE TEMPORARY INJUNCITON WILL NOT HARM THE PUBLIC INTEREST

This is the unusual case in which there is no harm to grant Defense Distributed's request for temporary injunction because the designs at issue are already available on the Internet. Defense Distributed's designs were downloaded more than 100,000 times before they were removed following the State Department's threatened prosecution.[9] The CAD files are now widely available on the Internet, including on distributed file-sharing networks such as the Pirate Bay, which are outside the reach of the State Department.[10] Therefore, ITAR's enforcement can do nothing to keep the designs out of the hands of foreign militaries. They are already available to anyone who wants them. Further, that the State Department has not threatened prosecution of anyone else who is distributing the files suggests that this prior restraint also fails due to underinclusiveness. *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (invalidating law due to underinclusiveness).

The district court was therefore incorrect to rule in the Defendants' favor on the third and fourth prongs of the preliminary injunction inquiry because of "the

---

[9]     Forbes, "3D-Printed Gun's Blueprints Downloaded 100,000 Times In Two Days (With Some Help From Kim Dotcom)," http://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-blueprints-downloaded-100000-times-in-two-days-with-some-help-from-kim-dotcom/ (last visited December 9, 2015).

[10]     "Defiant Pirate Bay to continue hosting banned 3D printer gun designs," https://www.rt.com/news/liberator-gun-defcad-pirate-bay-122/ (last visited December 9, 2015).

public's keen interest in restricting the export of defense articles." *Defense Distributed v. United States Dept. of State*, Dkt. No. 29 at 6. At least with respect to Plaintiffs' as-applied challenge, that interest would not be affected by granting the injunction.

As for Plaintiffs' facial challenge against ITAR's enforcement as a prior restraint more generally, the Court should consider the availability of so much other ITAR-controlled information when evaluating assertions of harm. As Justice White pointed out in the context of denying the government's request to stop publication of the Pentagon Papers,

> Normally, publication will occur and the damage be done before the Government has either opportunity or grounds for suppression. So here, publication has already begun and a substantial part of the threatened damage has already occurred. The fact of a massive breakdown in security is known, access to the documents by many unauthorized people is undeniable, and the efficacy of equitable relief against these or other newspapers to avert anticipated damage is doubtful at best.

*New York Times Co. v. United States*, 403 US 713, 733 (1971) (White, J., concurring). Note also the contrast between the harm asserted in connection with the Pentagon Papers and that in the instant case. In *New York Times* the government south to stop publication of classified information about the then-ongoing Vietnam War, asserting that its publication could jeopardize the war effort. Here, the government seeks to stop the publication of unclassified information that can already downloaded by anyone on Earth with a computer. And the information

merely discloses how to make firearms that have many ready substitutes online. The Court in *New York Times* held that the First Amendment could not tolerate such a prior restraint. This Court should have an easier time doing the same.

## CONCLUSION

The Court should reverse and remand to the district court with instruction to issue the preliminary injunction.

Respectfully Submitted,

_____
ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
JOEL STONEDALE
Texas Bar No. 24079406
jstonedale@texaspolicy.com
Texas Public Policy Foundation
Center for the American Future
901 Congress Avenue
Austin, TX 78701
PHONE: (512) 472-2700
FAX: (512 472-2728
*Attorneys for Texas Public Policy Foundation, as Amicus Curiae for Defense Distributors*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,857 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

3. All required privacy redactions have been made.

4. The ECF submission is an exact copy of the hard copy submissions, and

5. The digital submission has been scanned for viruses with the most recent version Apple OS X Yosemite and according to that program, is free of viruses.

Dated: December 18, 2015

_____
ROBERT HENNEKE

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for this Fifth Circuit by using the

appellate CM/ECF system in NO. 15-50759 on December 18, 2015.

I certify that all participants in the case are registered CM/ECF users and that

service will be accomplished by the appellate CM/ECF system.

Dated: December 18, 2015       _____
ROBERT HENNEKE