# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED,

Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,

Defendants-Appellees

On Appeal from the United States District Court
for the Western District of Texas

## BRIEF FOR FEDERAL APPELLEES

BENJAMIN C. MIZER
*Principal Deputy Assistant Attorney General*

RICHARD L. DURBIN, JR.
*United States Attorney*

MICHAEL S. RAAB
DANIEL TENNY
*Attorneys, Appellate Staff*
*Civil Division, Room 7215*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1838*

# CERTIFICATE OF INTERESTED PERSONS

*Defense Distributed v. U.S. Department of State*, No. 15-50759.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Plaintiffs-appellants:

Defense Distributed
Second Amendment Foundation, Inc.

Defendants-appellees:

United States Department of State
John F. Kerry, Secretary of State
Directorate of Defense Trade Controls
Kenneth B. Handelman, Deputy Assistant Secretary of State (individual capacity only)
Brian H. Nilsson, Deputy Assistant Secretary of State (official capacity only)[1]
C. Edward Peartree, Director, Office of Defense Trade Controls Policy Division
Sarah J. Heidema, Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy
Glenn Smith, Senior Advisor, Office of Defense Trade Controls

Counsel:

For plaintiffs-appellants:

Alan Gura, Gura & Possessky, PLLC

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d) and Federal Rule of Appellate Procedure 43(c)(2), Mr. Nilsson has been automatically substituted for his predecessor for purposes of the official-capacity claims.

Matthew A. Goldstein, Matthew A. Goldstein, PLLC
William B. Mateja, Fish & Richardson P.C.
William T. "Tommy" Jacks, Fish & Richardson P.C.
David Morris, Fish & Richardson P.C.
Josh Blackman

For defendants-appellees:

Benjamin C. Mizer, U.S. Department of Justice
Richard L. Durbin, Jr., U.S. Department of Justice
Anthony J. Coppolino, U.S. Department of Justice
Stuart J. Robinson, U.S. Department of Justice
Zachary C. Richter, U.S. Department of Justice
Eric J. Soskin, U.S. Department of Justice
Michael S. Raab, U.S. Department of Justice
Daniel Tenny, U.S. Department of Justice

*s/ Daniel Tenny*
Daniel Tenny

## STATEMENT REGARDING ORAL ARGUMENT

The government respectfully requests the opportunity to present oral argument to defend the agency's application of the Arms Export Control Act and implementing regulations.

# TABLE OF CONTENTS

**Page**

INTRODUCTION..............................................................................................................1

STATEMENT OF JURISDICTION .................................................................................2

STATEMENT OF THE ISSUE .........................................................................................2

STATEMENT OF THE CASE ...........................................................................................3

      A.     Statutory Background ...................................................................................3

      B.     Factual Background.......................................................................................5

      C.     Prior Proceedings .........................................................................................8

SUMMARY OF ARGUMENT .........................................................................................13

STANDARD OF REVIEW................................................................................................16

ARGUMENT .......................................................................................................................16

I.     Government officials did not act ultra vires........................................................16

II.    The application of the regulations in this case is fully consistent with the
       Constitution. ...........................................................................................................21

      A.     The regulations permissibly address the distribution and
              production of firearms, and any effect on protected speech is fully
              justified...............................................................................................21

            1.     The regulations serve the government's legitimate interest
                 in regulating the dissemination of arms and technical data. .........21

            2.     Plaintiffs' position cannot be reconciled with the approach
                 taken by other courts of appeals. ....................................................25

            3.     Plaintiffs' contrary arguments fail to address the basis for
                 applying the regulations in this case. ..............................................28

B. The regulations do not present the concerns associated with prior restraints on core expression...................................................................... 32

C. The regulations provide clear definitions and are not impermissibly subjective. .............................................................. 35

D. The regulations do not violate the Second Amendment......................... 38

III. The district court did not abuse its discretion in concluding that the remaining factors counsel against issuance of a preliminary injunction. ........... 40

CONCLUSION ................................................................................................... 41

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                         **Page(s):**

*Anderson v. Jackson,*
   556 F.3d 351 (5th Cir. 2009) ........................................................................ 16

*Catholic Leadership Coal. of Tex. v. Reisman,*
   764 F.3d 409 (5th Cir. 2014) ................................................................... 32, 33

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ..................................................................................... 19

*City of Lakewood v. Plain Dealer Publ'g Co.,*
   486 U.S. 750 (1988) ..................................................................................... 33

*City of Renton v. Playtime Theatres, Inc.,*
   475 U.S. 41 (1986) ....................................................................................... 29

*Commodity Futures Trading Comm'n v. Vartuli,*
   228 F.3d 94 (2d Cir. 2000) ..................................................................... 26, 27

*Danos v. Jones,*
   652 F.3d 577 (5th Cir. 2011) ................................................................... 10, 16

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ..................................................................................... 39

*Forsyth Cty. v. Nationalist Movement,*
   505 U.S. 123 (1992) ..................................................................................... 34

*Hazelwood Sch. Dist. v. Kuhlmeier,*
   484 U.S. 260 (1988) ..................................................................................... 33

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ................................................................................... 24, 37

*Junger v. Daley,*
   209 F.3d 481 (6th Cir. 2000) ....................................................................... 21

*Milwaukee Police Ass'n v. Jones,*
    192 F.3d 742 (7th Cir. 1999) .......................................................... 33

*National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
    700 F.3d 185 (5th Cir. 2012) .......................................................... 39

*Near v. Minnesota ex rel. Olson,*
    283 U.S. 697 (1931) ...................................................................... 34

*New York Times Co. v. United States,*
    403 U.S. 713 (1971) ...................................................................... 34

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) .............................................................. 28, 29

*United States v. Armstrong,*
    517 U.S. 456 (1996) ...................................................................... 38

*United States v. Edler Indus., Inc.,*
    579 F.2d 516 (9th Cir. 1978) ............................................ 19, 20, 25, 26

*United States v. Mak,*
    683 F.3d 1126 (9th Cir. 2012) ..................................................11, 25, 34

*United States v. O'Brien,*
    391 U.S. 367 (1968) .................................................................. 22, 29

*United States v. Posey,*
    864 F.2d 1487 (9th Cir. 1989) ...................................................... 25, 26

*United States v. Williams,*
    553 U.S. 285 (2008) ..............................................................31, 32, 37

*United States v. Wu,*
    711 F.3d 1 (1st Cir. 2013) .............................................................. 35

*Universal City Studios, Inc. v. Corley,*
    273 F.3d 429 (2d Cir. 2001) .................................................. 21, 22, 27, 28

**Statutes:**

Arms Export Control Act:
    22 U.S.C. § 2751 *et seq.* .................................................................... 3
    22 U.S.C. § 2778(a)(1) ...........................................................3, 16, 17, 25
    22 U.S.C. § 2778(a)(2) .................................................................... 3, 34
    22 U.S.C. § 2778(b)(2) ...............................................................3, 17, 18
    22 U.S.C. § 2778(c) .......................................................................... 3
    22 U.S.C. § 2778(e) .......................................................................... 3
    22 U.S.C. § 2778(h) ..................................................................... 3, 19

Undectable Firearms Act of 1988,
    18 U.S.C. § 922(p) .......................................................................... 6

18 U.S.C. § 2339B(a)(1) ..................................................................... 24

28 U.S.C. § 1292(a)(1) ....................................................................... 2

28 U.S.C. § 1331 ............................................................................. 2

50 U.S.C. § 4610(c) .......................................................................... 3

**Regulations:**

Administration of Reformed Export Controls,
    Exec. Order No. 13,637, 3 C.F.R. 223 (2014) ........................................ 4, 17

