# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 15-50759

DEFENSE DISTRIBUTED; SECOND AMENDMENT
FOUNDATION, INCORPORATED,

*Plaintiffs-Appellants,*

— v. —

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His
Official Capacity as the Secretary of the Department of State; DIRECTORATE
OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political
Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official
Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in
the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually
and in His Official Capacity as the Director of the Office of Defense Trade
Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official
Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of
Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official
Capacity as the Senior Advisor, Office of Defense Trade Controls,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS (HON. ROBERT L. PITMAN)

## BRIEF FOR *AMICUS CURIAE*
## THE BRADY CENTER TO PREVENT GUN VIOLENCE
## IN SUPPORT OF APPELLEES AND AFFIRMANCE

*Of Counsel:*
  JOHN D. KIMBALL
  MARTIN S. KREZALEK
  NICHOLAS R. TAMBONE

BLANK ROME LLP
*Attorneys for Amicus Curiae*
405 Lexington Avenue
New York, New York 10174
(212) 885-5000

# SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

*Defense Distributed, et al. v. U.S. Department of State, et al.*
No. 15-50759

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. The Brady Center to Prevent Gun Violence, *Amicus Curiae* in Support of Defendants-Appellees. The Brady Center to Prevent Gun Violence is a 501(c)(3) non-profit corporation. It has no parent corporation, no publicly held corporation holds ten percent or more of its stock, nor has it issued shares or debt securities to the public.

2. John D. Kimball, Esq., counsel for *Amicus Curiae,* the Brady Center to Prevent Gun Violence.

3. Martin S. Krezalek, Esq., counsel for *Amicus Curiae,* the Brady Center to Prevent Gun Violence.

4. Nicholas R. Tambone, counsel for *Amicus Curiae,* the Brady Center to Prevent Gun Violence.

February 18, 2016                    Respectfully submitted,


/s/ John D. Kimball
John D. Kimball
Attorney of Record for
The Brady Center
to Prevent Gun Violence

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ........................................................ 1

INTRODUCTION .............................................................................. 3

ARGUMENT ..................................................................................... 6

I. The Second Amendment does not protect an individual's right to manufacture firearms or to disseminate technical data about firearms. ........................................................ 6

    A. The Second Amendment's guarantee does not extend beyond the possession of a handgun in the home for self-defense by law-abiding citizens. ..................................... 7

    B. Fifth Circuit Analytical Framework. .................................. 10

    C. Under *Heller* and *NRA*, both the manufacture of firearms and the dissemination of technical data about firearms fall outside the scope of the Second Amendment. ...................................................................... 11

    D. Even if the manufacture of firearms or the dissemination of technical data about firearms fell within the scope of the Second Amendment, only intermediate scrutiny is warranted. .................................. 15

    E. The 3D-printed firearms at issue in this case are neither in "common use" nor "typically possessed by law-abiding citizens," and are not entitled to Second Amendment protection. ........................................... 17

II. Reversal of the District Court would have dangerous implications in the United States and abroad. ............................. 20

    A. Illegal firearm exports from the United States facilitate drug trafficking and other criminal activity. ......................... 21

        1. Untraceable firearms hamper efforts to combat gun trafficking. ...................................... 23

2.    Allowing the foreign dissemination of 3D-printer firearm files would exacerbate this problem ................................................................ 24

B.    3D firearm printing would have dangerous consequences on counter-terrorism. ................................... 27

1.    Terrorism and firearms. .................................... 28

2.    Reversing the District Court would put airport and hotel security at great risk. ............. 30

C.    Reversing the District Court could negatively impact United States foreign relations. .......................................... 34

CONCLUSION ................................................................ 36

CERTIFICATE OF COMPLIANCE ........................................ 37

CERTIFICATE OF SERVICE ................................................ 38

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Def. Distributed v. U.S. Dep't of State,*
No. 1-15-CV-372 RP, 2015 WL 4658921
(W.D. Tex. Aug. 4, 2015) .............................................................. 14, 15

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ................................................................ *passim*

*Friedman v. City of Highland Park, Illinois,*
784 F.3d 406 (7th Cir. 2015),
*cert. denied,* 136 S. Ct. 447 (2015) ................................................. 9, 19

*Muscarello v. United States,*
524 U.S. 125 (1998) .......................................................................... 8

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
804 F.3d 242 (2d Cir. 2015) ........................................................ 17, 18

*National Rifle Association v. Bureau of Alcohol, Tobacco,*
*Firearms, and Explosives,*
700 F.3d 185 (5th Cir. 2012) .......................................................... 10

*United States v. Fincher,*
538 F.3d 868 (8th Cir. 2008) .......................................................... 13

*United States v. Mazzarella,*
614 F.3d 85 (3d Cir. 2010) ............................................................. 13

*United States v. Sprague,*
282 U.S. 716 (1931) ....................................................................... 7

## Statutes and Constitution

U.S. Const. amend. II ................................................................ *passim*

18 U.S.C. § 922 .............................................................................. 13

26 U.S.C. § 5822 ...................................................................... 14

26 U.S.C. § 5841 ...................................................................... 13

Gun Control Act of 1968............................................. 13, 24, 29

National Firearms Act of 1934.............................................. 13

Omnibus Crime Control and Safe Streets Act of 1968......... 10, 11, 13, 15

Undetectable Firearms Act .................................................... 30

**Other Authorities**

Agencies, *International hotels draw elites and terror threat*,
THE ECONOMIC TIMES, Dec. 1, 2008 ...................................... 33

Aliza Chasan, *Undercover Homeland Security agent slips
through TSA security with fake bomb*, DAILY NEWS,
June 2, 2015 ........................................................................ 31

