Case No. 15-50759

# In the United States Court of Appeals for the Fifth Circuit

DEFENSE DISTRIBUTED;
SECOND AMENDMENT FOUNDATION, INCORPORATED,
Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official
Capacity as the Secretary of the Department of State; DIRECTORATE OF
DEFENSE TRADE CONTROLS, Department of State Bureau of Political
Military Affairs; KENNETH B. HANDELMAN, Individually and in His
Official Capacity as the Deputy Assistant Secretary of State for Defense
Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD
PEARTREE, Individually and in His Official Capacity as the Director of
the Office of Defense Trade Controls Policy Division; SARAH J.
HEIDEMA, Individually and in Her Official Capacity as the Division
Chief, Regulatory and Multilateral Affairs, Office of Defense Trade
Controls Policy; GLENN SMITH, Individually and in His Official Capacity
as the Senior Advisor, Office of Defense Trade Controls,
Defendants-Appellees

Appeal from an Order of the United States District Court for the
Western District of Texas, The Hon. Robert L. Pitman, District Judge
(Dist. Ct. No. 1:15-CV-372-RP)

REPLY BRIEF FOR THE APPELLANTS

Matthew Goldstein
MATTHEW A. GOLDSTEIN, PLLC
1875 Connecticut Avenue, N.W.
10th Floor
Washington, DC 20009
202.550.0040/Fax 202.683.6679

Alan Gura
    Counsel of Record
GURA & POSSESSKY, PLLC
916 Prince Street, Suite 107
Alexandria, VA 22314
703.835.9085/703.997.7665

February 29, 2016

Counsel for Appellants
(Additional Counsel Inside Cover)

## Additional Counsel for Appellants

William B. Mateja
POLSINELLI P.C.
2950 N. Harwood, Suite 2100
Dallas, TX 75201
214.397.0030/Fax 214.397.0033

William T. "Tommy" Jacks
David S. Morris
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, TX 78701
512.472.5070/Fax 512.320.8935

Josh Blackman
1303 San Jacinto Street
Houston, TX 77002
202.294.9003/Fax 713.646.1766

*Defense Distributed, et al.* v. *U.S. Dep't of State, et al.*, No. 15-50759

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Plaintiffs:
Defense Distributed, Second Amendment Foundation, Inc.

Defendants:
U.S. Dep't of State, John F. Kerry, Directorate of Defense Trade Controls, Kenneth B. Handelman, Brian H. Nilsson, C. Edward Peartree, Sarah J. Heidema, Glenn Smith

Plaintiffs' Counsel:
Alan Gura, Gura & Possessky, PLLC; Matthew A. Goldstein, Matthew A. Goldstein, PLLC; William B. Mateja, Polsinelli P.C.; William T. "Tommy" Jacks, David Morris, Fish & Richardson P.C.; Josh Blackman

Defendants' Counsel:
Loretta Lynch, Michael S. Raab, Daniel Bentele Hahs Tenny, Eric J. Soskin, Stuart J. Robinson, Richard L. Durban, Benjamin C. Mizer, Anthony J. Coppolino, Zachary C. Richter, – U.S. Department of Justice

Amici Curiae for Plaintiffs-Appellants
Representative Thomas Massie (Kentucky)
Representative Brian Babin (Texas)
Representative K. Mike Conaway (Texas)

Representative Jeff Duncan (South Carolina)
Representative Blake Farenthold (Texas)
Representative John Fleming (Louisiana)
Representative Paul Gosar (Arizona)
Representative Walter Jones (North Carolina)
Representative Mike Kelly (Pennsylvania)
Representative Steve King (Iowa)
Representative Raúl Labrador (Idaho)
Representative Jeff Miller (Florida)
Representative Bill Posey (Florida)
Representative Todd Rokita (Indiana)
Representative Daniel Webster (Florida)
Cato Institute
Electronic Frontier Foundation
Madison Society Foundation, Inc.
Reporters Committee for Freedom of the Press
Texas Public Policy Foundation
Thomas Jefferson Center for the Protection of Free Expression

Counsel for Amici Members of Congress
Raffi Melkonian, Wright & Close, LLP

Counsel for Amicus Curiae Cato Institute
Ilya Shapiro, Randal J. Meyer

Counsel for Amicus Curiae Electronic Frontier Foundation
Kit Walsh, Adam Schwartz

Counsel for Amicus Madison Society Foundation, Inc.
David T. Hardy; Leif A. Olson, The Olson Firm, PLLC

Counsel for Amicus Curiae Reporters Committee:
Bruce D. Brown, Gregg P. Leslie, Hannah Bloch-Wehba

Counsel for Amicus Curiae Texas Public Policy Foundation
Robert Henneke
Joel Stonedale

<u>Counsel for Amicus Curiae Thomas Jefferson Center</u>
J. Joshua Wheeler

<u>Amicus Curiae for Defendants-Appellees</u>
Brady Center to Prevent Gun Violence

<u>Counsel for Amicus Curiae Brady Center</u>:
John D. Kimball, Martin S. Krezalek, Nicholas R. Tambone, Blank Rome LLP


           <u>/s/ Alan Gura           </u>
           Alan Gura
           Counsel for Appellants

## TABLE OF CONTENTS

Certificate of Interested Persons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.       Defendants Fail to Establish Any Congressional
             Authority for Their Imposition of a Prior Restraint. . . . . . 3

    II.      Defendants Cannot Reconcile Inconsistent
             Government Positions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    III.     Defendants' Content-Based Restrictions Violate
             the First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.     Plaintiffs' Files Constitute Protected,
               Expressive Speech.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.     Defendants' Prior Restraint Is Plainly Content-Based. . . . 17

        C.     Defendants' Prior Restraint Fails Heightened Scrutiny. . . 20

        D.     The First Amendment Does Not Permit the
               Criminalization of Protected Public Speech Absent
               A Specific Criminal Intent. . . . . . . . . . . . . . . . . . . . . . . . 25

    IV.     Defendants' Restrictions on the Manufacturing
             of Firearms Violate the Second Amendment. . . . . . . . . . . . 28

    V.      Defendants' Prior Restraint Violates the
             Fifth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

Cases

*Bond* v. *United States*,
 134 S. Ct. 2077 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*,
 467 U.S. 837 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

*Christensen* v. *Harris County*,
 529 U.S. 576 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*City of Lakewood* v. *Plain Dealer Publishing Co.*,
 486 U.S. 750 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*City of Los Angeles* v. *Alameda Books, Inc.*,
 535 U.S. 525 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*City of Renton* v. *Playtime Theatres, Inc.*,
 475 U.S. 41 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20