International Traffic in Arms Regulations:
    22 C.F.R. §§ 120-130 ........................................................................ 4
    22 C.F.R. § 120.4(a) ......................................................................... 5
    22 C.F.R. § 120.4(g) ......................................................................... 5
    22 C.F.R. § 120.6 ....................................................................... 17, 25
    22 C.F.R. § 120.10 .......................................................................... 25
    22 C.F.R. § 120.10(a) .................................................................... 4, 17
    22 C.F.R. § 120.10(a)(1) ..............................................................4, 8, 36
    22 C.F.R. § 120.10(b) ...............................................................5, 18, 28
    22 C.F.R. § 120.11 .......................................................................... 36
    22 C.F.R. § 120.11(a) ...............................................................5, 28, 34
    22 C.F.R. § 120.17(a)(4) .............................................................5, 12, 36
    22 C.F.R. § 120.45(f) ........................................................................ 4

United States Munitions List:

    22 C.F.R. § 121.1, Category I, item (a) ..................................................... 17, 36

    22 C.F.R. § 121.1, Category I, item (i) .................................................... 4, 17

**Rule:**

Fed. R. App. P. 4(a)(1)(B) .................................................................................. 2

**Other Authority:**

Constitutionality of the Proposed Revision of the International Traffic in Arms

    Regulations, 5 Op. O.L.C. 202 (1981) .................................................... 29, 30

# INTRODUCTION

This case concerns the export of computer files that enable anyone with a 3-D printer or related device to produce an operable firearm. The firearms that are created are of particular concern because they need not include any metal to function, and thus can be made immune to detection by conventional security measures such as metal detectors. The availability of such firearms to foreign nationals, particularly if the availability of such firearms were attributable to the United States, could raise significant foreign policy and national security concerns.

Congress has granted broad authority to the President, delegated as relevant here to the Department of State, to impose export controls applicable to the dissemination of firearms and other "defense articles" to foreign nationals in furtherance of the security and foreign policy interest of the United States. In particular, Congress directed that the export of defense articles was prohibited unless the exporter obtained a license or other form of authorization from the federal government. Duly promulgated regulations have defined the category of items whose export requires a license to include not only arms themselves, but also certain "technical data" that are not in the public domain and that are necessary for the production of listed items.

Plaintiffs contend that the State Department acted beyond its authority, and contrary to the Constitution, when it concluded that distribution of the computer files at issue here to foreign nationals through an unrestricted Internet site would

constitute an export requiring a license.  The district court properly rejected plaintiffs' position, which would render the federal government powerless to prevent the dissemination of undetectable firearms to foreign nationals, so long as the necessary files were distributed on the Internet rather than through other means.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331.  The district court denied plaintiffs' motion for a preliminary injunction on August 4, 2015.  Order [ROA.679].  Plaintiffs timely appealed on August 13, 2015.  Notice of Appeal [ROA.1045]; *see* Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Plaintiff Defense Distributed wishes to post computer files on the Internet that enable a 3-D printer or related device, at the push of a button, to produce components of an operable firearm.  The question presented is whether the State Department had no colorable basis for its actions, or acted contrary to the Constitution, when it concluded that providing such files to foreign nationals over the Internet requires an export license under the Arms Export Control Act and implementing regulations.

## STATEMENT OF THE CASE

### A.      Statutory Background

The Arms Export Control Act, 22 U.S.C. § 2751 *et seq.*, authorizes the

President, "[i]n furtherance of world peace and the security and foreign policy of the

United States," to "control the import and the export of defense articles and defense

services." *Id.* § 2778(a)(1). "[T]he President is authorized . . . to promulgate

regulations for the import and export of such services," and to designate items as

defense articles and defense services by placing them on the "United States Munitions

List." *Id.* Designations under the regulations of "items as defense articles or defense

services . . . shall not be subject to judicial review." *Id.* § 2778(h).

With certain exceptions not relevant here, "no defense articles or defense

services . . . may be exported or imported without a license for such export or

import." 22 U.S.C. § 2778(b)(2). "Decisions on issuing export licenses . . . shall take

into account whether the export of an article would contribute to an arms race, aid in

the development of weapons of mass destruction, support international terrorism,

increase the possibility of an outbreak or escalation of conflict, or prejudice the

development of bilateral or multilateral arms control or nonproliferation agreements

or other arrangements." *Id.* § 2778(a)(2).

A violation of the statutes or implementing regulations can result in civil

penalties. 22 U.S.C. § 2778(e); 50 U.S.C. § 4610(c). A willful violation is a criminal

offense. 22 U.S.C. § 2778(c).

The President has delegated the authority conferred by this statute, as relevant

here, to the Secretary of State (though the concurrence of the Secretary of Defense is

required as to the designation of items as defense articles and defense services).  *See*

Administration of Reformed Export Controls, Exec. Order No. 13,637, § 1(n), 3

C.F.R. 223, 224 (2014).  Under that delegated authority, the Department of State has

promulgated the International Traffic in Arms Regulations, 22 C.F.R. §§ 120-130,

which are administered by the Department's Directorate of Defense Trade Controls.

Those regulations set out the U.S. Munitions List that defines items as defense articles

and defense services, and also set out the requirements and procedures for

determining whether particular items satisfy the regulatory definitions and, if so,

whether a license should be issued to permit their export.

In addition to arms themselves, the U.S. Munitions List includes "[t]echnical

data . . . directly related" to items on the list.  22 C.F.R. § 121.1, Category I, item (i).

"Technical data" is defined to include, among other things, "[i]nformation . . . which

is required for the design, development, production, manufacture, assembly,

operation, repair, testing, maintenance or modification of defense articles," including

"information in the form of blueprints, drawings, photographs, plans, instructions or

documentation."  *Id.* § 120.10(a)(1).[2]

_____

[2] A separate definition applies to "software."  *See* 22 C.F.R. §§ 120.10(a),
120.45(f).  This case concerns data files that are not classified as software.

4

The definition of technical data "does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities," nor does it include "information in the public domain." 22 C.F.R. § 120.10(b). Information in the "public domain," in turn, is defined as information "which is published and which is generally accessible or available to the public" in any of a number of forms and locations. *Id.* § 120.11(a). The regulations define the "export" of technical data to include "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." *Id.* § 120.17(a)(4).

Under the "commodity jurisdiction procedure," on request, "the Directorate of Defense Trade Controls shall provide a determination of whether a particular article or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a). Commodity-jurisdiction decisions are subject to an appeal procedure. *Id.* § 120.4(g).

## B. Factual Background

The particular items at issue in this case are computer files that are used for the three-dimensional "printing" (or the related process of "milling") of firearms and firearm components. The computer files enable someone who has a piece of hardware known as a "3-D printer" (or a related device in the context of milling) to click a button and have the printer create, out of raw materials, a firearm or parts of a firearm. Because the resulting firearm may be made of a material other than metal, it "can be produced in a way as to be both fully operable and virtually undetectable by

5

conventional security measures such as metal detectors." Aguirre Decl. ¶ 35(a) [ROA.570]. The "design includes insertion of a six-ounce piece of metal to make it detectable by metal detectors" and thus compliant with the Undetectable Firearms Act of 1988, 18 U.S.C. § 922(p), but "this metal content can be removed without rendering [the firearm] inoperable." Aguirre Decl. ¶ 35(a) n.6 [ROA.571].

The present dispute arose when the State Department sent a letter to Defense Distributed identifying as potentially subject to the International Traffic in Arms Regulations some computer files that had been posted on the Internet. The Directorate identified ten particular data files that instructed 3-D printers to create particular items. *See* Letter to Cody Wilson 2 [ROA.581]. The letter stated that the Directorate was reviewing the files and had yet to determine whether they were subject to the regulations. *Id.* at 1-2 [ROA.580-81]. Accordingly, the Directorate requested that Defense Distributed submit commodity-jurisdiction requests for the ten files. *Id.* at 2 [ROA.581]. The letter stated that until the commodity-jurisdiction determination had been made, "Defense Distributed should treat" the data as controlled by the regulations, which "means that all such data should be removed from public access immediately." *Id.* [ROA.581].