Andy Greenberg, *I Made an Untraceable AR-15 'Ghost Gun'
in My Office—And It Was Easy* ........................................ 26

Andy Greenberg, *Meet The "Liberator": Test-Firing The
World's First Fully 3D-Printed Gun*, Forbes, May 5, 2013 ............... 31

Billy Hallowell, *Do You Know About Japan's Highly-
Restrictive Gun Laws? 'The Polar Opposite' of America's
Second Amendment*, THE BLAZE, Jan. 28, 2013 ................................. 34

ATF, Office of Strategic Intelligence and Information,
Firearms Tracing System (Caribbean and Central
America), March 10, 2015.................................................... 23

CBS News, Security Tight As Mumbai Hotels Reopen, Dec.
20, 2008 (available at
http://www.cbsnews.com/news/security-tight-as-mumbai-
hotels-reopen/)...................................................................... 33

Claire Ricke, *TSA failed to catch man with loaded gun on
airplane*, KXAN, Nov. 16, 2015 .......................................... 31

CNN Library, *Mumbai Terror Attacks Fast Facts*,
Nov. 4, 2015 ...................................... 32

Dara Kerr, *"Ghost Gunner" lets people make untraceable,
homemade guns* ..................................... 25

Gethin Chamberlain, *Mumbai terror attacks: Nightmare in
the lap of luxury*, THE GUARDIAN, Nov. 29, 2008 ......... 32, 33

*Guns and Terror*, BRADY CENTER TO PREVENT GUN VIOLENCE
(2001)...................................... 28, 29, 30

Heidi Milkert, *Hong Kong Terrorists Caught With 3D
Printer, Perhaps Looking to Modify Airsoft Guns* ........... 35

Hong Kong Police Force - Advice for Tourists. Police.gov.hk.
(available at
http://www.police.gov.hk/ppp_en/04_crime_matters/cpa/cp
a_at_01.html) ...................................... 34

*Hotels in Mumbai, India, rethink security after terror attack*,
FM Link, Jan. 5, 2009...................................... 33

Jack Anderson, Dale Van Atta, *Qaddafi Buying Austrian
Plastic Pistols*, THE WASHINGTON POST, Jan 15, 1986 ....... 30

Justin Fishel, Pierre Thomas, Mike Levine, Jack Date,
*EXCLUSIVE: Undercover DHS Tests Find Security
Failures at US Airports*, ABC NEWS, June 2, 2015........... 31

Keith Bradsher, *Analysts Say It Will Be Difficult to Shield
Luxury Hotels From Terrorist Attacks*, N.Y. TIMES, Nov.
30, 2008...................................... 33

Matt Warman, *US demands removal of 3D printed gun
templates*, THE TELEGRAPH, May 10, 2013 ............ 27

Simon Murphy and Russell Myers, *How Mail On Sunday
"printed" first plastic gun in UK using a 3D printer- and
then took it on board Eurostar without being stopped in
security scandal*, DAILY MAIL, May 11, 2013............ 27, 28

Staff, *Japanese Man Arrested For Possessing Guns Made By 3D Printer*, REUTERS May 8, 2014 ..................................................... 34

U.S. Government Accountability Office, *FIREARMS TRAFFICKING: U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain* ......................................... 21, 24, 25

Violence Policy Center Research Report, *GUN-RUNNING NATION: How Foreign-Made Assault Weapons are Trafficked from the United States to Mexico and What to Do About It*, July 2015 ....................................................................... 22

# INTEREST OF *AMICUS CURIAE*[1]

The Brady Center to Prevent Gun Violence is a non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. Its membership includes individuals who are concerned with, and are affected by, the public health and safety issues stemming from gun violence.

The Brady Center has a substantial interest in ensuring that the Second Amendment is not misinterpreted as a barrier to strong and effective government action to prevent gun violence. Accordingly, the Brady Center submits this *Amicus Curiae* brief in support of the State Department's position that the regulations at issue in this case do not burden anyone's Second Amendment rights. The Brady Center further respectfully submits that the State Department acted within its authority in concluding that the actions of Appellants in providing its data files on the internet to foreign persons requires an export license.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), counsel for *Amicus Curiae* The Brady Center to Prevent Gun Violence represents that no counsel for a party authored the brief in whole or in part, and that no person or entity, other than the Brady Center to Prevent Gun Violence or its counsel, made a monetary contribution to the preparation or submission of this *amicus* brief.

Through its Legal Action Project, the Brady Center has filed numerous briefs *amicus curiae* in cases involving the constitutionality and interpretation of gun laws, including *District of Columbia v. Heller*, 554 U.S. 570 (2008), *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady Center brief), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *Abramski v. United States*, 134 S. Ct. 2259 (2014), and *National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) ("*NRA*").

All parties have consented to the filing of this brief.

## INTRODUCTION

The International Traffic in Arms Regulations ("ITAR") were promulgated to control the transfer of defense articles abroad or to foreign persons. That is precisely what the State Department is doing by applying the ITAR to regulate the internet publishing of files that are essential to the creation of firearms (and firearm components) through the 3D printing process—*i.e.*, the functional equivalent of exporting firearms. Consistent with its mandate to control weapons exports, the State Department's concern is limited to averting the dissemination of Appellants' electronic files overseas. The ITAR's export licensing provisions are applicable because if made widely available on the internet, the subject files would be disclosed without limitation to any foreign person with internet access.

Seeking to cloak their boundary-less publishing of do-it-yourself weapons blueprints with First and Second Amendment protection, Appellants essentially ask this Court to block the State Department from doing its job in enforcing defense trade control regulations in the era of the internet and 3D printing.