*Commodity Futures Trading Comm'n* v. *Vartuli*,
 228 F.3d 94 (2nd Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Consumer Prod. Safety Comm'n* v. *GTE Sylvania, Inc.*,
 447 U.S. 102 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*District of Columbia* v. *Heller*,
 554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*FDIC* v. *Meyer*,
 510 U.S. 471 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Holder* v. *Humanitarian Law Project*,
 561 U.S. 1 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*INS* v. *St. Cyr,*
533 U.S. 289 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Karn* v. *U.S. Dep't of State,*
925 F. Supp. 1 (D.D.C. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mance* v. *Holder,*
74 F. Supp. 3d 795 (N.D. Tex. 2015). . . . . . . . . . . . . . . . . . . . . . 29

*New Orleans Depot Servs., Inc.* v. *Director,*
*Office of Worker's Compensation Programs,*
718 F.3d 384 (5th Cir. 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Parker* v. *District of Columbia,*
478 F.3d 370 (D.C. Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Reed* v. *Town of Gilbert,*
135 S. Ct. 2218 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-20

*Reid* v. *Covert,*
354 U.S. 1 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Reno* v. *American Civil Liberties Union,*
521 U.S. 844 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Silvester* v. *Harris,*
41 F. Supp. 3d 927 (E.D. Cal. 2014).. . . . . . . . . . . . . . . . . . . . . . 31

*Simon & Schuster, Inc.* v. *Members of New York State*
*Crime Victims Bd.,* 502 U.S. 105 (1991) . . . . . . . . . . . . . . . . . . . . 20

*Skidmore* v. *Swift & Co.,*
323 U.S. 134 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Swan & Finch Co.* v. *United States,*
190 U.S. 143 (1903). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States* v. *Edler Industries*,
579 F.2d 516 (9th Cir. 1978).. . . . . . . . . . . . . . . . . . . . . . . 9, 25, 27, 28

*United States* v. *Ehsan*,
163 F.3d 855 (4th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States* v. *Huynh*,
246 F.3d 734 (5th Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States* v. *Lee*,
183 F.3d 1029 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States* v. *Marzzarella*,
614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States* v. *O'Brien*,
391 U.S. 367 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Pulungan*,
569 F.3d 326 (7th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States* v. *Swarovski*,
592 F.2d 131 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States* v. *Wu*,
711 F.3d 1 (1st Cir. 2013).. . . . . . . . . . . . . . . . . . . . . . . . . 12, 36, 37

Statutes and Rules

15 C.F.R. Parts 730-774 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

15 C.F.R. § 734.2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

15 C.F.R. § 746.1(a)(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 922(p). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 32

22 C.F.R. § 120.17. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

22 U.S.C. § 2778(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Other Authorities

49 Fed. Reg. 47,682 (Dec. 6, 1984). . . . . . . . . . . . . . . . . . . . . . . . . . 9

Black's Law Dictionary (10th ed. 2014) . . . . . . . . . . . . . . . . . . . . . . 6

Br. Amicus Curiae for the United States,
    *Reed* v. *Town of Gilbert*, No. 13-502. . . . . . . . . . . . . . . . . . . . . . . 19

H. Rpt. 96-1540 (Dec. 22, 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Letter of Sen. Daines, et al., to Sec. Kerry & Dep. Ass't
    Sec. Dearth, Aug. 3, 2015, available at
    https://www.daines.senate.gov/imo/media/
    doc/ITAR%20 Amendment--Revisions%20
    to%20Definitions;%20Data%20Transmission
    %20and%20Storage.pdf (last visited Feb. 27, 2016) .. . . . . . . . . . . . 4

Letter of Sens. Johnson & Grassley to Sec. Kerry,
    July 16, 2015, available at http://www.
    grassley.senate .gov/sites/default/files/judiciary
    /upload/2015-07-16%20CEG%20%2B%20
    RHJ%20to%20State%20Deparment%20%28
    ITAR%29.pdf (last visited Feb. 27, 2016). . . . . . . . . . . . . . . . . . . . . 4

Petition for Certiorari,
    *District of Columbia* v. *Heller,* No. 07-290. . . . . . . . . . . . . . . . . . . . 30

"How to Unblock US Websites Using DNS Proxy,"
    https://www.smartdnsproxy.com/page/how-
    to-unblock-us- websites-using-dns-proxy.
    aspx#.VtJrm-a37PY (last visited Feb. 27, 2016). . . . . . . . . . . . . . . . 22

Introduction

The Government does not restrict Plaintiffs' speech because it hypothetically relates to undetectable arms.[1] The Government restricts Plaintiffs' speech, along with a vast amount of other protected scientific and technical expression, for falling under a bottomless and murky definition of arms-related "technical data."

There is a world of difference between exporting physical objects, and disseminating knowledge online about physical objects. And the concept of scienter, which Defendants would here abolish, reflects the common-sense distinction between public speech, and the more nefarious-sounding "providing [] files to foreign nationals over the Internet," Appellees' Br. 2. The unavoidable reality that foreign persons access our public discourse, a public good, does not convert every expression of knowledge into a controllable act of potential espionage.

---

[1]Indeed, the Government concedes that as designed, the Liberator is detectable. ROA.571. Its metal firing pin, and unmistakable gun shape, would render a Liberator detectable even without its prescribed metallic insert. The end-product of a Ghost Gunner milling file is a detectible, metal rifle receiver.

Were this dispute merely about guns, especially guns alleged to be undetectable, Defendants' sudden effort to add to ITAR the prior restraint that they already claim here to exist would not have drawn opposition from such diverse commentators as GE, IBM, public universities, ITAR compliance attorneys, and even former State Department employees. ROA.728-29, 739, 765, 773, 796-98, 817, 825. The Association of American Universities, Association of Public and Land-grant Universities, and Council on Government Relations did not "urge DDTC to withdraw [the prior restraint proposal] or substantially limit its scope," ROA.765, out of concern for the right to bear arms.

Indeed, the (theoretical) undetectable firearms about which Defendants complain are already unlawful to manufacture per 18 U.S.C. § 922(p), a law implicating neither the First nor Fifth Amendments, and which is consistent with the Second Amendment. What Congress did not and could not authorize is a prior-restraint scheme so broad and malleable that it can be invoked in service of domestic law enforcement policy agendas under the guise of conducting foreign relations. This dangerous scheme should be enjoined.