In June 2013, Defense Distributed submitted a commodity-jurisdiction request covering the ten items identified in the letter. *See* Commodity Jurisdiction Request (June 21, 2013) [ROA.335]. Before receiving a final determination on that request, Defense Distributed submitted an additional request for the "Ghost Gunner"

machine, which Defense Distributed described as "an inexpensive machine with more than enough accuracy to manufacture firearms." Commodity Jurisdiction Request 2 (Jan. 2, 2015) [ROA.395]. According to Defense Distributed, the Ghost Gunner machine "was designed, developed, and manufactured by Defense Distributed to automatically manufacture publicly available designs with nearly zero user interaction." *Id.* at 1 [ROA.394]. The machine is capable of manufacturing both "parts to firearms controlled under the U.S. Munitions List" and other "items that are not controlled under the [Munitions List]." *Id.* [ROA.394].

Analyzing the requests required the State Department to "better understand additive manufacturing and 3D printing hardware and technology and its evolution and diffusion." Aguirre Decl. ¶ 27 [ROA.566]. In April 2015, the Department completed its review of the Ghost Gunner application, and in June 2015, the Department completed its review of the original request. *Id.* ¶ 28 [ROA.566-67].

The government concluded that the Ghost Gunner machine itself was not subject to the State Department's jurisdiction, although "technical data for producing a defense article" using the machine are subject to the Department's jurisdiction. Commodity Jurisdiction Determination (Apr. 15, 2015) [ROA.407]. As to the original request, the government determined that six of the ten files were subject to State Department jurisdiction. Commodity Jurisdiction Determination 2 (June 4, 2015) [ROA.501]. The other four files were not subject to the Department's jurisdiction. *Id.* at 1 [ROA.500].

7

The determination that certain computer files were subject to the Department's jurisdiction was based on "several factors." Aguirre Decl. ¶ 29 [ROA.567]. First, the "central function" of the files "appears to be to enable the manufacture of end-items that are . . . defense articles" governed by the regulations. *Id.* [ROA.567]. Second, because the process is automated, "[m]anufacture of a defense article in this way requires considerably less know-how than manufacture in reliance on conventional technical data, which . . . requires additional craftsmanship, know-how, tools, and materials." *Id.* [ROA.567]. Third, the functionality provided by the files at issue constituted "a meaningful step beyond previous, public-domain material." *Id.* [ROA.567-68]. Finally, the files fall within the plain text of the regulations, which include in the definition of "defense articles" those "'blueprints, drawings, photographs, plans, instructions or documentation' that can be used to automatically manufacture defense articles." *Id.* [ROA.568] (quoting 22 C.F.R. § 120.10(a)(1)).

## C.    Prior Proceedings

Plaintiffs are Defense Distributed (the putative distributor of the computer files discussed above) and the Second Amendment Foundation, some of whose members claim that they wish to access the computer files published by Defense Distributed. After receiving the commodity-jurisdiction determination for the Ghost Gunner machine, but before receiving the determination for the ten 3-D printing files, plaintiffs instituted this action in federal district court, asserting claims against the relevant government agencies, government officials in their official capacities, and

government officials in their individual capacities. *See generally* Compl. [ROA.12].

Plaintiffs asserted that the government was acting ultra vires, that the government's actions violated the First, Second, and Fifth Amendments to the U.S. Constitution, and that the individual defendants were liable for damages because they engaged in practices that were contrary to clearly established law. *See id.* ¶¶ 41-59 [ROA.21-24].[3]

As relevant here, plaintiffs sought a preliminary injunction that would have prevented the government from "enforcing any prepublication approval requirement against unclassified information under the International Traffic in Arms Regulations," including any requirement applicable either to the files that Defense Distributed had submitted for commodity-jurisdiction review or to any other files that Defense Distributed might create in the future. Proposed Order [ROA.82]. While the motion was pending, the government responded to the pending commodity-jurisdiction request as discussed above.

The district court denied the requested injunction. The court first observed that while plaintiffs had asserted that they suffered irreparable injury in the form of a deprivation of constitutional rights, a determination whether a preliminary injunction is warranted also requires "weighing . . . the respective interests of the parties and the public." Order 6 [ROA.684]. In particular, plaintiffs "fail[ed] to consider the public's

---

[3] This brief is filed on behalf of the government agencies and the official-capacity defendants only; claims for damages against the individual-capacity defendants are still pending in the district court.

keen interest in restricting the export of defense articles," and "the interest—and authority—of the President and Congress in matters of foreign policy and export." *Id.* [ROA.684]. The court concluded that plaintiffs had not "met their burden as to the final two prongs necessary for granting . . . a preliminary injunction." *Id.* at 7 [ROA.685]. But "in an abundance of caution," the court also addressed plaintiffs' likelihood of success on the merits. *Id.* [ROA.685].

The court concluded that plaintiffs' motion was lacking in that respect as well. The court observed that plaintiffs had acknowledged that the State Department has "authority . . . to regulate export of defense articles." Order 8 [ROA.686]. In addition, "Defense Distributed admits its purpose is 'facilitating *global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms.'" *Id.* [ROA.686] (quoting Compl. ¶ 1 [ROA.13]). Defense Distributed thus "engages in conduct which Congress authorized Defendants to regulate," and plaintiffs therefore had not demonstrated a likelihood of success on their claim that the government was acting ultra vires, which would require a showing that the government "was acting 'without any authority whatever,' or without any 'colorable basis for the exercise of authority.'" *Id.* at 8-9 [ROA.686-87] (quoting *Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011)).

Turning to the First Amendment claim, the district court assumed, for purposes of the preliminary-injunction analysis, that computer files were speech subject to First Amendment protection. Order 10 [ROA.688]. The court observed

that the regulations do "not regulate disclosure of technical data based on the message it is communicating." *Id.* at 13 [ROA.691]. Instead, the regulation "is intended to satisfy a number of foreign policy and national defense goals." *Id.* [ROA.691]. The court thus concluded that the regulations were subject to intermediate scrutiny. *Id.* [ROA.691].

The court noted that plaintiffs do not dispute that "there is a substantial governmental interest in regulating the dissemination of military information." Order 14 [ROA.692]. The court agreed with the Ninth Circuit's conclusion that the regulations substantially advance that interest by "provid[ing] clear procedures for seeking necessary approval." *Id.* at 14-15 [ROA.692-93] (citing *United States v. Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012)).

The court rejected plaintiffs' assertion that the regulations pose an impermissible burden on their domestic communication, noting that plaintiffs remain "free to disseminate the computer files at issue domestically in public or private forums." Order 15 [ROA.693]. And the court concluded that it was reasonable for the government to distinguish between domestic and foreign dissemination, noting that exports plainly pose greater national-security concerns. *Id.* at 15-16 [ROA.693-94].

As to plaintiffs' Second Amendment claim, the court concluded that the Second Amendment Foundation had standing on behalf of its members. Order 18 [ROA.696]. The court rejected the Second Amendment claim on the merits,

however.  The court reasoned that an individual who has more difficulty obtaining access to the computer files is "not prevented from possessing and using a handgun to defend his or her home and family."  Order 21 [ROA.699] (brackets and internal quotation marks omitted).  To the contrary, the regulations do not prohibit Second Amendment Foundation members "from manufacturing their own firearms, . . . from keeping and bearing other firearms," or, if they are in the United States, "from acquiring the computer files at issue directly from Defense Distributed."  *Id.* at 22 [ROA.700].  Given this limited burden on Second Amendment rights and the legitimate governmental interest served, the court concluded that the regulations satisfied intermediate scrutiny.  *Id.* [ROA.700].

Finally, the district court rejected plaintiffs' Fifth Amendment claim, which asserted that the regulations were unconstitutionally vague.  The court noted that plaintiffs "have not made precisely clear which portion of the [regulatory] language they believe is unconstitutionally vague."  Order 23 [ROA.701].  The court explained that the term "defense articles" is defined with great specificity in the regulations.  *Id.* at 23-24 [ROA.701-02].  The term "export" is also defined, "although at lesser length," and specifically includes "'[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad.'"  *Id.* at 24 [ROA.702] (quoting 22 C.F.R. § 120.17(a)(4)) (alteration in original).  That definition would put a person of ordinary intelligence on notice that plaintiffs' conduct would be covered by the regulations.  *Id.* [ROA.702].