Not only is Appellants' position reckless and hazardous to the safety of Americans at home and abroad, it is inconsistent with the U.S. Constitution. The Second Amendment does not protect the export of firearms or their functional equivalent. Furthermore, Appellants greatly overstate the purported Second Amendment rights at-issue.

With no basis, Appellants claim that it cannot be constitutional to bar Americans from creating and disseminating information necessary to the manufacture and maintenance of firearms. In fact, as set forth below, the Second Amendment cannot be reasonably interpreted to provide a right to manufacture or produce firearms, or to disseminate to foreign persons on the internet, technical data that could be used to produce firearms. And even if it could, the regulations at issue would at best warrant intermediate scrutiny. Since the U.S. government's objective in regulating the export of firearms and technical data that could be used to create firearms outside U.S. borders is plainly important to national security and foreign relations, the provisions survive a challenge under that standard.

Reversal of the District Court would have dangerous implications in the U.S. and abroad. It would make it easy for foreign drug

trafficking and criminal cartels to obtain untraceable firearms. This would undermine the government's efforts to disrupt gun trafficking to Mexico and Latin America and would reverse the hard-won recent successes made on that front by U.S. and Mexican authorities. A reversal would also have a devastating impact on counter-terrorism efforts. The global free flow of 3D-printed functional plastic firearms that can evade detection by metal detectors would invite terrorist infiltration of relatively secure locations. This would risk the lives of countless Americans who travel by air and international rail, and those who stay at luxury hotels overseas.

Finally, allowing Appellants to freely publish files used for printing 3D firearms would allow citizens of important U.S. allies to evade their countries' well-cultivated gun control structures. This could cause significant harm to U.S. foreign policy interests.

For all of these reasons, the District Court's decision denying Appellants a preliminary injunction should be affirmed.

# ARGUMENT

**I. The Second Amendment does not protect an individual's right to manufacture firearms or to disseminate technical data about firearms.**

Appellants' argument that their Second Amendment rights have been violated is simply incorrect. In fact, the regulations at issue do not violate the Second Amendment.

Appellants contend the Second Amendment secures the right to produce firearms and exchange technical data concerning firearms. (Appellants' Br. at 64). The State Department, however, does not seek to regulate either of these activities through the ITAR; rather, the regulations at issue concern the *export* of technical data related to defense articles. (Appellees' Br. at 13). The Second Amendment plainly does not protect the export of defense articles, including computer data files that would allow anyone with a 3D printer to create the parts and components of an operational firearm.

But even if the "production" of firearms or the "exchange" of technical data about firearms were somehow affected by the regulations at issue, neither the plain language of the Second Amendment, nor U.S. Supreme Court jurisprudence, supports Appellants' contention that

those activities are protected by the Second Amendment.

**A. The Second Amendment's guarantee does not extend beyond the possession of a handgun in the home for self-defense by law-abiding citizens.**

In the seminal case of *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court considered the constitutionality of the District of Columbia's prohibition on the possession of handguns in the home, and ultimately struck down the ban as unconstitutional. The court rejected an argument that the Second Amendment only guarantees a right to keep and bear arms for members of a "militia."

Justice Scalia noted that, in interpreting the text of the Second Amendment[2]:

> [W]e are guided by the principle that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." . . . Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation.

*Id.* at 576-77 (quoting *United States v. Sprague*, 282 U.S. 716, 731

---

[2] The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

(1931)).

Applying this principle, the Court examined each clause of the Amendment. In considering the text "keep and bear Arms," which the Court characterized as the "substance of the right [guaranteed by the Second Amendment]" (*id*. at 581), the Court addressed the words "keep" and "bear" individually.

As to the phrase "keep Arms," the Court held: "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id*. at 582. The Court stated that at the time the Second Amendment was drafted, "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*." *Id*. at 583 (emphasis in original).

As to the phrase "bear Arms," the Court held that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id*. at 584. Citing its decision in *Muscarello v. United States*, 524 U.S. 125 (1998), which analyzed the meaning of "carries a firearm" in a federal criminal statute, the Court acknowledged that the natural meaning of "bear arms" meant to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for

offensive or defensive action in a case of conflict with another person."
*Heller*, 554 U.S. at 584.

Having concluded that the core Second Amendment guarantee provided an individual right to "possess" a firearm, and to "carry" a firearm, for "defense of hearth and home," the Court struck down the District of Columbia's ban on handgun possession as an impermissible infringement on the core Second Amendment right. *Id.* at 629, 635 ("[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban."). The Court's holding appears to be limited to possession of a handgun for self-defense purposes; indeed, the Court recently denied certiorari in *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 447 (2015), where the Seventh Circuit held that a categorical ban on "assault weapons" and large capacity magazines fell outside the scope of the Second Amendment because the ordinance "leaves residents with many self-defense options," including handguns. *Id.* at 411.

## B.    Fifth Circuit Analytical Framework.

In *National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185 (5th Cir. 2012) ("*NRA*"), this Court upheld provisions of the Omnibus Crime Control and Safe Streets Act of 1968 that placed restrictions on firearm purchases by 18-to-20-year-olds.   In so doing, the Court adopted a two-step framework for analyzing a Second Amendment claim.

First, the Court must analyze "whether the conduct at issue falls within the scope of the Second Amendment right. . . . To determine whether a law impinges on the Second Amendment right, we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* at 194.  "If the challenged law burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster. . . . If the law burdens conduct that falls within the Second Amendment's scope, [the Court] then proceed[s] to apply the appropriate level of means-ends scrutiny." *Id.* at 195.  The Court also held that "a longstanding, presumptively lawful regulatory measure . . . would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at

step one of our framework." *Id.* at 196.