ARGUMENT

## I. DEFENDANTS FAIL TO ESTABLISH ANY CONGRESSIONAL AUTHORITY FOR THEIR IMPOSITION OF A PRIOR RESTRAINT.

In 1978, referencing ITAR's potential as a prior restraint, the Office of Legal Counsel "believe[d] that a more clear cut indication of Congressional judgment concerning the need for such a measure is in order." ROA.240. Nearly forty years later, Defendants offer no Congressional findings, hearing testimony, or any other legislative record upon which this Court can conclude that Congress ever intended to regulate public speech under the AECA.

But that is not to say that Congress has remained silent. In 1980, a House Subcommittee directed the State Department to address the constitutional objections identified in the 1978 DOJ memorandum. ROA.925.[2] Amici Members of Congress explain at length how Defendants' interpretation boldly and impermissibly departs from Congressional intent. *See* Br. Amicus Curiae of Representative Thomas Massie, et al. ("Congressional Amici") 10. Amici Representatives add that no enumerated power permits banning domestic publication of

---

[2]H. Rpt. 96-1540, at 119 (Dec. 22, 1980), available at http://tinyurl.com/CongressHearing (last visited Feb. 29, 2016).

information. *Id.* 18-22. For good measure, thirty senators have opposed Defendants' proposed codification of their prior restraint.[3]

Instead of providing any evidence of Congressional authorization for their prior restraint, Defendants rely on (1) a broad statement of authority to control exports of technical data; (2) their belief that publishing technical data on the Internet is an "export"; and (3) alleged deference under *Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984). Each of these arguments fails.

First, Plaintiffs do not dispute that Defendants have the authority to license disclosures of technical data in non-public settings, disclosures of classified information, and direct assistance to foreign nationals with respect to defense articles.[4] But Defendants' power to control arms

---

[3]Letter of Sen. Daines, et al., to Sec. Kerry & Dep. Ass't Sec. Dearth, Aug. 3, 2015, available at https://www.daines.senate.gov/imo/media/doc/ITAR%20Amendment--Revisions%20to%20Definitions;%20Data%20Transmission%20and%20Storage.pdf (last visited Feb. 27, 2016) (28 Senators); Letter of Sens. Johnson & Grassley to Sec. Kerry, July 16, 2015, available at http://www.grassley.senate.gov/sites/default/files/judiciary/upload/2015-07-16%20CEG%20%2B%20RHJ%20to%20State%20Deparment%20%28ITAR%29.pdf (last visited Feb. 27, 2016).

[4]The term "technical data" does not appear in the AECA. However, Defendants include the term in their definition of "Defense Articles" in the ITAR. *See* 22 C.F.R. § 120.6.

exports is not unlimited. They cannot take *any* action, no matter how broad or severe, merely because it might have the ancillary or incidental effect of impacting the arms trade. This case does not concern plans to illicitly aid some foreign actor, but an astonishing governmental effort to restrict public speech not directed at a specific person. Before addressing the difficult constitutional questions raised by Defendants' conduct, it is indeed fair to ask—as OLC once did— whether in enacting the AECA, Congress authorized the Defendants to impose a prior restraint against public speech.

"We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). There is zero evidence that Congress shared Defendants' views of what it means to "export" something. "Export" being undefined in the AECA, this Court must "construe [that] statutory term in accordance with its ordinary or natural meaning." *FDIC* v. *Meyer*, 510 U.S. 471, 476 (1994); *New Orleans Depot Servs., Inc.* v. *Director, Office of Worker's Compensation Programs*, 718 F.3d 384, 391 (5th Cir. 2013).

Defendants argue that an "export" includes public speech in the United States, not directed at a particular person, that a foreign person may see or overhear. But no person who is not a defendant in this lawsuit would ever ordinarily think that he or she is "exporting" information by speaking or publishing in a setting that might be frequented by foreigners. Defendants' definition is far afield from the plain, well-accepted, and common understanding of "export."

"'Export' is . . . a clear term" whose "ordinary meaning is manifest." *United States* v. *Ehsan*, 163 F.3d 855, 858 (4th Cir. 1998). "[A]ll [definitions of export] make clear that exportation involves the transit of goods from one country to another for the purpose of trade." *Id.* (collecting definitions). "Exportation occurs when the goods are shipped to another country with the intent that they will join the commerce of that country." *United States* v. *Huynh*, 246 F.3d 734, 741 (5th Cir. 2001); *Swan & Finch Co.* v. *United States*, 190 U.S. 143, 145 (1903); *see also* Congressional Amici 12-14; Black's Law Dictionary 700 (10th ed. 2014) (defining "export," both as noun and verb, as connected to a goods, merchandise, and/or a commodity).

Defendants' peculiar interpretation of "export" is also so counterintuitive that it would lead to (yet more) absurd results. Consider Defendants' interpretation in light of various United States embargoes on the "export" of commercial technology controlled under the Department of Commerce Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774.[5] For Cuba, the embargo extends to almost all exports of any technical information, regardless of enumeration on a control list, unless an exception applies. 15 C.F.R. § 746.1(a)(1). While the Commerce Department presently heeds a 1984 DOJ opinion not to impose a prior restraint on public speech under the EAR (ROA.260-262), it may change its position if Defendants prevail, resulting in a complete online ban of Commerce-regulated technical information—because Cuba has Internet access, as do Cubans located in various other countries.

Nor do Defendants address the canon of constitutional deference, which requires this Court to avoid unorthodox applications of common terms in a manner that creates constitutional questions—unless there

---

[5]Both the EAR and ITAR definitions of "export" include oral and visual disclosures to foreign persons in the U.S. or abroad. *See* 15 C.F.R. § 734.2(b) and 22 C.F.R. § 120.17.

is an express indication that Congress intended such a result. *INS* v. *St. Cyr*, 533 U.S. 289, 299 (2001).

To be sure, Congress knows how to act decisively in this area. Recently introduced House Resolution 376 would prohibit, inter alia, the distribution, marketing, and advertising of certain firearm parts in "any medium of electronic communications." While Plaintiffs question the validity of such a measure, it exemplifies the clear statement of Congressional intent and legislative process required to authorize a prior restraint on public speech. Additionally, as amicus observed, "Congress considered (and rejected) changes to the Undetectable Firearms Act that would have addressed the creation, transport, or sale of any 3D printed firearm that was not detectable by standard means." Br. Amicus Curiae of Electronic Frontier Foundation ("EFF Br.") 27. That Congress rejected a statute that would have directly addressed the supposed problem that Defendants' statutory construction only obliquely reaches casts further doubt that Defendants' actions are authorized.