12

## SUMMARY OF ARGUMENT

Congress and the Executive Branch have concluded that the export of defense articles, including firearms and firearm components, requires diligence and oversight to ensure that they are not used in ways inimical to the national security and foreign policy interests of the United States. As a consequence, a license or other form of authorization is required to export these items. The computer data files at issue here, if made available publicly without restriction, would allow anyone with a 3-D printer (or related device) to create, at the touch of a button, parts and components for an operational firearm that is untraceable and undetectable by metal detectors. Because such printers are readily available, allowing the distribution of the computer files at issue here is tantamount to permitting the dissemination of the firearms themselves. The export of the files thus requires a license. The licensing requirement contains no exception for cases in which the distribution of files to foreign nationals occurs by placing the files on an unrestricted Internet site, from which a foreign national downloads them.

Plaintiffs mistakenly assert that the State Department acted ultra vires in reaching these conclusions, which would require a showing that the Department had no colorable basis for its actions. As the district court recognized, the Arms Export Control Act creates an export licensing regime, and provides broad discretion to identify the items that will require an export license. Plaintiffs properly concede that certain forms of "technical data" are properly subject to the licensing scheme, and

that posting information on the Internet can be characterized as an "export." These concessions are fatal to their assertion that the Department had no colorable basis for its actions.

Plaintiffs' constitutional claims are likewise without merit. Plaintiffs' First Amendment argument misunderstands the nature of the licensing scheme and ignores the context of the Department's actions here. The licensing scheme does not target plaintiffs' ability to express ideas, but rather applies here only because the computer files at issue direct a computer to produce firearm components. Advancing the government's interest in preventing the export of defense articles is fully consistent with the First Amendment under any plausibly relevant standard. The district court's rejection of plaintiffs' First Amendment claim accords with decisions of the Ninth Circuit upholding export controls, and with decisions of the Second Circuit upholding other regulations related to computer files.

Plaintiffs' contrary argument is largely premised on hypotheticals not presented here concerning the dissemination of scientific ideas in academic fora or the distribution of information unrelated to firearms. The regulations contain broad exceptions designed to allow scientific discourse, although those exceptions are not implicated here because of the nature of the files and the mode of dissemination. This case relates to the export of computer files that direct a computer, without human intervention, to create components of an operable firearm. The regulations are plainly valid as applied to actions that make such files available to foreign

nationals, and plaintiffs' arguments about whether and how the regulations would apply in other circumstances are beside the point.

Plaintiffs' suggestions that the statute is impermissibly vague, or that it confers undue discretion on the State Department, similarly misunderstand the issues before the Court. The regulations describe in plain and objective terms the items that are subject to the licensing scheme. As the district court observed, plaintiffs have identified no ambiguous or subjective terms in the regulations that were applied in this case. Plaintiffs' general objections about potential applications in other contexts have no relevance here.

Plaintiffs' reliance on the Second Amendment is misplaced. The only limitation at issue here concerns the placement of certain computer data files on an unrestricted Internet site. Nothing in the statute or regulations prevents American citizens on U.S. soil from obtaining the files directly from Defense Distributed, much less from obtaining a firearm from other sources or from possessing a firearm for self-defense. Plaintiffs do not assert otherwise. And even if the Second Amendment were implicated, the government interests that are advanced by the export licensing scheme amply justify any limited intrusion on the ability to procure firearms within the United States.

Finally, the district court properly concluded that a preliminary injunction would not be in the public interest because the licensing scheme serves important government interests that outweigh any harm to plaintiffs. Plaintiffs' assertion of an

abstract interest in vindicating constitutional rights does not demonstrate that the district court erred in this regard. The district court properly denied plaintiffs' motion for a preliminary injunction.

## STANDARD OF REVIEW

This Court reviews the grant or denial of a preliminary injunction for abuse of discretion, and will "reverse the denial of a preliminary injunction" "[o]nly under extraordinary circumstances." *Anderson v. Jackson*, 556 F.3d 351, 355-56 (5th Cir. 2009) (quotation marks omitted).

## ARGUMENT

### I.     Government officials did not act ultra vires.

Plaintiffs argue that the Department of State acted ultra vires when it required Defense Distributed to obtain a license before uploading to an unrestricted Internet site computer files that allow export-controlled firearm components to be created at the touch of a button. As the district court explained, to establish that the government was acting ultra vires, plaintiffs must "establish that the officer was acting 'without any authority whatever,' or without any 'colorable basis for the exercise of authority.'" Order 8 [ROA.686] (quoting *Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011)). Plaintiffs cannot come close to meeting this standard.

The Arms Export Control Act authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States," to "control the import and the export of defense articles and defense services." 22 U.S.C.

§ 2778(a)(1). As particularly relevant here, the statute contemplates the promulgation of regulations designating particular items as "defense articles and defense services," *id.*, and prohibits the exportation of such articles and services without a license or other authorization, *id.* § 2778(b)(2). These powers have been delegated, as relevant here, to the Department of State. *See* Administration of Reformed Export Controls, Exec. Order No. 13,637, § 1(n), 3 C.F.R. 223-224 (2014).

The computer files at issue fall squarely within controlling regulations that have been duly promulgated under that authority. The files, which provide the data necessary for a 3-D printer or related device to produce a firearm or firearm component, relate to the creation of firearms that appear on the U.S. Munitions List. *See* 22 C.F.R. § 121.1, Category I, item (a). Items on the U.S. Munitions List are defined by the regulations to be "defense articles." *Id.* § 120.6. And in addition to including the firearms and firearm components themselves as "defense articles," the Munitions List explicitly includes "[t]echnical data" relating to items on the list. *Id.* § 121.1, Category I, item (i). Plaintiffs properly concede that the statute authorizes the regulations to extend not only to the export of physical firearms, but also to "the export of certain technical data." Appellants' Br. 38.

The regulations define "[t]echnical data" to include "[i]nformation . . . which is required for the . . . production . . . of defense articles." 22 C.F.R. § 120.10(a). Computer files that are needed to produce a firearm with a 3-D printer or related

device plainly fall within that definition. Plaintiffs offer no textual argument to the contrary.

There is an exception to the definition of "technical data" for materials in the "public domain." 22 C.F.R. § 120.10(b). Analyzing this exception required a factual analysis of the files at issue here and the materials that had already been placed in the public domain. After conducting that analysis, the agency concluded that the files at issue here constituted "a meaningful step beyond previous, public-domain material." Aguirre Decl. ¶ 29 [ROA.567-68]. The exception thus does not apply, and the files at issue are "defense articles."

Because the computer files at issue here constitute "defense articles" under governing regulations, the statute states that they may not be "exported . . . without a license for such export." 22 U.S.C. § 2778(b)(2). The agency reasonably concluded that sharing files with foreign nationals over the Internet constituted an "export." There can be no serious dispute that sending technical data to a foreign national by physically transporting a disk would constitute an export. And plaintiffs concede that the government "can bar individuals from . . . directly providing technical assistance to a foreign person on designing defense articles." Appellants' Br. 38. The agency was not compelled to distinguish between these scenarios and transmitting defense articles to foreign nationals over the Internet. Such a conclusion would create a loophole in the regulatory scheme by allowing technical data to be transferred to foreign nationals merely by placing it on an Internet site that they could access.

Plaintiffs properly do not "suggest that uploading files to the Internet cannot be viewed, in some sense, as an export." *Id.*

Unable to establish that the agency acted without any colorable basis in this case, plaintiffs complain generally that the regulations sweep too broadly. Plaintiffs' general critiques of hypothetical applications of the regulations provide no basis for concluding that the agency acted ultra vires in this case.