Second, if the conduct at issue falls within the scope of the Second Amendment, the Court must determine whether to apply strict or intermediate scrutiny. *Id.* at 195. Strict scrutiny is appropriate where the conduct threatens a "core" Second Amendment right—that is, "the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family." *Id.* Conduct that does not affect the core Second Amendment concern of self-defense within the home only warrants intermediate scrutiny. *Id.* Under intermediate scrutiny, the government need only "demonstrate a 'reasonable fit' between the challenged regulation and an 'important' government objective.'" *Id.*

### C. Under *Heller* and *NRA*, both the manufacture of firearms and the dissemination of technical data about firearms fall outside the scope of the Second Amendment.

Considering "the normal and ordinary" meaning of the words "keep and bear" in the Second Amendment text, and excluding a "secret or technical meaning" of the text as Justice Scalia instructed in *Heller*, it is apparent that the Second Amendment does not provide a right to "manufacture," "make," or "produce" a firearm, or to "exchange," "transfer," or "disseminate" technical data about firearms—let alone

"export" the functional equivalent of a firearm. Thus, the Court need not even reach the second step of the *NRA* framework, because the conduct challenged by Appellants falls outside the scope of the Second Amendment under a plain language analysis.

The "right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. If anything, a regulation affecting the export of firearms or technical data that could be used to produce firearms (or firearm components) is a "longstanding, presumptively lawful regulatory measure" that easily passes constitutional muster.

> From Blackstone through the 19th century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues . . . . [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or *laws imposing conditions and qualifications on the commercial sale of arms.*

*Id.* at 626-27 (emphasis added).

Both the commercial sale and the manufacture of firearms have a longstanding history of regulation in the United States. For instance, the Omnibus Crime Control and Safe Streets Act of 1968, provisions of which were upheld as constitutional by this Court in *NRA*, prohibits a person from "engag[ing] in the business of importing, manufacturing, or dealing in firearms," unless a person is a "licensed importer, licensed manufacturer, or licensed dealer." 18 U.S.C. § 922(a)(1)(A).[3]

The National Firearms Act of 1934, as amended by the Gun Control Act of 1968, requires that "[e]ach manufacturer, importer, and maker [of firearms] shall register each firearm he manufactures, imports, or makes." 26 U.S.C. § 5841(b). The Act also provides:

---

[3] *See United States v. Mazzarella*, 614 F.3d 85, 94-95, 98-99 (3d Cir. 2010) (affirming defendant's conviction under 18 U.S.C. § 922(k) for possession of a handgun with an obliterated serial number, and holding that "there is no categorical [Second Amendment] protection for unmarked firearms," that there is "no compelling reason why a law-abiding citizen would prefer an unmarked firearm," and that Section 922(k) passed both intermediate and strict scrutiny, in part because the statute "reaches only conduct creating a substantial risk of rendering a firearm untraceable," and "does not limit the possession of any class of firearms"); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) (holding that defendant's possession of a machine gun and a short-barreled shotgun are not protected by the Second Amendment, and noting that defendant "has not directly attacked the federal registration requirements on firearms, and we doubt that any such attack would succeed in light of *Heller*").

No person shall make a firearm unless he has (a) filed with the Secretary a written application, in duplicate, to make and register the firearm on the form prescribed by the Secretary; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the firearm to be made in the application form in such manner as the Secretary may by regulations prescribe; (d) identified himself in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; and (e) obtained the approval of the Secretary to make and register the firearm and the application form shows such approval. Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law.

26 U.S.C. § 5822.

Appellants ignore these longstanding regulatory measures, and contend that "[b]ecause there is a right to possess firearms, there is, necessarily, a right to acquire them." (Appellants' Br. at 65.) As the District Court noted, Plaintiffs cite no authority for this claim. *Def. Distributed v. U.S. Dep't of State*, No. 1-15-CV-372 RP, 2015 WL 4658921, at *13 (W.D. Tex. Aug. 4, 2015). If accepted, Appellants' contention that the manufacture of firearms somehow falls within the scope of the Second Amendment would eviscerate the longstanding

regulatory scheme requiring the registration of firearms, and for firearms manufacturers to apply for, and receive, a license to conduct the business of manufacturing arms. Indeed, Appellants' goal of spreading the availability of computer files capable of producing 3D-printed firearms would undermine the important objectives of the Omnibus Crime Control and Safe Streets Act, the National Firearms Act, and the Gun Control Act.

**D.    Even if the manufacture of firearms or the dissemination of technical data about firearms fell within the scope of the Second Amendment, only intermediate scrutiny is warranted.**

Although the District Court was "reluctant" to find that the conduct regulated by the ITAR fell within the scope of the Second Amendment, it proceeded to conduct an analysis under the second prong of *NRA*. *Defense Distributed*, 2015 WL 4658921, at *13. As discussed above, this Court need not adopt the cautious approach of the District Court because the regulations at issue here plainly fall outside the scope of the Second Amendment. But even if the Court applies the second prong of *NRA*, because the manufacture of firearms or the dissemination of technical data does not impinge on the core Second Amendment concern of self-defense within the home, any regulations

affecting such conduct only warrants intermediate scrutiny. Indeed, the District Court applied intermediate scrutiny, correctly noting that "[t]he burden imposed here falls well short of that generally at issue in Second Amendment cases." *Id.* As set forth below, the challenged provisions of the ITAR easily survive an intermediate scrutiny challenge.