Defendants' *Chevron* deference argument likewise fails. Their prior restraint cannot carry the force of law because it is not the result of

duly promulgated regulations. The only relevant regulation carrying the force of law was the State Department's 1984 Federal Register notice that removed Footnote 3 from the ITAR, expressly stating the agency's intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682, 47,683 (Dec. 6, 1984). In contrast, Defendants' interpretation is only set forth in their letter to Defense Distributed, filings in this case, and as supplementary information in proposed rulemaking issued after this case was filed. Such informal interpretations do not carry the force of law and are only entitled to the deference established in *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 140 (1944)—which defers to agency interpretations only to the extent that they have the "power to persuade." *Christensen* v. *Harris County*, 529 U.S. 576, 587 (2000). If Defendants had a responsive argument under *Skidmore* and *Christensen*, they should have briefed it.

The complete absence of a scienter requirement from Defendants' scheme provides yet another reason to find this prior restraint ultra vires, as a scienter requirement has long been understood to limit the AECA's reach. *United States* v. *Edler Industries*, 579 F.2d 516 (9th Cir. 1978). Accordingly, the Department of Justice has repeatedly

acknowledged that a prior restraint cannot apply to the dissemination of technical data by persons having no direct connection with foreign conduct, in settings in which there is no more than belief or a reasonable basis for believing (1) that a foreign national may take the technical data abroad and (2) that the data could be used by someone there in the manufacture or use of items on the Munitions List. ROA.255 (1981 DOJ memo), 276 (1984 DOJ memo); *see also* ROA.309 (1997 DOJ report to Congress, warning that "serious constitutional questions" would arise if the Government prohibited publication by person who merely "has reason to know that some unidentified, unspecified recipient thereof will use the information for an unlawful purpose, or if such an outcome is the 'natural consequence' of publication of the information.").

Scienter is a basic element of due process, not "a loophole." Appellees' Br. 18. Publishing information into the public domain, as a means of intentionally transmitting it to a foreign government, would still be unlawful. *Cf.* ROA.310 (1997 DOJ Report to Congress, explaining how scienter requirement restricts particular transactions without impeding general publications). But Americans cannot be

silenced merely because their scientific and technical expression might have value to other governments.

Finally, Defendants misconstrue the essential nature of Plaintiffs' claims by suggesting that 22 U.S.C. § 2778(h) bars judicial review of State Department determinations that files are ITAR technical data. Appellees' Br. 19. First, whether the subject files actually contain "technical data" is not the issue. Plaintiffs are challenging a prior restraint on the publication of technical data, which is not implicated by Section 2778(h). And Plaintiffs were not required to make any application under the prior restraint system in order to challenge it. "The Constitution can hardly be thought to deny to one subjected to the restraints of [a licensing law] the right to attack its constitutionality, because he has not yielded to its demands." *City of Lakewood* v. *Plain Dealer Publishing Co.*, 486 U.S. 750, 756 (1988) (quotation omitted). "As the ordinance [providing for unbridled licensing discretion] is void on its face, it was not necessary for appellant to seek a permit under it." *Id.* (quotation omitted).

Even were this challenge somehow construed as a constitutional challenge to Defendants' decision that the files are technical data,

Section 2778(h) "cannot bar a constitutional attack." *Karn* v. *U.S. Dep't of State*, 925 F. Supp. 1, 13 (D.D.C. 1996). Section 2778(h) also does not apply to *ex post facto* agency decisions, *United States* v. *Wu*, 711 F.3d 1, 17 (1st Cir. 2013), and does not prohibit challenges to determinations that particular information is subject to the ITAR because "[o]nly material 'in regulations' is covered by that statute" and such individualized determinations are not specifically set forth in the AECA. *United States* v. *Pulungan,* 569 F.3d 326, 328 (7th Cir. 2009).

Defendants' prior-restraint scheme is ultra vires.

## II. DEFENDANTS CANNOT RECONCILE INCONSISTENT GOVERNMENT POSITIONS.

Defendants claim that the Government's myriad, long-held positions precluding their prior-restraint scheme are all distinguishable; limited to cryptography, academic settings, dinner party discussions; or otherwise have no relevance to CAD files. Appellees' Br. 29-31. However, neither the 1981 nor 1984 DOJ memoranda, the 1997 DOJ Report to Congress, or relevant statements in *Bernstein* are so limited. In fact, the 1981 DOJ memorandum specifically references information related to "arms" throughout (ROA.244, 248, 250, 252, 254) as well as

public information on firearms not in excess of .50 caliber. ROA.245-246. And in *Bernstein*, the State Department unconditionally stated, "the Department does not seek to regulate the <u>means</u> themselves by which information is placed in the public domain." Appellants' Add. 23, 26. Although one of the Government's *Bernstein* pleadings identifies certain types of information as examples (i.e., "Information in the 'public domain' includes…"), it does not limit the Government's position to those types of information. *Id.* at 29. Nor do Defendants offer an argument as to *why* their "technical data" must be excluded from the Government's historic position regarding prior restraints.

Setting aside for now (see *infra*) Defendants' misleading suggestion that CAD files have the exclusive function of "facilitat[ing] the automated production of firearms," Appellees' Br. 31, Defendants' claim that the prior government positions are irrelevant because these did not concern CAD files also ignores the fact that this case involves design drawings, rendered images, and other technical information on firearms that are not CAD files. ROA.131 ¶13.

Even if CAD files could automatically produce a firearm (they cannot), such files are not singled out for special treatment in the DOJ

opinions, *Bernstein*, or in ITAR's definition of "public domain." And while 3D printing might not have existed in 1978, gunsmithing surely did—as did "technical data" that foreigners might have found useful in producing firearms, which was not exempted from DOJ's prior-restraint concerns. Moreover, Defendants' prior restraint applies to publications of any information subject to the ITAR, regardless of where described on the USML. As such, reason dictates that each of the prior government positions would apply to any publication of information subject to the ITAR, regardless of where the information might be found on the USML.

Defendants are far from the first government officials to have contemplated ITAR's application as a prior restraint. They are, however, the first to disregard repeated DOJ warnings not to impose the prior restraint.

III.  DEFENDANTS' CONTENT-BASED RESTRICTIONS VIOLATE THE FIRST AMENDMENT.

A.      Plaintiffs' Files Constitute Protected, Expressive Speech.

As a threshold matter, Defendants' case hinges on the mistaken implication that this dispute concerns only CAD files, and the false assertion that the CAD files are executable, in that they can create a

functional firearm with a "push" or "click" of a button." *See, e.g.,*
Appellees' Br. 14 ("This case relates to the export of computer files that
direct a computer, *without human intervention*, to create components of
an operable firearm.") (emphasis added). For these assertions,
Defendants rely exclusively on the lay declaration of Lisa Aguirre,[6] not
a word of which explains *how* the CAD files can be used to create a
functional firearm, let alone how CAD files can be transformed into a
gun with the "click" of a button "without human intervention."