Moreover, plaintiffs' general complaints misunderstand the statutory and regulatory scheme and the nature of the limitations at issue here. Plaintiffs appear to suggest that the definition of "technical data" is too broad. But that term was defined in duly promulgated regulations designating certain technical data as "defense article[s]" subject to export controls, and Congress has specified that "[t]he designation . . . in regulations . . . of items as defense articles . . . shall not be subject to judicial review," 22 U.S.C. § 2778(h). Even if the regulations were subject to judicial review, they would be subject to deference under basic administrative-law principles set out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837 (1984).

In any event, plaintiffs identify no flaw in the regulatory definition. As the Ninth Circuit has explained, "[t]he authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment." *United States v. Edler Indus., Inc.*, 579 F.2d 516, 520 (9th Cir.

1978).  The wisdom of those regulations is illustrated by this case, in which plaintiffs assert that the government is powerless to prevent them from sharing with foreign nationals computer files that allow firearm components to be manufactured at the touch of a button.

Plaintiffs do not seriously suggest that the statute and regulations permit them to transfer technical data to foreign nationals.  Instead, they focus on their asserted desire to share the files with fellow Americans.  But the regulations at issue do not prohibit Defense Distributed from sharing technical data with fellow U.S. citizens on American soil.  So far as the State Department is concerned, Defense Distributed may transfer such files, including by making the files available for U.S. citizens to download on the Internet.  This may be accomplished by verifying the citizenship status of those interested in the files, or by any other means adequate to ensure that the files are not disseminated to foreign nationals.

What Defense Distributed may not do is make defense articles available to foreign nationals.  Placing technical data on an unrestricted Internet site makes the data available for download around the world, and the State Department therefore warned Defense Distributed that the company could be liable under the regulations if it maintained the technical data on such a site.  The possibility that an Internet site could also be used to distribute the technical data domestically does not alter the analysis, any more than an email to a foreign national would become immune from export regulations if U.S. citizens were also copied on the email.

II.   **The application of the regulations in this case is fully consistent with the Constitution.**

A.   **The regulations permissibly address the distribution and production of firearms, and any effect on protected speech is fully justified.**

As discussed above, this case concerns a set of regulations designed to address the exportation of weapons. Most directly, the regulations prohibit the exportation of firearms without obtaining a license or other authorization. But technological advances permit firearms to be disseminated by distributing computer files that direct 3-D printers or related devices to produce firearm components. Imposing a licensing requirement on the dissemination of firearms to foreign nationals by this mechanism does not violate the First Amendment. The regulations at issue here address the exportation and overseas production of firearms, and do not constitute an effort to regulate the marketplace of ideas.

1.   **The regulations serve the government's legitimate interest in regulating the dissemination of arms and technical data.**

Plaintiffs contend that "[c]omputer code conveying information is 'speech' within the meaning of the First Amendment." Appellants' Br. 43 (quoting *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449-50 (2d Cir. 2001)). Even if plaintiffs are correct that computer code can serve as "an expressive means for the exchange of information and ideas about computer programming," *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000), that potential exchange of ideas is not the basis for the

government regulation here. While computer programs can in some cases be read by human beings (such as other computer programmers) and thus convey information, the computer files at issue are subject to regulation because they facilitate automated manufacture of a defense article. The State Department is concerned here with the use of the data files at issue by machines, not with their ability to express a message to humans. Although a person must direct a machine to read the files, "this momentary intercession of human action does not diminish the nonspeech component of [computer] code." *Corley*, 273 F.3d at 450.

The Supreme "Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Here, there can be no serious dispute that the government has an important interest in preventing regulated entities from evading the prohibition on exporting firearms by providing the means for the same firearms to be produced abroad.

"The United States and other countries rely on international arms embargoes, export controls, and other measures to restrict the availability of defense articles sought by terrorist organizations." Aguirre Decl. ¶ 35(b) [ROA.571]. The availability on the Internet of the computer files at issue here would "provide any such organization with defense articles, including firearms, at its convenience, subject only to its access to a 3D printer, an item that is widely commercially available." *Id.*

[ROA.571].  Providing "unrestricted access" to the computer files at issue here "would likewise provide access to the firearms components and replacement parts to armed insurgent groups, transnational organized criminal organizations, and states subject to U.S. or UN arms embargoes."  *Id.* ¶ 35(c) [ROA.571].  In addition, "[m]any countries, including important U.S. allies, have more restrictive firearms laws than the United States and have identified [the files at issue here] as a threat to domestic firearms laws."  *Id.* ¶ 35(d) [ROA.572].  The exports at issue here "would undercut the domestic laws of these nations . . . and thereby damage U.S. foreign relations with those countries and foreign policy interests."  *Id.* [ROA.572].

The firearms that would be produced by the files at issue here are of particular concern because they "can be produced in a way as to be both fully operable and virtually undetectable by conventional security measures such as metal detectors." Aguirre Decl. ¶ 35(a) [ROA.570].  If such a firearm were produced and "then used to commit an act of terrorism, piracy, assassination, or other serious crime," the United States could be held accountable, causing "serious and long-lasting harm to the foreign policy and national security interests of the United States."  *Id.* [ROA.571].

Congress and the Executive Branch thus have ample justification for imposing controls on exports of defense articles in general and the computer files at issue here in particular.  These interests are more than sufficient to justify any incidental effects the regulations may have on the expression of ideas.

The government's interests here would suffice to justify the regulations even if a more demanding standard were thought to apply. In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Supreme Court upheld a restriction on providing "material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), as applied to a group that sought to "facilitate only the lawful, nonviolent purposes" of certain foreign groups. *Humanitarian Law Project*, 561 U.S. at 8. The Court recognized that the particular activities in which the plaintiffs in that case wished to engage—legal training and political advocacy—"consist[ed] of communicating a message" and thus, unlike the computer files at issue here, had no non-expressive component. *Id.* at 28. But the Court nonetheless upheld the statute against a First Amendment challenge, concluding that Congress had permissibly determined that even support for peaceable, lawful conduct "can further terrorism by foreign groups." *Id.* at 30.

The Court emphasized that the issues presented "implicate[d] sensitive and weighty interests of national security and foreign affairs," and the Court thus gave deference to the government's determinations about the likely consequences of allowing the material support at issue. *Humanitarian Law Project*, 561 U.S. at 33-34. The Court concluded that "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Id.* at 35.

Here, Congress and the Executive Branch have concluded that restrictions on the export of arms are essential to the promotion of "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). In longstanding regulations, the Department of State has consistently and reasonably concluded that the overseas dissemination of arms cannot meaningfully be curtailed if unfettered access to technical data essential to the production of arms is not similarly subject to the export licensing scheme. *See* 22 C.F.R. §§ 120.6, 120.10. Plaintiffs provide no basis for this Court to disturb those conclusions in these sensitive areas.

### 2. Plaintiffs' position cannot be reconciled with the approach taken by other courts of appeals.

The Ninth Circuit has "repeatedly upheld the constitutionality of the [Arms Export Control Act], and its predecessor, the Mutual Security Act (MSA), under the First Amendment." *United States v. Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012). That court has properly recognized "the Government's strong interest in controlling 'the conduct of assisting foreign enterprises to obtain military equipment and related technical expertise.'" *Id.* at 1135-36 (quoting *United States v. Edler Indus., Inc.*, 579 F.2d 516, 520-21 (9th Cir. 1978)). "[E]ven assuming that the First Amendment offers some protection to the dissemination of technical data," the Ninth Circuit recognized that "the government has a strong interest in regulating the export of military information." *United States v. Posey*, 864 F.2d 1487, 1496 (9th Cir. 1989). "Technical

data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security." *Id.* at 1497.