First, the Government has an important objective in regulating the export of firearms and technical data about firearms outside U.S. borders, both for national security and for foreign affairs purposes. As addressed in further detail below, the use of 3D printers to manufacture 3D-printed firearms poses a grave threat to American security both within the U.S. and abroad. Also, the unregulated export of firearms and, as relevant here, computer files used for the 3D printing of firearms, may result in diplomatic consequences if the exported firearms are used in furtherance of criminal activity or terrorism in foreign nations.

Second, the ITAR is a reasonable fit to accomplish the Government's important objective. The ITAR is focused only on the export of defense articles and technical data related to defense articles.

The ITAR does not prohibit Appellants from purchasing firearms from a licensed manufacturer or vendor for legitimate self-defense purposes.

**E. The 3D-printed firearms at issue in this case are neither in "common use" nor "typically possessed by law-abiding citizens," and are not entitled to Second Amendment protection.**

Regulations affecting the 3D-printed firearms that can be manufactured using Appellants' "technical data" also pass constitutional muster because 3D-printed firearms are not entitled to Second Amendment protection. In *Heller*, the U.S. Supreme Court held that the Second Amendment only protects "the sorts of weapons" that are "in common use" (*Heller*, 554 U.S. at 627) and weapons that are "typically possessed by law-abiding citizens for lawful purposes" (*id.* at 625). S*ee N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015). Because 3D-printed firearms are neither in common use nor typically possessed by law-abiding citizens for lawful purposes, 3D-printed firearms are not entitled to Second Amendment protection.

In *N.Y. State Rifle and Pistol Association*, the Second Circuit considered a challenge to restrictions on the possession of "assault weapons" in Connecticut and New York enacted following the December 14, 2012 mass murder of twenty first-graders and six adults at Sandy

Hook Elementary School in Newtown, Connecticut. The threshold question addressed by the Second Circuit was whether the "assault weapons" at issue were in common use and typically possessed by law-abiding citizens. *Id.* at 254-55.

First, the court concluded that assault weapons are in common use because the record showed that Americans owned "millions" of assault weapons impacted by the regulation, even though the assault weapons were not as commonly used as the handguns at issue in *Heller*. *Id.* at 255.

Second, the court considered whether the assault weapons at issue were typically possessed by law-abiding citizens for lawful purposes. The court noted that even if assault weapons are used disproportionately in gun crimes, the same could be said for the handguns addressed in *Heller*. The court held that the court must consider whether a weapon is "dangerous and unusual in the hands of law-abiding civilians." *Id.* at 256. The court also held that in the absence of clearer guidance from the Supreme Court, the court would assume that the assault weapons were typically possessed by law-abiding citizens for lawful purposes. *Id.* at 257.

Ultimately, the Second Circuit adopted virtually the same two-part test that this Court set forth in *NRA*, applied intermediate scrutiny, and upheld nearly all aspects of the laws at issue. *Cf.* Friedman, 784 F.3d 406 (upholding categorical ban on assault weapons).

Unlike the assault weapons addressed in *N.Y. State Rifle and Pistol Association*, 3D-printed firearms are neither in common use, nor typically possessed by law-abiding citizens for lawful purposes. Unlike assault weapons, of which there are "millions" in the United States, 3D-printed firearms are not commonly used by the American public. And as addressed in Point II below, the greatest potential use for 3D-printed firearms—which can be virtually undetectable—is to aid criminal and terrorist activities, not lawful purposes such as self-defense or hunting. Even among law-abiding citizens, 3D-printed firearms are undisputedly "unusual"—and if 3D-printed firearms are made widely available to criminals and terrorists, 3D-printed firearms will also pose a grave danger to the public.

In sum, there is no Second Amendment right either to exchange technical data concerning firearms or to manufacture firearms—and

there certainly is no Second Amendment right to export firearms or technical data about firearms. And, 3D-printed firearms are not entitled to any Second Amendment protection because they are neither "in common use" nor "typically possessed by law-abiding citizens." To the extent that the regulations at issue burden Appellants' Second Amendment rights, as the District Court correctly held, only intermediate scrutiny is warranted, and the regulations at issue easily survive intermediate scrutiny.

## II. Reversal of the District Court would have dangerous implications in the United States and abroad.

Hanging in the balance of Appellants' challenge to the laws and regulations comprising the U.S.'s system of weapons export controls is the safety of Americans at home and overseas.

By the authority delegated to it by the President, the State Department has promulgated the ITAR to ensure that articles useful for warfare or terrorism are not exported to foreign persons, governments, and criminal or terrorist organizations to further global violence, or threaten U.S. national security. Applying the ITAR to prohibit Appellants from disseminating the subject 3D printer design files outside of the U.S. is wholly consistent with the State

Department's mandate to prevent the export of dangerous weapons. If Appellants are successful in upending the restrictions on the export of files used for the 3D printer-creation of guns and gun components, they will compromise U.S. national security and frustrate the State Department's interest in protecting countless Americans living or travelling internationally from terrorist attacks. What is more, a reversal of the District Court's reasoned decision will have damaging implications on U.S. efforts to combat gun running to drug trafficking organizations, and will negatively impact American foreign policy.