This is a fantastical description of the technology, lacking any
support in the record. CAD files do not "direct a computer" to do
anything. "[T]o create a physical object based on a CAD file, a third
party must supply additional software to read these files and translate
them into the motions of a 3D print head, the 3D printer itself, and the
necessary physical materials." EFF Br. 10. Beyond printing the
components, the process for creating a Liberator "requires additional
craftsmanship, know-how, tools, and materials." ROA.960-996 at ¶¶ 37-
45. For example, parts of the Liberator must be treated with acetone

---

[6]Aguirre's declaration appears without a curriculum vitae or any
indication of her qualifications.

vapor to render them functional. ROA.972, ¶¶ 22-25. Just as

Defendants failed to introduce *any* evidence to explain their view of 3D

printing, they failed to dispute (other than by unfounded post-hoc

assertions) Plaintiffs' description of the Liberator creation process.

Quite simply, Defendants' claim that "allowing the distribution of

the computer files at issue here is *tantamount* to permitting the

dissemination of the firearms themselves," Appellees' Br. 13, is

unfounded. The files are not automatically transmogrified into a

firearm; data is not "tantamount" to the actual gun. Unlike, for

example, software-generated currency trading instructions telling users

that they "must 'follow the signals with no second guessing,"

*Commodity Futures Trading Comm'n* v. *Vartuli,* 228 F.3d 94, 111 (2nd

Cir. 2000), Plaintiffs' open source files invite the user's mind to

intercede, modify and customize the code and any related construction

of a gun or gun part. More fundamentally, even were Plaintiffs' files

"functional," they would still be expressive in that they convey

information as between, and are understandable by, humans. *See*

ROA.335-36. And this case involves more than CAD (and CNC) files.

ROA.20-21, ¶¶37, 38; 131, ¶13, 133-34, ¶¶3, 4; ROA.135-36, ¶¶4, 5;

ROA.137-38, ¶¶4, 5. Plaintiffs challenge Defendants' prior restraint as applied to design drawings, rendered images, written manufacturing instructions, and other technical information.

B.     Defendants' Prior Restraint Is Plainly Content-Based.

Notwithstanding their steadfast insistence that ITAR is content-neutral, Defendants admit that they impose their prior restraint based on the content of Plaintiffs' speech. *See, e.g.*, Appellants' Br. 17 (claiming ITAR control because the files "relate to the creation of firearms that appear on the U.S. Munitions List."). Defendants' commodity jurisdiction process further evidences how their prior restraint is content-based, because it requires an in-depth case-by-case review of content to determine whether ITAR, and hence, the prior restraint applies. See 22 C.F.R. § 120.4.

There is no escaping the fact that such "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Reed* v. *Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015) (quotation omitted). And "a speech regulation targeted at a specific subject matter is content based even if

it does not discriminate among viewpoints within that subject matter." *Id.* at 2230 (quotation omitted).

Notwithstanding *Reed*'s clear application to this case, Defendants cling to the notion that screening speech for arms-related "technical data" is content-neutral, invoking *United States* v. *O'Brien*, 391 U.S. 367 (1968) and *City of Renton* v. *Playtime Theatres, Inc.*, 475 U.S. 41 (1986). But neither doctrine aids this effort.

*O'Brien* is plainly inapplicable, as this case presents no "non-speech" conduct. Plaintiffs are not burning a draft card, or dancing, or partaking of any allegedly expressive physical acts. Defendants may conflate "exporting firearms" with "providing the means for" their production abroad, Appellees' Br. 22, but the only "means" here is knowledge, which is "provided" by the simple act of speaking. Of course, at some level, speaking and writing are physical activities, requiring the movement of lips and hands. But uploading files to the Internet is no more "conduct" than is the act of typing a novel.

Defendants' *Renton* argument fares no better. *Renton* held that the government could single-out theaters based on their programming content and still be thought of as neutrally-regulating only for so-called

"secondary effects." *Renton* would appear to have been overruled by *Reed*, and indeed, the Government unsuccessfully argued in *Reed* that *Renton* called for the application of intermediate scrutiny in that case. Br. Amicus Curiae for the United States, *Reed* v. *Town of Gilbert*, No. 13-502, at 18-20.[7] But there is no need to go that far. Assuming *Renton* survived *Reed*, it is simply inapposite because *Renton*'s "secondary effects" doctrine addresses just that—secondary effects—while Defendants' complaint with Plaintiffs' speech relates to its primary effects.

Justice Kennedy's controlling opinion in *City of Los Angeles* v. *Alameda Books, Inc.*, 535 U.S. 525 (2002), helpfully explained the difference between "primary" and "secondary" effects of speech:

> Speech can produce tangible consequences: It can change minds. It can prompt actions. These primary effects signify the power and the necessity of free speech. Speech can also cause secondary effects, however, unrelated to the impact of the speech on its audience. A newspaper factory may cause pollution, and a billboard may obstruct a view. These secondary consequences are not always immune from regulation by zoning laws even though they are produced by speech.

---

[7]Available at http://www.americanbar.org/content/dam/aba/publications/supreme_court_preview/BriefsV4/13-502_pet_amcu_usa.authcheckdam.pdf

*Id.* at 444 (Kennedy, J., concurring).[8] The making of guns using knowledge gleaned from Plaintiffs' speech is a primary effect of that speech—it is a "prompted action" demonstrating the speech's "power," and not one "unrelated to the impact of the speech on its audience."

The Government acts in a content-neutral fashion when it targets secondary, not primary effects. Dubbing every targeted primary effect a "secondary effect" would enable the Government to eliminate strict scrutiny for content-based restrictions altogether. *Simon & Schuster, Inc.* v. *Members of New York State Crime Victims Bd.*, 502 U.S. 105, 120 (1991) ("the Board has taken the *effect* of the statute and posited that effect as the State's interest. If accepted, this sort of circular defense can sidestep judicial review of almost any statute, because it makes all statutes look narrowly tailored."). Notably, that was not the Supreme Court's approach in *Reed*.

C.        Defendants' Prior Restraint Fails Heightened Scrutiny.

There is no point belaboring the argument for strict scrutiny, but Defendants' prior restraint would fail any level of heightened review.