Plaintiffs misunderstand the Ninth Circuit's reasoning when they rely on a limiting construction adopted by that court. *See* Appellants' Br. 48. The Ninth Circuit has held that when "information could have both peaceful and military applications, . . . the defendant must know or have reason to know that its information is intended for the prohibited use." *Edler*, 579 F.2d at 521. That limitation, even if it is properly read into one or more of the enforcement provisions applicable today, has no application here: the files at issue here plainly are useful only for the creation of firearms, and are plainly intended for that use. *See, e.g.*, Appellants' Br. 19 ("Plaintiff Defense Distributed . . . is operated for the purpose of promoting popular access to arms . . . ."). What is relevant here is not the Ninth Circuit's construction of the regulations in a respect that is not at issue here, but rather that court's conclusion that the regulations withstand First Amendment scrutiny.

This case resembles *Commodity Futures Trading Commission v. Vartuli*, 228 F.3d 94 (2d Cir. 2000), where the Second Circuit rejected a First Amendment challenge to a prohibition on distributing software that provided automated investment advice without first registering with the Commodity Futures Trading Commission. The court emphasized that the software provided "automatic" advice and, rather than educating the consumer, provided explicit instructions about whether to buy or sell. *Id.* at 111. The court observed that "[n]one of the reasons for which speech is

26

thought to require protection above and beyond that accorded to non-speech behavior—the pursuit of truth, the accommodation among interests, the achievement of social stability, the exposure and deterrence of abuses of authority, personal autonomy and personality development, or the functioning of a democracy—is implicated" by a system that "did not materially differ from . . . electronically triggered trades." *Id.* (citation omitted).

The court's analysis was not altered by the possibility that some recipients of the software "doubtless used it as no more than a provider of information and advice." *Vartuli*, 228 F.3d at 111-12. Even if communications to those customers constituted "'speech,' and protected speech at that," that would not affect the court's analysis because the company "was properly required to register for its non-speech activities, such as the sale of [the software] as the automatic system for currency trading it was intended to be." *Id.* at 112. The possibility that the company "engaged in protected speech does not make the requirement that it register to carry on its non-speech business any the less constitutionally permissible." *Id.*

In *Universal City Studios, Inc. v. Corley*, similarly, the Second Circuit upheld an injunction prohibiting the Internet posting of computer software that facilitated the unlawful reproduction of movies stored on DVDs. The court recognized that computer software has both a functional and an informative component, but observed that the injunction "target[ed] only the nonspeech component." *Corley*, 273

27

F.3d at 454.  Here, similarly, the regulations target trafficking in arms, and are not aimed at restricting free expression.

### 3. Plaintiffs' contrary arguments fail to address the basis for applying the regulations in this case.

Unable to seriously dispute the government's legitimate interest in preventing the dissemination of firearms overseas, plaintiffs seek to characterize their conduct in different terms.  Plaintiffs assert that they seek to communicate "information regarding simple arms of the kind in common use for traditional lawful purposes." Appellants' Br. 48.  Much "information regarding simple arms" would fall within the regulations' exception for "information in the public domain."  22 C.F.R. §§ 120.10(b), 120.11(a).  The files at issue here, however, have novel functionality: they enable a 3-D printer or related device, at the push of a button, to create an article that appears on the U.S. Munitions List.  *See* Aguirre Decl. ¶ 29 [ROA.567-68].

This case is therefore quite unlike *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015). There, the Supreme Court considered an ordinance that prohibited the display of signs based on the expressive content of those signs.  In particular, the ordinance generally imposed a permitting requirement on outdoor signs, but exempted signs that "convey[ed] the message of directing the public to church or some other 'qualifying event,'" signs that were "'designed to influence the outcome of an election,'" and signs that "'communicat[ed] a message or ideas' that do not fit within" certain other specified categories.  *Id.* at 2227 (quoting ordinance).  Because the restrictions

"depend[ed] entirely on the communicative content of the sign," the Court concluded

that the ordinance was a content-based restriction on speech, regardless of the

government's justifications for enacting it. *Id.* The Court in *Reed* did not overrule by

implication cases in which the government regulation was premised not on the

communicative content of a particular action, but on other factors. *See O'Brien*, 391

U.S. at 376; *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49 (1986) (upholding

"zoning ordinance[] designed to combat the undesirable secondary effects" of

"businesses that purvey sexually explicit materials").

Similarly, plaintiffs seek to assume away the consequences of their actions

when they insist that they "are not seeking to help foreigners build controlled

weapons of war," but rather "are merely communicating with their fellow

Americans." Appellants' Br. 48. To the extent that plaintiffs are actually

communicating with their fellow Americans within the United States, the regulations

have no application. But to the extent that plaintiffs make defense articles available to

foreign nationals, the regulations apply. The United States is not powerless to prevent

its citizens from facilitating the production of arms by foreign nationals even if the

conduct at issue is principally intended for a different audience.

Plaintiffs do not advance their argument by citing an opinion from the Office

of Legal Counsel in the Department of Justice. *See* Constitutionality of the Proposed

Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202 (1981)

[ROA.244]. In that opinion, the Department of Justice cited the government's

"compelling interest in suppressing the development and use of sensitive technologies abroad," and concluded that the provision of "technical advice" was "an integral part of conduct that the government has a compelling interest in suppressing by appropriate means." *Id.* at 208 [ROA.250].

Written in 1981, the opinion understandably did not analyze the First Amendment implications of the dissemination of computer files on the Internet. Instead, the examples of applications that would raise constitutional concern involved "communications of unclassified information by a technical lecturer at a university" or "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest." 5 Op. O.L.C. at 212 [ROA.254].

This case does not involve university lectures or discussions of matters of theoretical interest at a dinner party. Rather, the regulation's application in this case involves the dissemination of computer files to foreign nationals that can be used, automatically, to generate firearms or firearm components that are on the U.S. Munitions List.

Plaintiffs' reliance on other statements by the government in contexts far removed from this case is likewise misplaced. Plaintiffs refer, for example, to the sharing in academic settings of information about cryptography. *See* Department of State, Munitions Control Newsletter (Feb. 1980) [ROA.332] (discussing "scientific exchanges of basic mathematical and engineering research data" related to cryptography); Lowell 2d Decl., *Bernstein v. U.S. Dep't of State*, No. 95-0582 (N.D. Cal.

July 26, 1996) (Appellants' Br. Add. 22). Plaintiffs also refer to a Department of Justice report about the publication within the United States, in a variety of settings, of information about making bombs. *See* Department of Justice, 1997 Report on the Availability of Bombmaking Information [ROA.280]. Those discussions have no evident bearing on this case, which involves a prohibition on making available to foreign nationals computer files that facilitate the automated production of firearms. And the United States has never taken the position, urged here by plaintiffs, that dissemination on the Internet is categorically excluded from regulation. *See, e.g.*, Defs.' Opp'n to Pl.'s Mot. for Summ. J. 28-29, *Bernstein v. U.S. Dep't of State*, No. 95-0582 (N.D. Cal. Aug. 30, 1996)[4] (arguing that "plaintiff's contention that distribution through the Internet would not implicate the notion of an export is highly suspect" and noting "the obvious concern that posting software without regard to whether it can be distributed to international destinations would circumvent" the export licensing regulations (citation omitted)).

The hypothetical application of the regulations to conduct not at issue here would be relevant only to a claim that the regulations are facially overbroad. "Invalidation for overbreadth is strong medicine that is not to be casually employed." *United States v. Williams*, 553 U.S. 285, 293 (2008) (internal quotation marks omitted). In particular, the Supreme Court has "vigorously enforced the requirement that a

---

[4] *Available at* https://app.box.com/Bernstein (*see* Appellants' Br. 14).

statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* at 292 (emphasis in original).

Plaintiffs make no effort to compare the regulations' legitimate applications to the hypotheticals that they posit. Any such comparison would demonstrate the regulations' facial constitutionality. As discussed above, the regulations operate to prevent the exportation of weapons and of information that is not in the public domain and is necessary to produce weapons. For the reasons given above, the ordinary operation of these regulations does not offend the First Amendment.