### A. Illegal firearm exports from the United States facilitate drug trafficking and other criminal activity.

The steady flow of firearms from the U.S. to Mexico allows Mexican drug trafficking organizations ("DTO") to traffic billions of dollars' worth of narcotics into the U.S. and furthers their other criminal activities, including human trafficking, kidnapping, money laundering, extortion, bribery, and racketeering. *See* U.S. Government Accountability Office, *FIREARMS TRAFFICKING: U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain*, GAO-16-223: Published: Jan 11,

2016 (hereinafter "GAO January 2016 Report") at 3.[4]

In fact, the majority of firearms recovered by authorities in Mexico are U.S.-sourced. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") traced more than 73,000 of the guns seized in Mexico from 2009 to 2014 to the U.S. *See* GAO January 2016 Report at 8; *see also* Washington Office on Latin America (WOLA) Violence Policy Center Research Report, *GUN-RUNNING NATION: How Foreign-Made Assault Weapons are Trafficked from the United States to Mexico and What to Do About It*, July 2015 (hereinafter "WOLA Report").[5] Mexican DTOs look to the U.S. for militarized firearms ranging from high-capacity semiautomatic pistols, to assault rifles, assault pistols, and long-range armor-piercing sniper rifles. *See* WOLA Report at 5. While Mexico maintains strict restrictions on firearm sale and possession, weak U.S. firearm laws allow DTOs to use straw purchasers to avoid background checks, or purchase firearms at gun shows or through private sellers, where background checks are not required under federal law. *Id.*

---

[4] Available at http://www.gao.gov/assets/680/674570.pdf.

[5] Available at
http://www.wola.org/sites/default/files/Gun_Running_Nation.pdf.

In addition to Mexico, illegal U.S. firearms trafficking also feeds crime in Latin America and the Caribbean. Recent ATF trace data for several Caribbean and Central American countries similarly confirms a high (albeit varying) percentage of U.S.-sourced firearms. For example: 97.9 percent of firearms recovered in the Bahamas; 40.3 percent of firearms recovered in the Dominican Republic; 49.3 percent of firearms recovered in El Salvador; and 46 percent of firearms recovered in Honduras, were U.S. sourced. *See* ATF, Office of Strategic Intelligence and Information, Firearms Tracing System (Caribbean and Central America), March 10, 2015.[6]

### 1.  Untraceable firearms hamper efforts to combat gun trafficking.

Given the manifest links between illegal firearms and international drug trade and other crime-related violence, U.S. authorities have been expending significant resources to combat gun trafficking from the U.S. to Mexico and Latin America.

---

[6] Available at https://www.atf.gov/resource-center/docs/centralamerica-cy2014pdf/download and https://www.atf.gov/resource-center/docs/caribbeancy14152492pdf/download.

However, complicating law enforcement officials' efforts to control trafficking is the recent phenomenon of weapons being transported to Mexico in parts to be later assembled into finished firearms. *See* GAO January 2016 Report at 16. All the more problematic for counter-trafficking purposes is the fact that a majority of gun components can actually be purchased (and exported) legally, and the only part that needs to be illegally transported to Mexico is the lower receiver.[7]

While the full extent of firearm parts trafficking has not yet been documented, recent seizures of firearms parts, firearms made with unmarked parts, and equipment used to assemble or manufacture firearms in Mexico suggest an emerging reliance by DTOs on this source of weapons. *See id.* at 20.

### 2. Allowing the foreign dissemination of 3D-printer firearm files would exacerbate this problem

The appeal of trafficking in firearm parts—and by extension, any other export method that would circumvent firearm export controls—is

---

[7] Aside from the lower receiver, which carries the gun's serial number and is legally considered a firearm, other firearm parts are not by definition "firearms" under U.S. law, transfers of those items are not regulated by the Gun Control Act of 1968[7] ("GCA"), or any other laws governing the transfer of firearms. *See* GAO January 2016 Report at 17.

obvious.  Since parts are much harder for authorities to track and/or intercept, the gun parts loopholes have provided DTOs with an abundant supply source of easy-to-ship untraceable firearms.  *See id.* at 19.

Because reversing the District Court's reasoned decision would result in the free flow of 3D printed gun components, including the lower receiver, a reversal would make it even easier for DTOs to obtain untraceable firearms.  Such a result could severely undermine the U.S. and Mexican authorities' efforts to disrupt the gun supply that is vital to the DTOs' criminal enterprises.

In particular, Appellants' "Ghost Gunner" files allow users to streamline the making of metal lower receivers for AR-15 semi-automatic rifles, one of the most deadly guns on the market—and one used in several recent mass shootings in the U.S.  *See* Dara Kerr, *"Ghost Gunner" lets people make untraceable, homemade guns*, CNET, Oct. 1, 2014.  The Ghost Gunner machine, coupled with the unrestricted freedom to download files needed for producing lower receivers, would make untraceable semiautomatic rifles available to just about anyone, anywhere.

Indeed, Andy Greenberg, a senior writer at the online technology news website Wired, and self-described man of "virtually no technical understanding of firearms and a Cro-Magnon man's mastery of power tools," painstakingly demonstrated how the Ghost Gunner machine and corresponding technical data allowed him to make a fully metal, functional, and accurate AR-15 for just over $2200. Andy Greenberg, *I Made an Untraceable AR-15 'Ghost Gun' in My Office—And It Was Easy*, Wired, June 3, 2015.[8] As $1500 of this figure was the one-time-cost of the Ghost Gunner machine, Greenberg essentially illustrated the ease of setting up a small operation capable of producing AR-15's for under $800.

The implications are ominous for those at the forefront of the battle against international criminal cartels. Allowing cash-rich DTOs unimpeded access to the Ghost Gunner files—and to the advanced 3D print firearm technology that the future undoubtedly holds—is a disastrous proposition.

---

[8] Available at http://www.wired.com/2015/06/i-made-an-untraceable-ar-15-ghost-gun/.

**B. 3D firearm printing would have dangerous consequences on counter-terrorism.**

The U.S. relies on its firearm export regulations to restrict the availability of weapons sought by terrorist organizations. (See Appellees' Br. at 22).