---

[8]The difference helps explain why *Renton* has apparently not been applied beyond the adult speech arena.

Plaintiffs have never asserted "that a regulatory scheme is unconstitutional unless enforcement action is taken in every case," Appellees' Br. 38, and this lawsuit contains no selective prosecution claims. Plaintiffs have, however, stressed that underinclusiveness is a feature of means-ends scrutiny, both because it tends to show poor constitutional "fit," and because it belies the Defendants' claims that they are truly concerned about foreign powers accessing American citizens' 3D printing files.

The Government's ability to selectively target disfavored speakers is also a chief evil of arbitrary prior restraints. Tellingly, Defendants neither suggest that they will shut down any of the other numerous websites hosting firearm printing files (including Defense Distributed's files),[9] nor do they deny politically targeting Defense Distributed.

Defendants' ever-evolving explanation of why this prior restraint does not, in fact, prohibit vast amounts of online and other public

---

[9] See e.g., www.jamesrpatrick.com; www.cncguns.com; www.optimusdefense.com; www.biggerhammer.net; www.yeggi.com; www.grabcad.com; www.turbosquid.com/3d-models/free-printing-3d-model/761509; https://grabcad.com/library/liberator-pistol-38-1; *see also* Google searches for "3D AR-15 CAD Lower." Many sites also offer instruction on making more traditional, non-3D printed guns. *See, e.g.,* www.wikihow.com/Make-a-Real-Gun

speech confirms its broad scope. Below, they suggested that Plaintiffs merely filter access to their websites to domestic IP addresses. ROA.523, n.4. However, as any unintentional disclosure to a foreign person is a strict liability offense under ITAR, relying on IP address filtering to keep oneself on the right side of the law is hardly prudent. IP addresses can be faked ("spoofed") quite easily, allowing foreign nationals to access files on the Internet domestically or abroad at Plaintiffs' peril.[10] And, even were Plaintiffs somehow able to limit access to domestic IP addresses, there is no way to stop a foreign person from looking at (or using) a U.S.-based internet connection. Every embassy in Washington is just steps away from free, domestic IP WiFi.[11]

Defendants' brief here does not invoke IP filtering, suggesting only that Defense Distributed "mak[e] the files available for U.S. citizens to

---

[10]It doesn't take James Bond's "Q" to access geographically restricted websites. Applications for defeating "geo-blocking" are readily found on the Internet. *See, e.g.*, "How to Unblock US Websites Using DNS Proxy," https://www.smartdnsproxy.com/page/how-to-unblock-us-websites-using-dns-proxy.aspx#.VtJrm-a37PY (last visited Feb. 27, 2016).

[11]Defendants below also suggested that Plaintiffs could personally deliver or mail "technical data" CDs to verified citizens, ROA.897, l. 10-14, a woefully obsolete, ineffective mode of communication.

download on the Internet . . . by verifying the citizenship status of those interested in the files, or by any other means adequate to ensure that the files are not disseminated to foreign nationals." Appellees' Br. 20. But they do not explain how this is supposed to happen. Or why Americans are not free to disseminate their own "technical data" in any public forum without verifying each attendee's nationality.

Critically, the State Department has never before—including in its latest proposed notice for rulemaking—offered citizen-verification-filtering as an acceptable method to publish files to the Internet (much less a safe harbor). For its part, Defense Distributed repeatedly sought guidance on ITAR compliance to no avail. ROA.335-39, 394-401, 433-35. In any event, it is not Plaintiffs' burden to ensure that prohibited persons will not come into contact with their speech. *Reno* v. *American Civil Liberties Union*, 521 U.S. 844, 865-67 (1997) (discussing access by minors); EFF Br. 30.

While the impact of Defendants' prior restraint is broad and severe, the justifications for it remain unpersuasive. Public speech containing "technical data" is not a new phenomenon, and our nation has gotten along well enough for many years without an ITAR-inflicted prior

restraint. And Americans' scientific and technical output has long been susceptible of being employed by bad actors throughout the world. All information, not just that related to arms, might be helpful to villains. Terrorist groups dependent on oil revenues, for example, might find useful all manner of Americans' speech concerning geology or petroleum engineering. But this is not enough to justify a prior restraint.

Even less persuasive are Defendants' arguments alleging that Plaintiffs' public speech could "damage U.S. foreign relations with" other nations. Appellees' Br. at 23. Other nations, claim Defendants, might be offended if Americans don't watch what they say about gun-making—a traditional American pursuit secured by our Bill of Rights—as such information might destabilize their regimes. Since when are Americans silenced to please foreign leaders? Had Chinese authorities, offended by Americans' online discussion of uncomfortable issues (Tiananmen Square massacre, conquest of Tibet, repression of the Falun Gong, etc.), threatened negative consequences for our relations with that highly consequential nation, would that justify a prior restraint? Respectfully, the President's role in foreign relations in

no way enhances his executive power, and does not allow him to violate clearly established constitutional rights. "[N]o agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution." *Reid* v. *Covert*, 354 U.S. 1, 16 (1957) (plurality); *Bond* v. *United States*, 134 S. Ct. 2077, 2101 (2014) (Scalia, J., concurring) ("We would not give the Government' support of the *Holland* principle the time of day were we confronted with 'treaty-implementing' legislation that abrogated the freedom of speech or some other constitutionally protected individual right.").

D.      The First Amendment Does Not Permit the
        Criminalization of Protected Public Speech
        Absent a Specific Criminal Intent.

As Plaintiffs have shown, courts and government officials have long recognized that the First Amendment demands a scienter requirement if public speech were to be criminalized. *See, e.g., Edler, supra*; ROA.255, 309.

Undaunted, Defendants insist that there is no distinction between generalized public speech that *might* assist foreign powers, and a direct effort to provide such illicit aid. For this proposition, Defendants look to

support in *Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010),

which upheld a restriction on the provision of aid to terrorist groups in

the form of speech. Defendants should have looked elsewhere.

Reviewing the law there at issue, the Supreme Court noted that "most

importantly, Congress has avoided any restriction on independent

advocacy, or indeed any activities not directed to, coordinated with, or

controlled by foreign terrorist groups." *Id.* at 5-6. Upholding the

Government's ability to bar assistance to terrorist groups, the Court

offered this important qualification:

> In particular, we in no way suggest that a regulation of independent
> speech would pass constitutional muster, even if the Government
> were to show that such speech benefits foreign terrorist
> organizations.