Plaintiffs highlight the lack of any limiting principle to their argument by suggesting that the computer files have "artistic and political utility" because they have been "repurposed" by artists. Appellants' Br. 21. Actual firearms and weapons of mass destruction could be "repurposed" to make political statements or to create art, but that does not diminish the government's ability to regulate those items based on their non-expressive characteristics.

### B.    The regulations do not present the concerns associated with prior restraints on core expression.

Plaintiffs' repeated references to the regulations as a "prior restraint" do not advance their argument. As the district court explained, this Court has recognized that "judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." Order 11 [ROA.689] (quoting *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014)). For example,

while a prior restraint involving "a facially content-based restriction on political speech in a public forum" is subject to strict scrutiny, "a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)), *cited in Catholic Leadership Coal.*, 764 F.3d at 438.

The licensing scheme at issue here could not plausibly give rise to the sort of censorship that has caused courts to invalidate prior restraints on news publications or public rallies. Heightened concerns about prior restraints arise when "a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). For such concerns to arise, the "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship risks." *Id.*

By contrast, "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken[] carry with them little danger of censorship." *City of Lakewood*, 486 U.S. at 760-61. The provisions at issue here fall squarely in this category. The Arms Export Control Act and implementing regulations are part of a regulatory scheme designed to curtail the

spread of defense articles to foreign nationals. Far from being aimed at restricting expression, the regulations "specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works." *Mak*, 683 F.3d at 1136 (citing 22 C.F.R. § 120.11(a)).

As discussed above, while the distribution of computer files could, in some circumstances, be done for expressive purposes, it nonetheless stands in obvious contrast to activities such as parading, posting signs, distributing handbills, or publishing newspapers, which are always (or almost always) done for expressive purposes. Cases involving restrictions on those activities are inapposite here. *See, e.g.*, *New York Times Co. v. United States*, 403 U.S. 713 (1971) (publication of Pentagon Papers in the newspaper); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (publication of charges of official misconduct in newspaper); *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992) (permit for protest march).

In addition, plaintiffs are mistaken in arguing that the State Department's processing times render the scheme an impermissible prior restraint. *See* Appellants' Br. 52-55. Plaintiffs have not sought a license in this case and present only general arguments about the pace of licensing decisions, without any concrete factual context. Moreover, on its face, the licensing determination appropriately involves considerations of numerous difficult questions of national security or foreign policy. *See* 22 U.S.C. § 2778(a)(2) (requiring consideration of "whether the export of an article

would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of an outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements."). Given the stakes and the complexity of the issues involved, there is no basis for plaintiffs' apparent view that such determinations must be made hastily.

There is no legal obligation to obtain a commodity-jurisdiction determination before exporting items or data that are not subject to the regulations. As a technical matter, the availability of such determinations thus does not impose a prior restraint. And as a practical matter, such determinations will be sought (and may be time consuming) only in difficult cases that require extensive review.

## C. The regulations provide clear definitions and are not impermissibly subjective.

Plaintiffs mistakenly suggest that the regulations are void for vagueness under the Fifth Amendment's Due Process Clause, Appellants' Br. 60-62, or that they confer inordinate discretion on government officials, *id.* at 50-52. The regulations contain precise and specific definitions. *See generally United States v. Wu*, 711 F.3d 1, 13 (1st Cir. 2013) ("To be within the reach of the Munitions List at all, an item must qualify as a 'defense article,' a term defined by the [regulations] with considerable specificity."). Those definitions are designed not to provide authority to exercise subjective

judgments about political or scientific speech, but rather to limit the foreign dissemination of firearms and other weapons of war.

As relevant here, the regulations apply specifically to firearms up to .50 caliber, 22 C.F.R. § 121.1, Category I, item (a), and to "[i]nformation . . . which is required for the . . . production . . . of" such firearms, *id.* § 120.10(a)(1). The regulations contain an exemption for information that is in the "[p]ublic domain," as that term is defined in the regulations. *Id.* § 120.11. And the regulations define "export" to include "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." *Id.* § 120.17(a)(4).

These regulations are clear and specific, and do not provide an open-ended invitation to make subjective judgments about the value of speech or to censor based on disagreement with a message. Plaintiffs identify no statutory or regulatory terms applicable here that give rise to subjective judgments. *See* Order 23 [ROA.701] (noting that plaintiffs "have not made precisely clear which portion of the [regulatory] language they believe is unconstitutionally vague"). Instead, they point to terms with no evident bearing on this case, asserting that "[r]easonable persons must guess at what 'specially designed' or 'military application' truly mean," and alluding to "Category XXI" of the U.S. Munitions List. Appellants' Br. 51. Although plaintiffs provide no explanation of why those terms, in context, are vague, for present purposes it suffices to point out that none of these regulatory terms or categories is relevant here. The Supreme Court has made clear that "a plaintiff whose speech is

clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice." *Humanitarian Law Project*, 561 U.S. at 20. And as discussed above, plaintiffs have not come close to establishing that any applications of disparate parts of the regulations call for the "strong medicine" of overbreadth under the First Amendment. *See supra* pp. 31-32.

Plaintiffs' argument that the regulations were unclear as applied in this case arises from their observation that it took two years to process Defense Distributed's commodity-jurisdiction requests. The fact that it took time to analyze the appropriate application of the regulations in a new factual scenario does not render the regulations vague. Even if Defense Distributed's request presented a close case under the regulations, that would still not pose a constitutional problem. To the contrary, the Supreme Court has made clear that although "[c]lose cases can be imagined under virtually any statute," "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Williams*, 553 U.S. at 306. The Court has thus "struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.* at 306. The regulations here contain no such terms. *See also Humanitarian Law Project*, 561 U.S. at 20-21 (upholding statute that "does not require . . . untethered, subjective judgments").

Plaintiffs' suggestion that the regulatory scheme is impermissibly underinclusive is also wide of the mark. Plaintiffs contend that Defense Distributed was singled out by the Department of State because plaintiffs are unaware of similar actions taken against other entities. Appellants' Br. 59. Plaintiffs offer no authority in support of their apparent view that a regulatory scheme is unconstitutional unless enforcement action is taken in every case. A claim that the regulations were inadequately enforced would amount, at most, to a selective-prosecution claim (though Defense Distributed has not been prosecuted), and plaintiffs make no effort to satisfy the standard applicable to such claims, which the Supreme Court has "taken great pains to explain . . . is a demanding one." *United States v. Armstrong*, 517 U.S. 456, 463 (1996); *see also id.* at 464 ("In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute . . . generally rests entirely in his discretion." (internal quotation marks omitted)).

### D.    The regulations do not violate the Second Amendment.

Plaintiffs' argument that the regulations violate the Second Amendment is without merit. The regulations at issue here do not meaningfully burden anyone's Second Amendment rights. Law-abiding, responsible American citizens can "acquir[e] the computer files at issue directly from Defense Distributed" and make firearms using a 3-D printer, and the regulations place no limitation whatsoever on the ability to obtain firearms from other sources or to possess them, in the home or

anywhere else. Order 22 [ROA.700]. While plaintiffs' declarants state that they would like to access Defense Distributed's files on the Internet, they do not allege that the regulations prevent them from exercising their right to keep or bear arms. *See generally* Gottlieb Decl. [ROA.658]; Williamson Decl. [ROA.661]; Versnel Decl. [ROA.664]. The district court properly explained that "[t]he burden imposed here falls well short of that generally at issue in Second Amendment cases." *Id.* at 21 [ROA.699].

There is thus no basis for plaintiffs' assertion that anyone's Second Amendment rights are affected by the regulations at issue here. But at an absolute minimum, the regulations survive any plausibly relevant standard of Second Amendment scrutiny.