The proliferation of 3D printed functional firearms made almost entirely of plastics increases the risk of breaches of secure locations. Appellants' "Liberator" files produce "a plastic handgun that could escape detection by conventional airport security. . . ." *See* Matt Warman, *US demands removal of 3D printed gun templates*, THE TELEGRAPH, May 10, 2013. In May of 2013, two reporters from the U.K.'s Daily Mail proved the point by smuggling the Liberator onto a packed weekend rush-hour Eurostar train from London to Paris. *See* Simon Murphy and Russell Myers, *How Mail On Sunday "printed" first plastic gun in UK using a 3D printer- and then took it on board Eurostar without being stopped in security scandal*, DAILY MAIL, May 11, 2013.[9] The reporters easily passed through strict "airport-style"

_____

[9] Available at http://www.dailymail.co.uk/news/article-2323158/How-Mail-On-Sunday-printed-plastic-gun-UK--took-board-Eurostar-stopped-security-scandal.html.

security" to carry the gun onto the train.  *See id*.  Terrorists likely took note.

### 1.     Terrorism and firearms.

The Eurostar anecdote underscores the significance of the ITAR to the global war against terrorism.

> The gun is part of the essential tool kit of domestic and foreign terrorists alike. Guns are used to commit terrorist acts, and guns are used by terrorists to resist law enforcement efforts at apprehension and arrest

Loren Burger and Dennis Henigan, *Guns and Terror*, BRADY CENTER TO PREVENT GUN VIOLENCE (2001) (hereinafter "Guns and Terror Report")[10] at 3.

Firearm attacks have long been part of the terrorist playbook.  In 2001—before the prospect of 3D firearm printing appeared on anyone's radar—the Brady Center advocated for stronger gun laws, and better enforcement of existing gun laws, as part of the nations' homeland security program.  *See* Guns and Terror Report at 4.  Among other things, Brady detailed how terrorists of various ilk had taken advantage of the U.S.'s lack of universal gun laws to exploit federal

---

[10] Available at
http://www.bradycampaign.org/sites/default/files/gunsandterror.pdf.

loopholes (and certain states' lax controls) to obtain firearms that were used in multiple deadly attacks. *Inter alia*, the report cited a loophole in the GCA, which effectively allowed terrorists to mail-order "gun kits," with no background checks resulting in homemade untraceable guns.[11] In one notable incident, in March of 1994, Rashid Baz, a 28-year-old Lebanese immigrant, opened fire on a van full of Orthodox Jewish students crossing the Brooklyn Bridge in New York, killing a 16-year old boy and wounding another. Guns and Terror Report at 27. One of the guns used by Baz was an assault pistol that he purchased in parts and assembled from a mail order kit manufactured and marketed by a Tennessee company. *Id*. at 28. The kit was legally purchased over the phone with no questions asked, no waiting period, and no background checks to weed out prohibited purchasers. *Id*.

---

[11] The loophole was rooted in the GCA's under-inclusive definition of "firearm," the term that triggers the application of federal gun laws and regulations governing the manufacture and sale of guns. The federal government's reading of the definition of "firearm" made it possible to legally sell all the parts to a gun together in a "parts kit" and not be selling a "firearm" as long as the seller left out of the kit the part of the gun housing the firing mechanism (*i.e.*, the receiver). Guns and Terror Report at 27.

In urging Congress to close the loophole that allowed gun makers to evade federal regulation and sell untraceable assault weapon kits that terrorists and other criminals can purchase by mail and assemble at home, Brady cited the Brooklyn Bridge attack in arguing that "[a]n assault weapon without a serial number [was] a terrorist's dream." *Id.* at 31. Those who do not learn history are doomed to repeat it. Enabling terrorists (including radicalized terrorists like Baz who are already in the U.S.) to print their own untraceable assault weapons and undetectable plastic guns at home is *a fortiori* a "terrorist's dream."

### 2. Reversing the District Court would put airport and hotel security at great risk.

Following the initial publishing of the Liberator files, New York Congressman Steve Israel pushed for a modernization of the Undetectable Firearms Act[12] to cover 3D printed receivers and magazines by requiring that any firearm have at least one major component that was detectable by typical metal detectors.

---

[12] The UFA was passed in part in response to reports that then Libyan dictator Muammar Qaddafi was in the process of buying more than 100 plastic handguns that would be difficult for airport security to detect. Jack Anderson, Dale Van Atta, *Qaddafi Buying Austrian Plastic Pistols*, THE WASHINGTON POST, Jan 15, 1986.

Representative Israel recognized the self-evident implications of unfettered 3D firearm printing:

> Security checkpoints, background checks and gun regulations will do little good if criminals can print their own plastic firearms at home and bring those firearms through metal detectors with no one the wiser.

Andy Greenberg, *Meet The "Liberator": Test-Firing The World's First Fully 3D-Printed Gun*, Forbes, May 5, 2013. More than ever, this dire warning should be heeded to protect Americans abroad from terrorist attacks with undetectable firearms.

To be sure, there have been alarming instances of airport security lapses.[13] But despite sporadic failings at security checkpoints, since the

---

[13] *See. e.g.*, Claire Ricke, *TSA failed to catch man with loaded gun on airplane*, KXAN, Nov. 16, 2015 (available at http://kxan.com/2015/11/16/tsa-failed-to-catch-man-with-loaded-gun-on-airplane/); Aliza Chasan, *Undercover Homeland Security agent slips through TSA security with fake bomb*, DAILY NEWS, June 2, 2015 (available at http://www.nydailynews.com/news/national/tsa-fails-tests-lets-bombs-article-1.2242674); Justin Fishel, Pierre Thomas, Mike Levine, Jack Date, *EXCLUSIVE: Undercover DHS Tests Find Security Failures at US Airports*, ABC NEWS, June 2, 2015 (explaining that in tests conducted by the US Department of Homeland Security, teams working undercover were able to sneak weapons through TSA security checkpoints sneak banned items such as fake explosives and other weapons in 67 out of 70 tests) (available at http://abcnews.go.com/ABCNews/exclusive-undercover-dhs-tests-find-

September 11 attack no terrorist has succeeded in bringing a loaded gun on a plane for use in an attack. Widely available blueprints for printing plastic handguns would jeopardize the safeguards behind this datum. The interest of travel safety thus strongly counsels against a reversal of the District Court's decision.