*Id.* at 39. Even if Plaintiffs' "independent speech," not directed to,

coordinated with or controlled by foreign agents, were to somehow be

beneficial to such foreign agents, it could not be so restricted.[12]

---

[12]The government cites Defense Distributed's mission statement, which includes "facilitating global access" to certain files as evidence of plaintiffs' intent. Appellees' Br. 10. This argument proves too much. Defense Distributed has no specific intent to share their files with any specific foreign nationals, let alone for any subversive purpose, but makes the files available on the Internet for collaboration and as a mode of political expression.

Equally wrong, but also unsettling, is Defendants' attempt to distinguish *Edler*'s imposition of a scienter requirement on the grounds that firearms are inherently illicit. Quoting the Ninth Circuit's observation that when "information could have both peaceful and military applications, . . . the defendant must know or have reason to know that its information is intended for the prohibited use," *Edler*, 579 F.2d at 521, Defendants offer that this "limitation . . . has no application here," because "the files at issue here plainly are useful only for the creation of firearms, and are plainly intended for that use." Appellees' Br. 26. However, there is nothing inherently illegal about manufacturing a firearm for personal use and Americans lawfully keep and use firearms for non-military applications, including self-defense, hunting, and sport, none of which are "prohibited." Certainly, it cannot be assumed that Plaintiffs, by publicly sharing gunsmithing knowledge, evince any particular intent to assist in the foreign production of controlled munitions.

Further, Defendants ignore the qualifying language of Edler that follows the language upon which they rely, which confines application of ITAR to "control the conduct of assisting foreign enterprises to obtain

military equipment and related technical expertise." *Edler*, 579 F.2d at 521. As noted above, the DOJ has repeatedly acknowledged this requirement— i.e., that a prior restraint on public speech cannot apply to the mere dissemination of ITAR technical data by persons having no direct connection with foreign conduct.

## IV.  DEFENDANTS' RESTRICTIONS ON THE MANUFACTURING OF FIREARMS VIOLATE THE SECOND AMENDMENT.

Unlike amicus curiae Brady Center, Defendants wisely do not waste time denying the obvious Second Amendment right to make arms. Brady's hyper-literal reading of the Second Amendment's operative clause, by which the Amendment secures only the "keeping" and "bearing" of arms and nothing else, is specious. Plaintiffs have offered more than enough support for the traditional right to make the arms whose keeping and bearing the Second Amendment protects, and amicus curiae Madison Society Foundation, whose brief Brady ignores, painstakingly surveys the history underlying this specific aspect of the right to keep and bear arms. America may have been a largely agrarian society in 1791, but Americans' "arms" did not grow on trees. They were made by private citizens.

The "creation of firearms was very much a 'home brew' operation."
Br. Amicus Curiae for Madison Society Foundation 5. Because there
were no stores to acquire guns, the right to keep and bear arms was
intrinsically linked to homemade weapons, custom designed for an
individual's specific needs. "Colonial-era statutes commonly recognized
. . . that in time of need, virtually anyone who could work metal or
wood could function as a gunsmith." *Id.* at 10. During the
Revolutionary War, "many local blacksmiths turned [into] gunsmiths."
*Id.* Even after gun manufactures entered the marketplace around the
Civil War, Americans continued to craft their own guns. This long-
standing practice establishes the foundation for the constitutional right
not just to buy a gun in a store, but to make one's own arms.[13]

Instead of challenging this history head-on, Defendants claim that
they can restrict gun-making speech because Plaintiffs would still have
access to *other* guns. Washington, D.C. attempted this argument,

---

[13]Brady's theory that would bootstrap the presumptive validity of
*longstanding* commercial restrictions on the sale of arms, into
authorization for the complete prohibition on the acquisition of arms,
has been rejected. *United States* v. *Marzzarella*, 614 F.3d 85, 92 n.8 (3d
Cir. 2010); *Mance* v. *Holder*, 74 F. Supp. 3d 795, 807 n.8 (N.D. Tex.
2015).

reasoning that it could ban too-dangerous handguns because it tolerated some long guns. The D.C. Circuit dismissed the argument as "frivolous." *Parker* v. *District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom District of Columbia* v. *Heller*, 554 U.S. 570 (2008).

> It could be similarly contended that all firearms may be banned so long as sabers were permitted. Once it is determined—as we have done—that handguns are 'Arms' referred to in the Second Amendment, it is not open to the District to ban them.

*Id.* (citation omitted).

Undeterred, District of Columbia officials presented the Supreme Court with the following question on certiorari: "Whether the Second Amendment forbids the District of Columbia from banning private possession of handguns while allowing possession of rifles and shotguns." Petition for Certiorari, *District of Columbia* v. *Heller,* No. 07-290. Heller successfully challenged this question as not accurately reflecting the issues in the case, and the Supreme Court adopted a very different "Question Presented" along the lines Heller proposed, namely, whether the city's laws violated the Second Amendment.

On the merits, the Supreme Court rejected the alternative arms argument.

It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon.

*Heller*, 554 U.S. at 629.

Similarly, the right to have a handgun is not diminished by the fact that one keeps, or has access to, *other* handguns. Just as the First Amendment does not allow the rationing of books or deities, the Second Amendment, without more, does not permit the rationing of handguns. *Cf. Silvester* v. *Harris*, 41 F. Supp. 3d 927, 962 n.33 (E.D. Cal. 2014).

Nor does it matter that 3D printing technology is in its infancy, and that printed guns may not yet be common. Few firearms today are made using 1791 technology, but handguns, however they might be manufactured, and whatever technological advances they contain, have served the same essential function since before the Second Amendment's ratification. The "common use" test allows for innovation. It is not circular, protecting only those arms that have attained common usage before they could be banned by Brady's government allies. Rather, it reflects expectations of what arms might be in common use for traditional lawful purposes. Handguns were not in

common lawful use in the Washington, D.C. of 2008, but the Court could look to American experience and expectations and strike down Washington's handgun ban.

Brady correctly notes that some courts have gone beyond common use, and applied various balancing tests to sanction the prohibition of arms of the kind in common use for traditional lawful purposes. Those courts erred. *Heller* plainly stands for the proposition that if an arm passes the common use test, it cannot be banned. The Court employed no balancing test to see if handguns were too dangerous to allow notwithstanding their common use status. But even so, this case does not address any particular arm, but rather the knowledge and means of making arms. The Government already requires that guns contain a minimum detectable metal content. 18 U.S.C. § 922(p). If it wished to regulate some other aspects of 3D printed guns, *e.g.*, by requiring their serialization or licensing their manufacture, that would be another story. But restricting the dissemination of practical gunsmithing knowledge that citizens would apply in the traditional making of arms plainly violates the Second Amendment.