As the district court explained, the validity of the provisions at issue here follows from this Court's analysis of statutes that prohibit the commercial sale of arms to individuals between the ages of 18 and 21. Order 21-22 [ROA.699-700] (citing *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012)). This Court held that those statutes "do not severely burden the Second Amendment rights" of those individuals, and "do not strike the core of the Second Amendment because they do not prevent 18-to-20-year-olds from possessing and using handguns 'in defense of hearth and home.'" *Id.* at 206 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). The Court thus upheld the statutes as a reasonable effort to "manage an important public safety problem." *Id.* at 207.

Here, as discussed above, the regulations do not prevent anyone from possessing and using handguns or any other weapon. And "[p]laintiffs do not question that the Government has a compelling interest in regulating arms exports." Appellants' Br. 68. Any limited imposition on the ability to keep and bear arms is more than justified by the national security and foreign affairs interests discussed above.

## III. The district court did not abuse its discretion in concluding that the remaining factors counsel against issuance of a preliminary injunction.

The district court explained that plaintiffs' submission on the balance of harms and the public interest "fail[ed] to consider the public's keen interest in restricting the export of defense articles." Order 6 [ROA.684]. Plaintiffs cannot demonstrate that the district court's holding was an abuse of discretion.

Plaintiffs seek a broad injunction against application of the regulations to any "unclassified information," including not only the files that have already been determined to be subject to the regulations but also to "all other files Defense Distributed has and will continue to create that contain technical information." Proposed Order 1 [ROA.82]. As discussed above, the government has a compelling interest in maintaining an export licensing scheme for files that have been determined to be subject to export controls, and for future files that might be subject to such controls.

Plaintiffs, on the other hand, have not attempted to demonstrate that they would be unable to distribute their files to U.S. citizens in this country through means other than providing access worldwide on the Internet. Rather, their asserted interest consists entirely of the abstract proposition that harm to a constitutional right amounts to irreparable harm. *See* Appellants' Br. 69-71. While the district court accepted that proposition, it properly went on to analyze the practical considerations at stake. *See* Order 6-7 [ROA.684-85]. The district court's denial of a preliminary injunction should be affirmed on this basis as well.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

BENJAMIN C. MIZER
  *Principal Deputy Assistant Attorney*
  *General*

RICHARD L. DURBIN, JR.
  *United States Attorney*

MICHAEL S. RAAB

  *s/ Daniel Tenny*

DANIEL TENNY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-1838*
  *daniel.tenny@usdoj.gov*

FEBRUARY 2016

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2016, I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the Fifth

Circuit by using the appellate CM/ECF system.  Participants in the case are registered

CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


*s/ Daniel Tenny*
Daniel Tenny

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a). This brief contains 9,832 words.

*s/ Daniel Tenny*
Daniel Tenny

# ADDENDUM

## TABLE OF CONTENTS

22 U.S.C. § 2778 (excerpts) .............................................................. A1

22 C.F.R. § 120.6 ............................................................................ A3

22 C.F.R. § 120.10 .......................................................................... A4

22 C.F.R. § 120.11 .......................................................................... A5

22 C.F.R. § 120.17 .......................................................................... A6

22 C.F.R. § 121.1 (excerpts) ............................................................ A7

**22 U.S.C. § 2778**

**§ 2778. Control of arms exports and imports**

(a) Presidential control of exports and imports of defense articles and services, guidance of policy, etc.; designation of United States Munitions List; issuance of export licenses; negotiations information

(1) In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

(2) Decisions on issuing export licenses under this section shall take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements.

(3) In exercising the authorities conferred by this section, the President may require that any defense article or defense service be sold under this chapter as a condition of its eligibility for export, and may require that persons engaged in the negotiation for the export of defense articles and services keep the President fully and currently informed of the progress and future prospects of such negotiations.

(b) Registration and licensing requirements for manufacturers, exporters, or importers of designated defense articles and defense services

. . .

(2) Except as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter, except that no license shall be required for exports or imports made by or for an agency of the United States Government
(A) for official use by a department or agency of the United States Government, or
(B) for carrying out any foreign assistance or sales program authorized by law and subject to the control of the President by other means.

. . .

(h) Judicial review of designation of items as defense articles or services

The designation by the President (or by an official to whom the President's functions under subsection (a) of this section have been duly delegated), in regulations issued under this section, of items as defense articles or defense services for purposes of this section shall not be subject to judicial review.

**22 C.F.R. § 120.6**

### § 120.6. Defense article.

Defense article means any item or technical data designated in § 121.1 of this subchapter. The policy described in § 120.3 is applicable to designations of additional items. This term includes technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in § 121.1 of this subchapter. It also includes forgings, castings, and other unfinished products, such as extrusions and machined bodies, that have reached a stage in manufacturing where they are clearly identifiable by mechanical properties, material composition, geometry, or function as defense articles. It does not include basic marketing information on function or purpose or general system descriptions.

**22 C.F.R. § 120.10**

**§ 120.10.  Technical data.**

(a) Technical data means, for purposes of this subchapter:

(1) Information, other than software as defined in § 120.10(a)(4), which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles.  This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation.

(2) Classified information relating to defense articles and defense services on the U.S. Munitions List and 600–series items controlled by the Commerce Control List;

(3) Information covered by an invention secrecy order; or

(4) Software (see § 120.45(f)) directly related to defense articles.

(b) The definition in paragraph (a) of this section does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain as defined in § 120.11 of this subchapter or telemetry data as defined in note 3 to Category XV(f) of part 121 of this subchapter.  It also does not include basic marketing information on function or purpose or general system descriptions of defense articles.

**22 C.F.R. § 120.11**

## § 120.11. Public domain.

(a) Public domain means information which is published and which is generally accessible or available to the public:

(1) Through sales at newsstands and bookstores;

(2) Through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information;

(3) Through second class mailing privileges granted by the U.S. Government;

(4) At libraries open to the public or from which the public can obtain documents;

(5) Through patents available at any patent office;

(6) Through unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States;

(7) Through public release (i.e., unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency (see also § 125.4(b)(13) of this subchapter);

(8) Through fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community. Fundamental research is defined to mean basic and applied research in science and engineering where the resulting information is ordinarily published and shared broadly within the scientific community, as distinguished from research the results of which are restricted for proprietary reasons or specific U.S. Government access and dissemination controls. University research will not be considered fundamental research if:

(i) The University or its researchers accept other restrictions on publication of scientific and technical information resulting from the project or activity, or

(ii) The research is funded by the U.S. Government and specific access and dissemination controls protecting information resulting from the research are applicable.

**22 C.F.R. § 120.17**

**§ 120.17.  Export.**

(a) Export means:

(1) Sending or taking a defense article out of the United States in any manner, except by mere travel outside of the United States by a person whose personal knowledge includes technical data; or

(2) Transferring registration, control or ownership to a foreign person of any aircraft, vessel, or satellite covered by the U.S. Munitions List, whether in the United States or abroad; or

(3) Disclosing (including oral or visual disclosure) or transferring in the United States any defense article to an embassy, any agency or subdivision of a foreign government (e.g., diplomatic missions); or

(4) Disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad; or

(5) Performing a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad.

(6) A launch vehicle or payload shall not, by reason of the launching of such vehicle, be considered an export for purposes of this subchapter.  However, for certain limited purposes (see § 126.1 of this subchapter), the controls of this subchapter may apply to any sale, transfer or proposal to sell or transfer defense articles or defense services.

(b) [Reserved]

**22 C.F.R. § 121.1**

## § 121.1. The United States Munitions List

(a) The following articles, services, and related technical data are designated as defense articles and defense services pursuant to sections 38 and 47(7) of the Arms Export Control Act. Changes in designations will be published in the Federal Register. Information and clarifications on whether specific items are defense articles and services under this subchapter may appear periodically through the Internet Web site of the Directorate of Defense Trade Controls.

. . .

Category I—Firearms, Close Assault Weapons and Combat Shotguns

*(a) Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm).

*(b) Fully automatic firearms to .50 caliber inclusive (12.7 mm).

. . .

(i) Technical data (as defined in § 120.10 of this subchapter) and defense services (as defined in § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a) through (h) of this category. Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.