Further, the threat posed by undetectable guns is not limited to undetectable firearms passing through train and airport security. Metal detectors also protect Americans staying in many international hotels. In November 2008, ten Pakistani men associated with the terror group Lashkar-e-Tayyiba stormed several buildings in Mumbai, India—including the Oberoi and Taj Mahal Palace hotels often frequented by Western business travelers—killing 164 people. CNN Library, *Mumbai Terror Attacks Fast Facts*, Nov. 4, 2015.[14] The killers carried out their massacre with AK-47 rifles, pistols and hand-grenades. Gethin Chamberlain, *Mumbai terror attacks: Nightmare in the lap of luxury*, THE GUARDIAN, Nov. 29, 2008. Survivors of the massacre said the gunmen were particularly interested in British and American guests,

widespread-security-failures/story?id=31434881).
[14] Available at http://www.cnn.com/2013/09/18/world/asia/mumbai-terror-attacks/.

singling them out as targets and ignoring other nationalities. *Id.* As conventional firearms played a major role in the attack—and since the gunmen reportedly slipped into the Taj Mahal Palace through a back entrance that did not have metal detectors[15]—many major hotels in Mumbai subsequently installed metal detectors to protect against similar attacks. *Hotels in Mumbai, India, rethink security after terror attack*, FM Link, Jan. 5, 2009.[16]

Even before the Mumbai siege (because of previous terrorist attacks) luxury hotels in several destinations—including the Jakarta Indonesia Grant Hyatt and the Cairo Egypt Marriot—had already been relying on metal detectors to protect their guests. *See* Keith Bradsher, *Analysts Say It Will Be Difficult to Shield Luxury Hotels From Terrorist Attacks*, N.Y. TIMES, Nov. 30, 2008; Agencies, *International hotels draw elites and terror threat*, THE ECONOMIC TIMES, Dec. 1, 2008.

Each of these hotels' security schemes—along with the lives of the hotels' patrons—would be put at risk by allowing Appellants to publish

---

[15] CBS News, Security Tight As Mumbai Hotels Reopen, Dec. 20, 2008 (available at http://www.cbsnews.com/news/security-tight-as-mumbai-hotels-reopen/)

[16] Available at http://fmlink.com/articles/hotels-in-mumbai-india-rethink-security-after-terror-attack/.

data files for plastic firearms that would escape detection by metal detectors. This further counsels against a reversal of the District Court's decision.

## C. Reversing the District Court could negatively impact United States foreign relations.

Finally, the publishing of 3D printable gun files online will allow citizens of important U.S. allies to evade their countries' gun controls. Indeed, it has already happened in Japan—a country that credits its extremely low crime rate to its restrictive gun policies. *See* Billy Hallowell, *Do You Know About Japan's Highly-Restrictive Gun Laws? 'The Polar Opposite' of America's Second Amendment*, THE BLAZE, Jan. 28, 2013. In April 2014, Police in Tokyo found five plastic guns made by a 3D printer at the home of a 27 year old Japanese man. Two of the handguns were later proved capable of killing or wounding people. Staff, *Japanese Man Arrested For Possessing Guns Made By 3D Printer*, REUTERS May 8, 2014. Similarly, a year later in Hong Kong, which also has strict gun controls,[17] police raided a group of nine individuals

---

[17] *See* Hong Kong Police Force - Advice for Tourists. Police.gov.hk. (available at http://www.police.gov.hk/ppp_en/04_crime_matters/cpa/cpa_at_01.html).

conspiring to attack government buildings ahead of a historic vote. Heidi Milkert, *Hong Kong Terrorists Caught With 3D Printer, Perhaps Looking to Modify Airsoft Guns*, 3D Print.com, June 26, 2015.[18]  Among the items recovered in the raid were explosives, masks, several airsoft rifles, and a desktop 3D printer—suggesting that the group intended to modify the airsoft rifles to make them lethal by using components fabricated on the 3D printer.  *Id.*

The Japan and Hong Kong examples demonstrate how the unconstrained publishing of Appellants' subject files would make U.S. weapons export to Asia as easy as export to Mexico and Latin America. This could have adverse effects on American foreign relations.  (See Appellees' Br. at 23).  The State Department has an interest in enforcing its regulations to ensure that the U.S. does not become the global provider of weaponry that other nations' laws have, to date, successfully prevented from terrorizing their citizens.

---

[18] Available at http://3dprint.com/76737/3d-printer-terrorists/.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be affirmed.

Dated: February 18, 2016    Respectfully submitted,

/s/ John D. Kimball
John D. Kimball
Martin S. Krezalek
Nicholas R. Tambone
BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 885-5000

*Attorneys for Amicus Curiae*
*Brady Center to Prevent Gun Violence*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2013 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

I also certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 29.3, Federal Rule of Appellate Procedure 29(d), and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,603 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(a)(7(B)(iii), according to the count of Microsoft Word.

Dated: February 18, 2016

/s/ John D. Kimball
John D. Kimball

**CERTIFICATE OF SERVICE**

I certify that on February 18, 2016, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. The participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

Dated:  February 18, 2016

/s/ John D. Kimball
John D. Kimball