V.    DEFENDANTS' PRIOR RESTRAINT VIOLATES THE FIFTH AMENDMENT.

The DOPSR review process is a black box. The law does not
establish a timeline, standard of review, or appeals process—and
Defendants do not dispute this. Under the auspices of broad national
security exceptions, Defendants acknowledge that they can override
DDTC's license processing deadlines. There is also no dispute that
ITAR prohibits judicial review of license determinations.

Acknowledging that no mechanism exists to challenge these stealth
proceedings, Defendants now claim for the first time on appeal that
Defense Distributed has not sought a license and "presents only
general arguments about the pace of licensing decisions, without any
factual context." Appellees' Br. 34. This is flatly contradicted by the
record. Defense Distributed submitted multiple requests for DOPSR
prepublication approval. ROA.130-31, ¶¶8, 10; ROA.410-24. DOPSR
refused to consider one request without a commodity jurisdiction
determination. After sitting on other requests for months, DOPSR
refused to issue a decision, directing plaintiff to the DDTC Compliance
and Enforcement Division for guidance. ROA.130-31, ¶10; ROA.426-31.
Determined to explore every avenue to a license, Defense Distributed

wrote to Defendants for guidance, but Defendants never responded. ROA.131, ¶ 11; ROA.433-456.

Defendants also did not address government reports indicating that commodity jurisdiction determinations languish at DDTC for half a year or more awaiting final determinations. ROA.163-68, 211-13, 221. Instead, they try to divorce the time involved in obtaining a commodity jurisdiction determination from their licensing scheme—claiming that there is no legal obligation to submit a commodity jurisdiction request. Appellees' Br. 35. But Defendants ad hoc licensing regime requires a commodity jurisdiction determination in two principal ways—with the practical effect of extending the time for license determinations by several months to a year or more.

First, the government effectively requires a commodity jurisdiction request before it will even consider certain license requests—as evidenced in this case, when DOPSR refused to consider Defense Distributed's request for prepublication approval without a preliminary commodity jurisdiction determination. ROA.130, ¶8; ROA.391-92. Second, it is often impossible to determine whether a license is required without submitting a commodity jurisdiction request because the scope

of information on firearms subject to ITAR control is unclear. For instance, a search of the State Department commodity jurisdiction determination webpage[14] under the words "firearm," "picatinny," "magazine" or "grip" reveals how Defendants' decisions on whether such items and associated information are subject to the USML vary considerably. Complicating matters further, there are no publicly stated reasons for inclusion or exclusion. It is against this uncertain regulatory background, punishable by up 20 years in prison, that Defense Distributed and SAF's members must decide whether to submit a commodity jurisdiction request or assume the risk of their own interpretations.

Defendants argue that Plaintiffs' speech is clearly described on the USML. Appellees' Br. 35-37. Were it so clear, it would not have taken two years and a federal lawsuit to unlodge a commodity jurisdiction ruling relating to this speech. And it is not at all clear that ITAR contains a prior restraint. ITAR makes no mention of public speech, and Defendants fail to explain how members of the public, the vast

---

[14] *See* www.pmddtc.state.gov/commodity_jurisdiction/ determinationAll.html

majority of which are not involved in international trade, would have any reason to suspect Defendants' unorthodox interpretations of the terms "export" and "public domain." To the contrary, as noted above, Defendants have in the past said there was no prior restraint, have never enforced the prior restraint, and even ITAR compliance attorneys and other sophisticated industry members disagree with Defendants' claim that the ITAR applies to public speech—largely because any hint of a prior restraint was removed in 1984 to avoid First Amendment concerns. Aggravating this situation, Defendants can subject anything to their prior restraint, without notice, under USML Category XXI—a secret list held only in their hip pocket.[15]

Defendants' reliance on *Wu*, *supra*, 711 F.3d 1, is misplaced. Wu did not involve Defendants' prior restraint on technical data. Moreover, the defendant in *Wu* was an international businesswoman that the court held to a higher degree of sophistication than the general public. *Id.* at

---

[15]Defendants do not post commodity jurisdiction determinations for Category XXI and, according to them, the only way to know if Category XXI applies is through a commodity jurisdiction determination or an official letter from Defendant Peartree. *See* www.pmddtc.state.gov/licensing/documents/WebNotice_CatXXI.pdf

14. Ironically, the fact the court in *Wu* felt the need to draw such a distinction provides further support for Plaintiffs' void for vagueness claim because it illustrates how courts do not ascribe any particular knowledge of the ITAR to members of the public who have no connection to international trade. *See also United States* v. *Lee*, 183 F.3d 1029, 1032 (9th Cir. 1999) ("The regulation at issue is directed to a relatively small group of sophisticated international businessmen"); *United States* v. *Swarovski*, 592 F.2d 131, 133 (2d Cir. 1979) ("We are dealing here with a regulation of limited scope aimed at a small and relatively sophisticated group of persons.").

## CONCLUSION

A preliminary injunction against ITAR's enforcement as a prior restraint is warranted.

Dated: February 29, 2016          Respectfully submitted,

/s/ Matthew Goldstein              /s/ Alan Gura
Matthew Goldstein                  Alan Gura
Matthew A. Goldstein, PLLC            Counsel of Record
1875 Connecticut Avenue, N.W.      GURA & POSSESSKY, PLLC
10th Floor                         916 Prince Street, Suite 107
Washington, DC 20009               Alexandria, VA 22314
202.550.0040/Fax 202.683.6679     703.835.9085/Fax 703.997.7665

/s/ William B. Mateja
William B. Mateja
POLSINELLI P.C.
2950 N. Harwood, Suite 2100
Dallas, TX 75201
214.397.0030/Fax 214.397.0033

/s/ David S. Morris
William T. "Tommy" Jacks
David S. Morris
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, TX 78701
512.472.5070/Fax 512.320.8935

/s/ Josh Blackman
Josh Blackman
1303 San Jacinto Street
Houston, TX 77002
202.294.9003/Fax 713.646.1766

*Counsel for Appellants*

# CERTIFICATE OF SERVICE

On this, the 29th day of February, 2016, I electronically filed the attached Brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users who will be served by the CM/ECF system on February 29, 2016.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 29th day of February, 2016.

/s/ Alan Gura
Alan Gura

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 6,983 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using WordPerfect X4 in 14 point Century Schoolbook font.

/s/ Alan Gura
Alan Gura
Attorney for Plaintiffs-Appellants
Dated: February 29, 2016